## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS and THE HERITAGE FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chairman of the Equal Employment Opportunity Commission; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, <br><br> *Defendants*. | CIVIL ACTION NO. 2:24-cv-00173 |

## COMPLAINT

1. On April 29, 2024, the Equal Employment Opportunity Commission (EEOC), by a 3-2 vote, issued "enforcement guidance" purporting to interpret employers' obligations under Title VII of the Civil Rights Act of 1964. *See* EEOC-CVG-2024-1, Enforcement Guidance on Harassment in the Workplace (April 29, 2024) (the 2024 Guidance)[1], attached as Exhibit 1.

2. The 2024 Guidance purports to interpret Title VII's prohibition of sex discrimination in employment in light of *Bostock v. Clayton Cty.*, 590 U.S. 644 (2020).

3. In particular, the 2024 Guidance reads Title VII to require employers—including the State of Texas (Texas) and The Heritage Foundation (Heritage)—to make certain accommodations to any male employee who says that he believes he is female and any to female employee who says

---

[1] U.S. Equal Emp't Opportunity Comm'n, EEOC-CVG-2024-1, Enforcement Guidance on Harassment in the Workplace (2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace  (last visited Aug. 14, 2024).

that she believes she is male (so-called "transgender" employees)—in the name of prohibiting discrimination based on sex.

4.   The 2024 Guidance reads Title VII to require employers to require employees to refer to any male employee who says he believes he is female using female pronouns, and to any female employee who says she believes she is male using male pronouns (the Pronoun Accommodation.)

5.   It also reads Title VII to require employers to allow any male employee who says he believes he is female to use the female bathrooms, locker rooms, and showers, and any female employee who says she believes she is male to use the male bathrooms, locker rooms, and showers (the Bathroom Accommodation).

6.   And it reads Title VII to require employers to allow any male employee who says he believes he is female to wear clothes complying with the dress code for females, and any female employee who says she believes she is male to wear clothes complying with the dress code for males (the Dress Code Accommodation).

7.   But *Bostock* explicitly refused to "prejudge" whether Title VII requires such accommodations. *Bostock*, 590 U.S. at 681.

8.   The *Bostock* majority very carefully limited its holding—that Title VII prohibits firing a male employee who says he believes he is female or a female employee who says she believes she is male—and did not discuss how such employers must accommodate such employees in the workplace. *Bostock*, 590 U.S. at 681–83.

9.   Moreover, Title VII does not require employers to make accommodations for sex.

10. It follows that, under *Bostock*, Title VII does not require employers to make accommodations—that is, exemptions from workplace policies that are concededly lawful in general—for a male employee who says he believes he is female or a female employee who says she believes she is male.

11.  Thus, EEOC may not interpret Title VII to require employers to comply with the Pronoun Accommodation, the Bathroom Accommodation, or the Dress Code Accommodation.

12. They are accommodations because they excuse certain male employees from work rules for males and exclude certain female employees from work rules for females.

13. EEOC claims that the Pronoun Accommodation, the Bathroom Accommodation, and the Dress Code Accommodation are not accommodations, but instead result from Title VII's prohibition of sexual harassment in the workplace.

14. That is completely wrong. An employee's statutory right to be free from sexual harassment is not an "accommodation" to certain employees, such that some employees may be harassed, and others may not.

15. EEOC defines workplace policies making all male employees comply with the same rules covering pronouns, bathrooms, and dress code, and not allowing some males to violate those rules, as unlawful "discrimination based on sex." The opposite is true.

16. Likewise, EEOC defines making all female employees comply with the same rules covering pronouns, bathrooms, and dress code, and not allowing some females to violate those rules, as unlawful "discrimination based on sex." The opposite is true.

17. The Court should declare unlawful, vacate, and set aside the 2024 Guidance's Pronoun Accommodation, Bathroom Accommodation, and Dress Code Accommodation.

## I.   Jurisdiction and Venue

18. The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this suit concerns the scope of EEOC's authority under federal law, and it also arises under the APA, 5 U.S.C. § 702–703. Further, the Court has jurisdiction to compel an officer or employee of EEOC to perform a duty under 28 U.S.C § 1361. Finally, the Court has the authority to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

19. Venue is proper in this District under 28 U.S.C. § 1391(e) because Texas is a resident of this judicial district, the State and its constituent agencies have employees in this District, and a

substantial part of the events or omissions giving rise to the State's claims against the unlawful agency actions of EEOC occurred in this District.

20.  This Court is authorized to award the requested relief under the APA, the Declaratory Judgment Act, and its general equitable powers.

## II. Parties

21.  Plaintiff Texas is a sovereign State and an employer subject to the requirements of Title VII. Through its constituent agencies, the State employs hundreds of thousands of people.

22.  Plaintiff Heritage is a non-profit public policy think tank and expressive association that stands for, among other values, individual freedom and traditional American values. Heritage employees approximately 300 individuals and is subject to the requirements of Title VII.

23.  Defendant EEOC is a federal agency empowered to bring civil enforcement actions against employers for violating Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-6. EEOC also may issue "right-to-sue" letters that allow private individuals to sue their employers for violating EEOC's interpretation of Title VII. *See id.* § 2000e-5(f).

24.  Defendant Charlotte A. Burrows is the Chairman of EEOC. She voted to issue the Guidance. She is sued in her official capacity.

25.  Defendant Merrick B. Garland is the Attorney General of the United States. The Attorney General is empowered to bring civil enforcement actions against governmental employers, including Texas, for alleged violations of Title VII. The Attorney General may also issue "right-to-sue" letters that allow private individuals to sue their governmental employers, including Texas, for violating EEOC's interpretation of Title VII. He is sued in his official capacity.

## III. Background

### A. The Statute

#### 1. Title VII prohibits discrimination "because of sex."

26. Title VII provides that it is "an unlawful employment practice for an employer" to discriminate against employees and applicants for employment or to deprive any individual of employment opportunities "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1), (2).

27. "Employer" means "a person engaged in an industry affecting commerce." 42 U.S.C. § 2000e(b).

