# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

|  |  |
|---|---|
| STATE OF TEXAS; and THE HERITAGE FOUNDATION, | |
| *Plaintiffs*, | |
| v. | Case No. 2:24-cv-173-Z |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chairman of the Equal Employment Opportunity Commission; and MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | |
| *Defendants*. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ IV

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

    A.   Title VII ......................................................................................................................... 2

    B.   The 2021 Guidance ....................................................................................................... 3

    C.   The 2024 Guidance ....................................................................................................... 4

STANDARD OF REVIEW ........................................................................................................... 7

SUMMARY OF ARGUMENT ..................................................................................................... 8

ARGUMENT ................................................................................................................................ 8

I.    Plaintiffs' challenge to the 2024 Guidance is justiciable. ........................................................ 8

    A.   Plaintiffs have standing to challenge the 2024 Guidance. ........................................... 8

    B.   The 2024 Guidance is final agency action. ................................................................ 10

II.   The 2024 Guidance is contrary to law because it contravenes Title VII ............................... 14

    A.   EEOC misreads *Bostock*. ......................................................................................... 14

    B.   Title VII does not require employers to accommodate conduct associated with transgender status. .................................................................................................... 17

    C.   Regardless, sex-segregated bathrooms, dress codes, and pronouns are not discriminatory. .......................................................................................................... 22

    D.   EEOC's other authorities do not justify the 2024 Guidance. .................................... 25

III.  The 2024 Guidance is arbitrary and capricious. .................................................................. 26

    A.   EEOC failed to consider women's safety. ................................................................ 26

    B.   EEOC failed to consider implementation burdens. .................................................... 27

    C.   EEOC failed to consider effects on federalism. ........................................................ 28

IV.  The 2024 Guidance is an invalid substantive rule. .............................................................. 29

V.   The 2024 Guidance was required to be published in the Federal Register. ............................ 29

VI.  The Court should issue declaratory relief. ........................................................................... 30

VII. The Court should vacate the 2024 Guidance. ..................................................................... 30

VIII. The Court should issue permanent injunctive relief. ........................................................... 31

    A.   Plaintiffs succeed on the merits. ................................................................................ 31

    B.   Plaintiffs will suffer irreparable harm. ...................................................................... 31

    C.   The balance of equities and public interest favor an injunction. ................................ 33

  D. The scope of injunctive relief properly extends beyond the 2024 Guidance. ..................34

CONCLUSION.....................................................................................................................36

CERTIFICATE OF SERVICE ...........................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ............................................................................................................10

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................................7, 8

*Baldwin v. Dep't of Transp.,*
EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015) .............................25

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................................11

*Bostock v. Clayton County,*
590 U.S. 644 (2020)..................... 1, 3, 4, 5, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,*
477 U.S. 41 (1986) ..............................................................................................................10

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...............................................................................................................7

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
473 U.S. 432 (1985) (Marshall, J., concurring in the judgment in part and
dissenting in part) ..............................................................................................................24

*Davis v. FEC,*
554 U.S. 724 (2008) ...............................................................................................................8

*Dobbs v. Jackson Women's Health Org.,*
142 S. Ct. 2228 (2022) ........................................................................................................19

*Doe 2 v. Shanahan,*
917 F.3d 694 (D.C. Cir. 2019) (Williams, J., concurring in the result) .......................17, 20

*Doe v. Triangle Doughnuts, LLC,*
472 F. Supp. 3d 115 (E.D. Pa. 2020)..............................................................................25, 26

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
575 U.S. 768 (2015)..............................................................................................................20

*EEOC v. Catastrophe Mgmt. Sols.,*
852 F.3d 1018 (11th Cir. 2016) ...........................................................................................18

iv

*Espinoza v. Farah Mfg. Co.*,
    414 U.S. 86 (1973)................................................................................................18

*Garcia v. Gloor*,
    618 F.2d 264 (5th Cir. 1980)...........................................................................18

*Garcia v. Spun Steak Co.*,
    998 F.2d 1480 (9th Cir. 1993) ...................................................................18, 21

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976)..........................................................................................18

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)..........................................................................................10

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) (Ginsburg, J., concurring)........................................15, 25

*Hazen Paper Co., v. Biggins*,
    507 U.S. 614 (1993)..........................................................................................18

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001).......................................................................10

*L.A. Dep't of Water & Power v. Manhart*,
    435 U.S. 702 (1978)..........................................................................................16

*Lusardi v. Dep't of the Army*,
    EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015)................25

*Maner v. Dignity Health*,
    9 F.4th 1114 (9th Cir. 2021) (Bea, J.) ............................................................16

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
    584 U.S. 617 (2018)..........................................................................................23

*Meritor Sav. Bank v. Vinson*,
    477 U.S. 57 (1986)..............................................................................................2

*Oncale v. Sundowner Offshore Servs.*,
    523 U.S. 75 (1998)...........................................................................2, 15, 21, 22

*Phillips v. Martin Marietta Corp.*,
    400 U.S. 542 (1971)..........................................................................................16

*Ragas v. Tenn. Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998)..............................................................................7

*Raytheon Co. v. Hernandez,*
540 U.S. 44 (2003).........................................................................................................19

*Tennessee v. U.S. Dep't of Educ.,*
615 F. Supp. 3d 807 (E.D. Tenn. 2022)........................................................................11

*Tex. Dept. of Cmty. Affairs v. Burdine,*
450 U.S. 248 (1981)...................................................................................................2, 19

*Texas v. Biden,*
20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds sub nom. Biden v. Texas*, 597 U.S.
785 (2022)...................................................................................................................12

*Texas v. EEOC,*
633 F. Supp. 3d 824 (N.D. Tex. 2022) (Kacsmaryk, J.)
............................................................................................ 1, 3, 4, 11, 12, 15, 17, 25

*Texas v. EEOC,*
933 F.3d at 446 ........................................................................... 9, 10, 11, 12, 13, 14

*Texas v. EEOC,*
No. 2:21-CV-194-Z, 2022 WL 22869778 (N.D. Tex. May 26, 2022) ................. 8, 11, 12

*Toilet Goods Ass'n, Inc. v. Gardner,*
387 U.S. 158 (1967).....................................................................................................11

*Tudor v. Southeastern Oklahoma State Univ.,*
13 F.4th 1019 (10th Cir. 2021) ....................................................................................26

*Tudor v. Southeastern Oklahoma State Univ.,*
Case No. CIV-15-324, 2017 WL 4849118 (W.D. Okla. Oct. 26, 2017).........................26

*U.S. Army Corps of Eng'rs v.Hawkes,*
578 U.S. 590 (2016).............................................................................................. 13, 14

*In re Union Pac. R.R. Emp. Pracs. Litig.,*
479 F.3d 936 (8th Cir. 2007) ........................................................................................18

*United States v. Virginia,*
518 U.S. 515 (1996) (Ginsburg, J.).......................................................................... 23, 25

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
570 U.S. 338 (2013).....................................................................................................21

*Walker v. Sears, Roebuck & Co.,*
853 F.2d 355 (5th Cir. 1988)..........................................................................................8

*West v. Radtke,*
48 F.4th 836 (7th Cir. 2022) .........................................................................................15

*Willingham v. Macon Tel. Publ'g Co.*,
    507 F.2d 1084 (5th Cir. 1975) (en banc) .............................................................16

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018) (en banc) ................................................15, 16, 24

**Statutes**

5 U.S.C. § 704 ..............................................................................................................10

42 U.S.C. § 2000e-2(a) ..................................................................................................2

42 U.S.C. § 2000e-2(a)(1) ...........................................................................................25

42 U.S.C. § 2000e-2(j) ...................................................................................................2

42 U.S.C. § 2000e-5 .....................................................................................................13

42 U.S.C. § 2000e-5(b) ..................................................................................................9

42 U.S.C. § 2000e-5(f) .................................................................................................12

42 U.S.C. § 2000e-12(a) ................................................................................................3

42 U.S.C. § 2000e-16(a) ..............................................................................................25

42 U.S.C. § 2000e-16c ..............................................................................................9, 12

42 U.S.C. § 2000e(j) ...............................................................................2, 5, 17, 19, 20

42 U.S.C. § 2000e-(k) ..................................................................................................18

42 U.S.C. § 12111(9) ....................................................................................................20

42 U.S.C. § 12211(a), (b)(1) ........................................................................................21

Tex. Agric. Code § 12.013(a) ......................................................................................10

**Other Authorities**

29 C.F.R. §§ 1603.109, .304 ..........................................................................................9

29 C.F.R. §§ 1603.109, 1603.304 ................................................................................12

34 C.F.R. § 106.33 ........................................................................................................24

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 107 ........................19

## INTRODUCTION

On October 1, 2022, this Court vacated an Equal Employment Opportunity Commission ("EEOC") guidance document that required employers to provide bathroom, dress code, and pronoun accommodations for employees whose gender identity differed from their sex (the "2021 Guidance"). *See Texas v. EEOC*, 633 F. Supp. 3d 824 (N.D. Tex. 2022) (Kacsmaryk, J.). This Court concluded that Title VII does not require accommodations for the conduct that is often associated with transgender status. *Id.* at 829–30. As a result, this Court held that requiring bathroom, dress code, and pronoun accommodations for transgender employees contravened Title VII. *Id.* at 829–36.