28. "Industry affecting commerce" means "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry 'affecting commerce' within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C. 401 et seq.], and further includes any governmental industry, business, or activity." 43 U.S.C. § 2000e(h).

29. Consequently, Heritage and Texas, along with the latter's agencies, and subdivisions, are "employers" subject to Title VII.

#### 2. Title VII does not require accommodations based on sex.

30. Federal law requires employers to make certain accommodations to employees.

31. Title VII defines religion to require employers to make some accommodations for their employees' religious beliefs. 42 U.S.C. 2000e(j); *Groff v. DeJoy*, 600 U.S. 447, 453 (2023).

32. The Americans with Disabilities Act requires employers to make some accommodations for employees with disabilities. 42 U.S.C. §§ 12131–32; *US Airways, Inc. v. Barnett*, 535 U.S. 391, 393 (2002). The same holds for the Rehabilitation Act. *See* 29 U.S.C. § 794(d).

33. The Pregnant Workers Fairness Act requires employers to make reasonable accommodations for an employee's pregnancy and childbirth, *see* 42 U.S.C. § 2000gg-1.

34. But neither Title VII nor any other federal statute requires employers to make any accommodations based on sex.

**3. Discrimination "because of sex" can include workplace harassment.**

35.   The Supreme Court also reads Title VII to prohibit certain kinds of workplace harassment and abusive working environments. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998).

36.   But courts "have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quotation marks and citation omitted).

**4. EEOC and DOJ have statutory enforcement authority.**

37.   EEOC may investigate state employers for violations of Title VII. The Attorney General may sue state employers to enforce Title VII. Both EEOC and the Attorney General may issue aggrieved individuals "right-to-sue" letters, allowing those persons to sue a state employer for violating Title VII. *Texas v. Equal emp. Opportunity Comm'n*, 933 F.3d 433, 439 (5th Cir. 2019) (citing 42 U.S.C. §§ 2000e-5(f), 2000e-6).

**5. EEOC has limited statutory rulemaking authority.**

38.   EEOC has the "authority from time to time to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter. 42 U.S.C. § 2000e-12(a).

39.   In other words, EEOC has limited rulemaking power with respect to Title VII and may not promulgate substantive rules implementing Title VII. *Texas v. EEOC*, 933 F.3d at 439.

40.   An administrative agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quotations omitted).

**B.  *Bostock v. Clayton County***

41.  On June 15, 2020, the Supreme Court held Title VII's "because of ... sex" terminology prohibits an employer from firing an individual for being transgender.[2] *Bostock,* 590 U.S. at 651–52.

42.  The *Bostock* Court defined "transgender" as "persons with one sex identified at birth and another today." *Id*. at 669.

43.  Thus, under *Bostock*, Title VII prohibits firing someone for being male but identifying himself as female or for being female but identifying herself as male. *See id.* at 681–83.

44.  The *Bostock* majority emphasized that the only issue before the Court was firing someone "simply for *being . . .* transgender." *Id*. at 681 (emphasis added).

45.  It also emphasized that the issues of "sex-segregated bathrooms, locker rooms, and dress codes" were not before the Court, and expressly declined to "prejudge any such question today," and "[did] not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.*

46.  *Bostock* did not address harassment of "persons with one sex identified at birth and another today." *Id*. at 669.

**C.  EEOC's 2021 Guidance, Texas's Previous Lawsuit, and this Court's Order Vacating the 2021 Guidance**

47.  One year after the Supreme Court decided *Bostock*, Defendant Burrows issued a "technical assistance document" (2021 Guidance),[3] "professedly explaining 'what the *Bostock* decision means for LGBTQ+ workers (and all covered workers) and for employers across the country' and 'the [EEOC's] established legal positions on LGTBQ+-related matters, as voted by the Commission.'" *Texas v. EEOC*, 633 F.Supp.3d 824, 828 (N.D. Tex. 2022) (Kacsmaryk, J.).

---

[2] *Bostock* addressed firing employees "for being homosexual or transgender but the 2024 Enforcement Guidance's Accommodations for "transgender" employees have no obvious application to homosexual employees.

[3] U.S. Equal Emp't Opportunity Comm'n, *Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity*, https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender (last visited Aug. 14, 2024).

48.   The 2021 Guidance stated: "Prohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination." 2021 Guidance, item 9.

49.   It also stated that "employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. In other words, if an employer has separate bathrooms, locker rooms, or showers for men and women, all men (including transgender men [i.e. women who say that they believe they are men]) should be allowed to use the men's facilities and all women (including transgender women [i.e. men who say that they believe they are women]) should be allowed to use the women's facilities." *Id.*, item 10 (footnote omitted).

50.   And it stated that "intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment." *Id.*, item 11.

51.   Texas sued EEOC to have the 2021 Guidance declared unlawful. *Texas v. EEOC*, 633 F.Supp.3d at 829.

52.   The district court agreed with Texas and declared the 2021 Guidance unlawful and vacated and set aside the 2021 Guidance. *Id.* at 847.

53.   Judge Kacsmaryk noted that "the crux of the parties' disagreement distills down to one question: is the non-discrimination holding in Bostock cabined to 'homosexuality and transgender *status*' or does it extend to correlated *conduct*—specifically, the sex-specific: (1) dress; (2) bathroom; [and] (3) pronoun . . . practices underlying the Guidance[]?" *Id.* at 829–30 (emphasis in original).

54.   The court further described the dispute as being over "the meaning of [the *Bostock* majority's] repeated phrase, '*for being* . . . transgender.' The '*for*' refers back to the discriminatory employer's actions or intentions, but what does [the *Bostock* majority] Gorsuch mean by '*being*'?" *Id.* at 833 (emphasis in original).

55.   The court agreed with Texas "that 'being' means the . . . identification (transgender) expressly referenced in [the *Bostock*] majority opinion—but not necessarily all associated actions,

which remain subject to case-by-case Title VII analysis, and that "the State of Texas may not discriminate against an employee . . . 'for being transgender'—i. e., . . . 'persons with one sex identified at birth and another today'—but may regulate correlated conduct via sex-specific dress, bathroom, [and] pronoun . . . policies, if otherwise consistent with Title VII case law." *Id.*

56.  Similarly, it held that *Bostock*'s "non-discrimination holding" was "cabined to 'transgender status,'" and therefore rejected EEOC's argument that Title VII "extend[s] to correlated conduct—specifically, the sex-specific: (1) dress; (2) bathroom; [and] (3) pronoun . . . practices underlying the [2021] Guidance[]." *Id.* at 829.