Instead of appealing this Court's ruling or going back to the drawing board, EEOC issued a new guidance document that repeats the agency's errors in every relevant respect. Just like the 2021 Guidance, the guidance under review here requires employers to provide bathroom, dress code, and pronoun accommodations for transgender-identifying employees. As EEOC sees it, an employer that failed to provide such accommodations for such employees creates a hostile work environment with harassment that discriminates based on sex. Even if everyone else must use restrooms, dress codes, and pronouns that correspond to their sex, the EEOC guidance forces employers to permit transgender-identifying employees to do the opposite. But as this Court has already held, Title VII requires no such thing.

The EEOC still claims that its policy follows from *Bostock v. Clayton County*, 590 U.S. 644 (2020), which held that Title VII's prohibition on sex discrimination necessarily reaches firing an employee solely "for being homosexual or transgender." *Id.* at 651–52. But—as this Court has already recognized—*Bostock* expressly declined to "prejudge" bathroom, dress code, or pronoun issues. *Id.* at 681. Moreover, the decision is best read to prohibit discriminating on the basis of transgender status, not associated conduct. Finally, the logic of *Bostock* is that firing an employee because he identifies as transgender necessarily discriminates on the basis of sex. But declining to accommodate a transgender-identifying employee's desire to use the opposite sex's bathroom does

1

not discriminate on the basis of sex. In fact, it ensures that all employees are treated equally by requiring everyone to use the bathroom that corresponds to his sex.

In addition, the new EEOC guidance is arbitrary and capricious as the agency failed to consider several important aspects of the problem. The guidance exceeds EEOC's authority to only issue procedural regulations. And the guidance was never published in the Federal Register, even though the Freedom of Information Act requires it.

## BACKGROUND

### A. Title VII

Title VII makes it illegal for employers to "discriminate against" an employee "with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. § 2000e-2(a). Sometimes, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998).

Because Title VII "is directed only at *discrimination* because of sex," however, it does not reach "all verbal or physical harassment in the workplace." *Id.* (cleaned up). To show a Title VII violation on a workplace harassment theory, "the critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quotation omitted).

While Title VII prohibits discrimination based on sex, it does not require employers to affirmatively *accommodate* or "give preferential treatment" based on sex. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981); *see* 42 U.S.C. § 2000e-2(j). In this regard, Title VII treats sex differently than religion. When it comes to religion, employers must "reasonably accommodate" an employee's "religious observance or practice." 42 U.S.C. § 2000e(j).

Congress limited EEOC's authority to issue regulations under Title VII. EEOC only has authority "to issue, amend, or rescind suitable *procedural* regulations to carry out" Title VII. 42 U.S.C. § 2000e-12(a) (emphasis added).

### B. The 2021 Guidance

In June 2021, EEOC Chairman Charlotte Burrows issued a "technical assistance document" purportedly explaining "the EEOC's established legal positions on LGTBQ+-related matters, as voted by the Commission." *Texas*, 633 F.Supp.3d at 828 (quoting the guidance). The 2021 Guidance announced three notable positions. First, it stated EEOC's view that "[p]rohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination." EEOC, *Protections Against Discrimination Based on Sexual Orientation or Gender Identity*, at Item 9 (June 15, 2021) https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender. Second, it stated EEOC's view that "employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity." *Id.* at Item 10. Third, it stated EEOC's view that "intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment." *Id.* at Item 11.

Texas sued EEOC, seeking a declaration that the 2021 Guidance was unlawful and should be vacated. This Court viewed the "crux" of the case as whether *Bostock*'s holding that Title VII prohibited *discrimination* based on "homosexuality and transgender *status*" also extended to require *accommodations* for "correlated *conduct*," such as "dress-code, bathroom, and pronoun accommodations." *Texas*, 633 F. Supp. 3d at 829–30, 840 (emphasis added).

This Court declared the 2021 Guidance unlawful and vacated it. *Id.* at 847. As relevant here, it first held that, under *Bostock*, "Title VII prohibits employment discrimination because of sexual orientation and gender-identity status — *i.e.*, 'being homosexual,' 'being transgender' — but not necessarily all correlated conduct." *Id.* at 830. As a result, the 2021 Guidance exceeded

Title VII by requiring employers to accommodate conduct associated with transgender status, such as "dress codes, bathrooms, and pronouns." *Id.* at 832. The Court then held that EEOC had exceeded its statutory authority to issue only procedural rules because the 2021 Guidance was a substantive rule. *Id.* at 840–42. Finally, the Court held that the 2021 Guidance violated the APA because EEOC failed to publish it in the Federal Register. *Id.* at 842. EEOC did not appeal.

### C. The 2024 Guidance

In October 2023, EEOC proposed new enforcement guidance reflecting essentially the same interpretation of Title VII's prohibition on sex discrimination set forth in the agency's vacated 2021 Guidance, this time presenting examples of what the agency considers "sex-based harassment" and requesting public comments. EEOC, *Proposed Enforcement Guidance on Harassment in the Workplace*, 88 Fed. Reg. 67,750 (Oct. 2, 2023) ("Proposed Guidance"). The Proposed Guidance was published on EEOC's website. *See* https://www.eeoc.gov/proposed-enforcement-guidance-harassment-workplace. The Proposed Guidance asserted that under *Bostock*'s reasoning, Title VII prohibits as "sex-based harassment" the denial of accommodations for bathroom and pronoun use based on gender identity. Thus, the Proposed Guidance again attempted to extend *Bostock* to situations that the Court explicitly declined to "prejudge"—*e.g.*, bathrooms and pronouns—while also proposing to impose liability on employers for the conduct of their customers or other third parties.

Texas and nineteen other States commented on the Proposed Guidance, highlighting statutory, constitutional, and APA flaws in EEOC's new interpretation of Title VII. Most relevant here, the States explained that the Proposed Guidance contravened EEOC's statutory authority. States' Comment Letter at 3–4, App.007–08. The States argued that *Bostock*'s narrow holding does not support the agency's expanded application of Title VII to all transgender-related employment issues, such as sex-segregated bathrooms and use of pronouns. The States further claimed that EEOC proposed essentially to amend Title VII to create a *de facto* accommodation requirement for gender identity—requiring employers to exempt transgender employees from

traditional workplace policies (*e.g.*, men use the men's bathroom; women use the women's bathroom) when they conflict with their gender identity—even though *Bostock* did not address this. As the States explained, Congress knew how to require accommodations for certain protected classes in Title VII, *see, e.g.,* 42 U.S.C. § 2000e(j) (mandating religious accommodations), yet has thus far declined to do so for transgenderism or gender identity, or even sex. States' Comment Letter at 4, App.008; *see also* Texas Comment Letter at 3, App.003.

The States also pointed out several policy problems with the EEOC's approach: (1) allowing men who identify as women into women's restrooms and locker rooms puts women at risk; (2) the accommodation mandate will be difficult for employers to implement; and (3) the guidance raised significant federalism concerns.

On April 29, 2024, EEOC published the 2024 Guidance on the internet. EEOC, *Enforcement Guidance on Harassment in the Workplace*, App.019–207, available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace ("2024 Guidance"). EEOC did not publish the 2024 Guidance in the Federal Register. The 2024 Guidance did not have unanimous support among Commissioners, which passed it by a split vote of 3-2. EEOC, *Commission Votes: April 2024*, https://www.eeoc.gov/commission-votes-april-2024 (last visited October 22, 2024).

The 2024 Guidance's stated purpose was to "communicate[] the Commission's position on important legal issues" and "provide clarity to the public regarding existing requirements under the law or agency policies. App.020. It addressed "harassment based on race, color, religion, sex, national origin, age, disability, or genetic information." App.019. Citing *Bostock*, the 2024 Guidance provides that "[s]ex-based discrimination under Title VII includes employment discrimination based on sexual orientation or gender identity," and thus, "sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed." App.035.

The 2024 Guidance reimposed similar dress code, bathroom, and pronoun accommodation policies as the 2021 Guidance. The 2024 Guidance announced that "[h]arassing conduct"

includes failure to provide a bathroom accommodation (or the "denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity"), the failure to provide a pronoun accommodation (or the "repeated and intentional use of a name or pronoun inconsistent with the individual's known gender identity") to transgender employees, and the failure to provide a dress code accommodation to transgender employees (or "harassing conduct because an individuial does not present in a manner that would stereotypcially be associated wiuth that person's sex"). App.035. The 2024 Guidance then shed light on this prohibition with an example that instructed.