57.  The court also denied any "'false distinction' between status and conduct," citing *Bostock*'s repeated presumption that "there will be Title VII cases where the protected class 'sex' may not reach particular conduct," *id.* at 834; distinguished the Supreme Court's decisions in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), and *Lawrence v. Texas*, 539 U.S. 558 (2003), *id.* at 834–35; and explained that Title VII decisions from the Supreme Court and the federal appellate courts "reveal[] that 'status' and 'conduct' do not necessarily merge every time an employee plausibly pleads a 'closely associated' trait," *id.* at 836.

58.  Further, the court held that the 2021 Guidance was a substantive rule because it "imposes new duties and chang[ed] the text of the statute it professed to interpret. [It] imposes dress-code, bathroom, and pronoun accommodations as existing requirements under the law and established legal positions in light of *Bostock* and prior EEOC decisions interpreting Title VII. But Title VII— as interpreted in *Bostock*—does not require such accommodations." *Id.* at 840.

59.  Consequently, Judge Kacsmaryk also found that EEOC had no authority to issue the Guidance because EEOC may only issue "procedural regulations." *Id.* at 841–42 (citing U.S.C. § 2000e-12(a)).

60.  Finally, because the 2021 Guidance was substantive, Judge Kacsmaryk also found that EEOC was required to publish it in the Federal Register but did not, and that "even if the [2021] Guidance was] not [a] substantive rule[], FOIA's publication requirement also applies to

'statements of general policy or interpretations of general applicability formulated and adopted by the agency,'" which the 2021 Guidance is. *Id.* at 842.

61. For these reasons and others, Judge Kacsmaryk declared the 2021 Guidance unlawful and vacated and set aside the 2021 Guidance.

62. EEOC did not appeal.

### D. The 2024 Guidance

63. In October 2023, EEOC proposed new enforcement guidance on harassment in the workplace.[4]

64. EEOC published an announcement of the proposed guidance (but not the proposed guidance itself) in the Federal Register and requested comments. Proposed Enforcement Guidance on Harassment in the Workplace, 88 Fed. Reg. 67,750 (Oct. 2, 2023).

65. On April 29, 2024, EEOC published the 2024 Guidance on the internet.[5] Ex. 1.

66. EEOC did not publish the 2024 Guidance in the Federal Register.

#### 1. The stated purpose of the 2024 Guidance reinforces its importance.

67. The purpose of the 2024 Guidance is stated as: "This transmittal issues the Commission's guidance on harassment in the workplace under EEOC-enforced laws. It communicates the Commission's position on important legal issues." Ex. 1 at 2.

68. Further, according to EEOC, the Guidance "provide[s] clarity to the public regarding existing requirements under the law or agency policies." *Id.*

69. Its effective date is "[u]pon issuance"—that is, April 29, 2024. *Id.*

---

[4] U.S. Equal Emp't Opportunity Comm'n, *Proposed Enforcement Guidance on Harassment in the Workplace*, https://www.eeoc.gov/proposed-enforcement-guidance-harassment-workplace (last visited Aug. 14, 2024).

[5] *Enforcement Guidance on Harassment in the Workplace,* https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace (last visited Aug. 14, 2024).

70. It "addresses how harassment based on race, color, religion, sex, national origin, age, disability, or genetic information is defined under EEOC-enforced statutes and the analysis for determining whether employer liability is established." Ex. 1 at 1.

71. Moreover, "[t]his guidance serves as a resource for employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues." Ex. 1 at 8.

72. The 2024 Guidance "supersedes *Compliance Manual Section 615: Harassment* (1987); *Policy Guidance on Current Issues of Sexual Harassment* (1990); *Policy Guidance on Employer Liability under Title VII for Sexual Favoritism* (1990); *Enforcement Guidance on* Harris v. Forklift Sys., Inc. (1994); and *Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors* (1999)." Ex. 1 at 1–2.

73. In other words, the 2024 Guidance is EEOC's first new enforcement guidance on harassment in the workplace in decades.

### 2. The 2024 Guidance Reads Title VII to impose the same Dress Code Accommodation, Bathroom Accommodation, and Pronoun Accommodation as the 2021 Guidance.

74. The 2024 Guidance has substantively the same Dress Code Accommodation, Bathroom Accommodation, and Pronoun Accommodation as the 2021 Guidance that Judge Kacsmaryk found unlawful.

75. Much more than the 2021 Guidance, the 2024 Guidance asserts that the Dress Code Accommodation, Bathroom Accommodation, and Pronoun Accommodation necessarily result from a supposed prohibition on *harassment* based on "gender identity": "Sex-based discrimination includes discrimination based on . . . gender identity [citing *Bostock*]. Accordingly, sex-based harassment includes harassment on the basis of . . . gender identity, including how that identity is expressed." Ex. 1 at 17.

76. In contrast to EEOC's characterization of the Accommodations as combating unlawful harassing conduct, Judge Kacsmaryk characterized the Accommodations as "dress-code, bathroom, and pronoun *accommodations*." *Texas v. EEOC*, 633 F.Supp.3d at 840.