> **Example 46: Harassment Based on Gender Identity Creates an Objectively Hostile Work Environment.**
>
> Jennifer, a female cashier who is transgender and works at a fast-food restaurant, is regularly and intentionally misgendered by supervisors, coworkers, and customers over a period of several weeks. One of her supervisors, Allison, intentionally and frequently uses Jennifer's prior male name, male pronouns, and "dude" when referring to Jennifer, despite Jennifer's requests for Allison to use her correct name and pronouns. Other managers also intentionally refer to Jennifer as "he" whenever they work together. In the presence of customers, coworkers ask Jennifer questions about her sexual orientation and anatomy and assert that she is not female. After hearing these remarks by employees, customers also intentionally misgender Jennifer and make offensive comments about her transgender status. Based on these facts, which must be viewed in the context of Jennifer's perspective as a transgender individual, Jennifer has been subjected to an objectively hostile work environment based on her gender identity that includes repeated and intentional misgendering.

App.064–065.

And the 2024 Guidance further explained that Title VII is violated by "harassing conduct because an individual does not present in a manner that would stereotypically be associated with that person's sex." App.035. The 2024 Guidance then shed light on this statement by providing an example of "harassing conduct," in which an employer "instructed" a male employee who identified as female to "wear pants to work because a dress would be in 'inappropriate.'" App.036. In full, the EEOC instructed:

**Example 15: Harassment Based on Gender Identity.**

Chloe, a purchase order coordinator at a retail store warehouse, is approached by her supervisor, Alton, who asks whether she was "born a man" because he had heard a rumor that "there was a transvestite in the department." Chloe disclosed to Alton that she is transgender and asked him to keep this information confidential. After this conversation, Alton instructed Chloe to wear pants to work because a dress would be "inappropriate," despite other purchase order coordinators being permitted to wear dresses and skirts. Alton also asks inappropriate questions about Chloe's anatomy and sexual relationships. Further, whenever Alton is frustrated with Chloe, he misgenders her by using, with emphasis, "he/him" pronouns, sometimes in front of Chloe's coworkers. Based on these facts, Alton's harassing conduct toward Chloe is based on her gender identity.

App.035–036.

That example confirms that the 2024 Guidance also announced a dress-code-accommodation requirement: Even if the employer has a sex-specific dress code, the employer must excuse men who identify as women (or women who identify as men) from that general policy to avoid liability for "harassing conduct." App.035.

The 2024 Guidance never addressed this Court's earlier ruling setting aside the 2021 Guidance.

## STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of the motion and show from the record that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When reviewing summary-judgment evidence, the court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). If enough evidence supports a disputed allegation that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Anderson*, 477 U.S. at 250.

## SUMMARY OF ARGUMENT

The 2024 Guidance is unlawful because it contravenes Title VII, is arbitrary and capricious, exceeds EEOC's authority because it is a substantive rule, and violates the Freedom of Information Act because it was not published in the Federal Register. It should be declared unlawful, vacated, and Defendants should be permanently enjoined from interpreting or enforcing Title VII as including mandates similar to those in the 2024 Guidance.

## ARGUMENT

### I.    Plaintiffs' challenge to the 2024 Guidance is justiciable.

#### A.    Plaintiffs have standing to challenge the 2024 Guidance.

To have standing to sue, plaintiffs must "[(1)] present an injury that is concrete, particularized, and actual or imminent; [(2)] fairly traceable to the defendant's challenged behavior; and [(3)] likely to be redressed by a favorable ruling." *Davis v. FEC*, 554 U.S. 724, 733 (2008). This Court already held that Texas had standing to challenge the 2021 Guidance, *Texas v. EEOC*, No. 2:21-CV-194-Z, 2022 WL 22869778, at *8–12 (N.D. Tex. May 26, 2022), and the same result should obtain for the 2024 Guidance.

Both Texas and the Heritage Foundation have standing as employers directly regulated by the 2024 Guidance. "[T]here is ordinarily little question" that the "object of the action ... at issue" is injured by the agency's decision, or "that a judgment" setting aside "the action will address" that injury. *Lujan*, 504 U.S. at 561–62. The 2024 Guidance directly applies to both Texas and Heritage. Texas employs hundreds of thousands of people. Thwe Texas Department of Agriculture alone employs about 650. Miller Decl. ¶ 1, App.210; Heritage employs about 300. Korsvall Decl. ¶ 4, App.216. Title VII applies to both employers, and the 2024 Guidance expressly

states that it applies to both private employers and state governments. App.119. As a result, both employers have standing as "the object[s] of the Guidance." *Texas v. EEOC*, 933 F.3d at 446.

If the 2024 Guidance remains in place, both Texas and Heritage face an imminent risk of injury. A Texas agency (the Texas Department of Agriculture) relies on sex-specific bathroom and dress policies, and it does not require its employees to use pronouns based on "gender identity" when that diverges from an employees' sex. Miller Decl. ¶¶ 6–9, App.211–212.Heritage has a dress code that requires employees to "come to work in professional dress, consistent with the mission, culture, business functions, and purpose of Heritage," and historically employees have dressed in a manner traditionally befitting their biological sex. Korsvall Decl. ¶9, App.217.

EEOC can directly investigate and sue a private employer like Heritage, and it can refer a charge of discrimination against Texas to the U.S. Attorney General, who can sue Texas or authorize the aggrieved employee to do so. *See* 42 U.S.C. § 2000e-5(b); *id.* § 2000e-5(f)(1). EEOC also has authority to investigate certain Title VII claims against Texas. 42 U.S.C. § 2000e-16c; 29 C.F.R. §§ 1603.109, .304.

EEOC means business: it recently sued an employer for allegedly subjecting transgender employees to sexual harassment in the workplace, including by providing "unequal access to bathrooms." EEOC, *EEOC Sues Two Employers for Sex Discrimination*, https://www.eeoc.gov/newsroom/eeoc-sues-two-employers-sex-discrimination-0 (Oct. 1, 2024).

Further, Texas and Heritage would bear "an increased regulatory burden" from trying to comply with the 2024 Guidance, if it remained in place. *EEOC,* 933 F.3d at 446. Texas must analyze, agency by agency, the risk of EEOC investigations arising from the Guidance's standards, facing the forced choice of either overriding the State's interest in adhering to longstanding employment policies and changing them at taxpayer expense or ignoring the Guidance and accepting impending enforcement actions and increased costs of litigation and liability under Title VII. The Texas Department of Agriculture would have to devote signifcant time and resources to update or develop new training materials and treain its personnel. Miller Decl. ¶¶ 10–13, App.212. And Heritage would have to develop new materials and training programs to reflect the 2024

Guidance's policy changes. Korsvall Decl. ¶¶ 6–9, App.217. Heritage would also have to spend resources investigating whether to convert all existing sex-specific intimate facilities into single-occupancy units. Korsvall Decl. ¶ 10, App. 217–18.

Finally, Texas will suffer an additional injury to its sovereignty. The 2024 Guidance will "pressure" Texas to "change state law," infringing upon its "sovereign interest in the power to create and enforce a legal code." *EEOC*, 933 F.3d at 447. Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). It is a sovereign interest of a State to determine how its agencies perform their duties under state law, and how its employees conduct themselves.

Texas law empowers the Commissioner of the Texas Department of Agriculture to "employ personnel as the duties of the department require" and to determine "their qualifications for employment and their responsibilities under applicable laws relating to standards of conduct for state employees." Tex. Agric. Code § 12.013(a); *id.* at § 11.001. Through that authority, the Department maintains longstanding workplace policies of sex-segregated bathrooms, dress codes, and pronoun usage to "express certain values." *Id.*; Miller Decl. *passim*, App.210–214. Texas's "inability to enforce its duly enacted" laws "inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also, e.g.*, *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (irreparable harm where agency action put its "sovereign interests and public policies at stake"); s*ee also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 & n.17 (1986) (finding "no question" that a state's sovereignty is "diminished" and standing therefore exists when federal law alters the state's ability to "structure its relationship with its employees") (cleaned up). The continued existence of the 2024 Guidance will impinge on that sovereign right.

### B. The 2024 Guidance is final agency action.

The APA allows judicial review of "final agency action." 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark

the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible." *EEOC*, 933 F.3d at 441 (cleaned up).

This Court already held that the 2021 Guidance is final agency action; the same result obtains for the 2024 Guidance, which is substantively identical. *Texas*, 2022 WL 22869778, at *2–6.