77. The 2024 Guidance lists examples of "harassing conduct" based in gender identity. Ex. 1 at 17.

78. One example is "repeated and intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)." *Id.*

79. Another is an employer's "denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.*

80. The 2024 Guidance also asserts that it is unlawful to act against an employee for not "present[ing] in a manner that would stereotypically be associated with that person's sex." *Id.*

81. These correspond to the same Dress Code Accommodation, Bathroom Accommodation, and Pronoun Accommodation as the 2021 Guidance that Judge Kacsmaryk found unlawful. The 2024 Guidance provides the following examples of supposedly unlawful harassment based on gender identity:

> **Example 15: Harassment Based on Gender Identity.**
> Chloe, a purchase order coordinator at a retail store warehouse, is approached by her supervisor, Alton, who asks whether she was "born a man" because he had heard a rumor that "there was a transvestite in the department." Chloe disclosed to Alton that she is transgender and asked him to keep this information confidential. After this conversation, Alton instructed Chloe to wear pants to work because a dress would be "inappropriate," despite other purchase order coordinators being permitted to wear dresses and skirts. Alton also asks inappropriate questions about Chloe's anatomy and sexual relationships. Further, whenever Alton is frustrated with Chloe, he misgenders her by using, with emphasis, "he/him" pronouns, sometimes in front of Chloe's coworkers. Based on these facts, Alton's harassing conduct toward Chloe is based on her gender identity.

*Id.* at 17–18.

> **Example 46: Harassment Based on Gender Identity Creates an Objectively Hostile Work Environment.**
> Jennifer, a female cashier who is transgender and works at a fast-food restaurant, is regularly and intentionally misgendered by supervisors, coworkers, and customers

over a period of several weeks. One of her supervisors, Allison, intentionally and frequently uses Jennifer's prior male name, male pronouns, and "dude" when referring to Jennifer, despite Jennifer's requests for Allison to use her correct name and pronouns. Other managers also intentionally refer to Jennifer as "he" whenever they work together. In the presence of customers, coworkers ask Jennifer questions about her sexual orientation and anatomy and assert that she is not female. After hearing these remarks by employees, customers also intentionally misgender Jennifer and make offensive comments about her transgender status. Based on these facts, which must be viewed in the context of Jennifer's perspective as a transgender individual, Jennifer has been subjected to an objectively hostile work environment based on her gender identity that includes repeated and intentional misgendering.

*Id.* at 46.

82.   The 2024 Guidance thus directly contradicts Judge Kacsmaryk's unappealed ruling that Title VII does not require accommodations based on gender identity in bathrooms, dress codes, or pronoun usage. *See Texas v. EEOC*, 633 F.Supp.3d at 840.

83.   The 2024 Guidance acknowledges that "*Bostock* itself concerned allegations of discriminatory discharge," but nevertheless asserts that "the Supreme Court's reasoning in the decision logically extends to claims of harassment." Ex. 1 at 110 n.37.

84.   EEOC acknowledged that "commenters [had] contended that . . . the proposed guidance exceeded the scope of Title VII as interpreted" in *Bostock*.

85.   But EEOC denied that "the guidance exceed[s] the scope of the Supreme Court's decision." Ex. 1 at 92–94.

86.   While *Bostock* dealt only with "failing or refusing to hire," EEOC asserted that the Court's reasoning and Title VII's text necessarily protect employees from discrimination on the basis of sexual orientation or gender identity with respect to other "terms, conditions, or privileges of employment." Ex. 1 at 94.

87.   EEOC also acknowledged *Bostock*'s refusal to address "bathrooms, locker rooms, or anything else of the kind." *Bostock*, 590 U.S. at 681; Ex. 1 at 92.

88.   Nevertheless, EEOC cited past administrative appeals decisions and district court cases to determine that so-called "misgendering" and denying individuals access to sex-segregated spaces

that correspond with their gender identity, "viewed in light of the totality of the circumstances, [are] potentially supportive of a hostile work environment claim." Ex. 1 at 92–94.

89.    EEOC made similar arguments in defense of the 2021 Guidance. But Judge Kacsmaryk ruled that "these decisions are irrelevant because they interpret Title VII provisions applicable to federal employers—not private-sector and state employers. *Compare* 42 U.S.C. § 2000e-2(a)(1) (declaring it unlawful for private-sector and state employers to 'fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex'), with 42 U.S.C. § 2000e-16(a) ('All personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on . . . sex . . .'). These differences 'hold the Federal Government to a stricter standard than private employers or state or local governments.'" *Texas v. EEOC*, 633 F.Supp.3d at 836 (citing *Babb v. Wilkie*, 589 U.S. 399, 411 (2020)).

90.    In short, the 2024 Guidance purports to extend *Bostock* to situations that the *Bostock* Court explicitly declined to "prejudge"—dress codes, bathrooms/locker rooms, and pronouns—on the grounds that "the Supreme Court's reasoning logically extends" to those situations.

91.    Under the 2024 Guidance, an employer must take affirmative steps to prevent harassment (defined as including allowing "transgender" employees the Dress Code Accommodation, Bathroom Accommodation, and Pronoun Accommodation), including monitoring the workplace and developing "anti-harassment polic[ies], complaint procedures, and training[s]." Ex. 1 at 67.

92.    The 2024 Guidance requires employers with notice of harassing behavior (again, defined as including allowing "transgender" employees the Dress Code Accommodation, Bathroom Accommodation, and Pronoun Accommodation) by a *non-employee* to take corrective actions, potentially requiring the non-employee to vacate the workplace. Ex. 1 at 60, 76–85.

93.   The 2024 Guidance did not have unanimous support among Commissioners, passing by a split vote of 3-2 with Chairman Burrows, Vice Chair Samuels, and Commissioner Kotagal voting to approve.[6]

## IV. Legal Analysis

### A. The Guidance is Final Agency Action

94.   "The APA allows judicial review only of a "final agency action," meaning an action that (1) mark[s] the consummation of the agency's decisionmaking process and (2) by which rights or obligations have been determined, or from which legal consequences will flow." *Texas v. EEOC*, 933 F.3d at 441 (footnotes and quotation marks omitted).

95.   The 2024 Guidance is self-evidently the consummation of EEOC's decisionmaking process.

96.   An "agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations." *Texas v. EEOC*, 933 F.3d at 441.

97.   EEOC describes the 2024 Guidance as "Commission-approved enforcement guidance [which] presents a legal analysis of standards for harassment and employer liability applicable to claims of harassment under the equal employment opportunity (EEO) statutes enforced by the Commission, which prohibit work-related harassment based . . . sex (including . . . sexual orientation[] and gender identity)." Ex. 1 at 7.