*Consummation.* The first requirement of finality is easily satisfied here. *See Texas*, 633 F. Supp. 3d at 838–41; *see also Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 830 (E.D. Tenn. 2022) (vacating the 2021 Guidance). Because it was promulgated after formal notice-and-comment, the 2024 Guidance cannot fairly be characterized as preliminary, procedural, or intermediate. *See Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967). Indeed, the purpose of the 2024 Guidance is to "communicate[] the Commission's position on important legal issues" and "provide clarity to the public regarding existing requirements under the law or agency policies." App.020.

*Legal Consequences.* An "agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations," satisfying the second requirement. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The 2024 Guidance announces itself as "Commission-approved enforcement guidance [which] presents a legal analysis of standards of harassment and employer liability applicable to claims of harassment ... enforced by the Commission." App.025. The 2024 Guidance further holds itself out "as a resource for employers, employees, and practitioners, *for EEOC staff* and the staff of other agencies that investigate, adjudicate, or litigate harassment claims." App.026 (emphasis added). And the 2024 Guidance gives mandatory commands to these audiences: It states authoritatively that "sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed." App.035. And it provides definitive examples of factual scenarios that

11

would create liability for harassing conduct based on gender identity. App.035–036, Examples 14 & 15.

Like the 2021 Guidance, the 2024 Guidance "binds agency staff and the public because of its mandatory language." *Texas*, 633 F. Supp. 3d at 840. Through specific examples, the 2024 Guidance "broadly condemns" specific employment practices, leaving "no room for EEOC staff *not* to" act "when an employer implements the condemned practice." *Id.* (quotation omitted). By broadly condemning employers who require employees to use restrooms, pronouns, and dress that correspond to their sex, the 2024 Guidance leaves EEOC staff no discretion about whether to permit such longstanding practices. The 2024 Guidance is final agency action.

The 2024 Guidance's disclaimer that it is "not meant to bind the public in any way" does not change things. App.020. As this Court has explained, such "boilerplate provisions" do "not render a guidance non-final where legal consequences still flow from it, as they do here." *Texas*, 2022 WL 22869778, at *5. Thus, courts ask whether the practical effects of an agency's decision make it final agency action, not whether it is "label[ed]" as such. *Texas v. Biden*, 20 F.4th 928, 949 (5th Cir. 2021), *rev'd on other grounds sub nom. Biden v. Texas*, 597 U.S. 785 (2022). As EEOC Commissioner Andrea Lucas aptly explained in her dissent, a "rule called by any other name is still a rule." App.209.

A second reason that the 2024 Guidance has legal consequence is that it sets forth norms or safe harbors by which employers can avoid EEOC enforcement actions and public employers can avoid EEOC referrals to DOJ. When, as here, "the language of the agency document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." *EEOC*, 933 F.3d at 442 (cleaned up).

EEOC has the power to bring its own enforcement actions against private employers. *See* 42 U.S.C. § 2000e-5(f). There is also a limited circumstance where EEOC has the authority to investigate and adjudicate Title VII claims against a state employer: where the claim is on behalf of certain high-level State employees pursuant to the Government Employee Rights Act of 1991 ("GERA"). *See* 42 U.S.C. § 2000e-16c; 29 C.F.R. §§ 1603.109, 1603.304. This further undercuts

EEOC's claims against justiciability here. EEOC and DOJ share enforcement responsibilities concerning claims of discrimination against state and local governments. EEOC investigates and, if it finds reasonable cause that there is a violation of Title VII, attempts to a reach a settlement with the State or local employer. *See* 42 U.S.C. § 2000e-5. If no settlement is reached, EEOC refers the matter to DOJ, which then pursues litigation. *See id.* § 2000e-5(f)(1). DOJ has never disavowed an intention to pursue enforcement of EEOC referrals pursuant to the 2024 Guidance.

Had EEOC reached different conclusions—by concluding that Title VII did not require employers to adopt dress code, bathroom, or pronoun accommodations in their workplace policies—it would have "narrow[ed] the field of potential plaintiffs and limit[ed] the potential liability" that employers face. *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 599 (2016). Those revised conclusions would undoubtedly result in legal consequences and "[i]t follows that" denying those potential safe harbors has "legal consequences as well." *Id.* "This conclusion tracks the 'pragmatic' approach [the Supreme Court has] long taken to finality." *Id.*

If the 2024 Guidance had, for example, deemed policies such as those of the Texas Department of Agriculture consistent with Title VII, it would bind EEOC to find no reasonable cause and it could not bring an enforcement action against private employers, against State employers under GERA, or refer the case to DOJ.

That EEOC has no power to bring an enforcement action against Texas, *see EEOC*, 933 F.3d at 439, does not alter this conclusion. The 2024 Guidance at all times either is or is not a final agency action. Its status does not change based on the identity of the plaintiff challenging the action. *See id.* at 444 ("Finality, however, cannot vary depending on who sued the agency; it depends on the rule itself."). And while DOJ may still be able to bring a "pattern or practice" claim without a referral, *EEOC*, 933 F.3d at 439 n.5, this does not change the fact that an entire category of claims by DOJ would be eliminated. Under *Hawkes*, denying that safe harbor is a legal consequence.

The Rule does contain three norms or safe harbors on which EEOC expects employers to rely in shaping their behavior: (1) the dress code accommodation provides a safe harbor for

employers to avoid liability if they allow transgender employees to dress according to their gender identity rather than their biological sex; the bathroom accommodation provides a safe harbor for employers to avoid liability if they allow transgender employees to use bathrooms according to their gender identity rather than their biological sex; and the pronoun accommodation provides a safe harbor for employers to avoid liability if they enforce any employees' demands that co-workers refer to them by pronouns according to their gender identity rather than their biological sex. That these "safe harbors" are phrased in the negative ("don't do this or you will be liable") rather than in the affirmative ("do this and you will avoid liability") is of no consequence. *See EEOC*, 933 F.3d at 442 (discussing "affirmative" versus "negative" jurisdictional determinations as safe harbors in *Hawkes*, 578 U.S. at 598–99). The 2024 Guidance is thus "binding as a practical matter because private parties can rely on it as a norm or safe harbor by which to shape their actions" "thus opening the field of potential plaintiffs." *EEOC*, 933 F.3d at 444 (cleaned up).

## II.    The 2024 Guidance is contrary to law because it contravenes Title VII.

The 2024 Guidance states that an employer unlawfully "discriminates" on the basis of sex if it adheres to sex-specific bathroom, dress, or pronoun policies without accommodating transgender employees. This Court already held that the 2021 Guidance contravenes Title VII, and the Court should do the same for the 2024 Guidance, which is substantively the same.

### A.  EEOC misreads *Bostock*.

In *Bostock*, the Supreme Court was only concerned with—and thus its holding only addresses—allegations of discriminatory termination. *See* 590 U.S. at 651. It was a narrow decision, holding only that terminating an employee "simply for *being* … transgender" constitutes discrimination "because of…sex" under Title VII. *Id.* at 650–51. The Court expressly declined to "prejudge" issues like "bathrooms, locker rooms, dress codes." *Id.* at 681. And it never addressed pronoun usage.

As this Court already concluded, the best reading of *Bostock* is that "Title VII prohibits employment discrimination against an individual 'for being homosexual,' 'for being transgender'"

14

but does not reach "all correlated conduct." *Texas*, 633 F. Supp. 3d at 831. Thus, the 2024 Guidance "misread[s] *Bostock* by melding 'status' and 'conduct' into one catchall protected class covering all conduct correlating to 'sexual orientation' and 'gender identity.'" *Id.* Just because *Bostock* prevents firing an employee for being transgender does not mean it requires allowing transgender employees to engage in conduct, such as using the opposite sex's bathroom, that is otherwise prohibited. The 2024 Guidance never addresses this Court's previous opinion.

The 2024 Guidance does concede that "*Bostock* itself" only "concerned allegations of discriminatory discharge," but it then claims that "the Supreme Court's reasoning in the decision … logically extends" to other employment activities, like bathroom and pronoun policies. App.128 at n. 37. Not so.

*Bostock* did not prohibit all sex-based distinctions in employment. *Bostock* repeatedly cited the Court's earlier decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), as authority. *Oncale* explained that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "requires neither asexuality nor androgyny in the workplace." *Id.* at 81.

*Oncale* noted the central concern of Title VII was not every aspect of interaction in the workplace but only "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). The Second Circuit—in one of the cases consolidated with and affirmed in *Bostock*—also favorably cites *Oncale* as "arguably" supporting the view that "sex-specific bathroom and grooming policies [do not] impose disadvantageous terms or conditions" because not all distinctions of "'sexual content or connotations' rise to the level of discrimination." *Zarda v. Altitude Express, Inc.,* 883 F.3d 100, 119 & n.16 (2d Cir. 2018) (en banc) (quoting *Oncale*, 523 U.S. at 79–80)); *see also West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (finding Title VII would not be violated by preventing transgender prison guard from performing strip searches of opposite-sex inmates because it did not constitute an adverse employment action).