98.   The purpose of the 2024 Guidance is stated as: "This transmittal issues the Commission's guidance on harassment in the workplace under EEOC-enforced laws. It communicates the Commission's position on important legal issues." Ex. 1 at 2.

99.   Further, according to EEOC, the 2024 Guidance "provide[s] clarity to the public regarding existing requirements under the law or agency policies." *Id.*

---

[6]   U.S. Equal Emp't Opportunity Comm'n, *Commission Votes: April 2024*, https://www.eeoc.gov/commission-votes-april-2024 (last visited Aug. 14, 2024)

100. It "addresses how harassment based on race, color, religion, sex, national origin, age, disability, or genetic information is defined under EEOC-enforced statutes and the analysis for determining whether employer liability is established." Ex. 1 at 1.

101. The document says that "[t]his guidance serves as a resource for employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues." Ex. 1 at 8.

102. "This guidance serves as a resource for . . . EEOC staff," *id.*, who will be expected to investigate employers who do not make pronoun, bathroom, and dress code accommodations for employees claiming a different gender than their biological sex.

103. Thus, the 2024 Guidance binds EEOC staff.

104. Therefore, the 2024 Guidance is a final agency action. *Texas v. EEOC*, 933 F.3d at 441.

## B.  EEOC Lacks Statutory Authority to impose the Accommodations.

### 1.  EEOC misreads *Bostock*.

105. *Bostock* was a narrow decision, holding only that terminating an employee "simply for *being* . . . transgender" constitutes discrimination "because of…sex" under Title VII. 590 U.S. at 650–51 (emphasis added).

106. The *Bostock* majority "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female," and did not include "norms concerning gender identity." *Id.* at 655.

107. The Supreme Court expressly declined to "prejudge" issues like "bathrooms, locker rooms, and dress codes" under Title VII's prohibition of discrimination based on sex. *Id.* at 681.

108. The 2024 Guidance attempts to extend *Bostock* to situations that the Supreme Court explicitly declined to "prejudge."

109. *Bostock's* narrow holding does not support the agency's expanded application of Title VII to other "transgender"-related employment issues.

110. *Bostock*'s "non-discrimination holding" was "cabined to 'transgender *status*,'" and therefore EEOC's argument that Title VII "extend[s] to correlated *conduct*—specifically, the sex-specific: (1) dress; (2) bathroom; [and] (3) pronoun . . . practices underlying the" [2021] Guidance[]," *Texas v. EEOC*, 633 F.Supp.3d at 829. The same applies to the Accommodations in the 2024 Guidance.

111. *Bostock* did not prohibit all sex-based distinctions in employment.

112. *Bostock* repeatedly cited the Supreme Court's earlier decision in *Oncale,* 523 U.S. 75, as authority.

113. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Onccale*, 523 U.S. at 81.

114. The *Oncale* Court noted the central concern of Title VII was not every aspect of interaction in the workplace but "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id*. at 80 (quoting *Harris v. Forklift Sys.,* 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

115. *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* . . . transgender defies the law." *Bostock*, 590 U.S. at 683 (emphasis added).

116. The analysis of *Bostock* (and its several hypotheticals) in *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), *aff'd on other grounds, Braidwood Mgmt., Inc., v. EEOC*, 70 F.4th 914 (5th Cir. 2023), is the one that makes the most sense of the opinion. The *Bear Creek Bible Church* court pointed to "[t]wo diverging tests [that] have emerged in Title VII sex discrimination litigation: favoritism and blindness." *Id*. at 618 (citing *Wittmer v. Phillips* 66 Co., 915 F.3d 328, 333–34 (5th Cir. 2019) (Ho, J., concurring)). "Under the [favoritism test], 'Title VII prohibits employers from favoring men over women, or vice versa. By contrast, under [the blindness test], Title VII does more than prohibit favoritism toward men or women—it requires employers to be

entirely blind to a person's sex.'" *Id.* (quoting *Wittmer*, 915 F.3d at 333–34). Thoroughly examining the language of *Bostock* and its hypotheticals, the *Bear Creek Bible Church* court concluded that "*Bostock* did not explicitly endorse one or the other," *id.*, but a hybrid of the two: "the proper test must be favoritism, plus blindness to sex if the secondary trait is . . . transgenderism." *Id.* at 619.

117. The favoritism aspect relating to sex makes sense of *Bostock*'s repeated reliance on *Oncale*, which explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Oncale*, 523 U.S. at 81. Thus, Title VII does not require a disregard of sex differences where neither sex is disadvantaged.

118. And the blindness aspect relating to the subcategories of sexual orientation and gender identity prevents other aspects of Title VII from being undermined by the subjectivity of these social constructs. Since context determines meaning, it makes sense to consider the entire context of the language under construction. With statutory construction, that means looking not only to the provision in question, but also to "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Courts construe statutes so one provision does not contradict another. The "task is to fit, if possible, all parts into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)).

119. By requiring total disregard of the concept of gender identity in employment decisions, the blindness approach prevents several provisions of Title VII from becoming incoherent. For example, under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must show that he (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 429 (5th Cir. 2023) (cleaned up). If the replacement employee were able to be classified as a member of the same sex of the plaintiff based solely the replacement employee's

unchallengeable assertion to be a member of that sex, Congress's intention to protect employees against sex discrimination would be undermined. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013) (defining "transgender" to include "individuals who transiently" identify one way).

120. Consider also the allowance in Title VII for positions where sex is a *bona fide* employment qualification, 42 U.S.C. § 2000e-2(c)(1), including for accommodating patients' privacy interests in the healthcare setting, *Everson v. Michigan Dep't of Corr.*, 391 F.3d 737, 756–60 (6th Cir. 2004); *Jones v. Hinds Gen. Hosp.*, 666 F.Supp. 933, 937 (S.D. Miss. 1987) (addressing privacy concerns between male patients and female nurses). This provision could not serve its purpose if a man could claim qualification for such a position by his subjective identification as a woman. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

121. The 2024 Guidance does not challenge the right of employers to have sex-specific dress codes, bathrooms, and pronoun usage policies as a general matter. But it requires employers to allow exceptions for employees who subjectively identify as the opposite sex, which destroys the whole point of the policies. If employers may have sex-specific dress codes, bathrooms, and pronoun usage policies, then they may also require their employees to comply with that policy. *Cf.* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 192–93 (2012) ("[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied.") (citation omitted). Sex-specific dress codes, bathrooms, and pronoun usage policies do not classify based on the "gender identity" of employees but disregard that concept altogether, exactly as *Bostock* requires. Indeed, to allow employers to have sex-specific workplace policies, but then require them to allow exemptions only for "transgender" employees, is contrary to the law as specified in *Bostock*.