Relatedly, *Bostock* also cautioned that "Title VII does not concern itself with everything that happens 'because of' sex," 590 U.S. at 657—only discrimination that is "inextricably" related to sex is forbidden; distinctions "related to sex in some vague sense" or having only "some disparate impact on one sex or the other" are not reached by the statute. *Id.* at 660–61.

*Bostock* also did not overturn any Supreme Court precedents, instead resting on those dating to the 1970s. It also did not disturb lower-court precedent that has long applied those same precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), which upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971), one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda*— which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta* and *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978))—favorably cited *Willingham* as consistent with its analysis, 883 F.3d at 118–19.

In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 590 U.S. at 683 (emphasis added).

In fact, an employer that follows the 2024 Guidance will effectively provide accommodations to transgender-identifying employees. But, as explained next in more detail, Title VII does not require accommodations.

16

**B. Title VII does not require employers to accommodate conduct associated with transgender status.**

The 2024 Guidance does not challenge employees' right to have sex-specific dress codes, bathrooms, or pronoun-usage policies as a general matter. But it reads Title VII to require employers to *accommodate* transgender employees by excusing them from longstanding work rules applicable to all employees. In particular, the 2024 Guidance requires employers to excuse employees from three rules—that (1) men use the men's restroom, women use the women's restroom; (2) men wear professional men's clothes, women wear professional women's clothes; and (3) men are referred to by masculine pronouns, women are referred to be feminine pronouns—whenever following those rules would subject the employee to practices that conflict with his gender identity.

This Court has already concluded that Title VII does not require accommodating conduct correlated with transgender status including, "specifically, the sex-specific (1) dress; (2) bathroom; [and] (3) pronoun … practices underlying" the 2024 Guidance. *Texas*, 633 F. Supp. 3d at 830. For good reason. While federal law requires employers to make reasonable accommodations for conduct associated with an employee's religion, *see* 42 U.S.C. § 2000e(j), disability, *see id.* § 12131–32, and pregnancy, *see id.* § 2000gg-1, it does not require accommodations from general workplace rules based on an employee's sex, let alone on transgender status.

By finding Title VII to prohibit discrimination based on transgender status because it is sex discrimination, *Bostock* forbids employers from discriminating against an employee based on that individual's internal sense of being male or female. *See Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C. Cir. 2019) (Williams, J., concurring in the result) ("Transgender individuals have a gender identity—an internalized, felt sense of who they are as male or female—that does not align with their sex assigned at birth.") (cleaned up).

*Bostock* does not allow any expansion of this concept to conduct that may be "associated with" transgender status. Any such conduct would only be "related [to transgender status] in 'some vague sense,'" or merely have "some disparate impact" on transgender employees. *Bostock*,

590 U.S. at 661. Given that many transgender persons make no attempt to socially transition by using bathrooms, pronouns, or dress of the opposite sex, such behavior is not "inextricably" related to transgender status, and thus not sufficiently related to sex to be reached by Title VII. *Id.*

*Bostock*'s treatment of sex discrimination is consistent with longstanding judicial precedent relating to other protected categories in Title VII and other anti-discrimination laws. As a result, even if "social transitioning" relating to bathroom usage, pronoun usage, or dress is *correlated* with transgender status, it is not protected. For example, Title VII permits employers to limit the languages spoken in the workplace, even though an employee's native language is closely bound up with his national origin and he may have a strong cultural connection with his native language. *See, e.g., Garcia v. Gloor,* 618 F.2d 264, 268 (5th Cir. 1980); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489–90 (9th Cir. 1993).

For all categories in Title VII (other than religion), courts have repeatedly rejected attempts to conflate volitional behavior or attributes that are associated with protected classes. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 95 (1973) (rejecting conflation of citizenship or alienage status with Title VII category of national origin); *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1032 (11th Cir. 2016) (noting "every court to have considered the issue has rejected the argument that Title VII protects hairstyles culturally associated with race") (collecting cases); *In re Union Pac. R.R. Emp. Pracs. Litig.*, 479 F.3d 936, 942– 45 (8th Cir. 2007) (rejecting conflation of contraception use with Title VII category of sex); *cf. Hazen Paper Co., v. Biggins*, 507 U.S. 614, 608–14 (1993) (rejecting conflation of age discrimination under ADEA with seniority or pension status).

Consider the Pregnancy Discrimination Act that explicitly added to the definition of "because of sex" discrimination to include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e-(k). This was adopted after the Supreme Court had held that such discrimination was not covered by the general prohibition on discrimination "because of sex" in Title VII. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136–38 (1976). There is no such statute relating to traits or attributes "associated with" transgenderism, so the 2024

Guidance's interpretation is doomed by the "Negative–Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)"). Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 107.

Even if there were a high correlation between (1) particular "gender expression" relating to bathrooms, pronoun usage, or dress, and (2) transgender status, even perfect correlation is not enough to constitute discrimination. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (citations omitted).

While *Bostock* prohibits an employer from discriminating against employees based on sexual orientation or gender identity, the employer is not required to treat homosexual or transgender employees more favorably than other employees. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) (employers not required to give preferential treatment to minorities or women). By requiring employers to make exceptions to concededly lawful policies for practices "associated with" a particular gender identity, the 2024 Guidance turned Title VII's prohibition on sex discrimination into an accommodation mandate. There is no textual warrant for requiring accommodations for any aspect of sex discrimination—unlike, for example, religious accommodation. *See* 42 U.S.C. § 2000e(j). The 2024 Guidance did not address discrimination based on sexual orientation or gender identity as aspects of sex discrimination, as did *Bostock*. Instead, it attempted to require employers to accommodate practices that are purportedly "associated with" transgender status, even though it is well established that "apply[ing] a neutral, generally applicable" policy "can, in no way, be said to have been motivated by" a protected classification and constitute illegal disparate treatment. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 (2003).

It is helpful to see how the Americans with Disabilities Act defines the term:

The term "reasonable accommodation" may include--
(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate

> adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

That is exactly what the 2024 Guidance was attempting to do: to require the alteration of the ordinary work rules, facilities, terms, and conditions that apply to all other employees. *Cf. Doe 2*, 917 F.3d at 708 (Williams, J., concurring in the result) (describing the requirement that all servicemembers serve in their biological sex as "declining to make … accommodations for gender transition," rather than "a transgender ban"). But "[f]ailure to provide a reasonable accommodation is a type of unlawful discrimination … not generally applicable to all the protected status groups under Title VII, and has been reserved to issues of discrimination on the basis of religion and disability." 1 Barbara T. Lindemann & Paul Grossman, *Employment Discrimination Law* 265 (4th ed. 2007).

Compare the 2024 Guidance's accommodation mandates with Title VII's well-known accommodation requirement for religion. Title VII defines "religion" broadly to include "all aspects of religious *observance and practice*, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice." 42 U.S.C. § 2000e(j) (emphasis added). And Title VII's accommodation requirement, unlike the norm of neutrality for most anti-discrimination provisions, requires preferential treatment for employees based on religious practices:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual … because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious … practice," it is no response that the subsequent "fail[ure] … to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015).

*Bostock*, on the other hand, forbids "favored treatment" based on sexual orientation and gender identity, and thus precludes any requirement of accommodation. None of the other Title VII protected characteristics require accommodation of employees' voluntary "observance[s] or practice[s]," including dress, bathroom usage, or customized language demands. The religious accommodation requirement "reinforce[es] the conclusion that Congress acted deliberately when it omitted" any accommodation requirement from the sex discrimination provision in the same section of the statute. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013). Indeed, Congress has explicitly precluded gender dysphoria or transgender status (or homosexuality) as a basis for an accommodation under the Americans with Disabilities Act. *See* 42 U.S.C. § 12211(a), (b)(1). Through the 2024 Guidance, EEOC seeks to overcome Congress's deliberate choice to not require accommodations based on these concepts.

Consider pronouns. Standard English usage is that individual pronouns are based on sex, not gender identity—a usage that existed long before the latter concept existed. EEOC does not assert that standard English is forbidden in workplaces in general, but the 2024 Guidance requires that an exception be made when referring to transgender employees. But it is difficult to think of anything more of a "genuine but innocuous difference[] in the ways men and women routinely interact with members of the same sex and of the opposite sex," *Oncale*, 523 U.S. at 81, than the standard use of the English language.

Unlike with religion, Title VII does not protect "observance[s] or practice[s]" related to sexual orientation or gender identity nor require employers to accommodate such volitional practices—transgender *status* or homosexual *status* alone are protected. "[T]here is nothing in Title VII which requires an employer to allow employees to express their cultural identity." *Spun Steak Co.*, 998 F.2d at 1487.