19

**2. Federal law does not require employers to make accommodations based on sex.**

122. The 2024 Guidance reads Title VII to contain an accommodation requirement for sex, at least with respect to the Dress Code, Bathroom, and Pronoun Accommodations.

123. They are accommodations because they excuse certain males from complying with work rules applicable to all males, and certain females from complying with work rules applicable to all females.

124. But while Title VII requires employers to make accommodations for an employee's religion, *see* 42 U.S.C. § 2000e(j) (mandating religious accommodations), and the Americans with Disabilities Act requires employers to make accommodations for an employee's disability, *see* 42 U.S.C. § 12131–32 (mandating accommodations for disabilities), and the Pregnant Workers Fairness Act requires employers to make reasonable accommodations for an employee's pregnancy and childbirth, *see* 42 U.S.C. § 2000gg-1, no statute requires employers to make accommodations for an employee's sex generally—let alone for an employee's "transgenderism" or "gender identity."

125. For all categories in Title VII (other than religion), courts have repeatedly rejected attempts to conflate volitional behavior or attributes that are associated with protected classes. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 95 (1973) (rejecting conflation of citizenship or alienage status with Title VII category of national origin); *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016) (noting "every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race") (collecting cases); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942–45 (8th Cir. 2007) (rejecting conflation of contraception use with Title VII category of sex); *cf. Hazen Paper Co., v. Biggins*, 507 U.S. 614, 608–14 (1993) (rejecting conflation of age discrimination under ADEA with seniority or pension status).

126. Consider the Pregnancy Discrimination Act that explicitly added to the definition of "because of sex" discrimination to include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e-(k). This was adopted after the Supreme Court

had held that such discrimination was not covered by the general prohibition on discrimination "because of sex" in Title VII. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136–38 (1976). There is no such statute relating to traits or attributes "associated with" transgenderism, so their interpretation is doomed by the "Negative-Implication Canon[:] The expression of one thing implies the exclusion of others ('*expressio unius est exclusio alterius*')." *Reading Law: The Interpretation of Legal Texts* 107.

127. While *Bostock* interprets Title VII to prohibit an employer from discriminating against employees based on transgender status, the employer is not required to treat "transgender" employees more favorably than other employees. *See Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) (employers not required to give preferential treatment to minorities or women). By requiring employers to make exceptions to concededly lawful policies for practices "associated with" a particular "gender identity," the 2024 Guidance turns Title VII's prohibition on sex discrimination into an accommodation mandate. There is no textual warrant for requiring accommodations for any aspect of sex discrimination—unlike, for example, religious accommodation. See 42 U.S.C. § 2000e(j).

128. It is helpful to see how the Americans with Disabilities Act defines the term:

The term "reasonable accommodation" may include—

(A)    making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B)    job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

129. The 2024 Guidance similarly requires the alteration—for transgender employees—of the ordinary work rules, facilities, terms, and conditions that apply to all other employees. *Cf. Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C. Cir. 2019) (Williams, J., concurring in the result) (describing

the requirement that all servicemembers serve in their biological sex as "declining to make . . . accommodations for gender transition," rather than "a transgender ban"). But "[f]ailure to provide a reasonable accommodation is a type of unlawful discrimination . . . not generally applicable to all the protected status groups under Title VII and has been reserved to issues of discrimination on the basis of religion and disability." B. Lindemann & P. Grossman, *Employment Discrimination Law* 265 (4th ed. 2007).

130. The 2024 Guidance's accommodation requirements are similar to Title VII's accommodation requirement for religion. Title VII defines "religion" broadly to include "all aspects of religious *observance and practice*, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice." 42 U.S.C. § 2000e(j) (emphasis added). Title VII's accommodation requirement, unlike the norm of neutrality for most anti-discrimination provisions, requires preferential treatment for employees based on religious practices:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious . . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015).

131. *Bostock*, on the other hand, forbids "favored treatment" based on transgender status, and thus precludes any requirement of accommodation. None of the other Title VII protected characteristics require accommodation of employees' voluntary "observance[s] or practice[s]," including dress, bathroom usage, or customized language demands. The religious accommodation requirement "reinforce[es] the conclusion that Congress acted deliberately when it omitted" any accommodation requirement from the sex discrimination provision in the same section of the statute. *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 354 (2013).

132. Gender dysphoria and other gender-identity disorders (as well as homosexuality or bisexuality) are not a "disability" that must be accommodated under the Americans with Disabilities Act, *see* 42 U.S.C. § 12211(a), (b)(1), or the Rehabilitation Act, *see* 29 U.S.C. § 705(20)(c), (F)(i). But EEOC seeks to overcome Congress's deliberate choice to not require accommodations based on these concepts in the 2024 Guidance.

133. Unlike with religion, Title VII does not protect "observance[s] or practice[s]." "[F]ailing or refusing to hire" based on "transgender" *status* alone is protected. "[T]there is nothing in Title VII which requires an employer to allow employees to express their cultural identity." *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1487 (9th Cir. 1993).

134. Moreover, the 2024 Guidance essentially requires employers to grant the Accommodations to anyone who asks for them.

135. EEOC's position that "transgender men" and "transgender women" are entitled to the Accommodations is exactly equivalent to a position that employers must allow *every* male and *every* female to choose their own male or female dress code, bathrooms, or pronouns.

136. Thus, the 2024 Guidance treats Title VII's term "sex" as subjective, contrary to the *Bostock* court's assumption to the contrary, contrary to the meaning of "sex" (as opposed to "gender"), and contrary to science.