Defendants have previously attempted to distinguish the 2024 Guidance from the 2021 Guidance on the theory that the 2024 Guidance supposedly allows refusals to accommodate to be used only as evidence of status-based discrimination. But that view is belied by the 2024 Guidance itself, which says that "[h]arassing conduct based on sexual orientation or gender identity

21

includes" conduct against employees not "present[ing] in a manner that would stereotypically be associated with that person's sex," App.035, or "denial of access to a bathroom or other sex-segregated facility consistent with [an] individual's gender identity," *id.*, or "repeated and intentional use of a name or pronoun inconsistent with [an] individual's known gender identity (misgendering)." *Id.* The 2024 Guidance thus imposes the same kinds of bathroom, dress code, and pronoun rules that the 2021 Guidance did.

### C. Regardless, sex-segregated bathrooms, dress codes, and pronouns are not discriminatory.

Title VII only prohibits sex-based *discrimination.* Workplace harassment, the purported subject of the 2024 Guidance, only violates Title VII if it exposes "members of one sex … to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quotation omitted). To discriminate in violation of Title VII, an employer must "intentionally treat[] a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex." *Bostock*, 590 U.S. at 658.

But maintaining sex-segregated bathrooms, dress codes, and pronoun usage does not treat transgender individuals worse than others *because of sex*; it treats similarly situated individuals the same regardless of any gender identity: all men must use male facilities, and all women must use female facilities, and all facilities are generally equal. Similarly, all men must wear male clothing and be called by masculine pronouns, and all women must wear female clothing and be called by feminine pronouns. And while these policies do classify based on sex, those classifications simply reflect the "genuine but innocuous differences" between the sexes without preferencing one sex or distinguishing between members of the same sex. *Oncale*, 523 U.S. at 81. The 2024 Guidance exceeds Title VII by announcing that employers can face liability even when they do not discriminate on the basis of sex.

The implications of EEOC's unlawful power grab are far-reaching. Commissioner Lucas issued a statement warning that the 2024 Guidance "effectively eliminates single-sex workplace facilities and impinges on women's (and indeed, all employees') rights to freedom of speech and

belief." App.208. She explained that "[i]t is not harassment to acknowledge" biological sex or the "enduring" differences between men and women. *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.)). She also rejected the 2024 Guidance's conclusion that *Bostock* forbids businesses from "draw[ing] distinctions between the sexes in providing single-sex bathrooms or other similar facilities which implicate … significant privacy and safety interests." *Id.* She argued that maintaining sex-segregated spaces has historically been viewed as "exercising reasonable care to prevent harassment of female workers," but the 2024 Guidance now treats this "reasonable and necessary step to protect women" as "evidence of harassment against any biological male who self-identifies as having a female 'gender identity.'" *Id.* (emphases in original).

> *Bostock* itself cautioned that:
>
> As sweeping as even the but-for causation standard can be, Title VII does not concern itself with everything that happens "because of" sex. The statute imposes liability on employers only when they "fail or refuse to hire," "discharge," "or otherwise … discriminate against" someone because of a statutorily protected characteristic like sex.

*Bostock*, 590 U.S. at 657. To "discriminate against" a person "mean[s] mean treating that individual worse than others who are similarly situated," and "the difference in treatment based on sex must be intentional." *Id.*

Justice Gorsuch's concurring opinion in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 643–54 (2018), illuminates what he means by this in *Bostock*. There, he reasoned that Jack Phillips had no intent to discriminate based on sexual orientation when he refused to bake a cake for a same-sex wedding. *Id.* at 644–48 (Gorsuch, J., concurring). Justice Gorsuch noted a distinction between the foreseeable effects of Mr. Phillips' conduct on the same-sex couple and "actual proof of intent to discriminate on the basis of membership in a protected class." *Id.* at 648. *Bostock*, of course, notes that Title VII requires actual intent to discriminate. Justice Gorsuch also previews his use of "inextricably tied" to a protected trait to describe conduct

towards a protected class,[1] *id.* at 647–48, a test which he finds Mr. Phillips's actions did not meet and thus did not constitute discrimination based on a protected characteristic. *Id.* at 646 ("But there's no indication the bakers actually *intended* to refuse service *because of* a customer's protected characteristic") (emphases in original). This illustrates the status-conduct distinction that would come later in *Bostock*.

*Bostock*'s analysis with respect to employment termination does not extend to decisions concerning bathrooms. Discrimination requires treating certain individuals "worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. Providing separate but "comparable," 34 C.F.R. § 106.33, restrooms for the different sexes does not treat members of one sex worse than members of the other sex. Counsel for the plaintiffs in *Bostock* agreed, stating at oral argument that sex-separated bathrooms are "not discriminatory because" no one is "subjected to a disadvantage." Tr. of Oral Arg. at 12-13, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (Nos. 17-1618, 17-1623); *see also* Reply Br. for Resp'ts at 19-21, *Altitude Express, Inc. v. Zarda*, 590 U.S. 644 (2020), 2019 WL 4464222, at *19-21; Reply Br. for Pet'r at 23, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), 2019 WL 4464221, at *23 ("Sex-specific dress, bathroom, fitness, or other policies may be justified as bona fide occupational qualifications … and they may not even be discriminatory at all because they do not constitute '*disadvantageous* terms or conditions of employment.'" (emphasis in original) (quoting *Zarda*, 883 F.3d at 118).

Nor are members of one sex "similarly situated" to members of the other sex when it comes to bathrooms, locker rooms, and the like where privacy interests are at stake. While "[a]n individual's homosexuality or transgender status *is not relevant* to employment decisions" about hiring and firing, *Bostock*, 590 U.S. at 660 (emphasis added), *sex is relevant* in contexts such as bathrooms where physiological differences between the sexes matter. "A sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne*

---

[1] Compare Justice Gorsuch's use of this phrase with "inextricably bound up with sex" to describe the traits protected from intentional discrimination in *Bostock*, 590 U.S. at 660–61.

*Living Ctr., Inc.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *see also United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (admitting women to the Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements").

As to pronoun usage, the 2024 Guidance did not mandate that employers use a gender-neutral (but awkward and confusing) "they" at all times in the workplace. As Defendants don't think biologically based pronoun usage is inherently discriminatory, it cannot constitute harassing behavior. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) ("When the workplace is permeated with "discriminatory intimidation, ridicule, and insult" Title VII is violated) (citation omitted).

### D. EEOC's other authorities do not justify the 2024 Guidance.

In addition, EEOC points to its own "federal sector cases," where the Commission has "concluded that sex-based harassment includes harassment based on sexual orientation or gender identity." App.128–29 at n.37 (citing *Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *10–13 (Apr. 1, 2015) and *Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at *5, *10 (July 15, 2015)). "But these decisions are irrelevant because they interpret Title VII provisions applicable to *federal* employers—not private-sector and state employers." *Texas*, 633 F. Supp. 3d at 836; *compare* 42 U.S.C. § 2000e-2(a)(1) (declaring it unlawful for private-sector and state employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's … sex"), *with* 42 U.S.C. § 2000e-16(a) ("All personnel actions affecting employees or applicants for employment … shall be made free from any discrimination based on … sex … .").

EEOC also invokes a handful of nonbinding cases. App.128–131 at nn.37-43. But those cases do not move the ball. For instance, consider *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115 (E.D. Pa. 2020). There, the district court merely held that the plaintiff's alleged pattern of harassment stated a claim for a hostile work environment under Title VII. *Id.* at 129–30. Although so-called "misgendering" and bathroom use were among the many allegations of harassment, it is

not clear that those allegations governed the court's determination that the complaint there stated a claim under Title VII. *See id.* The same is true of *Eller v. Prince George's County Public Schools*, where the alleged harassment also included comments that were "explicitly sexual in nature," like threats of "rape." 580 F. Supp. 3d 154, 172 (D. Md. 2022). The decision in *Tudor v. Southeastern Oklahoma State Univ.*, Case No. CIV-15-324, 2017 WL 4849118, at *1 (W.D. Okla. Oct. 26, 2017), is of a piece. The court in *Tudor* noted long-standing restrictions on bathroom use and extensive "misgendering" among multiple factors by which it determined a jury could find harassment. 2017 WL 4849118, at *1. But that theory was ultimately rejected by a jury. *See Tudor v. Southeastern Oklahoma State Univ.*, 13 F.4th 1019, 1027 (10th Cir. 2021).

*    *    *

The Court should declare the 2024 Guidance unlawful, vacate it, and enjoin Defendants from implementing it and the interpretation of Title VII it implements.

### III.    The 2024 Guidance is arbitrary and capricious.

The APA instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action runs afoul of this standard when the agency "entirely fails to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The 2024 Guidance failed to address three important factors: women's safety, the difficulty of implementing EEOC's scheme, and federalism concerns.