## C. The 2024 Guidance is a Substantive Rule

137. The 2021 Guidance was a substantive rule because it "imposes new duties and chang[ed] the text of the statute it professed to interpret. [It] imposes dress-code, bathroom, and pronoun accommodations as existing requirements under the law and established legal positions in light of *Bostock* and prior EEOC decisions interpreting Title VII. But Title VII—as interpreted in *Bostock*—does not require such accommodations." *Texas v. EEOC*, 663 F.Supp.3d at 840.

138. Consequently, Judge Kacsmaryk also found that EEOC had no authority to issue the Guidance because EEOC may only issue "procedural regulations." *Id.* at 841–42 (citing U.S.C. § 2000e-12(a)).

139. The same applies to the Accommodations in the 2024 Guidance.

140. The Accommodations are a substantive rule—EEOC has no power to adopt such rules.

### D.   The 2024 Guidance was not Published in the Federal Register

141. Judge Kacsmaryk held that that even if the 2021 Guidance were not a substantive rule, FOIA's publication requirement also applies to "statements of general policy or interpretations of general applicability formulated and adopted by the agency," *id.*, which the 2021 Guidance was.

142. Likewise, the 2024 Guidance was required to be published in the Federal Register even if it were not a substantive rule because it is a statement of general policy, or interpretations of general applicability, formulated and adopted by the agency.

### E.   The Effect of the 2024 Guidance on Plaintiffs

143. Texas employes hundreds of thousands of people.

144. The Texas Department of Agriculture (TDA) requires its employees to dress tastefully and professionally and be well-groomed. If any employee dressed as a member of the opposite sex, TDA would consider such conduct to be a violation of its policy.

145. TDA has both unisex and single-occupancy bathrooms and bathrooms that are designated by sex. It interprets "sex" as referring to biological sex rather than "gender identity". If any employee wanted to use the bathrooms designated for the opposite sex, TDA would reject such a request.

146. TDA does not have a policy of directing its employees to use pronouns based on "gender identity" to refer to other employees. It also does not discipline employees based on any use of pronouns based on biological sex rather than the gender identity of other employees. If any employee wanted TDA to require other employees to use pronouns based on gender identity, TDA would reject such a request.

147. The Guidance has a direct and immediate impact on the day-to-day business of the State, its agencies, and its political subdivisions, including TDA.

148. Texas faces imminent injury for noncompliance with the Guidance in the form of EEOC investigations, Justice Department enforcement actions, and suits by "private attorneys general," *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211 (1972), authorized by the Justice Department. State employers, including TDA, no less than private ones, are susceptible to "charges" of discrimination based on EEOC's unlawful interpretation of Title VII. See 42 U.S.C. § 2000e-5(b).

149. The only difference between EEOC's authority regarding state employers and private ones is that the Commission generally does not have the authority to directly initiate a civil enforcement action against the former. See 42 U.S.C. § 2000e-5(f)(1). When it is a state employer that allegedly committed an unlawful employment practice, EEOC must refer the charge of discrimination to the Attorney General. *Id.* The Attorney General, in turn, can either sue the State or authorize the employee to do so. *Id.*

150. But EEOC does have the authority to investigate and adjudicate Title VII claims against a state employer where the claim is on behalf of certain high-level state employees. See 42 U.S.C. § 2000e-16c; 29 C.F.R. §§ 1603.109, .304.

151. The State and its agencies often face lawsuits under Title VII including on the basis of sex discrimination.

152. EEOC has issued a substantive interpretation of Title VII that purports to preempt the State's sovereign power to enact and abide by its workplace policies. The State must analyze, agency by agency, the risk of EEOC investigations arising from the Guidance's standards, facing the forced choice of either changing their policies at taxpayer expenses or ignoring the Guidance and accepting impending enforcement actions and increased costs of litigation and liability under Title VII.

153. Heritage employs approximately 300 individuals and is headquartered in Washington, DC.

154. Heritage enforces a Dress Code that requires employees to "come to work in professional dress, consistent with the mission, culture, business functions, and purpose of Heritage."

155. Heritage employees dress in a manner traditionally befitting their biological sex. Similarly, employees use Heritage's on-site bathroom, shower, and nursing facilities according to biological sex, and use pronouns that correspond to people's biological sex in the workplace and in their work product.

156. Heritage provides sex-specific intimate facilities (including bathrooms, showers, and nursing facilities) for many reasons, including to protect the privacy and safety of its employees, especially women.

157. Barring any applicable legal defenses, to avoid the liability imminently threatened by EEOC's current understanding of what Title VII requires (as reflected in the 2024 Guidance), Heritage would need to devote significant time and resources to creating or updating policies, customs, or training programs.

158. For example, Heritage would need to revise its existing policies to account for the myriad of new workplace discrimination and harassment examples the 2024 Guidance believes amount to discrimination or harassment. Heritage would also have to update or develop new materials and training programs to reflect those policy changes.

159. All of this would require Heritage to expend up-front and ongoing resources that Heritage would never recover.

160. Heritage also would have to spend resources investigating whether it must convert all existing sex-specific intimate facilities into single-occupancy units consistent with Heritage's expressive mission. In the event Heritage concludes such a project is required to comply with the 2024 Guidance, Heritage would have to spend significant financial resources on the conversions. Heritage's headquarters is in downtown Washington, D.C., just a few blocks from the U.S. Capitol, and available space is extremely limited, making any such conversions even costlier.

161. The 2024 Guidance is broad, wide-ranging, and asserts various philosophical, moral, and ideological value judgments. Some of the value judgments motivating the 2024 Guidance are directly contrary to Heritage's own values. Fully implementing the 2024 Guidance forces Heritage to affirm certain philosophical, moral, and ideological beliefs with which Heritage strongly

disagrees. If Heritage were forced to fully implement all aspects of the 2024 Guidance, it would likely damage Heritage's message, mission, values, reputation, and culture. Such damage will impose further costs on Heritage, including substantial brand and reputational damage, resource costs (such as staff resignations, fewer applications for staff openings, and lost donor support) and moral costs (such as lower employee morale, loss of employee privacy and safety, and forced affirmation of philosophical, moral, and ideological beliefs). This is unacceptable to Heritage because, as an expressive association, Heritage is one of the most prominent public voices against the very gender ideology being imposed by much of the 2024 Guidance.