### A.    EEOC failed to consider women's safety.

Society has long recognized the need for sex-segregated restrooms to protect women from sexual harassment and sexual assault. *See generally* W. Burlette Carter, *Sexisim in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227 (2018). Unsurprisingly, the Supreme Court recognized the need for—and lawfulness of—sex-segregated

26

"living arrangements" to protect women's "privacy" too. *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996); *see also Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns").

Unfortunately, the country has been reminded of the need for sex-segregated bathrooms in recent years. At least one study has found a link between policies that permit transgender individuals to use restrooms that correspond to their gender identity are linked to sexual incidents, in particular voyeurism-related offenses. Paul Dirks, *Gender-Inclusion Policies and Sexual Violence: A Longitudinal Analysis of Media Reports at Target Stores*, Woman Means Something (2018), https://perma.cc/YJ5G-32FW. And central to the nationwide debate over gender identity and bathroom policies has been whether and to what extent women are put at risk by permitting men who identify as women to use women's intimate spaces.

Yet, EEOC never even addressed this important consideration—the risk to women's safety—in its 2024 Guidance. That failure alone justifies setting aside the 2024 Guidance as arbitrary and capricious. *See State Farm*, 463 U.S. at 43. This failure is even more damning in view of a comment letter signed by the Texas Attorney General and 19 other States that raised this exact concern to EEOC. States' Comment Letter at 9–10, App.013–14. EEOC has no excuse for failing to address this "important aspect of the problem." *State Farm*, 463 U.S. at 43.

Relatedly, EEOC never considered that the 2024 Guidance could potentially expose employers to even further Title VII liability when female employees suffer harassment at work from men entering their restrooms and locker rooms.

### B. EEOC failed to consider implementation burdens.

To comply with the 2024 Guidance, employers must ascertain their employees' gender identity. Only by doing so can the employer ensure that its employees are referred to by pronouns that correspond to their gender identity and are permitted to dress and use restrooms that correspond to their gender identity.

But that creates a serious implementation hurdle. It is often difficult for employers to tell the gender identity of their employees. As one advocacy group put it, "[t]here is no way to determine if someone is transgender or non-binary unless they share their personal gender identity." Human Rights Campaign, *Transgender and Non-Binary People FAQ*, https://tinyurl.com/5f9jvs4c. Even then, gender identity is not fixed, as some individuals may "embrace a fluidity of gender identity," or "may identify as being both a man and a woman, somewhere in between, or as falling completely outside these categories." *See, e.g.*, HRC Glossary, https://perma.cc/4UYM-ZW3Q. According to those on the cutting edge of transgender theory, there are some 80 types of genders and gender identities, ranging from "aliagender" to "bigender" to "demiboy" to "genderqueer" to "transfeminine" and many more. Chris Drew, *81 Types of Genders & Gender Identities (A to Z List)*, HELPFULPROFESSOR.COM (Mar. 26, 2022), https://tinyurl.com/yc3xajrj. Yet, the 2024 Guidance makes employers responsible for determining and then monitoring the gender identities of their employees, so that the employer can accommodate the conduct associated with those gender identities.

The 2024 Guidance never gave employers any guidance on how to do this, and indeed, never considered this important aspect of the problem. Once again, this concern had been pointed out in comments, States' Comment Letter at 10–11, App.014–15—yet EEOC pressed on without even addressing it. This provides an additional basis for setting aside the 2024 Guidance.

### C. EEOC failed to consider effects on federalism.

The 2024 Guidance has several clear implications for federalism. For one, numerous state and local government agencies and departments have 15 or more employees, and therefore are directly affected by Title VII. For another, a number of States—including Texas, *see* Miller Decl *passim*, App.210–14—have laws or policies that the 2024 Guidance purports to preempt. For example, many States have laws requiring sex-segregated bathrooms. *See, e.g., Tennessee*, 615 F. Supp. 3d at 823 n.9 (noting laws in Nebraska, Oklahoma, Tennessee, and West Virginia); Ark. Code Ann. § 6-21-120; Idaho Code Ann. § 33-6601, et seq.

28

The effects of the 2024 Guidance on federalism should have been a significant factor in the decision-making process. Indeed, Executive Order 13,132 requires agencies to consider the impacts of their actions on federalism. Yet, EEOC never considered federalism, despite the States raising this issue in a comment. States' Comment Letter at 12, App.016.

### IV.    The 2024 Guidance is an invalid substantive rule.

The Fifth Circuit has held that EEOC "has limited rulemaking and enforcement power with respect to Title VII [and] may issue only 'procedural regulations' implementing Title VII and may not promulgate substantive rules." *Texas v. EEOC*, 933 F.3d at 439 (citing 42 U.S.C. § 2000e-12(a)). "Substantive" or "legislative rules" are rules that have the "force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Echoing the "final agency action" inquiry, courts must consider "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion," *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (internal marks omitted).

The 2024 Guidance, like the 2021 Guidance, satisfies both prongs. First, it creates "new duties" by altering employers' obligations under Title VII and "impos[ing] dress-code, bathroom, and pronoun accommodations" that Title VII does not require, just like the 2021 Guidance did. *Id.*; *see also Tennessee*, 615 F. Supp. 3d at 832. Second, the 2024 Guidance "binds agency staff and the public because of its mandatory language." *Texas*, 633 F. Supp. 3d at 840.

Because "EEOC is not authorized to promulgate substantive rules to implement Title VII," *EEOC*, 933 F.3d at 450, the 2024 Guidance is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

### V.    The 2024 Guidance was required to be published in the Federal Register.

The Freedom of Information Act requires that agencies publish "substantive rules of general applicability" and "statements of general policy or interpretations of general applicability" in the Federal Register. 5 U.S.C. § 552(a)(1)(D). The 2024 Guidance was never published in the Federal Register.

As already established, the 2024 Guidance imposes rights and obligations and binds agency actors and is therefore a substantive rule. *See Texas*, 809 F.3d at 151–155. One reason the APA was adopted was "to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). To further advance that interest, FOIA requires that "substantive rules of general applicability adopted as authorized by law" be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). But it goes further, even making "statements of general policy or interpretations of general applicability formulated and adopted by the agency"—and no one could dispute that the 2024 Guidance is at least a statement of that kind —subject to the publication requirement. *Id.*

There is no dispute that EEOC never published the 2024 Guidance in the Federal Register. By violating FOIA's publication requirement, the agencies have violated the APA's ban on agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). This Court previously held the 2021 Guidance was unlawful for the same reason. *See Texas*, 633 F.Supp.3d at 842.

## VI.    The Court should issue declaratory relief.

The Declaratory Judgment Act allows courts to "declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. The APA expressly contemplates declaratory relief: "The form of proceeding for judicial review … includ[es] actions for declaratory judgments or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703.

## VII.    The Court should vacate the 2024 Guidance.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022). The Fifth Circuit does not "require consideration of the various

equities at stake before determining whether a party is entitled to vacatur" because "Section 706, after all, provides that a reviewing court *shall* set aside unlawful agency action." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024).

**VIII.    The Court should issue permanent injunctive relief.**

A permanent injunction is proper when a plaintiff has prevailed on the merits, there is no adequate remedy at law for the plaintiff's injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits." *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 847–48 (5th Cir. 2004). Plaintiffs have satisfied each of these elements.

**A.  Plaintiffs succeed on the merits.**

As explained above, the 2024 Guidance is unlawful.

**B.  Plaintiffs will suffer irreparable harm.**

Not only is the 2024 Guidance unlawful, but it also will impose irreparable harm on Plaintiffs. Generally, it is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984)).

"Whether someone is an object of a regulation is a flexible inquiry rooted in common sense." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (citation omitted). "That common sense inquiry is easy here [because the 2024 Guidance] explicitly states that it applies to state employers[;] … [t]hus, by its own terms, the [2024 Guidance] covers Texas." *Id.*; *see* App.025, 119 n.4. The 2024 Guidance is aimed squarely at Plaintiffs and other employers with workplace policies based on biological sex rather than gender identity. Defendants cannot now pretend that they have no consequences, and that Plaintiffs are unaffected by them.

*First,* Plaintiffs would suffer the irreparable harm of nonrecoverable compliance costs. *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 235 (5th Cir. 2024); "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).

A critical factor in assessing both hostile-work-environment claims, generally, and employers' vicarious Title VII liability, in particular, is whether the employer has adequate training materials and procedures for reporting unlawful harassment. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 806–09 (1998). Plaintiffs therefore will need to review discrimination policies, revise and reissue policies that conflict with the 2024 Guidance, draft new policies, and develop and distribute training and educational materials for supervisors and employees. *See* Miller Decl. ¶¶ Miller Decl. ¶¶ 10–13, App.212. And Heritage would have to develop new materials and training programs to reflect the 2024 Guidance's policy changes; Korsvall Decl. ¶¶ 6–910, App.217–18.