## V. Claims for Relief

### COUNT 1
### Violation of APA, 5 U.S.C. § 706(2)(A), (C):
### The 2024 Guidance Contrary to Law and Exceeding Statutory Authority

162. All foregoing allegations are repeated and realleged as if fully set forth herein.

163. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

164. EEOC is a federal agency within the meaning of the APA.

165. The 2024 Guidance constitutes a final agency action reviewable under the APA. 5 U.S.C. § 704.

166. It is a "rule" under the APA. 5 U.S.C. § 701(b)(2).

167. The 2024 Guidance is not in accordance with law because it contradicts Title VII.

168. Title VII, as interpreted by *Bostock*, forbids discrimination based on "transgender status."

169. Title VII's sex-discrimination provision—unlike its religion-discrimination provision—has no accommodation requirement.

170. The 2024 Guidance requires employers to treat employees of the same sex differently based on the employee's "gender identity" by mandating accommodations for transgender employees with regard to generally applicable workplace policies that do not consider the concept of "gender identity."

## COUNT 2
### Violation of APA, 5 U.S.C. § 706(2)(A), (C):
### The 2024 Guidance in Excess of EEOC's Statutory Rulemaking Authority

171. All foregoing allegations are repeated and realleged as if fully set forth herein.

172. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

173. The 2024 Guidance exceeds EEOC's statutory authority because it is a substantive rule that EEOC is powerless to promulgate.

174. An administrative agency, "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. at 301 (quotation omitted).

175. EEOC "may issue only 'procedural regulations' implementing Title VII and may not promulgate substantive rules." *Texas v. EEOC*, 933 F.3d at 439 (citing 42 U.S.C. § 2000e-12(a)).

176. There are "two criteria [that] distinguish [procedural rules] from substantive rules: whether the rule (1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decisionmakers free to exercise discretion." *Texas v. United States (DAPA)*, 809 F.3d 134, 151–55 (5th Cir. 2015) (quotation omitted).

177. Under those criteria, the 2024 Guidance is a substantive rule.

178. "Because the Guidance is a substantive rule, and the text of Title VII and precedent confirm that EEOC lacks authority to promulgate substantive rules implementing Title VII," *Texas v. EEOC,* 933 F.3d at 451, it is unlawful and must be set aside. 5 U.S.C. § 706.

179. Because the 2024 Guidance is not in accordance with the law, it is invalid and must be set aside. *Id.*

## COUNT 3
### Violation of APA, 5 U.S.C. § 706(2)(A):
### The 2024 Guidance is Arbitrary and Capricious

180. All foregoing allegations are repeated and realleged as if fully set forth herein.

181. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . .  arbitrary and capricious." 5 U.S.C. § 706(2)(A).

182. The 2024 Guidance is arbitrary and capricious because it does not account for key aspects of sex-segregated workplace policies.

183. Most notably, EEOC failed to consider or address the long-recognized privacy and safety justifications for sex-segregated spaces, which have long been recognized by courts as valuable and lawful. *See, e.g., United States v. Virginia*, 518 U.S. 515, 550 n.10 (1996). Sex-separate restrooms and changing facilities reduces the potential for harassment, voyeurism, and even violence, especially against women. *See id.* at 533 (recognizing the "enduring" "[p]hysical differences between men and women"). Yet EEOC disregarded those justifications.

184. Relatedly, EEOC disregarded that the 2024 Guidance very well may expose employers to Title VII liability by increasing the potential for harassment, voyeurism, and even violence, especially against women.

185. EEOC also ignored the heavy implementation burdens on employers, for whom it is nearly impossible to discern and verify gender identity, especially given that some individuals claim to change their gender identity over time or identify as genderless. The end result is that the 2024 Guidance allows every male and every female to choose their own male or female dress code, bathrooms, or pronouns.

186. EEOC also failed to account for the 2024 Guidance's disruption to federalism. Texas and other Staters have enacted laws and policies that cannot co-exist with the 2024 Guidance, yet EEOC ignored this "[i]ntrusive federal oversight of State administration." E.O. 13132, § 3(c) (requiring that federal agencies consider federalism implications of a rule).

**COUNT 4**
**Violation of APA, 5 U.S.C. § 552(a)(l)(D):**
**Failure to Publish in the Federal Register**

187. All foregoing allegations are repeated and realleged as if fully set forth herein.

188. The 2024 Guidance is a substantive rule, so EEOC was required to publish it in the Federal Register, 5 U.S.C. § 552(a)(l)(D)—but did not.

189. Even if the 2024 Guidance were not a substantive rule, EEOC was still required to publish it in the Federal Register because it is a "statement[] of general policy or interpretation[] of general applicability formulated and adopted by the agency." *Id.*

## VI. Demand for Relief

Plaintiffs respectfully request that the Court:

a. Declare that the 2024 Guidance is unlawful;

b. Vacate and set aside the 2024 Guidance;

c. Issue a permanent injunction prohibiting Defendants from enforcing or implementing the 2024 Guidance and from interpreting Title VII to require employers to provide the Accommodations;

d. Award Plaintiffs the costs of this action and reasonable attorney's fees; and

e. Award such other and further relief as the Court deems equitable and just.

Dated: August 15, 2024.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

*/s/Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas State Bar No. 24105085
Ryan.Walters@oag.texas.gov

JOHNATHAN STONE
Special Counsel
Texas State Bar No. 24071779
johnathan.stone@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371
jacob.przada@oag.texas.gov

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

COUNSEL FOR STATE OF TEXAS

Respectfully submitted.

DANIEL D. MAULER
General Counsel of The Heritage Foundation

*/s/ R. Trent McCotter*
R. TRENT MCCOTTER
ANDREW W. SMITH
Boyden Gray PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Telephone: (202) 706-5488
tmccotter@boydengray.com
*(motions for pro hac vice forthcoming)*

The Heritage Foundation
214 Massachusetts Ave. NE
Washington, DC 20002-4999
Telephone: (202) 617-6975

COUNSEL FOR THE HERITAGE FOUNDATION