Texas has shown imminent injury because it "has opted to express certain values [in its workplace policies] and the [2024 Guidance] imposes a regulatory burden on Texas to comply with [them] to avoid enforcement actions and, consequently, pressures it to abandon its laws and policies." *Id.*; *see also Texas v. EEOC*, 827 F.3d 372, 379 (5th Cir. 2016) (injury-in-fact requirement satisfied where "the Guidance does, at the very least, force Texas to undergo an analysis, agency by agency, regarding whether the certainty of EEOC investigations stemming from the Enforcement Guidance's standards overrides the State's interest in not hiring felons for certain jobs"). The same is true for the burden on Heritage.

*Second*, on top of unrecoverable compliance costs, EEOC's gender-identity-accommodation mandate fundamentally infringes on the sovereignty of Texas. *See* ECF No. 53, Order at 18–19 (discussing harms to Texas sovereignty from 2021 Guidance). The 2024 Guidance strips Texas of its sovereign interest and ability to create and enforce its own laws and policies.

Texas's "inability to enforce its duly enacted" laws "inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also, e.g.*, *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (irreparable harm where agency action put its "sovereign interests and public policies at stake"); s*ee also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 & n.17 (1986) (finding "no question" that a state's sovereignty is "diminished" and standing therefore exists when federal law alters the state's ability to "structure its relationship with its employees") (cleaned up).

Texas has employment policies that are not consistent with the 2024 Guidance's bathroom, dress code, and pronoun requirements. *See* Miller Decl. *passim*, App.210–214. Because it is the object of the mandates in the 2024 Guidance, Texas suffers an increased regulatory burden because "it deems unlawful" its current workplace policies and "warns the [S]tate that … it will be able to show that its current policies … are lawful under Title VII only if it abandons those policies." *EEOC*, 933 F.3d at 447. "Texas [thus] faces the possibility of investigation by EEOC and referral to the Attorney General for enforcement proceedings if it fails to align its laws with the [2024 Guidance]." *Id*.

Here, Plaintiffs suffer both substantial financial injuries and injuries that cannot be undone through monetary means. As discussed above, an injury to Texas's sovereign interests is irreparable. Moreover, because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), Plaintiffs cannot compel the federal government to reimburse them for any harms.

Together, therefore, the injuries to Plaintiffs' financial—and Texas's sovereign—interests are irreparable and should be protected with a permanent injunction.

### C.  The balance of equities and public interest favor an injunction.

Finally, the remaining injunction factors—the balance of the equities and the public interest—tilt in Plaintiffs' favor. These two considerations "merge when the Government is the opposing party," as is the case here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). While the

Defendants may contend that eliminating discrimination is in the public interest, any such claimed interest in carrying out the 2024 Guidance is "illegitimate," as the federal government has no interest "in enforcing an unlawful" agency action. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

For the reasons given above, Plaintiffs succeeded on the merits and confront substantial, imminent irreparable harm—the two most important factors in the analysis for injunctive relief. *See Career Colleges & Sch. of Texas.*, 98 F.4th at 239 (likelihood of success on the merits in similar preliminary-injunction context); *see also Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) (same); *Spectrum WT v. Wendler*, 693 F.Supp.3d 689, 711 (N.D. Tex. 2023) (Kacsmaryk, J.) (irreparable harm). The EEOC Defendants thus "face[] a high hurdle" in establishing that the remaining two factors weigh against granting relief. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Granting a permanent injunction would serve the public interest by ensuring that Texas and Heritage may continue to enforce their laws and policies without risking enforcement by EEOC. Redressing Plaintiffs' injuries serves the public interest and does not harm the Defendants. Accordingly, the balance of equities and the public interest weighs in favor of Plaintiffs.

### D.  The scope of injunctive relief properly extends beyond the 2024 Guidance.

The Court should issue permanent injunctive relief against the Defendants—enjoining not only enforcement of the 2024 Guidance, but also preventing them from interpreting, applying, or enforcing (including by denying federal financial assistance or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions) the provision of Title VII of the Civil Rights Act of 1964 applicable to private and State employers, 42 U.S.C. § 2000e-2(a)(1), as requiring Plaintiffs to allow employees to: comply with dress or grooming policies based on gender identity rather than biological sex; or use bathrooms, locker rooms, or showers based on gender identity rather than biological sex; or demand that they be referred to by pronouns, names, titles, or honorifics based on gender identity rather than biological sex.

The Court should also enjoin the Defendants from relying on decisions of the Commission applying the provision of Title VII applicable to federal employers, 42 U.S.C. § 2000e-16(a), to pursue, charge, or assess any penalties, fines, assessments, investigations, or other enforcement actions (including by denying federal financial assistance) against Plaintiffs.

This broader relief against interpreting Title VII in a way that contradicts the statute is appropriate. The Fifth Circuit has termed a "false dichotomy" the notion that "a lawsuit challenging a regulation and a lawsuit challenging the underlying statute are different." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 378 (5th Cir. 2022). This is because "a challenge to an agency regulation is necessarily a challenge to the underlying statute as well[] … because an agency literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Id.* (internal quotations omitted). As a result, any argument against this relief "rests on the faulty premise that [Plaintiffs were] 'suing' a regulation" as opposed to "the right way to view [this] suit [] as challenging '*one* Government action that causes their harm: the [EEOC's] threatened enforcement of [Title VII], *through* its implementing regulation.'" *Id.* (emphasis in original) (quoting *FEC v. Cruz*, 142 S. Ct. 1638, 1650 (2022)).

Several cases within the Northern District of Texas illustrate the propriety of such relief against an agency interpreting a statute in a way contrary to law. In a previous challenge to the Department of Education's issuance of a guidance document on this subject, Judge O'Connor granted injunctive relief against the Department interpreting Title IX as including discrimination based on sexual orientation or gender identity:

> Defendants are enjoined from enforcing the Guidelines against Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions. Further, while this injunction remains in place, Defendants are enjoined from initiating, continuing, or concluding any investigation based on Defendants' interpretation that the definition of sex includes gender identity in Title IX's prohibition against discrimination on the basis of sex. Additionally, Defendants are enjoined from using the Guidelines or asserting the Guidelines carry weight in any litigation initiated following the date of this Order.

*Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016). Similarly, Judge O'Connor granted injunctive relief against the Department of Health and Human Services interpreting a provision of the Affordable Care Act in this way:

> For the foregoing reasons, the Court **GRANTS** Plaintiffs' request for a permanent injunction and **PERMANENTLY ENJOINS** HHS, Secretary Becerra, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116(a), or any implementing regulations thereto against Plaintiffs, their current and future members, and those acting in concert or participation with them, including their respective health plans and any insurers or third-party administrators in connection with such health plans, in a manner that would require them to perform or provide insurance coverage for gender-transition procedures or abortions, including by denying Federal financial assistance because of their failure to perform or provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions.

*Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021), and *aff'd in relevant part*, 47 F.4th 368 (5th Cir. 2022); *see also Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1153–54 (D.N.D. 2021), *aff'd in relevant part, remanded in part sub nom. Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) (applying similar scope of injunctive relief against interpretation of Title VII). Most recently, Judge O'Connor entered a similar scope of injunctive relief against any future attempt to apply *Bostock* to Title IX. *See Texas v. Cardona*, ---F.Supp.3d---, No. 4:23-cv-606, 2024 WL 3658767, *52 (N.D. Tex. Aug. 5, 2024), *appeal filed*, No. 24-10910 (5th Cir. Oct. 7, 2024).

The harm done to Plaintiffs arises from the Defendants' wrongful interpretation and application of Title VII. The Court should grant full relief by enjoining such actions, whether through the specific challenged guidance document or otherwise.

## CONCLUSION

For the foregoing reasons, this Court should declare that the 2024 Guidance is unlawful; vacate it and set aside; and issue a permanent injunction prohibiting the EEOC from enforcing or interpreting Title VII as requiring acommodations based on gender identity.

Dated: October 23, 2024

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

/s/Ryan D. Walters
RYAN D. WALTERS
Chief, Special Litigation Division
Texas State Bar No. 24105085
Ryan.Walters@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Texas State Bar No. 24125371
jacob.przada@oag.texas.gov

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

COUNSEL FOR STATE OF TEXAS

Respectfully submitted.

DANIEL D. MAULER
General Counsel of The Heritage Foundation

/s/ R. Trent McCotter
R. TRENT MCCOTTER
ANDREW W. SMITH
Boyden Gray PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Telephone: (202) 706-5488
tmccotter@boydengray.com
(motions for pro hac vice forthcoming)

The Heritage Foundation
214 Massachusetts Ave. NE
Washington, DC 20002-4999
Telephone: (202) 617-6975

COUNSEL FOR THE HERITAGE FOUNDATION

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2024, a true and correct copy of the above and foregoing document has been filed and served, *via* the CM/ECF system, to all counsel and parties of record.

/s/Ryan D. Walters
RYAN D. WALTERS