## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

STATE OF TEXAS and
THE HERITAGE FOUNDATION,

       *Plaintiffs*,

v.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION; CHARLOTTE A.
BURROWS, in her official capacity as Chairman
of the Equal Employment Opportunity
Commission; MERRICK B. GARLAND, in his
official capacity as Attorney General of the
United States,

       *Defendants*.

CIVIL ACTION NO. 2:24-cv-173-Z

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## APPENDIX

Texas's Statement re: Proposed Enforcement Guidance on Harassment in the Workplace Agency Docket No.: EEOC-2023-0005, Dated November 1, 2023 .........................................App. 001–004

Tennessee-led Statement re: Docket No. EEOC-2023-0005 ("Proposed Enforcement Guidance on Harassment in the Workplace"), Dated November 1, 2023.........................................App. 005–018

Enforcement Guidance on Harassment in the Workplace, Dated April 29,2024............................................................................................................ App. 019–207

Commissioner Andrea R. Lucas's Statement on EEOC Enforcement Guidance in the Workplace. Dated April 29, 2024.................................................................................................App. 208–209

Declaration of Texas Commissioner of Agriculture Sid Miller..................................App. 210–214

Declaration of Eric Korsvall .....................................................................................App. 215–218

Dated: October 22, 2024

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas State Bar No. 24105085
Ryan.Walters@oag.texas.gov

JACOB E. Przada
Special Counsel
Texas State Bar No. 24125371
jacob.przada@oag.texas.gov

KYLE S. TEBO
Special Counsel
Texas State Bar No. 24137691
kyle.tebo@oag.texas.gov

OFFICE OF THE TEXAS ATTORNEY GENERAL
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

COUNSEL FOR STATE OF TEXAS

Respectfully submitted,

DANIEL D. MAULER
General Counsel of The Heritage Foundation

*/s/ R. Trent McCotter*
R. TRENT MCCOTTER
ANDREW W. SMITH
Boyden Gray PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Telephone: (202) 706-5488
tmccotter@boydengray.com

The Heritage Foundation
214 Massachusetts Ave. NE
Washington, DC 20002-4999
Telephone: (202) 617-6975

COUNSEL FOR THE HERITAGE FOUNDATION



## KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

November 1, 2023

**SUBMITTED ELECTRONICALLY
VIA REGULATIONS.GOV**

Raymond Windmiller
Executive Officer
Executive Secretariat
U.S. Equal Employment Opportunity Commission
131 M Street NE
Washington, DC 20507

> **RE:    Proposed Enforcement Guidance on Harassment in the Workplace
> Agency Docket No.: EEOC-2023-0005, RIN: 3046-ZA02**

Dear Mr. Windmiller:

The State of Texas submits the following public comment to the United States Equal Employment Opportunity Commission ("the Commission") in response to the Commission's request for comments on its proposed guidance titled *Proposed Enforcement Guidance on Harassment in the Workplace*, 88 Fed. Reg. 67,750 (October 2, 2023).

## I.    The Commission lacks statutory authority to issue substantive rules under Title VII.

The proposed guidance is in excess of the Commission's statutory authority because it does not possess the power to issue substantive rules or regulations under Title VII. "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976). The proposed enforcement guidance the Commission published in the Federal Register claims to describe regulated employers' duties pursuant to Title VII relating to sexual orientation and gender identity, mandating the manner in which those employers implement their company policies regarding pronoun usage, access to bathroom facilities, and access to other facilities separated by biological sex. It also purports to define as harassment speech disapproving of contraception or abortion.

Therefore, the proposed enforcement guidance is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C); *see also Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019) (finding that the EEOC overstepped its statutory authority in issuing guidance because it constituted a substantive rule and "the text of Title VII and precedent

**App. 001**

confirm that EEOC lacks authority to promulgate substantive rules implementing Title VII"); *Texas v. EEOC*, 633 F. Supp. 3d 824, 840 (N.D. Tex. 2022) (rejecting that EEOC's 2021 guidance requiring bathroom, dress code, and pronoun usage to be implemented based on gender identity rather than biological sex imposed only "'existing requirements under the law' and 'established legal positions' in light of *Bostock* and prior EEOC decisions interpreting Title VII"). The proposed guidance should be withdrawn on this basis.

## II. The proposed enforcement guidance is inconsistent with Title VII and *Bostock*.

The proposed guidance on sexual orientation and gender identity also conflicts with Title VII and with *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Contrary to the Commission's position, *Bostock* described a much narrower interpretation of Title VII than is announced in the proposed guidance.

The proposed guidance arbitrarily expands the Supreme Court's reasoning in *Bostock* to situations that were not before the court for its consideration. First, the *Bostock* court emphasized that its decision did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753. It also did not rule on the issue of addressing employees using biological sex-specific personal pronouns, which is the established English language usage. *Bostock* did not hold that an employer who enforces a policy requiring an employee to use the bathroom that corresponds to the employee's biological sex rather than the employee's gender identity discriminates under Title VII. Separating restroom facilities based on biological sex is permitted by Title VII and has been permitted since its enactment, because such a practice does not subject anyone to a disadvantage based on sex. *See, e.g.*, *Causey v. Ford Motor Co.*, 516 F.2d 416 (5th Cir. 1975); *see also Bostock*, 140 S. Ct. at 1740 ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than other who are similarly situated.") (citing *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 59 (2006)).

Second, the proposed guidance conflates "sexual orientation" and "gender identity" with sex. But *Bostock* did not expand the definition of "sex." Instead, the court "proceed[ed] on the assumption that 'sex' … refer[s] only to biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739. The outcome of *Bostock* did not turn on "norms concerning gender identity and sexual orientation," because Title VII is only concerned with discrimination based on biological sex. *Id.*

Third, *Bostock* allows employers to make some sex-based distinctions in employment matters. *Bostock* relied upon *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) in support of its reasoning. *Oncale* clarified that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same, and the opposite, sex," and noted that Title VII's "prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace." *Id.* at 81. The Court further emphasized that Title VII is concerned with "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring). *Bostock* warned that "Title VII does not concern itself with everything that happens 'because of' sex," *Bostock*, 140 S. Ct. at 1740, but prohibits only discrimination "inextricably bound up with sex." *Id.* at 1742.

2

Fourth, *Bostock* did not overrule any Supreme Court precedent, and instead cited to precedent from as far back as the 1970s as authority. *See, e.g., Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971); *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978). *Bostock* decided only a single issue: whether an employer who fires someone simply for being homosexual or transgender has discriminated against the terminated employee because of sex. *Bostock*, 140 S. Ct. at 1737.

It also did not disturb lower-court precedent that has long applied those same longstanding precedents. "[T]the Court relied in *Bostock* on the same well established Title VII principles that animated the outcome in those prior decisions [of lower courts that applied the same key precedents, so those courts] effectively anticipated *Bostock*'s rationale." *Maner v. Dignity Health*, 9 F.4th 1114, 1124 (9th Cir. 2021) (Bea, J.) (explaining *Bostock* did not overturn decades of lower-court precedents rejecting "paramour preference" theory of liability).

This is consistent with *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc), which upheld sex-specific grooming codes under Title VII. *Willingham* applied *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971), one of the key cases the Supreme Court relied on in *Bostock*. The Second Circuit in *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 119 (2d Cir. 2018) (en banc)—which relied on the same key precedents that the Supreme Court would later adopt in *Bostock* (*Martin Marietta Corp.* and *L.A. Dep't of Water & Power*)—favorably cited *Willingham* as consistent with its analysis, 883 F.3d at 118–19.

In short, *Bostock* did not nullify the Supreme Court's longstanding acceptance of differences between the sexes. It did not question any longstanding precedent beyond the narrow question before it: whether "[a]n employer who fires an individual *merely for being* gay or transgender defies the law." *Bostock*, 140 S. Ct. at 1754 (emphasis added).

Finally, *Bostock* did not define the terms "sexual orientation," "gender identity," or "transgender status." The issue before the court in *Bostock* was solely related to discrimination based on an employee's status, and not an employee's conduct. *Bostock*, 140 S. Ct. at 1737 ("Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status."). However, the Commission's proposed enforcement guidance seeks to mandate that employers provide exceptions to permissible biological sex-based policies regarding pronoun usage, dress codes, access to bathroom facilities, and access to other facilities separated by sex—in other words an accommodation requirement as opposed to a non-discrimination requirement. The proposed guidance falsely equates an employee's status and correlated conduct. *See Zarda,* 883 F.3d at 119 (noting that "[w]hether sex-specific bathroom and grooming policies impose disadvantageous terms or conditions is a separate question from this Court's inquiry into whether sexual orientation discrimination is 'because of … sex,'" and has no bearing on the efficacy of the comparative test" used to determine whether Title VII has been violated); *see also EEOC*, 633 F. Supp. 3d at 830–36 (*Bostock* applies to homosexual or transgender *status*, not "correlated conduct" that may contradict sex-specific dress, bathroom, pronoun, and healthcare policies).

### III. Workplace speech opposing contraception or abortion does not constitute sex discrimination under Title VII.

The proposed guidance also wrongly treats workplace speech opposing contraception or abortion as unlawful harassment. This is contrary to Title VII—opposition to abortion is not sex discrimination, *see Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–74 (1993), and even denying access to contraception does not violate the sex discrimination provision of Title VII. *In re Union Pacific Railroad Employment Practices Litigation*, 479 F.3d 936 (8th Cir. 2007). There is no basis for the Commission to treat speech opposing contraception or abortion as raising an issue under Title VII.

### IV. Conclusion

For the foregoing reasons, the Commission should not adopt the proposed guidance.

Very truly yours,

Ken Paxton
ATTORNEY GENERAL OF TEXAS

App. 004

STATE OF TENNESSEE

# Office of the Attorney General



**JONATHAN SKRMETTI**
ATTORNEY GENERAL AND REPORTER

P.O. BOX 20207, NASHVILLE, TN 37202
TELEPHONE (615)741-3491
FACSIMILE (615)741-2009

November 1, 2023

**SUBMITTED ELECTRONICALLY
VIA REGULATIONS.GOV**

Mr. Raymond Windmiller
Executive Officer, Executive Secretariat
U.S. Equal Employment Opportunity Commission
131 M Street NE
Washington, DC 20507

**Re:    Docket No. EEOC-2023-0005 ("Proposed Enforcement Guidance on Harassment in the Workplace")**

Dear Mr. Windmiller:

The State of Tennessee, joined by the States of Alabama, Alaska, Arkansas, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia, welcomes the opportunity to comment on the Equal Employment Opportunity Commission's "Proposed Enforcement Guidance on Harassment in the Workplace," 88 Fed. Reg. 67,750 (Oct. 2, 2023) ("Proposed Guidance").  This is not the first time Tennessee and EEOC have interfaced on issues surrounding Title VII guidance and transgender status.  The last go-round, Tennessee and a coalition of nineteen other States filed suit to challenge Chair Burrows' "technical assistance document," which advanced a vastly expanded view of Title VII liability for the nation's employers.  Chair Burrows unilaterally issued that guidance in 2021 without opportunity for comment, and the U.S. District Court for the Eastern District of Tennessee enjoined it.  *See Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022).  A different court later vacated Chair Burrow's guidance altogether in a decision EEOC declined to appeal.  *See Texas v. EEOC*, 633 F. Supp. 3d 824 (N.D. Tex. 2022).

By a split vote of 3-2, EEOC has again put forward sweeping new Title VII guidance that threatens Tennessee, the co-signing States, and countless other employers with widespread liability for failing to promote the gender-identity preferences of their employees.  Specifically, the Proposed Guidance would broaden EEOC's definition of "sex-based harassment" to include, among other

1

things, "intentional and repeated use of a name or pronoun inconsistent with the individual's gender identity (misgendering)" and "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." Proposed Guidance at II.A. Unlike before, EEOC has allowed a period for public comment—albeit only 30 days—regarding its expanded conception of what Title VII requires. Tennessee appreciates EEOC's belated move toward baseline measures of procedural regularity and the chance to respond to EEOC's proposal.

As this comment explains, EEOC's Proposed Guidance suffers stark legal flaws.

*First*, EEOC's proposal contravenes the Commission's statutory authority. In *Bostock v. Clayton County*, the Supreme Court narrowly held that an employer violates Title VII when it fires an employee "simply for being … transgender." 140 S.Ct. 1731, 1737 (2020). Yet EEOC casts *Bostock* as a silver bullet for imposing breathtakingly broad transgender-based liability in contexts the Supreme Court never considered. To illustrate:

- The Proposed Guidance asserts that employers violate Title VII when they maintain the "nearly universal" practice of separating bathrooms and changing facilities based on sex, rather than gender identity. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022). But *Bostock* expressly *refrained* from deciding whether that practice violates Title VII in language that EEOC does not meaningfully address. 140 S. Ct. at 1753.

- The Proposed Guidance also requires employers to adopt—and correct colleagues and customers for not adopting—transgender employees' preferred pronouns. But such regulation of pure speech is likewise absent from *Bostock*.

In short, *Bostock* gives no license to these and other of EEOC's novel proposals. Nor, in all events, can EEOC permissibly require these deeply controversial gender-identity accommodations without express congressional authorization—authorization not found in Title VII.

*Second*, EEOC's Title VII stance will unleash unconstitutional chaos in the Nation's workplaces. The Proposed Guidance "seeks to force [employers and their employees] to speak in ways that align with its view but defy [their] conscience about a matter of major significance." *303 Creative v. Elenis*, 600 U.S. 570, 602-03 (2023). Here, the Proposed Guidance would require employers to affirm or convey to employees and customers—often against religious conviction or deeply held personal belief—messages that a person can be a gender different from his or her biological sex, that gender has no correlation to biology, or that they endorse the use of pronouns like "they/them," "xe/xym/xyrs," or "bun/bunself."[1] This mandate flouts First Amendment freedoms of religion and speech—yet EEOC rejects any role for accommodation of contrary religious beliefs or speech. Further, EEOC's for-cause insulation from direct presidential supervision unconstitutionally blurs the lines of accountability for this overhaul of workplaces nationwide.

*Third*, EEOC's proposal is arbitrary and capricious under the Administrative Procedure Act. The proposal shortchanges the long-recognized privacy and safety justifications for sex-segregated facilities in the course of requiring a radical and expensive restructuring of all employer facilities around gender identity. The Proposed Guidance also does not account for the difficulty, if not complete inability, of employers to confirm a person's self-professed gender identity. EEOC further

---

[1] *See* Ezra Marcus, *A Guide to Neopronouns*, NEW YORK TIMES (Sept. 18, 2022), *available at* https://www.nytimes.com/2021/04/08/style/neopronouns-nonbinary-explainer.html.

fails to meaningfully consider the ways its proposal would backfire on the employment prospects of transgender employees, as well as damage employee morale—and workplace productivity—to boot. And the proposal fails to engage in any meaningful federalism analysis or justify EEOC's about-face from its prior recognition that States could permissibly implement policies requiring sex-segregated facilities.

Tennessee and the undersigned States are committed to ensuring that all persons are able to work in environments that appropriately balance safety, freedom of speech and religion principles, collegiality, and productivity. The undersigned States hope that EEOC will reconsider its Proposed Guidance, which would harm the States' interests on each of these fronts.

## I.    EEOC's Proposed Guidance Unlawfully Expands the Scope of Title VII.

As an administrative agency, EEOC "literally has no power to act … unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Thus, EEOC can only act "within the bounds" of its statutory authority when promulgating rules. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014); *see* 5 U.S.C. § 706(2)(C). EEOC claims the Supreme Court's decision in *Bostock* empowers it to compel the Proposed Guidance's new gender-identity regime. But *Bostock* is not nearly that broad, and EEOC otherwise lacks the authority to saddle the undersigned States with novel gender-identity-based liability.

### A.    *Bostock* does not license EEOC's expanded application of Title VII to all transgender-related employment issues.

The Proposed Guidance, like the invalid 2021 guidance, fundamentally misconstrues and improperly extends *Bostock* to support its construction of Title VII. *See, e.g.*, Proposed Guidance at II.A n.29.

*Bostock* only concerned—and thus its holding only addresses—allegations of discriminatory termination. *See* 140 S. Ct. at 1753 (concluding that "employers are prohibited from firing employees on the basis of homosexuality or transgender status"). The Court *explicitly disclaimed* any intent "to address bathrooms, locker rooms, or anything else of the kind." *Id.* Citing this clear limit, courts previously rejected EEOC's argument that *Bostock* supported the Title VII analysis in Chair Burrows' 2021 guidance document. *See Tennessee*, 615 F. Supp. 3d at 833 ("*Bostock* does not require Defendants' interpretations of Title VII and IX."); *Texas*, 633 F. Supp. 3d at 840 ("Title VII — as interpreted in *Bostock* — does not require such [dress-code, bathroom, and pronoun] accommodations."). Yet the Proposed Guidance re-ups EEOC's reliance on *Bostock* to include "denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity" as sex-based discrimination under Title VII. Proposed Guidance at II.A. As with the 2021 guidance, this move finds no grounding in *Bostock*'s narrow holding.

Nor does *Bostock*'s broader reasoning support EEOC's position. *Bostock* did not change the definition of "sex," but instead proceeded "on the assumption that 'sex' signified . . . biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739. But these biological distinctions are the core basis for separate bathrooms, as opposed to employment decisions generally. *Cf. id.* at 1741 ("An individual's … transgender status is not relevant to employment decisions."). If anything, *Bostock*'s sex-means-sex logic *confirms* that separate bathrooms and changing facilities for men and women are lawful: Because all men must use male facilities, and all women must use female facilities,

differentiating facilities based on sex does not involve treating a transgender employee "worse than others who are similarly situated." *Id.* at 1740. EEOC's contrary reading would implausibly preference the category of "gender identity" (absent from Title VII) over sex (actually protected under Title VII).

Furthermore, the Proposed Guidance amends Title VII to create a *de facto* accommodation for gender identity—even though *Bostock* did not address the accommodations context. Under Title VII, simple recognition of sex-based differences, such as that reflected in the use of different pronouns or private spaces, does not violate Title VII. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (holding that Title VII's prohibitions on discrimination do "not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex"). By requiring employers to create exceptions to otherwise lawful policies that segregate bathrooms by sex or permit use of gendered pronouns, the Proposed Guidance would require employers to affirmatively accommodate a person's gender identity. Congress knew how to require accommodations for certain classes in Title VII, *see, e.g.*, 42 U.S.C. §2000e(j) (mandating religious accommodations), yet has thus far declined to do so for transgender persons. Congress's failure to adopt this "ready alternative" of requiring transgender-based accommodations "indicates that Congress did not in fact want what [EEOC] claim[s]." *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

EEOC subtly expands *Bostock* along another important dimension. The Proposed Guidance states that Title VII prohibits discrimination based on "sexual orientation" or "gender identity." Proposed Guidance at II.A. But *Bostock* only addresses "homosexuality" and "transgender status," *Bostock*, 140 S. Ct. at 1753—which are distinct concepts in important ways. In particular, transgender status, as *Bostock* understood it, is "inextricably bound up with sex" such that treating a transgender person differently "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Bostock*, 140 S. Ct. at 1741. Gender identity, by contrast, is much more expansive and includes numerous identities that fall entirely outside of the biological binary of male and female. *See, e.g.*, HRC Glossary ("Non-binary people may identify as being both a man and a woman, somewhere in between, or as falling completely outside these categories.").[2] Such nonbinary identities are not "inextricably bound up with sex" in the way *Bostock* cast transgender status—further undercutting *Bostock*'s applicability here.

## B.    Other precedents do not license EEOC's expanded application of Title VII to all transgender-related employment issues.

Nor can EEOC permissibly draw support from the cases it cites beyond *Bostock*. As an initial matter, the EEOC itself has indicated that only the U.S. Supreme Court's construction of Title VII is authoritative. *Lavern B., Complainant*, EEOC DOC 0720130029, 2015 WL 780702, at *11 (Feb. 12, 2015) ("[I]n the federal sector, federal district and circuit court decisions may be persuasive or instructive, but are not binding on the Commission."). Similarly, to the extent that the EEOC relies on its own administrative decisions,[3] such decisions "are not binding authority and cannot be considered definitive interpretations of Title VII." *Tennessee*, 615 F. Supp. 3d at 840 n.17; *see also Wade v. Brennan*, 647 F. App'x 412, 416 n.8 (5th Cir. 2016) ("We may rely on EEOC decisions as persuasive

---

[2] Human Rights Campaign, Glossary of Terms, https://tinyurl.com/2tbewj2v (last visited Oct. 25, 2023)

[3] *See, e.g.*, Proposed Guidance at II.A n.28 (citing *Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *1 (Apr. 1, 2015)), *Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at *5, *10 (July 15, 2015).

4

authority, but they are not binding."). That is doubly true where EEOC's cited decisions pertain to federal employers, which are subject to a different statutory standard than private or state employers. *Compare* 42 U.S.C. §2000e-16(a) ("All personnel actions . . . shall be made free from any discrimination based on . . . sex.") *with* 42 U.S.C. §2000e-2(a)(1) ("It shall be . . . unlawful . . . to discriminate against any individual . . . because of such individual's . . . sex.").

The Proposed Guidance otherwise cites to only two non-binding district court cases that arguably support[4] its construction of Title VII. *See* Proposed Guidance at II.A n.29 (citing *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115 (E.D. Pa. 2020); *Tudor v. Southeastern Oklahoma State Univ.*, Case No. CIV-15-324, 2017 WL 4849118, at *1 (W.D. Okla. Oct. 26, 2017)). These are a "wafer-thin reed on which to rest such sweeping" requirements. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). In *Triangle Doughnuts*, the district court merely held that the plaintiff's alleged pattern of harassment stated a claim for a hostile work environment under Title VII. 472 F. Supp. 3d at 129-30. Although misgendering and bathroom use were among the numerous allegations of harassment, it is not clear that those allegations played any role—let alone governed—the court's determination that the Complaint stated a claim under Title VII. *See id.* Similarly, in *Tudor*, the court noted long-standing restrictions on bathroom use and extensive misgendering among multiple factors by which it determined a jury could find harassment. 2017 WL 4849118, at *1. The jury declined the invitation and rejected the plaintiff's harassment claim. *See Tudor v. Southeastern Oklahoma State Univ.*, 13 F.4th 1019, 1027 (10th Cir. 2021) (noting that the jury had found for the defendant on Dr. Tudor's hostile work environment claim).

Title IX caselaw also cannot sustain EEOC's flawed reading. Although some federal circuits have interpreted Title IX to entitle students to use the restroom according to their gender identity, the federal circuit courts are divided on that issue. *See* Proposed Guidance at II.A n.34 (citing cases). Regardless, Title VII and Title IX are different statutes with different wording, so "principles announced in the Title VII context [do not] automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *see Bostock*, 140 S. Ct. at 1753 (declining to "prejudge" questions about "other federal or state laws that prohibit sex discrimination").

### C.    EEOC's Proposed Guidance otherwise exceeds the agency's Title VII authority.

On top of all this, EEOC's Proposed Guidance violates limits on EEOC's power to enshrine new substantive Title VII requirements.

1.    The Proposed Guidance exceeds EEOC's narrow rulemaking authority, which empowers EEOC to adopt only "*procedural regulations* to carry out the provisions of this subchapter." 42 U.S.C. §2000e-12(a) (emphasis added). As this plain text indicates, EEOC "may not promulgate substantive rules." *Texas v. EEOC*, 933 F.3d 433, 439 (5th Cir. 2019); *see also E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991) (recognizing that Title VII "did not confer upon the EEOC authority

---

[4] The Proposed Guidance's strained reliance on other cited cases only further indicts EEOC's reading. *Houlb v. Saber Healthcare Grp., LLC* construed Ohio employment law, not Title VII. No. 1:16-CV-02130, 2018 WL 1151566, at *2 (N.D. Ohio Mar. 2, 2018). In *Versace v. Starwood Hotels & Resorts Worldwide, Inc.*, the court only assumed *arguendo* that alleged misgendering might violate Title VII on the way to concluding that the conduct was not sufficiently pervasive to support a violation. No. 6:14-CV-1003, 2015 WL 12820072, at *7 (M.D. Fla. Dec. 7, 2015). In *Parker v. Strawser Constr., Inc.*, the court made a single reference to misgendering in recounting the factual background and never returned to it when performing a Title VII analysis. 307 F. Supp. 3d 744, 748 (S.D. Ohio 2018).

5

**App. 009**

to promulgate rules or regulations"). A substantive rule issued by EEOC is invalid regardless of whether the EEOC participates in notice-and-comment rulemaking. *Texas*, 933 F.3d at 451.

The Proposed Guidance expands Title VII beyond its text and structure and, therefore, acts as a substantive rule. In this way, EEOC's Proposed Guidance repeats the same legal error of the vacated 2021 guidance issued by Chair Burrow. As with the 2021 guidance, the Proposed Guidance states that intentional misgendering and denial of access to a bathroom consistent with an employee's gender identity is "sex-based harassment" that violates Title VII. As with the 2021 guidance, this interpretation by the Proposed Guidance expands rather than implements Title VII, and thus constitutes a substantive rule rather than a procedural regulation. *See Texas*, 623 F. Supp. 3d at 840 (rejecting that the 2021 guidance imposed only "'existing requirements under the law' and 'established legal positions' in light of *Bostock* and prior EEOC decisions interpreting Title VII"); *Tennessee*, 615 F. Supp. 3d at 832 ("Though the EEOC maintains that the Technical Assistance Document does not alter employers' obligations under Title VII, it precisely does."). As with the 2021 guidance, this dynamic would render the Proposed Guidance unlawful if finalized.

It is no response that the Proposed Guidance contains a boilerplate disclaimer that "[t]he contents of this document do not have the force and effect of law and are not meant to bind the public in any way." Proposed Guidance at I.A. Courts assessing the 2021 guidance rejected the relevance of a similar disclaimer because the document otherwise evinced an intent to propose an expansive and authoritative construction of Title VII. *See Texas*, 633 F. Supp. 3d at 839-40; *Tennessee*, 615 F. Supp. 3d at 831. As with the 2021 guidance, EEOC clearly intends for the Proposed Guidance to be authoritative and for legal consequences to flow from it once implemented. Proposed Guidance at II ("The federal EEO laws prohibit workplace harassment if it is shown to be based on one or more of a complainant's characteristics that are protected by these statutes."); *id.* at II.A ("Sex-based harassment includes . . . intentional and repeated use of a name or pronoun inconsistent with the individual's gender identity (misgendering) or the denial of access to a bathroom or other sex-segregated facility consistent with the individuals gender identity."); *see also id.* at I.A ("This guidance also consolidates, and therefore supersedes, several earlier EEOC guidance documents.").

Moreover, Title VII standards mean employers would need to immediately implement new training and employment materials that reflect EEOC's Proposed Guidance. *See* Proposed Guidance at IV.C.2.b.i. This is because a critical factor in assessing both hostile-work-environment claims generally and employers' vicarious Title VII liability in particular is whether the employer has adequate training materials and procedures for reporting unlawful harassment. *E.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 808-09 (1998); *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349-50 (6th Cir. 2005); *see also* EEOC, Checklists for Employers – Checklist Two: An Anti-Harassment Policy, https://www.eeoc.gov/checklists-employers-0 (employer policies should include "[a]n easy-to-understand description of prohibited conduct"). Practically speaking, then, EEOC's Proposed Guidance operates as a proactive mandate to overhaul employer processes upon its publication.

2.      Congress has not clearly authorized EEOC to broaden the reach of Title VII to include the Proposed Guidance's nationwide gender-identity-accommodation regime. There is no doubt that EEOC's policy purports to resolve questions "of vast economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022); *see Bostock*, 140 S. Ct. at 1753 (2020) ("We can't deny that today's holding . . . is an elephant."). It is thus up to clearly expressed "legislative action," not an unelected and unaccountable EEOC, to resolve the "fraught line-drawing dilemmas" associated with

balancing gender-identity accommodations, employee health, welfare, and safety, and freedom of speech, conscience, and religion. *L.W. ex rel Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023).

3.    Statutes also must, whenever possible, "be construed to avoid serious constitutional doubts." *Brawner v. Scott Cnty.*, 14 F.4th 585, 592 n.2 (6th Cir. 2021) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009)). Yet EEOC's Proposed Guidance would open a Pandora's Box of constitutional problems with Title VII. *See infra* p. 7-9, 12. The constitutional-avoidance canon "take[s] precedence" over any interpretive deference EEOC might claim and cuts further against EEOC's novel interpretation of Title VII. *Arangure v. Whitaker*, 911 F.3d 333, 339-40 (6th Cir. 2018).

## II.    EEOC's Proposed Guidance Violates the Constitution.

Agency action cannot be "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). Here, multiple constitutional violations pervade EEOC's proposal. *First*, the Proposed Guidance improperly compels employers and their employees to convey EEOC's preferred message regarding gender ideology, vitiating core First Amendment freedoms. And *second*, the EEOC's putatively independent structure—in which Commissioners are insulated from at-will presidential removal—violates the separation of powers.

### A.    EEOC's proposal contravenes First Amendment protections of employers and employees.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *303 Creative*, 600 U.S. at 584-85 (quoting *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). That core First Amendment principle reflects that "the freedom of thought and speech is 'indispensable to the discovery and spread of political truth.'" *Id.* at 584 (quoting *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring)). The Proposed Guidance flouts these principles by prolifically dictating how employers and their employees must view and speak about controversial gender-identity preferences.

EEOC's Proposed Guidance would unlawfully compel employers to convey government-preferred messages they "do[] not endorse" on pain of significant liability. *Id.* at 581. To avoid potential liability for creating a "hostile work environment," EEOC would require employers to affirmatively correct employees and customers who use biologically correct pronouns that conflict with a person's gender identity—thus conveying agreement with the controversial message that sex stems from something other than biology. So too, to comply with Title VII as EEOC reads it, an employer must promulgate written policies, training materials, a complaint procedure, and a monitoring program affirming gender ideology. *See* Proposed Guidance at IV.C.2.b.i. And under the EEOC's Proposed Guidance, even persons who seek employment with a covered employer can be compelled to affirm the government's gender-ideology viewpoint.

Free-speech limits do not allow EEOC to compel employers to "speak its preferred message" against their will. *303 Creative*, 600 U.S. at 597. The Supreme Court's *303 Creative* decision is squarely on point. There, Colorado sought "to compel speech" by a website designer that she did "not wish to provide." *Id.* at 588. The Court concluded that Colorado's efforts violated the First Amendment. Simply put, the government generally cannot "force someone who provides her own expressive

**App. 011**

services to abandon her conscience and speak its preferred message instead"—even when "others may find" the speaker's preferred message "misinformed or offensive." *Id.* at 595, 597.

*303 Creative*'s rule likewise governs here. EEOC's Proposed Guidance means that if an employer "wishes to speak, she must either speak as the State demands or face sanctions for expressing her own beliefs." *Id.* at 589. The First Amendment does not let EEOC put employers to that choice. Indeed, applying a similar rule, the Sixth Circuit has already concluded that requiring the unwanted use of preferred pronouns violates free-speech rights. *See Meriwether*, 992 F.3d at 511-12 (holding university's policy requiring faculty to use students' preferred pronouns violated professor's free-speech rights). Yet EEOC mentions neither of these cases.

Compounding its problems, EEOC's requirement further limits speech based on viewpoint— a particularly "egregious form of content discrimination." *Rosenberger v. Rectors & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995). Employers and their employees may speak without restriction when they embrace an ideology of mutable gender divorced from sex, but face liability if they do otherwise. *See Otto v. Boca Raton, Florida*, 981 F.3d 854, 863 (11th Cir. 2020) (holding unconstitutional ordinances that "codif[ied] a particular viewpoint—sexual orientation is immutable, but gender is not—and prohibit the therapists from advancing any other perspective when counseling clients"); *see also Business Leaders in Christ v. University of Iowa*, 991 F.3d 969, 978 (8th Cir. 2021) (affirming that university policy was unlawful where student group "was prevented from expressing its viewpoints on protected characteristics while other student groups 'espousing another viewpoint [were] permitted to do so'").

Requiring that employers and employees adhere to EEOC's chosen gender-ideology orthodoxy likewise trenches on religious freedoms. Whether under the First Amendment or the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq., EEOC's gender-ideology accommodation mandate would impermissibly violate employers' and employees' free-exercise rights. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720-21 (2014). The First Amendment's limits on impinging free exercise also prohibit EEOC's interpretation of Title VII. Because the law provides exemptions for small employers, it is not "generally applicable" and therefore triggers strict scrutiny under free-exercise caselaw. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881-82 (2021).

Nor could EEOC satisfy the strict First Amendment scrutiny its problematic approach triggers. That employees may take offense at the refusal of others to address them according to their gender identity is not a sufficient ground to compel the use of their preferred pronouns. *303 Creative*, 600 U.S. at 595 ("Nor, in any event, do the First Amendment's protections belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive."); *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("[I]t is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive."). And EEOC's sweeping approach— including its rejection of any room for protecting "religious expression that creates, or reasonably threaten to creates, a hostile work environment," Proposed Guidance at IV.C.3.b.ii.b—is far from narrowly tailored.

### B.    EEOC's proposal is invalid because EEOC is unconstitutionally structured.

Article II of the Constitution vests "'the executive Power'—all of it"—in the President. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1). Tennessee and other

co-signing States have recently written to point out how EEOC's putative "independent" status violates this Article II command.[5] Tennessee incorporates and renews that objection here and writes only to reemphasize that EEOC's separation-of-powers foul is no mere technicality. Our constitutional system ensures "the ultimate authority resides in the people alone," Jonathan Skrmetti, *Why We Must Fight to Preserve the Constitution*, THE TENNESSEAN (Sept. 15, 2023), https://tinyurl.com/ycjx7wwu; *see also The Federalist* No. 46, including by requiring that the executive officials who "wield significant authority … remain[] subject to the ongoing supervision and control of the elected President," *Seila Law*, 140 S. Ct. at 2203. EEOC's current scheme impermissibly thwarts public accountability for radical agency policies by blurring who is to blame among the President and EEOC heads.

## III.    EEOC's Proposed Guidance Is Arbitrary and Capricious.

The APA requires agency decision-making to be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Agency actions are arbitrary and capricious when they "entirely fail[] to consider an important aspect of the problem or offer[] an explanation for its decision that runs counter to the evidence before it." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383-84 (2020) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). EEOC's proposal violates these baseline APA rules in multiple respects.

### A.    EEOC has not considered or addressed the long-recognized privacy and safety justifications for sex-segregated spaces.

EEOC's Proposed Guidance would subject employers to liability for requiring transgender employees to use bathrooms associated with their sex. But Courts have repeatedly recognized the value in, and sometimes the necessity of, private, sex-segregated spaces. A sampling:

- "Admitting women to [Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

- "[S]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." *Adams*, 57 F.4th at 804 (quoting Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21 (emphasis original)).

- "[S]ociety [has expressed] undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the differences between the genders demand a facility for each gender that is different." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993).

The federal government, for its part, has specifically created exceptions for single-sex living facilities in education—thus endorsing the longstanding and common-sense practice of segregating the sexes to promote privacy and safety. *See* 20 U.S.C. §1686.

---

[5] *See* Comment Ltr. of Tennessee *et al.* on EEOC RIN 3046-AB30, *Regulations to Implement the Pregnant Workers Fairness Act* (Oct. 10, 2023), https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2023/pr23-44-comment.pdf

What makes places like restrooms and changing facilities private, however, also makes them susceptible to abuse by bad actors. Public restrooms, in particular, have long been designed to feature deliberately obstructed sightlines, limited points of ingress or egress, and a categorical exemption from most forms of surveillance. Add the fact that many people using these facilities are partially or completely undressed, and the potential for harassment, voyeurism, or even violent crime is obvious. Women, moreover, are particularly vulnerable in light of the "[e]nduring" "physical differences between men and women." *Virginia*, 518 U.S. at 533; *see* Brief for the Women's Liberation Front as *Amicus Curiae* 9, *Adams*, 57 F.4th 791 (arguing that allowing men in women's private spaces "inherently threatens women's physical safety in the places previously preserved exclusively for women and girls").

It is thus an unfortunate reality that the news is replete with reported instances of assaults occurring in public restrooms.[6] EEOC nonetheless fails to recognize that its Proposed Guidance will *enable* this nefarious conduct. At present, a woman encountering a male in a "sex-segregated space … do[es] not have to wait until the man has already assaulted her before she can fetch security."[7] But if a person's self-reported (and potentially multi-faceted or shifting) gender identity can determine the bathrooms he may use, that safety valve will be bolted shut. *See id.* Some women may not even have recourse *following* abuse if their male perpetrators had every right to be present, expose themselves, or witness others changing in a restroom or changing room.[8] In fact, the victims of voyeurism might not even realize when it has occurred or have any hope of identifying a suspect afterward.[9] Nor can EEOC sidestep these incidents by noting they can occur with or without sex-segregated spaces. The "important aspect of the problem" with the Proposed Guidance is not that it fails to prevent these crimes from occurring, but that it risks *facilitating* some number of such crimes by stripping away crucial safeguards. *State Farm*, 463 U.S. at 43.

### B.    EEOC has not considered or addressed the difficulties of discerning and authenticating gender identity.

The Proposed Guidance also fails to address the difficulty in ascertaining gender identity. Sex is an "immutable characteristic determined solely by accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). In contrast, "the transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her

---

[6] *See, e.g.,* Emma James, *Oklahoma mother files lawsuit against school district after her teenage daughter, 15, was 'severely beaten' by a transgender student, 17, in the girls' bathroom*, DAILY MAIL (June 1, 2023), https://tinyurl.com/2p8d9srz; Audrey Washington, *'A heinous crime:' 15-year-old girl says student sexually assaulted her in Cobb high school bathroom*, WSB-TV NEWS (May 16, 2023), https://tinyurl.com/3nrk6rut; Henri Hollis, *Man arrested in 'egregious' rape of girl in bathroom at Kennesaw park, cops say*, ATLANTA JOURNAL-CONSTITUTION (May 13, 2022), https://tinyurl.com/3m85kr5c; Virginia Abraham, *Teenager found guilty in Loudoun County bathroom assault*, WASHINGTON EXAMINER (Oct. 25, 2021), https://tinyurl.com/4vmxzkkh; *Pittsburgh McDonald's sued after manager charged with raping worker*, PITTSBURGH POST-GAZETTE (Sept. 22, 2021), https://tinyurl.com/2u4v9wx7; Spencer Neale, *Gender-neutral bathroom closed after high school student arrested for sexual assault*, WASHINGTON EXAMINER (March 4, 2020), https://tinyurl.com/ymevmdaa; City News Service, *Man Accused of Secretly Recording Women in Denny's Restaurant Restroom*, NBC4 NEWS (Nov. 17, 2016), https://tinyurl.com/bde38ffk; *Employee attacked in Duke hospital bathroom*, WRAL NEWS (Sept. 23, 2015), https://tinyurl.com/nhf88zxn; Emily L. Mahoney, *Man held in Cortez Park rape*, THE REPUBLIC (July 9, 2015), https://tinyurl.com/ysts9yw5; Juan Flores, *Man Sought in Sexual Assault of Girl, 10, in Denny's Restroom*, KTLA NEWS (Jan. 7, 2014), https://tinyurl.com/yntfn4ap.

[7] Cambridge Radical Feminist Network, *There is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019), https://tinyurl.com/3ncw6ss5.

[8] *See, e.g., Man in Women's Locker Room Cites Gender Rule*, King 5 Seattle (Feb. 16, 2016), https://tinyurl.com/ye299ndz.

[9] *See, e.g., Man Dressed as Woman Arrested for Spying into Mall Bathroom Stall, Police Say*, 4 Washington (last updated Nov. 18, 2015), https://tinyurl.com/mr2dz9yk.

**App. 014**

biological sex)." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Wilkins, J., concurring).  As one prominent advocacy group has advised, "[t]here is no way to determine if someone is transgender or non-binary unless they share their personal gender identity."[10]  Although some transgender individuals may change their name or preferred pronouns or medically transition through hormone therapy or surgery, a transgender person "may choose to undergo some, all, or none of these processes."[11]  Accordingly, the only evidence that an employer can have as to a person's current gender identity is concurrent representations by that person.

Moreover, gender identity is not fixed.  A person can "embrace a fluidity of gender identity" or have "a fluid or unfixed gender identity."[12]  And the possibilities for potential protected identities continue to grow:  Recent estimates cite some 80 types of genders and gender identities, ranging from "aliagender" to "bigender" to "demiboy" to "genderqueer" to "transfeminine" and many more.[13]  EEOC does not explain how employers are to continually monitor and update their employment policies to reflect the latest developments in gender ideology, let alone adequately account for the costs of complying with this demanding requirement.  Holding employers liable for unknowable, unverifiable, and in some cases oft-changing traits is unsustainable, especially in conjunction with society's legitimate interest in sex-restricted private spaces.

### C.    EEOC has not considered or addressed how the Proposed Guidance may harm the employment prospects of transgender persons as well as workplace morale and productivity.

Under the APA, agencies must consider the countervailing consequences of a proposed regulatory approach.  *See, e.g., Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19-20 (D.C. Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005).  Here, EEOC's proposal risks grave harm to the ability of transgender employees to obtain employment.  The Proposed Guidance requires employers to police interactions between transgender employees and customers so that they can intervene should customers engage in "misgendering."  Proposed Guidance at II.A, Example 4.  It should be obvious that injecting employers into such sensitive interactions threatens the customer-business relationship by deterring future patronage.  Likewise, requiring employers to open up bathrooms and changing facilities to employees based on their preferred gender identity could lead to conflicts with other employees and customers who feel their privacy or safety has been compromised.  Not to mention, requiring employers to enforce policies that violate the deeply held beliefs of many workers risks creating the type of strife, confusion, and resentment that in turn drains productivity.  Given all this, EEOC's Proposed Guidance may well make it more difficult for transgender employees to obtain employment—thus harming rather than helping this population.  Yet EEOC has not mentioned—let alone addressed—this patent downside of its proposal, as the APA requires.

---

[10] Human Rights Campaign, *Transgender and Non-Binary People FAQ*, https://tinyurl.com/5f9jvs4c (last visited Oct. 25, 2023).

[11] HRC Glossary, https://tinyurl.com/2tbewj2v.

[12] *Id.*

[13] Chris Drew, *81 Types of Genders & Gender Identities (A to Z List)*, HELPFULPROFESSOR.COM (Mar. 26, 2022), https://tinyurl.com/yc3xajrj.

**App. 015**

**D.    EEOC has failed to undertake the required federalism analysis and performs an impermissible about-face on contrary state policies.**

Executive Order 13,132 requires agencies to consult with state and local officials to minimize the intrusive effects of 'policies' that have federalism implications." E.O. 13,132 §3(c).  Here, the Proposed Guidance contains no such analysis despite its clear implications for federalism.  Numerous state and local government agencies and departments have 15 or more employees, and therefore are directly affected by Title VII.  Additionally, a number of States have laws that would be directly impacted by the Proposed Guidance.

For example, Tennessee and other States have laws protecting privacy in sex-segregated bathrooms.  *See, e.g., Tennessee*, 615 F. Supp. 3d at 823 n.9 (noting laws in Nebraska, Oklahoma, Tennessee, and West Virginia); Ark. Code Ann. § 6-21-120; Idaho Code Ann. § [33-6701]33-6601, *et seq*. Notably, EEOC's own current regulations recognize and support such laws.  *See* 29 C.F.R. §1604.2(b)(5) ("Some States require that separate restrooms be provided for employees of each sex. An employer will be deemed to have engaged in an unlawful employment practice if it refuses to hire or otherwise adversely affects the employment opportunities of applicants or employees in order to avoid the provision of such restrooms for persons of that sex.").  Yet EEOC's Proposed Guidance would override them with a novel take on Title VII preemption.

Tennessee and other States also have laws prohibiting educators from being compelled to use a student's preferred pronoun inconsistent with the student's biological sex.  *E.g.*, Tenn. Code Ann. § 49-6-5102; Ky. Rev. Stat. Ann. § 158.191(5); Ark. Code Ann. § 6-1-108.  Compliance with those State laws would be considered sexual harassment under the Proposed Guidance.

The APA required EEOC to consider Tennessee and other States' "legitimate reliance" on their laws protecting sex-segregated-facilities and free speech and their implementation before "chang[ing] course[]" from its prior position. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

\*\*\*

The undersigned States thank EEOC for considering these concerns.  If EEOC insists on pursuing its enforcement proposal, it must "make appropriate changes" to the Proposed Guidance, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142 (6th Cir. 2022), to avoid once more imposing unlawful gender-identity rules on the nation's employers.  *See generally Tennessee*, 615 F. Supp. 3d 807. Should EEOC decline, Tennessee and the other co-signing States are prepared to pursue appropriate legal action to protect their interests, affected employers, and the democratic process.

Sincerely,

Jonathan Skrmetti
Tennessee Attorney General & Reporter

Steve Marshall
Alabama Attorney General

Treg Taylor
Alaska Attorney General

Tim Griffin
Arkansas Attorney General

Raúl Labrador
Idaho Attorney General

Todd Rokita
Indiana Attorney General

Brenna Bird
Iowa Attorney General

Kris Kobach
Kansas Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Andrew Bailey
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Ohio Attorney General
Dave Yost

13

App. 017



Gentner Drummond
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Marty Jackley
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Sean Reyes
Utah Attorney General

Jason Miyares
Virginia Attorney General Virginia

Patrick Morrisey
West Virginia Attorney General

14

App. 018

 **U.S. Equal Employment Opportunity Commission**

# Enforcement Guidance on Harassment in the Workplace

This guidance document was issued upon approval by vote of the U.S. Equal Employment Opportunity Commission.

| | |
|---|---|
| **OLC Control Number:** | EEOC CVG 2024 1 |
| **Concise Display Name:** | Enforcement Guidance on Harassment in the Workplace |
| **Issue Date:** | 04 29 2024 |
| **General Topics:** | Harassment, Race, Color, Religion, Sex, National Origin, Age, Disability, Genetic Information |
| **Summary:** | This document addresses how harassment based on race, color, religion, sex, national origin, age, disability, or genetic information is defined under EEOC enforced statutes and the analysis for determining whether employer liability is established. |
| **Citation:** | Title VII, ADEA, ADA, GINA, 29 CFR Part 1601, 29 CFR Part 1604, 29 CFR Part 1605, 29 CFR Part 1606, 29 CFR Part 1625, 29 CFR Part 1626, 29 CFR Part 1630, 29 CFR Part 1635 |
| **Document Applicant:** | Employers, Employees, Applicants, Attorneys and Practitioners, EEOC Staff |
| **Previous Revision:** | Yes. This document replaced Compliance Manual Section 615: Harassment (1987); Policy Guidance on Current Issues |

**App. 019**

of Sexual Harassment (1990); Policy Guidance on
Employer Liability under Title VII for Sexual Favoritism
(1990); Enforcement Guidance on Harris v. Forklift Sys.,
Inc. (1994); and Enforcement Guidance on Vicarious
Employer Liability for Unlawful Harassment by
Supervisors (1999).

The contents of this document do not have the force and effect of law and are
not meant to bind the public in any way. This document is intended only to
provide clarity to the public regarding existing requirements under the law or
agency policies.

| | | |
|---|---|---|
| | | Number |
| **EEOC** | ***NOTICE*** | 915.064 |
| | | Date |
| | | 4/29/24 |

**SUBJECT: Enforcement Guidance on Harassment in the Workplace**

**PURPOSE:** This transmittal issues the Commission's guidance on harassment in the
workplace under EEOC enforced laws. It communicates the Commission's position
on important legal issues.

**EFFECTIVE DATE:** Upon issuance.

**EXPIRATION DATE:** This Notice will remain in effect until rescinded or superseded.

**OBSOLETE DATA:** This Enforcement Guidance supersedes *Compliance Manual
Section 615: Harassment* (1987); *Policy Guidance on Current Issues of Sexual
Harassment* (1990); *Policy Guidance on Employer Liability under Title VII for Sexual
Favoritism* (1990); *Enforcement Guidance on* Harris v. Forklift Sys., Inc. (1994); and

*Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors* (1999).

**ORIGINATOR:** Office of Legal Counsel

Charlotte A. Burrows

Chair

TABLE OF CONTENTS

**I. Introduction**

   **A. Background**

   **B. Structure of this Guidance**

**II. Covered Bases and Causation**

   **A. Covered Bases**

     **1. Race**

     **2. Color**

     **3. National Origin**

     **4. Religion**

     **5. Sex**

       **a. Harassing Conduct of a Sexualized Nature or Otherwise Based on Sex**

       **b. Pregnancy, Childbirth, or Related Medical Conditions Under Title VII**

**App. 021**

### c. Sexual Orientation and Gender Identity

#### 6. Age

#### 7. Disability

#### 8. Genetic Information

#### 9. Retaliation

#### 10. Cross-Bases Issues

### B. Establishing Causation

#### 1. Generally

#### 2. Facially Discriminatory Conduct

#### 3. Stereotyping

#### 4. Context

#### 5. Link Between Conduct That Is Not Explicitly Connected to a Protected Basis and Facially Discriminatory Conduct

#### 6. Timing

#### 7. Comparative Evidence

#### 8. Causation Issues Related to Sex-Based Harassment

## III. Harassment Resulting in Discrimination with Respect to a Term, Condition, or Privilege of Employment

### A. Background: Distinguishing an Explicit Change to the Terms, Conditions, or Privileges of Employment from a Hostile Work Environment

### B. Hostile Work Environment

#### 1. Unwelcomeness

##### a. Conduct That Is Subjectively and Objectively Hostile Is Also Necessarily Unwelcome

**App. 022**

**b. Derivation of Unwelcomeness Inquiry**

**2. Subjectively Hostile Work Environment**

**3. Objectively Hostile Work Environment**

**a. In General**

**b. Severity**

**i. In General**

**ii. Hostile Work Environment Based on a Single Incident of Harassment**

**c. Pervasiveness**

**d. Context**

**C. The Scope of Hostile Work Environment Claims**

**1. Conduct Must Be Sufficiently Related**

**2. Types of Conduct**

**a. Conduct That Is Not Directed at the Complainant**

**b. Conduct That Occurs in Work-Related Context Outside of Regular Place of Work**

**c. Conduct That Occurs in a Non-Work-Related Context, But with Impact on the Workplace**

**IV. Liability**

**A. Overview of Liability Standards in Harassment Cases**

**B. Liability Standard for a Hostile Work Environment Depends on the Role of the Harasser**

**1. Proxy or Alter Ego of the Employer**

**2. Supervisor**

**3. Non-Supervisory Employees, Coworkers, and Non-Employees**

**App. 023**

**C. Applying the Appropriate Standard of Liability in a Hostile Work Environment Case**

   **1. Alter Ego or Proxy - Automatic Liability**

   **2. Supervisor - Vicarious Liability**

      **a. Hostile Work Environment Includes a Tangible Employment Action: No Employer Defense**

      **b. Hostile Work Environment Without a Tangible Employment Action: Establishing the *Faragher-Ellerth* Affirmative Defense**

         **i. First Prong of the Affirmative Defense: Employer's Duty of Reasonable Care**

         **ii. Second Prong of the Affirmative Defense: Employee's Failure to Take Advantage of Preventive or Corrective Opportunities**

            **a) Reasonable Delay in Complaining or in Failing to Use the Employer's Complaint Procedure**

            **b) Reasonable Efforts to Avoid Harm Other than by Using the Employer's Complaint Process**

   **3. Non-Supervisory Employees (E.g., Coworkers) and Non-Employees— Negligence**

      **a. Unreasonable Failure to Prevent Unlawful Harassment**

      **b. Unreasonable Failure to Correct Harassment of Which the Employer Had Notice**

      **i. Notice**

      **ii. Reasonable Corrective Action**

         **a) Prompt and Adequate Investigation**

         **b) Appropriate Corrective Action**

**App. 024**

**c) Assessing the Liability of Joint Employers**

**V. Systemic Harassment**

   **A. Harassment Affecting Multiple Complainants**

   **B. Pattern or Practice of Harassment**

**VI. Selected EEOC Harassment Resources**

**Addendum on Responses to Major Comments**

# I. Introduction

## A. Background

In 1986, the U.S. Supreme Court held in the landmark case of *Meritor Savings Bank, FSB v. Vinson*[1] that workplace harassment can constitute unlawful discrimination under Title VII of the Civil Rights Act of 1964 (Title VII). Decades later, harassing conduct remains a serious workplace problem. For the five fiscal years (FY) ending with FY 2023, over one third of the charges of employment discrimination received by the Equal Employment Opportunity Commission ("the Commission" or "the EEOC") included an allegation of unlawful harassment based on race, sex, disability, or another statutorily protected characteristic.[2] The actual cases behind these numbers reveal that many people experience harassing conduct at work that may be unlawful.[3]

This Commission approved enforcement guidance presents a legal analysis of standards for harassment and employer liability applicable to claims of harassment under the equal employment opportunity (EEO) statutes enforced by the Commission, which prohibit work related harassment based on race, color, religion, sex (including pregnancy, childbirth, or related medical conditions; sexual orientation; and gender identity), national origin, disability, genetic information, and age (40 or over).[4] This guidance also consolidates and supersedes several earlier EEOC guidance documents: *Compliance Manual Section 615: Harassment* (1987); *Policy Guidance on Current Issues of Sexual Harassment* (1990); *Policy Guidance on Employer Liability under Title VII for Sexual Favoritism* (1990);

**App. 025**

*Enforcement Guidance on* Harris v. Forklift Sys., Inc. (1994); and *Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors* (1999).

This guidance serves as a resource for employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues. This document is not intended to be a survey of all legal principles that might be appropriate in a particular case.[5] The contents of this document do not have the force and effect of law, are not meant to bind the public in any way,[6] and do not obviate the need for the EEOC and its staff to consider the facts of each case and applicable legal principles when exercising their enforcement discretion. Nothing in this document should be understood to prejudge the outcome of a specific set of facts presented in a charge filed with the EEOC. In some cases, the application of the EEO statutes enforced by the EEOC may implicate other rights or requirements including those under the United States Constitution; other federal laws, such as the Religious Freedom Restoration Act (RFRA); or sections 702(a) and 703(e)(2) of Title VII.[7] The EEOC will consider the implication of such rights and requirements on a case by case basis.

## B. Structure of this Guidance

In explaining how to evaluate whether harassment violates federal EEO law, this enforcement guidance focuses on the three components of a harassment claim. Each of these must be satisfied for harassment to be unlawful under federal EEO laws.

- Covered Bases and Causation: Was the harassing conduct based on the individual's **legally protected characteristic** under the federal EEO statutes?

- Discrimination with Respect to a Term, Condition, or Privilege of Employment: Did the harassing conduct constitute or result in **discrimination with respect to a term, condition, or privilege of employment**?

- Liability: Is there a basis for holding the employer **liable** for the conduct?

This guidance also addresses systemic harassment and provides links to other EEOC harassment related resources.[8]

# II. <u>Covered Bases and Causation</u>

> **Harassment must be based on an employee's legally protected characteristic.**

Under the first part of a harassment claim, harassment (or harassing conduct) is only covered by federal EEO laws if it is based on one (or more) of the individual's characteristics that are protected by these laws. In this document, the terms "harassment" and "harassing conduct" are generally used interchangeably. The terms refer to conduct that can, but does not necessarily always, constitute or contribute to unlawful harassment, including a hostile work environment. Not all harassing conduct violates the law, even if it is because of a legally protected characteristic. As discussed throughout this guidance, whether specific harassing conduct violates the law must be assessed on a case-by-case basis.

**Section II.A** of this guidance identifies the **legally protected characteristics** covered by the federal EEO laws enforced by the EEOC.

**Section II.B** of this guidance explains how to determine whether harassing conduct is **because of** a legally protected characteristic.

Taken together, these two sections address whether conduct is based on a protected characteristic and, therefore, whether it can contribute to creating a hostile work environment. S**ection II** does not address whether such conduct reaches the point of creating a hostile work environment. The next section of this guidance, **section III**, discusses how to determine whether harassing conduct rises to the level of a hostile work environment.

## A. <u>Covered Bases</u>

### 1. <u>Race</u>

Title VII prohibits discrimination, including unlawful harassment, based on race. Harassment is based on a complainant's race if it is because the complainant is

**App. 027**

Black, Asian, White, multiracial, or another race. Examples of harassing conduct based on race include racial epithets or offensive comments about members of a particular race, or harassment based on stereotypes about the complainant's race. [9] It also can include harassment based on traits or characteristics linked to an individual's race, such as the complainant's name, cultural dress, accent or manner of speech, and physical characteristics, including appearance standards (e.g., harassment based on hair textures and hairstyles commonly associated with specific racial groups).[10]

> **Example 1: Race-Based Harassment.** Mia, a personal trainer at a large fitness center chain, is multiracial (Asian, Black, and Pacific Islander). Some coworkers refer to Mia using epithets directed at her mixed  race status, including "mutt." These coworkers also call Mia slurs based on her separate racial attributes. Other coworkers make comments that they don't consider to be insulting,[11] such as telling Mia how "exotic" she looks; calling her "cute nicknames," such as "panda" and "Moana"; and commenting that Mia inherited the "best traits," such as being strong because she is part Pacific Islander, athletic because she is part Black, and smart and articulate because she is part Asian. Based on these facts, the coworkers' harassing conduct toward Mia is based on race.

> **Example 2: Race-Based Harassment.** Chelsea, a hostess at an upscale restaurant, is a Black woman who wears her hair in locs for both cultural reasons and to reflect the natural texture of her hair. Chelsea's manager, Gregor, periodically tries to touch Chelsea's hair while asking questions about it, such as "why does Black people's hair look like that?" and "what does it feel like?" Gregor says that Chelsea could go from "savage to stunning" if she relaxed her hair. On other occasions, Gregor criticizes her hair as "messy," "untamed," and "unprofessional." Based on these facts, Gregor's harassing conduct toward Chelsea is based on her race.

**App. 028**

## 2. Color

Although sometimes related to harassment based on race or national origin, color-based harassment due to an individual's pigmentation, complexion, or skin shade or tone is independently covered by Title VII.[12] For example, if a supervisor harasses Black employees with darker complexions but does not harass Black employees with lighter skin tones, this may be evidence that the harassment was due to color.

> **Example 3: Color-Based Harassment.** Shawn, an inspector at a medical equipment manufacturing facility, is a Pakistani American with brown skin. Two of Shawn's supervisors make comments to him that suggest his skin is the color of human feces. Based on these facts, the supervisors' harassing conduct toward Shawn is based on his color.[13]

## 3. National Origin

Title VII prohibits employment discrimination, including unlawful harassment, based on national origin—meaning discrimination due to a complainant's, or the complainant's ancestors', place of origin. Harassment based on national origin includes ethnic epithets, derogatory comments about individuals of a particular nationality, and use of stereotypes about the complainant's national origin.[14] It also can include harassment regarding traits or characteristics linked to an individual's national origin, such as physical characteristics, ancestry, or ethnic or cultural characteristics (e.g., attire or diet), and linguistic characteristics (e.g., non-English language accent or a lack of fluency in English).[15]

> **Example 4: Harassment Based on National Origin.** Antonio is an immigrant from Mexico who works at a butcher shop. Over the course of several months, his Mexican American and White managers subject him to slurs about his Mexican origin such as "wetback" and other vulgar and derogatory epithets in Spanish. They also mock and ridicule Antonio's accent and limited English proficiency. Based on these facts, the managers' harassing conduct toward Antonio is based on his national origin.

**App. 029**

### 4. Religion

Title VII prohibits employment discrimination, including unlawful harassment, based on religion. Religion is broadly defined under Title VII.[16] Harassment based on religion includes the use of religious epithets or offensive comments based on a complainant's religion (including atheism or lack of religious belief[17]), religious practices, or religious dress.[18] It also includes harassment based on religious stereotypes[19] and harassment because of a request for a religious accommodation or receipt of a religious accommodation.[20]

> **Example 5:**[21] **Religion-Based Harassment.** Thiago, a fraud investigator at a property and casualty insurer, is agnostic and rejects organized religion. After Thiago's sister died unexpectedly, Thiago is despondent. He is approached by a coworker, Laney, who says that she can communicate with the dead and has received the following messages from Thiago's sister: the sister is suffering in Hell, and Thiago will go to Hell as well if he does not "find God." Thiago becomes upset and asks Laney to never bring up the topic again. Nevertheless, Laney repeatedly encourages Thiago to find religion so Thiago will not "go to Hell like his sister," despite Thiago's ongoing requests for Laney to "drop it." Based on these facts, Laney's harassing conduct toward Thiago is based on religion.[22]
>
> **Example 6: Harassment Based on Religious Accommodation.** Harpreet is an observant Sikh who, because of his religious beliefs, does not cut his beard. He works as an emergency medical technician (EMT) for an ambulance services provider. Harpreet's employer has a policy that requires all EMTs to be able to wear a tight-fitting respirator, which requires a clean shaven face where the respirator touches the skin. When Harpreet's employer learns that he cannot meet the respirator requirement due to his beard, the employer grants Harpreet a religious accommodation by permitting Harpreet to use a loose fitting powered

air purifying respirator (PAPR) instead of a tight-fitting respirator. Harpreet's supervisor, Jessie, has expressed disdain for Harpreet's accommodation, including by telling colleagues that PAPRs scare patients and saying, "Anybody who can't wear a basic respirator shouldn't be working here." Jessie also refers to Harpreet as "looking unprofessional" or "shabby." Based on these facts, Jessie's harassing conduct is targeted at Harpreet's religious accommodation and therefore is based on Harpreet's religion.

Religious harassment also encompasses explicitly or implicitly coercing employees to engage in religious practices at work.[23]

### Example 7: Harassment Based on Religious Coercion.

Sandra, an exterminator for a pest control service, is a Christian. The owner of the pest control service, Fabian, is a self described "spiritual guru" who believes he is called by the universe to help people transcend the Judeo-Christian belief system. Fabian regularly makes comments to Sandra denigrating Judeo Christian tenets; asks Sandra probing questions about her faith; distributes tracts arguing that "traditional religion" is the cause of all ills in modern society; and states a "strong hope" that Sandra will attend his lunchtime lectures, which consistently focus on Fabian's religious beliefs. While Fabian claims he would never require employees to share his beliefs, attend his lectures, or read the material he distributes, he also keeps track of which employees do and do not participate in his religious activities and tends to act with favoritism toward employees who agree with or are receptive to his religious messages. Sandra feels she must feign interest in Fabian's beliefs or else she will be subject to ostracism or possibly even termination. Based on these facts, Fabian's harassing conduct toward Sandra is based on religion.[24]

**App. 031**

## 5. <u>Sex</u>

Title VII prohibits employment discrimination, including unlawful harassment based on sex. Under Title VII, "sex" includes "pregnancy, childbirth, and related medical conditions" and sexual orientation and gender identity, as discussed in this section.

### a. <u>Harassing Conduct of a Sexualized Nature or Otherwise Based on Sex</u>

Harassing conduct based on sex includes conduct of a sexualized nature, such as unwanted conduct expressing sexual attraction or involving sexual activity (e.g., "sexual conduct"); sexual attention or sexual coercion, such as demands or pressure for sexual favors; rape, sexual assault, or other acts of sexual violence; or discussing or displaying visual depictions of sex acts or sexual remarks.[25]

Harassment based on sex under Title VII[26] also includes non-sexual conduct based on sex,[27] such as sex based epithets; sexist comments (such as remarks that women do not belong in management or that men do not belong in the nursing profession); or facially sex-neutral offensive conduct motivated by sex (such as bullying directed toward employees of one sex).[28]

> **Example 8: Sex-Based Harassment.** John, an employee in a supermarket bakery department, works with a coworker, Laverne, who rubs up against him in a sexual manner, tells sexual jokes, and displays dolls made from dough in sexual positions. Based on these facts, Laverne's harassing conduct toward John is based on his sex.

> **Example 9: Sex-Based Harassment.** Aiko, a construction worker on a road crew, is subjected to sex-based epithets and other demeaning sex-based language by her supervisor, such as "sandwich maker" and "baby." This supervisor also disparages women's participation in the construction industry, for example by stating that road construction is "a man's job." Based on these facts, the supervisor's harassing conduct toward Aiko is based on sex.

**App. 032**

**Example 10: Sex-Based Harassment.** Ferguson, a millwright at a cabinet manufacturer, has just returned from a short period of medical leave taken to recover from a vasectomy. Immediately upon his return, some of Ferguson's coworkers repeatedly ridicule Ferguson for the vasectomy, calling him "gelding," "eunuch," and "numb nuts," and saying things such as "why did you neuter yourself like a dog?" and "a real man would never get a vasectomy." Based on these facts, the coworkers' harassing conduct toward Ferguson is based on sex.

### b. Pregnancy, Childbirth, or Related Medical Conditions Under Title VII[29]

Sex-based harassment under Title VII includes harassment based on pregnancy,[30] childbirth, or related medical conditions.[31] This can include issues such as lactation;[32] using or not using contraception;[33] or deciding to have, or not to have, an abortion.[34] Harassment based on these issues generally would be covered if it is linked to a targeted individual's sex including pregnancy, childbirth, or related medical conditions.

**Example 11: Pregnancy-Based Harassment.** Kendall, a veterinary assistant at a nationwide veterinary clinic chain, recently announced to coworkers that she is pregnant. After Kendall's announcement, one of her supervisors, Veronica, begins berating Kendall's work as slow, shoddy, and scatter-brained, and accuses Kendall of focusing more on getting ready for her new baby than doing her job. Veronica also begins to scrutinize Kendall's bathroom usage and, on at least one occasion, yelled at Kendall for "always" being in the bathroom. As Kendall's pregnancy progresses, Veronica refers to Kendall as a "heifer," and makes the comment, "We don't treat livestock at this office." Based on these facts, Veronica's harassing conduct toward Kendall is based on sex (pregnancy).

**App. 033**

**Example 12: Harassment Based on Pregnancy-Related Medical Condition (Lactation).** Lisbet, a software engineer for a video game publisher, recently returned to work after giving birth. Lisbet uses a lactation room at work as needed in order to express breastmilk. Lisbet's coworker, Nathaniel, knocks loudly on the lactation room door while Lisbet is inside and pretends that he is going to enter. Nathaniel also refers to Lisbet's breasts as "milk jugs," makes suckling noises when Lisbet enters and exits the lactation room, and asks Lisbet if he can have a squirt of milk for his coffee.[35] Nathaniel also refers to the lactation room as "Lisbet's getaway" and asks why he is not allowed to take breaks in private rooms. Based on these facts, Nathaniel's harassing conduct toward Lisbet is based on a pregnancy related medical condition (lactation).

**Example 13: Harassment Based on Pregnancy-Related Medical Condition (Morning Sickness).** Kristina, a graphic designer at a marketing firm, is experiencing pregnancy-related morning sickness. Kristina's employer accommodates her limitations due to morning sickness by permitting Kristina to telework up to three days per week and utilize flexible scheduling on the days she comes into the office. Kristina's colleagues complain that pregnant women always get special perks and privileges and accuse Kristina of getting pregnant "just so she can kick back, relax at home on the couch, and collect a paycheck." During a team meeting to discuss staffing a new, high priority portfolio, when Kristina requests to be considered, her coworkers scoff that "if Kristina is so sick that she cannot come into the office, how can she be well enough to work on such an important account?" Based on these facts, the coworkers' harassing conduct toward Kristina is based on a pregnancy related medical condition (morning sickness).

**App. 034**

**c. Sexual Orientation and Gender Identity**

Sex based discrimination under Title VII includes employment discrimination based on sexual orientation or gender identity.[36] Accordingly, sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed.[37] Harassing conduct based on sexual orientation or gender identity includes epithets regarding sexual orientation or gender identity;[38] physical assault due to sexual orientation or gender identity;[39] outing (disclosure of an individual's sexual orientation or gender identity without permission);[40] harassing conduct because an individual does not present in a manner that would stereotypically be associated with that person's sex;[41] repeated and intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering);[42] or the denial of access to a bathroom or other sex segregated facility consistent with the individual's gender identity.[43]

> **Example 14: Harassment Based on Sexual Orientation.** Heidi, a staff journalist at a media conglomerate, recently attended a company award ceremony with her wife, Naomi. After the ceremony, one of Heidi's coworkers, Trevor, approaches Heidi and says, "I did not know you were a d*ke, that's so hot." Trevor asks Heidi questions such as, "because you are both girly girls, who is the man in your marriage?" and "who wears the pants at home?"[44] Trevor also repeatedly sends the scissor emoji and images of scissors to Heidi, which Trevor intends as a euphemism for Heidi having sex with her wife. Based on these facts, Trevor's harassing conduct toward Heidi is based on her sexual orientation.

> **Example 15: Harassment Based on Gender Identity.** Chloe, a purchase order coordinator at a retail store warehouse, is approached by her supervisor, Alton, who asks whether she was "born a man" because he had heard a rumor that "there was a transvestite in the department." Chloe disclosed to Alton that she is transgender and asked him to keep this information confidential. After this conversation, Alton instructed

**App. 035**

Chloe to wear pants to work because a dress would be "inappropriate," despite other purchase order coordinators being permitted to wear dresses and skirts. Alton also asks inappropriate questions about Chloe's anatomy and sexual relationships. Further, whenever Alton is frustrated with Chloe, he misgenders her by using, with emphasis, "he/him" pronouns, sometimes in front of Chloe's coworkers. Based on these facts, Alton's harassing conduct toward Chloe is based on her gender identity.[45]

### 6. Age

The Age Discrimination in Employment Act (ADEA)[46] prohibits age based discrimination, including unlawful harassment, of employees forty or older because of their age.[47] This includes harassment based on negative perceptions about older workers.[48] It also includes harassment based on stereotypes about older workers, even if they are not motivated by animus, such as pressuring an older employee to transfer to a job that is less technology-focused because of the perception that older workers are not well suited to such work or encouraging an older employee to retire.[49]

> **Example 16: Age-Based Harassment.** Lulu, age sixty eight, is a makeup artist and salesperson at a department store. Lulu's manager repeatedly asks Lulu about her retirement plans, despite Lulu expressing that she has no interest in retiring. Lulu's manager also tells her that the brand needs "fresh faces" and "high energy." When Lulu makes even a minor mistake, her manager disparages Lulu for having "senior moments." Further, on one occasion, the manager snapped at Lulu, "Nobody wants makeup advice from their granny." Based on these facts, the manager's harassing conduct toward Lulu is based on her age.

**App. 036**

5/20/24, 1 28 PM
Enforcement Guidance on Harassment in the Workplace | U S Equal Employment Opportunity Commission
Case 2:24-cv-00173-Z    Document 31    Filed 10/23/24    Page 39 of 220    PageID 385

## 7. Disability[50]

Title I of the Americans with Disabilities Act (ADA)[51] prohibits employment discrimination, including unlawful harassment, based on an individual's physical or mental disability,[52] including harassment based on stereotypes about individuals with disabilities in general or about an individual's particular disability. It also can include harassment based on traits or characteristics linked to an individual's disability, such as how an individual speaks, looks, or moves.[53]

> **Example 17: Disability-Based Harassment.** Abdul, a financial advisor at a private wealth management firm, has a pronounced stutter resulting from anxiety. Abdul's coworkers mockingly imitate his stutter[54] and ask Abdul to repeat himself, even though the coworkers understood what Abdul said. Based on these facts, the coworkers' harassing conduct toward Abdul is based on disability.

Disability-based harassment also includes:

- Harassment because of an individual's request for, or receipt of, reasonable accommodation;[55]

> **Example 18: Harassment Based on Disability Accommodation.** Charlie, a seasonal cashier at a garden supply store, has psoriatic arthritis, which affects his knees and ankles and makes standing for prolonged periods of time painful. Charlie's employer has a rule that prohibits cashiers from using fatigue standing mats or chairs while at the cash register, but grants Charlie a reasonable accommodation under the ADA to use a mat or chair as needed. Charlie's coworkers berate him for getting "special treatment." They also hide Charlie's mat and chair, which prevents Charlie from starting his work on time, because it's "unfair" that he gets to be "more comfortable" than them. Based on these facts, the coworkers' harassing conduct toward Charlie is based on

**App. 037**

disability (receipt of a reasonable accommodation).

- harassment because an individual is regarded as having an impairment, even if the individual does not have an actual disability, or a record of disability, under the ADA;[56]

- harassment because an individual has a record of a disability, even if the individual currently does not have a disability;[57] and

- harassment based on the disability of an individual with whom they are associated.[58]

> **Example 19: Harassment Based on Disability of Person with Whom the Employee Is Associated.** Karl's husband, Jamal, has long COVID that meets the ADA's definition of disability. Karl's employer, a business consulting firm, has a policy that allows employees to telework three days each week. One of Karl's coworkers, Lenny, posts a statement on the shared team communication platform that reads in part, "Keep Karl Home Every Day! If Karl's husband is so sick, then Karl needs to stay at home, otherwise he is going to infect us all!" Karl periodically uses his accrued paid time off to take Jamal to doctor's appointments, which often coincide with team meetings. Sometimes during these meetings, a different coworker, Barry, questions Karl's professional competence and dedication given his recent focus on taking care of Jamal, stating that Karl seems more interested in helping Jamal "get over a cold" than doing his job. Based on these facts, Lenny's and Barry's harassing conduct toward Karl is based on disability (association with a person with a disability).

**App. 038**

## 8. <u>Genetic Information</u>[59]

The Genetic Information Nondiscrimination Act (GINA)[60] prohibits employment discrimination, including unlawful harassment, on the basis of genetic information, which includes harassment based on an individual's, or an individual's family member's, genetic test or on the basis of an individual's family medical history.[61] For example, harassment based on genetic information includes harassing an employee because the employee carries the BRCA gene, which is linked to an increased risk of breast and ovarian cancer, or because the employee's mother recently experienced a severe case of norovirus, which resulted in overnight hospitalization.[62]

> **Example 20: Harassment Based on Genetic Information.** Manuella, a web developer at a university, joined in on a lively conversation between coworkers who recently used DNA ancestry testing to learn more about their extended families. Some mentioned finding unknown cousins, and others said that they had extended family from countries that surprised them. Manuella, taking part in the conversation, mentioned that although she had not taken a DNA ancestry test, a cousin recently took a genetic test that revealed that they had inherited the gene mutation that would put them at a higher risk of developing Hypertrichosis, a condition also known as Werewolf Syndrome. Soon after this discussion, coworkers began to refer to Manuella as "the werewoman," to make howling noises when they passed her office, and to leave dog treats on her desk. Based on these facts, the coworkers' harassing conduct toward Manuella is based on her genetic information.

## 9. <u>Retaliation</u>

The EEO statutes prohibit employers from retaliating against employees and applicants for employment because of their "protected activity"　opposing an employer's unlawful discrimination under the EEO statutes or participating in an investigation, hearing, or proceeding under the EEO statutes.[63]

**App. 039**

Sometimes, retaliatory conduct is characterized as "retaliatory harassment." The threshold for establishing unlawful retaliatory harassment is different than that for a discriminatory hostile work environment. As the Supreme Court explained in *Burlington Northern & Santa Fe Railway Co. v. White*, the EEO laws' antiretaliation provisions complement their antidiscrimination provisions but protect against a broader range of behaviors they forbid anything that might deter a reasonable person from engaging in protected activity.[64] Thus, retaliatory harassing conduct can be challenged under the *Burlington Northern* standard even if it is not sufficiently severe or pervasive to alter the terms and conditions of employment by creating a hostile work environment.[65]

If an employee has been subjected both to harassment based on race, sex, or another protected characteristic and to retaliation, then the legal standard or standards that apply to particular harassing conduct will depend on whether the conduct is being challenged as part of a harassment claim, a retaliation claim, or both.

For a more detailed discussion of retaliation, see EEOC, *Enforcement Guidance on Retaliation and Related Issues* (2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)** .

### 10. Cross-Bases Issues

Discussed below are some issues that apply to all of the covered bases.

Harassment based on the perception that an individual has a particular protected characteristic for example, the belief that a person has a particular national origin, religion, or sexual orientation—is covered by federal EEO law even if the perception is incorrect.[66] Thus, harassment of a Hispanic person because the harasser believes the individual is Pakistani is national origin based harassment, and harassment of a Sikh man wearing a turban because the harasser thinks he is Muslim is religious harassment, even if the perception in both instances is incorrect.

The EEO laws also cover "associational discrimination." This includes harassment because the complainant associates with someone in a different protected class[67] or harassment because the complainant associates with someone in the same protected class.[68] For example, the EEO laws apply to harassment of a White

employee because his spouse is Black[69] or harassment of a Black employee because she has a biracial child.[70] Although the association often involves a close relationship, such as with a close relative or friend, the degree of closeness is irrelevant to whether the association is covered.[71]

Harassment that is based on the complainant's protected characteristic is covered even if the harasser is a member of the same protected class (intraclass harassment).[72]

> **Example 21: Intraclass Harassment Based on Age.**
> Pedro, age sixty five, is a salesperson at a furniture store. Pedro's supervisor, Simon, age fifty two, has recently become dismissive of Pedro. After Pedro asks to use some personal leave, Simon denies Pedro's request, stating, "You old motherf**ker, you are not taking a day off." After that, Simon stops referring to Pedro by name, and instead calls him "old man" and "pops."[73] Simon also refers to Pedro as "over the hill." Based on these facts, Simon's harassing conduct toward Pedro is based on Pedro's age even though Simon also is within the ADEA's protected class (40 or older).

> **Example 22: Intraclass Harassment Based on National Origin.** Mei, a flight attendant at a global airline, is of Chinese ancestry. Her supervisor, Hua, is also of Chinese ancestry. Hua frequently berates Mei for not living up to Hua's conception of an ideal Chinese worker. For example, Hua calls Mei lazy, useless, and spoiled; says that Mei's ancestors would be ashamed of her; and says that Mei "wouldn't last a day in China." Hua also says Mei should be proud to come from such an industrious and responsible culture, and that Mei "might as well be Caucasian" based on her mediocre performance. Based on these facts, Hua's harassing conduct toward Mei is based on Mei's national origin even though they are both of Chinese ancestry.[74]

**Example 23: Intraclass Harassment Based on Sex.**
Dara and Sloane are lab technicians at a pharmaceutical research laboratory. On multiple occasions, one of their coworkers, Rose, makes dismissive comments to Dara, who has three children, such as, "shouldn't mothers stay at home with their kids?" and "don't expect to move up the career ladder with all of those children." Rose also makes dismissive comments to Sloane, who has no children and intends to remain childfree, on a handful of occasions, such as, "women who don't want children are frigid," "it is sad to watch you choose a career over a family," and "are you sure you don't want a baby? Every woman should want a baby!" Based on these facts, Rose's harassing conduct toward Dara and Sloane is based on their sex even though they all are women.

Harassment may be based on more than one protected characteristic of an employee, either under a single EEO statute, such as Title VII, or under multiple EEO statutes, such as Title VII and the ADEA. For example, a Black woman might be harassed both because she is Black and because she is a woman, or alternatively, because she is a Black woman. This last example is sometimes referred to as intersectional harassment, or harassment based on the intersection of two or more protected characteristics, which may, in fact, compound the harm.[75] If a Black woman is harassed based on stereotypes about Black women, such harassment is covered as both race and sex discrimination. Similarly, if a woman who is age forty or older is harassed based on stereotypes about older women, this harassment is covered as both age and sex discrimination.[76]

**Example 24: Intersectional Harassment Based on Age and Sex.** Janet, age fifty-one, works as a sales associate for a pet supplies store. One day at work, Janet quickly removed her jacket and began fanning herself. An assistant manager, Truman, stated when he observed her behavior, "Oh, you're having a hot flash! You must be menopausal." Truman then added, "You know your husband will start looking for younger women." Janet covered her ears and said, "I don't want

**App. 042**

to hear you talking about any of this." On another occasion when Janet mixed up a customer order, Truman yelled at her and asked if the mistake was because she was having a "menopausal moment" or because she was just getting too old to get the orders right. Janet was visibly flustered by his yelling, which prompted Truman to add, "Don't get so emotional. Isn't there something you can take for your hormones?" Based on these facts, Truman's harassing conduct toward Janet is based on her status as an older woman.

Harassment based on one protected characteristic, such as national origin, also may overlap with harassment based on another characteristic, such as religion, because of the close association (actual or perceived) between two protected groups. For example, harassment against an individual who is Middle Eastern and Muslim may be based on both national origin and religion.[77]

Harassment based on protected characteristics includes harassment based on social or cultural stereotypes regarding how persons of a particular protected group, such as persons of a particular race, national origin, or sex, may act, appear, or behave.[78] This includes, but is not limited to, harassment based on stereotypes about racial, ethnic, or other protected characteristics, or sex-based stereotypes about family responsibilities,[79] suitability for leadership,[80] or gender roles.[81]

**Example 25: Harassment Based on Stereotype About Race.** Sydney, who is Black, is a sales associate at a jewelry store. One of Sydney's coworkers, Mackenzie, repeatedly admonishes Sydney not to steal anything from the store.[82] Mackenzie frequently brings up news stories and social media videos depicting Black people engaging in theft, and suggests that all Black people, including Sydney, have a propensity to steal. Based on these facts, Mackenzie's harassing conduct toward Sydney is based on race.

**Example 26: Harassment Based on Stereotypes About National Origin.** Mirlande, a Haitian American, is an esthetician at a luxury resort and spa. One of

**App. 043**

> Mirlande's coworkers, Celine, believes that all Haitians practice voodoo and, based on this cultural assumption about Haitians, repeatedly makes voodoo related remarks, such as that Mirlande will curse staff members and clients, knows a witch doctor, and has voodoo dolls at home. Based on these facts, Celine's harassing conduct toward Mirlande is based on national origin.

As discussed below in section II.B, harassing conduct need not explicitly refer to a protected characteristic to be based on that characteristic where there is other evidence establishing causation.

## B. Establishing Causation

### 1. Generally

Causation is established if the evidence shows that the complainant was subjected to harassment *because of* the complainant's protected characteristic, whether or not the harasser explicitly refers to that characteristic or targets a particular employee.[83] If an employee experiences harassment in the workplace but the evidence does not show that the harassment was based on a protected characteristic, the EEO statutes do not apply.[84]

> **Example 27: Insufficient Evidence That Harassment Was Based on a Protected Characteristic.** Isaiah, a customer service representative at a financial services firm, alleges he was subjected to harassment based on his national origin and color by his coworker, Zach. Isaiah asserts that last winter Zach became increasingly hostile and rude, throwing paper at Isaiah, shoving him in the hall, and threatening to physically harm him. Zach's misconduct started shortly after a disagreement during a league basketball game during which Isaiah, captain of the firm's basketball team, benched Zach. No evidence was found during the investigation to link Zach's threats and harassment to Isaiah's national origin or color; therefore, Isaiah

**App. 044**

cannot establish that Zach's misconduct subjected him to harassment because of a protected characteristic.[85]

**Example 28: Sufficient Evidence That Harassment Was Based on a Protected Characteristic.** Julius, who is Black, works on a line operation crew for a pharmaceutical manufacturer. All line crew members are Black, and they are supervised by Murphy, who is White. Murphy frequently refers to himself as a "zookeeper" and to the crew, including Julius, as "my animals." Murphy does not refer to members of other line crews, which are comprised of non Black employees, as "animals"; likewise, Murphy does not refer to supervisors of those other line crews as "zookeepers." Following an investigation, evidence shows that Murphy calls Julius and crew members "animals" because of their race, even though Murphy does not directly refer to race. Based on these facts, Julius can establish that Murphy subjected him to harassment because of race, a protected characteristic.[86]

The determination of whether hostile-work-environment harassment is based on a protected characteristic will depend on the totality of the circumstances.[87] Although causation must be evaluated based on the specific facts in a case, the principles discussed below will generally apply in determining causation. Not all principles will necessarily apply in every case.

## 2. Facially Discriminatory[88] Conduct

Conduct that explicitly insults or threatens an individual based on a protected characteristic   such as racial epithets or graffiti, sex based epithets, offensive comments about an individual's disability, or targeted physical assaults based on a protected characteristic—discriminates on that basis.[89] The motive of the individual engaging in such conduct is not relevant to whether the conduct is facially discriminatory. Such conduct also need not be directed at a particular worker based on that worker's protected characteristic, nor must all workers with the protected characteristic be exposed to the conduct. For example, degrading

**App. 045**

workplace comments about women in general, even if they are not related to a specific female employee, show anti female animus on their face, so no other evidence is needed to show that the comments are based on sex.[90] Further, derogatory comments about women are sex-based even if all employees are exposed to the comments.[91]

> **Example 29: Causation Established Where Harassment Is Facially Discriminatory.** Kiran, an archivist at a non profit foundation, is an individual with a neuropathic condition that causes his muscles to atrophy and degenerate. As a result of his condition, Kiran walks with a limp and must wear leg braces. On a near daily basis his coworkers make fun of his limp and leg braces by mimicking his gait and calling him names like "Forrest Gump" and "cr\*pple." Based on these facts, Kiran has been subjected to harassment based on disability that is facially discriminatory.[92]

### 3. Stereotyping

Harassment is based on a protected characteristic if it is based on social or cultural expectations—be they intended as positive, negative, or neutral—regarding how persons of a particular protected group may act or appear.[93] This includes harassment based on sex-based assumptions about family responsibilities,[94] suitability for leadership,[95] gender roles,[96] weight and body types,[97] the expression of sexual orientation or gender identity,[98] or being a survivor of gender based violence. Similarly, harassment based on race includes derogatory comments involving racial stereotypes, such as referring to Black employees as drug dealers[99] or suggesting that Black employees have the propensity to commit theft.[100]

Such stereotyping need not be motivated by animus or hostility toward that group.[101] For example, age based harassment might include comments that an older employee should consider retirement so that the employee can enjoy the "golden years."[102] Likewise, sex-based harassment might include comments that a female worker with young children should switch to a part-time schedule so that she can spend more time with her children.[103]

**Example 30: Causation Established Based on Sex Stereotyping.** After Eric, an iron worker, made a remark that his foreman, Josh, considered "feminine," Josh began calling Eric "Erica," "princess," and "f*ggot." Several times a week, Josh approached Eric from behind and simulated intercourse with him. More than once, Josh exposed himself to Eric. Based on these facts, Josh targeted Eric based on his perception that Eric did not conform to traditional male stereotypes and subjected Eric to harassment based on sex.[104]

**Example 31: Causation Established Based on Sex Stereotyping.** Maria, a receptionist, has recently experienced domestic violence. Because Maria must attend court dates related to the domestic violence, she discloses her situation to her supervisor, Nolan. Nolan warns Maria that she should not take "too much" leave and should not bring "drama" into the workplace because "women can be histrionic and unreliable." Nolan also comments that "women think everything is domestic violence" and that "a good wife doesn't have to worry about anything in her marriage." Nolan begins to criticize Maria's decision-making skills, stating that Maria can't be relied on to make good choices because she can't even manage her personal problems. Based on these facts, Nolan targeted Maria based on his sex-based perception of victims of gender based violence and subjected Maria to harassment based on sex.

### 4. Context

Conduct must be evaluated within the context in which it arises.[105] In some cases, the discriminatory character of conduct that is not facially discriminatory becomes clear when examined within the specific context in which the conduct takes place or within a larger social context. For example, the Supreme Court observed that use of the term "boy" to refer to a Black man may reflect racial animus depending on such

**App. 047**

5/20/24, 1 28 PM
Enforcement Guidance on Harassment in the Workplace | U S  Equal Employment Opportunity Commission
Case 2:24-cv-00173-Z    Document 31    Filed 10/23/24    Page 50 of 220    PageID 396

factors as "context, inflection, tone of voice, local custom, and historical usage."[106] In some contexts, terms that may not be facially discriminatory when viewed in isolation, such as "you people," may operate as "code words" that contribute to a hostile work environment based on a protected characteristic.[107]

> **Example 32: Causation Established by Social Context.** Ron, a Black truck driver, finds banana peels on his truck on multiple occasions. After the third of these occasions, Ron sees two White coworkers watching his reaction to the banana peels. There is no evidence that banana peels were found on any other truck or that Ron found any trash on his truck besides the banana peels. Based on these facts, the appearance of banana peels on Ron's truck is likely not coincidental. Further, because banana peels are used to invoke "monkey imagery," it would be reasonable to conclude, given the history of racial stereotypes against Black individuals, that the banana peels were intended as a racial insult. Therefore, the conduct under these circumstances constitutes harassment based on race.[108]

### 5. Link Between Conduct That Is Not Explicitly Connected to a Protected Basis and Facially Discriminatory Conduct

Conduct that is neutral on its face may be linked to other conduct that is facially discriminatory, such as race based epithets or derogatory comments about individuals with disabilities. Facially neutral conduct therefore should not be separated from facially discriminatory conduct and then discounted as non-discriminatory.[109] In some instances, however, facially discriminatory conduct may not be sufficiently related to facially neutral conduct to establish that the latter also was discriminatory.[110]

> **Example 33: Facially Neutral Conduct Sufficiently Related to Religious Bias.** Imani, a devout Christian employed as a customer service representative, alleges that coworkers made offensive comments or engaged in other hostile conduct related to her religious beliefs

**App. 048**

and practices, including suggesting that Imani belonged to a cult; calling her religious beliefs "crazy"; drawing devil horns, a devil tail, and a pitchfork on her Christmas photo; and cursing the Bible and teasing her about Bible reading. In addition, the same coworkers excluded Imani from office parties and subjected her to curse words that the coworkers knew Imani regarded as offensive because of her religion. Although some of the coworkers' conduct was facially neutral with respect to religion, that conduct was closely related to the religious harassment and thus the entire pattern of harassment was based on Imani's religion.[111]

### 6. Timing

If harassment began or escalated shortly after the harasser learned of the complainant's protected status, including religion, pregnancy, sexual orientation, or gender identity, the timing may suggest that the harassment was discriminatory.[112]

> **Example 34: Timing as Evidence of Causation.** Sami, a security guard at an electronics store, discloses his Egyptian ancestry to coworkers during a conversation about turmoil in the Middle East. Following this disclosure, Sami's colleagues, who had made offensive comments about Middle Eastern people during the conversation, begin to avoid and ostracize him. Approximately one week after Sami disclosed his national origin, Sami arrives late for his shift, and a coworker asks, "Did your camel break down?" Another coworker begins to hum the Bangles' "Walk Like an Egyptian" and mime the music video's dance moves when Sami walks by. The timing of the coworkers' conduct, in addition to the content of the conduct, provides evidence that Sami has been subjected to discrimination based on national origin.

**App. 049**

### 7. <u>Comparative Evidence</u>

Evidence showing qualitative and/or quantitative differences in the conduct directed against individuals in different groups can support an inference that the harassment of workers subjected to more, or more severe, harassment was based on their protected status.[113]

> **Example 35: Comparative Evidence Gives Rise to Inference that Harassment Is Based on a Protected Characteristic.** Tyler is a manager for an educational services firm. Tyler directly supervises two women, Kailey and Anu, and two men, Sandeep and Levi. Tyler regularly hovers over Kailey and Anu as they work to make sure they don't "mess up." Tyler yells and shakes his fist at Kailey and Anu when he is angry at them. In addition, although Tyler is occasionally irritable, he generally engages in friendly banter with Sandeep and Levi that is different from the aggressiveness that he displays toward female employees. Tyler sometimes even allows Sandeep and Levi to relax in his office in the afternoons, doing little or no work. Tyler permits Sandeep and Levi to leave the office early on Fridays and does not monitor their work performance. Tyler's different treatment of women and men who are similarly situated would support the conclusion that Tyler's treatment of Kailey and Anu was based on their sex.[114]

### 8. <u>Causation Issues Related to Sex-Based Harassment</u>

A claim of sex-based harassment may rely on any of the causation theories described in the preceding sections and in this document. The Supreme Court has addressed three non-exclusive evidentiary routes for establishing causation in a sex-based harassment claim: (1) explicit or implicit proposals of sexual activity; (2) general hostility toward members of the complainant's sex; and (3) comparative evidence showing how the harasser treated persons who shared the complainant's sex compared to the harasser's treatment of those who did not.[115] As noted, these three routes are not exclusive; they are examples of ways in which it may be

established that harassment is based on sex.[116] For example, harassment is sex-based if it occurs because of sex stereotyping[117] or if members of one sex are routinely sexualized.

# III. Harassment Resulting in Discrimination with Respect to a Term, Condition, or Privilege of Employment

For workplace harassment to violate the law, not only must it be based on a protected characteristic, as discussed in the preceding section, it also must affect a "term, condition, or privilege" of employment.[118]

## A. Background: Distinguishing an Explicit Change to the Terms, Conditions, or Privileges of Employment from a Hostile Work Environment

In *Meritor Savings Bank, FSB v. Vinson*, the Supreme Court discussed two examples of unlawful harassment: (1) an explicit change to the terms or conditions of employment that is linked to harassment based on a protected characteristic, e.g., firing an employee because the employee rejected sexual advances; and (2) conduct that constructively[119] changes the terms or conditions of employment through creation of a hostile work environment.[120]

The first type of claim was initially described as "quid pro quo" harassment in the context of sexual harassment.[121] In early sexual harassment cases, quid pro quo described a claim in which a supervisor carried out an adverse change to an employee's compensation, terms, conditions, or privileges of employment because the employee rejected the supervisor's sexual advances.[122]

However, citing the Supreme Court's 1998 decision in *Burlington Industries, Inc. v. Ellerth*, the Second Circuit later explained that a quid pro quo allegation now only "makes a factual claim about the particular mechanism by which a plaintiff's sex became the basis for an adverse alteration of the terms or conditions of [the plaintiff's] employment."[123] The underlying issue in a quid pro quo allegation is the same as in any claim of disparate treatment (i.e., intentional discrimination): whether the claimant has satisfied the statutory requirement of establishing "discriminat[ion] . . . because of . . . sex" affecting the "terms [or] conditions of

**App. 051**

employment."[124] For example, if a supervisor denies an employee a promotion or other job benefit for rejecting sexual advances, the denial of the job benefit itself is an explicit change to the terms and conditions of employment and thus constitutes unlawful sex discrimination.[125]

To be actionable absent such an explicit change to the terms or conditions of employment, the harassment must change the terms or conditions of employment by creating a hostile work environment. The Supreme Court explained in 1993 in *Harris v. Forklift Systems, Inc.* that to establish a hostile work environment, offensive conduct must be both subjectively hostile and objectively hostile.[126]

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.[127]

The EEO statutes are therefore not limited to discriminatory conduct that has tangible or economic effects and instead "strike at the entire spectrum of disparate treatment."[128] However, these statutes do not impose a general civility code that covers "run-of-the-mill boorish, juvenile, or annoying behavior."[129] As discussed below in section III.B.3, the standard established in *Harris* takes a "middle path" that requires the conduct to be more than merely offensive but does not require that the conduct cause psychological harm.[130]

## B. Hostile Work Environment

**These are key questions that typically arise in evaluating a hostile work environment claim and whether it amounts to unlawful harassment:**

- **Was the conduct both objectively and subjectively hostile?**
  - Objective hostility: was the conduct sufficiently severe or pervasive to create a hostile work environment from the perspective of a reasonable person?

**App. 052**

- ○ Subjective hostility: did the complainant actually find the conduct hostile?

- **What conduct is part of the hostile work environment claim?**

  - ○ Can conduct that occurred outside the workplace be considered?

  - ○ Can conduct that was not specifically directed at the complainant be considered?

A wide variety of conduct by supervisors, coworkers, or non employees that affects the workplace can contribute to a hostile work environment, including physical or sexual assaults or threats; offensive jokes, slurs, epithets, or name calling; intimidation, bullying, ridicule, or mockery; insults or put-downs; ostracism; offensive objects or pictures; and interference with work performance.

A hostile work environment claim also can include conduct that is independently actionable as disparate treatment. For example, if a woman was subjected to offensive sex-based comments and demoted because she refused to submit to unwanted sexual advances, the demotion would be independently actionable as sex discrimination (disparate treatment) and also actionable as part of a hostile work environment.[131]

The EEO laws prohibit harassment resulting in a work environment that is both subjectively and objectively hostile.

> **Example 36: Employee Was Subjected to Both Subjectively and Objectively Hostile Work Environment.** Chadwick, who is Black, was recently hired as a sommelier and wine program director at an upscale restaurant. The restaurant is co-owned by Mark, who comes to check in on his investment approximately every three months. Mark arrives for a visit as the staff is preparing to open for evening service. Upon seeing Chadwick, whom Mark has not met before, Mark loudly asks, "Which dumbass manager is hiring n****rs for customer service positions now?" Mark continues on a racist diatribe that the entire staff can hear, leaving Chadwick

**App. 053**

> humiliated and in tears. Based on these facts,
> Chadwick has been subjected to conduct that creates
> both a subjectively hostile work environment and an
> objectively hostile work environment and therefore the
> conduct has resulted in a hostile work environment
> that violates Title VII.

## 1. Unwelcomeness

### a. Conduct That Is Subjectively and Objectively Hostile Is Also Necessarily Unwelcome

Although a complainant alleging a hostile work environment must show that the harassment was unwelcome, conduct that is subjectively and objectively hostile also is necessarily unwelcome. In the Commission's view, demonstrating unwelcomeness is logically part of demonstrating subjective hostility. If, for example, a complainant establishes that a series of lewd, sexist, and derogatory comments based on sex were subjectively hostile, then those comments also would be, by definition, unwelcome. In some circumstances, evidence of unwelcomeness also may be relevant to the showing of objective hostility.[132]

### b. Derivation of Unwelcomeness Inquiry

The unwelcomeness inquiry derives from the Supreme Court's 1986 decision in *Meritor Savings Bank, FSB v. Vinson*, where the Court stated that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome,'"[133] and from the 1980 EEOC Guidelines upon which the Court relied.[134] In *Meritor*, the Court distinguished the concept of unwelcomeness from the concept of voluntariness, noting that the complainant's participation in the challenged conduct did not necessarily mean that she found it welcome.[135] When the Supreme Court refined the hostile work environment analysis in 1993, in *Harris v. Forklift Systems, Inc.*, to require a showing that the conduct was both subjectively and objectively hostile,[136] the Court did not explicitly eliminate unwelcomeness as the gravamen of a harassment claim.

Following *Harris*, a number of courts have addressed unwelcomeness as part of determining subjective hostility, because conduct that is subjectively hostile will also, necessarily, be unwelcome.[137] Other courts continue to analyze "unwelcomeness" as a separate element in a plaintiff's prima facie harassment

**App. 054**

case, in addition to the "subjectively and objectively hostile work environment" analysis.[138] In the Commission's view, this latter approach incorporates an unnecessary step in a court's legal analysis of workplace harassment.

### 2. Subjectively Hostile Work Environment

In general, the complainant's own statement that the complainant perceived conduct as hostile is sufficient to establish subjective hostility.[139] A subjectively hostile work environment also may be established if there is evidence that an individual made a complaint about the conduct, as it follows logically that the individual found it hostile.[140] Similarly, if there is evidence that the individual complained to family, friends, or coworkers about the conduct, it is likely that the individual found it subjectively hostile.[141] To be clear, although evidence of contemporaneous complaints may be sufficient to show subjective hostility, such evidence is not necessary.

Whether conduct is subjectively hostile depends on the perspective of the complainant. Thus, if a male complainant does not welcome sexual advances from a female supervisor, it is irrelevant for the subjectivity analysis whether other men in the workplace would welcome these advances.[142] In addition, the fact that a complainant tolerated or even participated in the conduct does not necessarily mean that he did not find it hostile; for example, an employee might have experienced derogatory comments or other conduct targeted at the employee's racial or national origin group as hostile but felt that there was no other choice but to "go along to get along."[143] By contrast, if there is evidence that the complainant did not find the harassment to be hostile, such as the complainant's statement that the complainant did not feel harassed by the challenged conduct, then subjective hostility may be at issue.[144]

A complainant's subjective perception can change over time. For example, a complainant who did not perceive certain conduct as unwelcome in the past might subsequently perceive similar conduct as hostile after a certain point in time, such as after the end of a romantic relationship,[145] or where a colleague's race based jokes are initially dismissed as poor attempts at humor, but become unwelcome when they persist or are later accompanied by additional race-based conduct. Moreover, although the complainant may welcome certain conduct, such as sexually tinged conduct, from a particular employee, that does not mean that the complainant also would welcome it from other employees.[146] Nor does

**App. 055**

acceptance of one form of sexually tinged conduct mean that the complainant would welcome all sexually tinged conduct, particularly conduct of a more severe nature.[147]

### 3. **Objectively Hostile Work Environment**

#### a. **In General**

Even if a complainant subjectively finds conduct based on a protected characteristic to be hostile, the conduct does not constitute a violation of federal EEO law unless it is also sufficiently severe or pervasive to create an objectively hostile work environment.[148]

Conduct need not be both severe and pervasive to establish a hostile work environment: the legal standard is severe *or* pervasive. The more severe the harassment, the less pervasive it must be, and vice versa.[149] There is neither a "magic number" of harassing incidents that automatically establishes a hostile work environment nor a minimum threshold for severity.[150] Whether a series of incidents is sufficiently severe or pervasive to create a hostile work environment depends on the specific facts of each case, viewed in light of the totality of the circumstances.[151]

The issue of whether conduct creates a hostile work environment depends on the totality of the circumstances, as viewed from the perspective of a reasonable person, and no single factor is determinative.[152] Some relevant factors are the frequency and severity of the conduct; the degree to which the conduct was physically threatening or humiliating; the degree to which it interfered with an employee's work performance; and the degree to which it caused an employee psychological harm.[153] Another relevant factor is whether there is a power disparity   and its extent   between the harasser and the person harassed.[154] These factors are not exhaustive, and "no single factor is required" to establish an objectively hostile work environment.[155]

If harassing acts are based on multiple protected characteristics, and the acts are sufficiently related to be considered part of the same hostile work environment, then all the acts should be considered together in determining whether the conduct created a hostile work environment.[156] For example, if an employee alleges that her supervisor subjected her to harassing conduct based on both race and sex, then the combined effect of the alleged race-based and sex-based harassment should be

considered, even if the employee cannot establish that either the race-based harassment or sex based harassment, standing alone, is sufficiently severe or pervasive.[157]

### Example 37: Sex-Based Remark Does Not Create Hostile Work Environment.
Roxana and Liam, both audio and video technicians at a broadcast news station, are in a heated meeting about upcoming holiday programming. After Roxana makes a suggestion with which Liam disagrees, Liam says to Roxana, "It must be your time of the month, are you on the rag?" Although harassment based on menstruation can constitute or contribute to a hostile work environment based on sex,[158] Liam's lone remark is insufficient to create an objectively hostile work environment, despite being offensive.

### Example 38: Age-Based Harassment Creates Hostile Work Environment.
Henry, age sixty two, is a consultant at a professional services company. Ryan, his supervisor, calls him "old man" on a periodic basis. Since Henry's sixtieth birthday, Ryan has repeatedly asked him when he plans to retire, saying he can't wait to bring in "young blood" and "fresh ideas." During a recent staff meeting, Ryan reminded staff to get their flu shots, then looked at Henry and said, "Although I wouldn't be heartbroken if the flu took out some of the old timers." Henry asked Ryan if he was referring to him, and Ryan replied, "Absolutely, old man." Henry reports feeling targeted and ashamed by Ryan's comments. Based on these facts, Ryan has subjected Henry to an objectively hostile work environment based on age.[159]

A complainant need not show that discriminatory conduct harmed the complainant's work performance to prove an objectively hostile work environment if the evidence otherwise establishes that the conduct was sufficiently severe or pervasive to alter the terms or conditions of the complainant's employment.[160]

**App. 057**

5/20/24, 1 28 PM
Enforcement Guidance on Harassment in the Workplace | U S  Equal Employment Opportunity Commission
Case 2:24-cv-00173-Z    Document 31    Filed 10/23/24    Page 60 of 220    PageID 406

Similarly, actionable harassment can be established in the absence of psychological injury, though evidence of psychological harm from the harassment may be relevant to demonstrating a hostile work environment.[161]

> **Example 39: Hostile Work Environment Created Even Though Complainant Continued to Perform Well.** Irina works as a sales representative for a freight transportation company. She and her coworkers sit in adjacent cubicles. Her coworkers, both men and women, often discuss their sexual liaisons; use sex-based epithets when describing women; and look at pornographic materials. Irina was horrified by the loudness and vulgarity of the conduct, and she frequently left the office to sit in her car and decompress from her coworkers' conduct. Despite this conduct, however, Irina could meet her daily and weekly quotas, and her work continued to be rated in her performance review as above average. Based on these facts, Irina was subjected to a hostile work environment. Although the harassing conduct did not result in a decline in her work performance or in psychological injury, the nature of the conduct and Irina's reactions to it were sufficient to establish that the ongoing sexual conduct created a hostile work environment because the conduct made it more difficult for a reasonable person in Irina's situation to do her job.[162]

### b. Severity

#### i. In General

Because a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character,"[163] harassment by a supervisor or other individual with authority over the complainant typically has more impact on a complainant's work environment than similar misconduct by an individual lacking such authority.[164] Moreover, the severity of the harassment may be heightened if

**App. 058**

the complainant reasonably believes that the harasser has authority over her, even if that belief is mistaken.[165]

The more directly harassment affects the complainant, the more likely it is to negatively affect the complainant's work environment. Thus, harassment is generally more probative of a hostile work environment if it occurs in the complainant's presence than if the complainant learns about it secondhand. Nevertheless, a complainant's knowledge of harassing conduct that other employees have separately experienced may be relevant to determining the severity of the harassment in the complainant's work environment.[166]

Some conduct may be more severe if it occurs in the presence of others, such as the complainant's coequals, subordinates, or clients. For example, a worker's sexually degrading comments may be more severe if made in the presence of the complainant and the complainant's subordinates rather than solely in the complainant's presence, due to the humiliating nature of the interaction.[167] Conversely, some conduct may be more severe when the complainant is alone with the offending individual because the isolation may enhance the threatening nature of the discriminatory conduct.[168]

Because the severity of harassment depends on all of the circumstances, the considerations discussed above are not exclusive. Other factors may be relevant in evaluating the severity of alleged harassment. For example, harassment may be more severe if a complainant has reason to believe that the harasser is insulated from corrective action. This could arise if the harasser is a highly valued employee, or the employer has previously failed to take appropriate corrective action in similar circumstances.[169]

### ii. Hostile Work Environment Based on a Single Incident of Harassment

In limited circumstances, a single incident of harassment can result in a hostile work environment. The following is a non-exhaustive list of examples of conduct that courts have found sufficiently severe to establish a hostile work environment based on a single incident:

- Sexual assault,[170]

- Sexual touching of an intimate body part,[171]

- Physical violence or the threat of physical violence,[172]

- The display of symbols of violence or hatred, such as a swastika, an image of a Klansman's hood, or a noose,[173]

- The use of denigrating animal imagery, such as comparing the employee to a monkey, ape, or other animal,[174]

- A threat to deny job benefits for rejecting sexual advances,[175] and

- The use of the "n word" by a supervisor in the presence of a Black subordinate.[176]

Using epithets based on protected characteristics is a serious form of workplace harassment. As stated by one court, epithets are "intensely degrading, deriving their power to wound not only from their meaning but also from 'the disgust and violence they express phonetically.'"[177]

### c. **Pervasiveness**

More frequent but less serious incidents can create a hostile work environment, and most hostile work environment claims involve a series of acts.[178] The focus is on the cumulative effect of these acts, rather than on the individual acts themselves. As noted above, there is not a "magic number" of harassing incidents that automatically establishes a hostile work environment.[179] Whether a series of events is sufficiently severe or pervasive to create a hostile work environment depends on the specific facts of each case.[180] Relevant considerations may include the frequency of the conduct[181] and the relationship between the number of incidents and the time period over which they occurred.[182]

> **Example 40: Hostile Work Environment Created by Pervasive Sexual Harassment.** Juan, who works as a passenger service assistant for an airline, alleges that Lydia, a female coworker who shares the same schedule, sexually harassed him for several weeks. The evidence shows that Lydia directed sexual overtures and other sex based conduct at Juan as often as several times a week, despite his repeated statements that he was not interested. For example, Lydia gave Juan revealing photographs of herself, sent him notes asking for a date, described fantasies about him, and persistently told him how attractive he was and how

**App. 060**

much she loved him. Based on these facts, the conduct was sufficiently pervasive to create a hostile work environment.[183]

**Example 41: Sexual Favoritism Creating a Hostile Work Environment.** Tasanee, an employee at a government agency, alleges that she has been subjected to a hostile work environment based on her sex. The evidence shows that supervisors engaged in consensual sexual relationships with female subordinates that were publicly known and behaved in sexually charged ways with other agency employees in public. Supervisors rewarded the subordinates who were in relationships or who acceded without objection to the behavior by granting them promotions, awards, and other benefits. Because the conduct was pervasive and could reasonably affect the work performance and motivation of other women workers who found the favoritism offensive, the evidence is sufficient to show that Tasanee was subjected to a sex-based hostile work environment.[184]

### d. Context

The harassment being challenged must create an objectively hostile work environment from the perspective of a reasonable person in the complainant's position.[185] The impact of harassment must be evaluated in the context of "surrounding circumstances, expectations, and relationships."[186] Discussed below are some significant aspects of context that can be relevant in determining whether harassment was sufficiently severe or pervasive to create a hostile work environment. Other considerations also may be relevant in evaluating harassment in light of the totality of the circumstances.

The determination of whether harassment was objectively hostile requires "an appropriate sensitivity to social context"[187] and should be made from the perspective of a reasonable person of the complainant's protected class.[188] Thus, if a Black individual alleges racial harassment, the harassment should be evaluated from the perspective of a reasonable Black individual in the same circumstances as

the complainant. Conduct can establish a hostile work environment as to the complainant even if some members of the complainant's protected class did not or would not find it to be hostile.[189]

In addition to protected status, other personal or situational[190] characteristics of a particular complainant may affect whether the complainant reasonably perceives certain conduct as creating a hostile work environment. For example, if a teenager was harassed by a substantially older individual, then the age difference may intensify the perceived hostility of the behavior.[191] Similarly, if an undocumented worker is targeted by harassment, then the heightened risk of deportation may contribute to objective hostility.[192]

> **Example 42: Religion-Based Harassment Creates an Objectively Hostile Work Environment.** Josephine, an IT support specialist at a regional medical facility, attends an employee appreciation barbecue lunch hosted by her employer. When asked by colleagues why she is not eating any of the barbecued pork, Josephine explains that she is Jewish and her religion's dietary laws prohibit eating pork. After the barbecue, a few coworkers begin making comments to or within earshot of Josephine, such as calling Josephine "Jew sephine," questioning why Josephine even works because she must have a lot of "Jew money"[193] in the bank, and stating that "Jews control the media." Based on these facts, this conduct, viewed from the perspective of a reasonable Jewish person, created an objectively hostile work environment based on religion.

> **Example 43: Disability-Based Harassment Creates an Objectively Hostile Work Environment.** Jin, a cook, has Post-Traumatic Stress Disorder (PTSD). He tells his coworkers that he served in Iraq on active duty, has PTSD, and, as a result, is uncomfortable with sudden loud noises and unanticipated physical contact. He asks them to tell him in advance about any anticipated loud noises, and requests that they avoid

**App. 062**

approaching him from behind without warning. Lila, a server, regularly drops or bangs on metal trash cans and sneaks up behind Jin while he is working, because she thinks his response is funny. Jin is so rattled after these encounters that he sometimes mixes up orders or fails to cook the food properly. Jin repeatedly tells Lila to stop, to no avail, and the conduct continues. Based on these facts, Lila's harassment, viewed from the perspective of a reasonable person with PTSD, has created an objectively hostile work environment based on disability.

**Example 44: National-Origin-Based Harassment Creates an Objectively Hostile Work Environment.** Somchai, a Thai national, performs seasonal agriculture work at a sweet potato farm and has an H 2B visa. Somchai is told that his employer specifically recruits individuals from Thailand because they are obedient and submissive and have a good work ethic. At the worksite, Somchai is subject to frequent physical and verbal abuse, including epithets such as "slant eyes" and "rice eater." Further, if Somchai's supervisor observes Somchai pausing in his work, even to use the bathroom or eat lunch, the supervisor threatens to have Somchai's visa revoked, saying, "That will turn you into an 'illegal' so I can call ICE and have you arrested and deported."[194] Based on these facts, the national-origin-based harassment experienced by Somchai, which is compounded by Somchai's vulnerability as a migrant worker and visa holder, is sufficiently severe or pervasive to create an objectively hostile work environment.

**Example 45: Sex-Based Harassment Creates an Objectively Hostile Work Environment.** Velma, a technician at a metal fabrication company, has recently been subjected to dating violence by her long-term intimate partner, which resulted in Velma moving

**App. 063**

out of their shared residence and into a shelter. Velma's coworker, Dan, learns about Velma's current living situation and, viewing her as vulnerable, asks Velma out on a date. Despite Velma declining his request, during each shift that they work together, Dan continues to say things like, "Is living in a shelter really worse than cuddling me at night?"; "I'll let you live with me free of charge on one condition: that you clean my house while naked"; and "the only thing that I would ever hit is that ass." Based on these facts, the sex based harassment experienced by Velma, which must be viewed in the context of her vulnerability as a survivor of dating violence, is sufficiently severe or pervasive to create an objectively hostile work environment.

**Example 46: Harassment Based on Gender Identity Creates an Objectively Hostile Work Environment.**

Jennifer, a female cashier who is transgender and works at a fast food restaurant, is regularly and intentionally misgendered by supervisors, coworkers, and customers over a period of several weeks. One of her supervisors, Allison, intentionally and frequently uses Jennifer's prior male name, male pronouns, and "dude" when referring to Jennifer, despite Jennifer's requests for Allison to use her correct name and pronouns. Other managers also intentionally refer to Jennifer as "he" whenever they work together. In the presence of customers, coworkers ask Jennifer questions about her sexual orientation and anatomy and assert that she is not female. After hearing these remarks by employees, customers also intentionally misgender Jennifer and make offensive comments about her transgender status. Based on these facts, which must be viewed in the context of Jennifer's perspective as a transgender individual, Jennifer has been subjected to an objectively hostile work

environment based on her gender identity that includes repeated and intentional misgendering.[195]

Conduct also must be evaluated in the context of the specific work environment in which it occurred. For example, in some instances, conduct may be more likely to create a hostile work environment if the complainant works in a remote location alone with the harasser.[196] There is, however, no "crude environment" exception to Title VII.[197] Prevailing workplace culture, likewise, does not excuse discriminatory conduct.[198] Thus, public displays of pornography or sexually suggestive imagery demeaning women can contribute to an objectively hostile work environment for female employees, even if it is a long-standing practice.[199]

As discussed above in section III.B.1, in the Commission's view, demonstrating unwelcomeness is logically an inherent part of demonstrating subjective hostility. In some circumstances, evidence of unwelcomeness also may be relevant to the showing of objective hostility.[200] When analyzing whether conduct is objectively hostile, some courts have focused on whether the harasser had notice that the conduct was unwelcome   either because the complainant had communicated as much or the harasser otherwise had reason to know.[201] Such notice may be relevant in determining whether it is objectively reasonable for a person in the complainant's position to have perceived the ongoing conduct as hostile.[202] For example, flirtatious behavior or asking an individual out on a date may, or may not, be facially offensive, depending on the circumstances. An individual's continued flirting or asking for a date after notice that this conduct was unwelcome can support a determination that a reasonable person in the complainant's position would perceive the conduct as hostile.[203]

The same may be true in the context of religious expression. If a religious employee attempts to persuade another employee of the correctness of his beliefs, the conduct is not necessarily objectively hostile. If, however, the employee objects to the discussion but the other employee nonetheless continues, a reasonable person in the complainant's position may find it to be hostile.[204]

> **Example 47: Religious Expression Does Not Create an Objectively Hostile Work Environment.** Ellen, an observant Lutheran, works as a nurse in a retirement community where the majority of staff are Muslim. Some of Ellen's Muslim colleagues pray in accordance with their religious beliefs in a designated room

**App. 065**

observable from the nurse's station, which Ellen sometimes finds distracting. Ellen's Muslim colleagues also coordinate an optional lunchtime Qur'an study group, which all employees are invited to join. After Ellen declines the group's invitation, stating that she studies the Bible at home, she is not invited to the Qur'an study group again. On occasion, and sometimes within Ellen's earshot, Ellen's Muslim colleagues openly discuss their religious beliefs in a manner that does not disparage others. Ellen tells her supervisor that she finds these discussions of religion in the workplace to be "disruptive." Based on these facts, the religious expression of Ellen's Muslim colleagues does not create an objectively hostile work environment for Ellen.

**Example 48: Religious Expression Creates an Objectively Hostile Work Environment.** Same facts as above, however, after Ellen declines the invitation to attend the optional lunchtime Qur'an study group, Sayiddah, a colleague, openly admonishes Ellen for not believing in Allah and repeatedly warns her that she is "on the wrong spiritual path."[205] Ellen asks Sayiddah to stop discussing religion with her; however, Sayiddah says she will not, explaining that her prayers come from a place of love and that she has a religious obligation to spread the word of Islam to non believers. Based on these facts, Sayiddah's religious expression creates an objectively hostile work environment for Ellen.

## C. The Scope of Hostile Work Environment Claims

### 1. Conduct Must Be Sufficiently Related

Because separate incidents that make up a hostile work environment claim constitute a single unlawful employment practice, the complainant can challenge an entire pattern of conduct, as long as at least one incident that contributed to the

hostile work environment is timely.[206] The earlier conduct, however, must be sufficiently related to the later conduct to be "part of the same actionable hostile work environment practice" claim.[207] Relevant considerations depend on the specific facts but may include the similarity of the actions involved, the frequency of the conduct, and whether the same individuals engaged in the conduct.[208]

A hostile work environment claim may include hostile conduct that affects the complainant's work environment, even conduct that may be independently actionable as unlawful discrimination (disparate treatment), as long as it is part of an overall pattern of harassing conduct. For example, a racially discriminatory transfer to a less desirable position that is separately actionable also may contribute to a racially hostile work environment if the action was taken by a supervisor who frequently used racial slurs.[209] Under such circumstances, the transfer could be challenged as part of a hostile work environment claim and would be considered in determining whether the entire course of conduct, including both the transfer and the repeated racial slurs, was sufficiently severe or pervasive to create a hostile work environment. In addition, if the transfer occurred within the filing period, then the complainant could also bring a separate claim alleging discriminatory transfer. For more information on the timeliness of hostile work environment claims, see EEOC, *Compliance Manual Section 2: Threshold Issues* § 2 IV.C.1.b (2009), **https://www.eeoc.gov/policy/docs/threshold.html#2-IV-C-1-b (https://www.eeoc.gov/policy/docs/threshold.html#2-IV-C-1-b)** .

> **Example 49: Earlier Harassment Was Sufficiently Related to Later Harassment.** Rabia, a Muslim with Palestinian family ties, was subjected to offensive comments about her religion and ethnicity by her team leader in the packaging department, Josiah. Rabia complained to the plant manager, who did not take any action, and Josiah's harassment continued. At her own request, Rabia was transferred to the stretch wrap department. Soon after, she saw Josiah speaking with Franklin, a stretch wrap employee, while pointing at Rabia and laughing. Starting the next day, Franklin regularly referred to Rabia using religious and ethnic slurs, including "m*zzie," and "terrorist." Franklin also refused to fill in for her when she needed to take a break. Rabia complained to the plant manager about

**App. 067**

Franklin's conduct, but again the plant manager did not take any action. Here, Rabia experienced harassment in two different departments by different harassers, but the conduct was similar in nature. The harassment in the second department occurred shortly after the harassment in the first department; the harassment in the second department started after the two harassers met; and the plant manager was responsible for addressing harassment in both departments. Based on these facts, the harassment based on religion and national origin experienced by Rabia in the two departments constitutes part of the same hostile work environment claim.[210]

**Example 50: Earlier Harassment Was Insufficiently Related to Later Harassment.** Cassandra, who works for a printing company, was exposed to sexually explicit discussions, jokes, and vulgar language when she worked in the company's production department. After Cassandra was transferred to the estimating department, she was no longer exposed to the harassing conduct she had experienced in the production department. However, while working in the estimating department, Cassandra overheard a male worker on the other side of her cubicle wall tell someone that if a weekend trip with one of his female friends "was not a sleepover, then she wasn't worth the trip." The sleepover comment was made nearly a year after Cassandra's transfer and was not directed at Cassandra or made for her to hear. Other than that comment, Cassandra did not experience any alleged harassment after her transfer to the estimating department, which did not interact with the production department. Based on these facts the alleged harassment experienced by Cassandra in the production department was not part of the same hostile work environment claim as the alleged harassing conduct in the estimating department.[211]

**App. 068**

## 2. Types of Conduct

### a. Conduct That Is Not Directed at the Complainant

Harassing conduct can affect an employee's work environment even if it is not directed at that employee, although the more directly it affects the complainant, the more probative it will be of a hostile work environment.[212] For instance, the use of sex-based epithets may contribute to a hostile work environment for women even if the epithets are not directed at them.[213] Similarly, anonymous harassment, such as racist or anti‑Semitic graffiti or the display of a noose or a swastika, may create or contribute to a hostile work environment, even if it is not clearly directed at any particular employees.[214] Offensive conduct that is directed at other individuals of the complainant's protected class also may contribute to a hostile work environment for the complainant. Such conduct may even occur outside of the complainant's presence as long as the complainant becomes aware of the conduct during the complainant's employment and it is sufficiently related to the complainant's work environment.[215]

> **Example 51: Conduct Not Directed Against Complainant Contributes to a Hostile Work Environment.** Peter is an Assistant District Manager for an insurance company. Peter, who is Black, oversees four sales representatives who also are Black. Peter reports to the District Manager, Lilliana, who is White. Over the two years that Peter has worked for the insurance company, Lilliana has used the term "n****r" when talking to Peter's subordinates; she also told Peter that his "Black sales representatives are too dumb to be insurance agents"; and on another occasion she called the corporate office to ask them to stop hiring Black sales representatives. Some of the comments were made in Peter's presence, and Peter learned about other comments secondhand, when sales representatives complained to him about them. Based on these facts, Lilliana's conduct toward Peter's subordinates contributed to a hostile work environment for Peter because the comments either

occurred in Peter's presence or he learned about them from others.**216**

In some circumstances, an individual who has not personally been subjected to unlawful harassment based on their protected status may be able to file an EEOC charge and a lawsuit alleging that they have been harmed by unlawful harassment of a third party.**[217]**

> **Example 52: Individual Harmed by Unlawful Harassment of Third Party.** Sophie works in an accounting office with her coworker Eitan, who is Jewish and the son of Israelis, and their mutual supervisor, Jordan. Jordan makes frequent offensive comments about Jews and Israel, asking Eitan repeatedly when he was going to "go home and start fighting." One day, after referring to Eitan with an epithet used for Jews, Jordan tells Sophie to hide Eitan's work files on the office server to "make his life difficult" and to reschedule a series of important team meetings so that they will conflict with Eitan's scheduled time off, effectively excluding him from the meetings. Sophie objects, but Jordan tells her that "if you want a future here, you better do what I tell you." Fearing workplace repercussions if she fails to comply, Sophie reluctantly participates in the ongoing national origin  and religion based harassment of Eitan.
>
> Sophie and Eitan both file EEOC charges. Eitan's allegation is that he faced a hostile work environment based on national origin and religion; Sophie's allegation is that Eitan faced a hostile work environment based on his national origin and religion and she was forced to participate in it. Based on evidence that the harassment occurred on a regular basis and included serious and offensive conduct, including harassment designed to interfere with Eitan's work performance and ostracize him, the investigator

**App. 070**

concludes that Eitan was subjected to a hostile work environment based on his race and religion.

The investigator further concludes that, although Sophie was not personally subjected to unlawful harassment based on her race, religion, or other protected status, she had standing to file a charge and obtain relief for any harm she suffered as a result of the unlawful harassment of Eitan because she was required, as part of her job duties, to participate in the harassment.[218]

### b. Conduct That Occurs in Work-Related Context Outside of Regular Place of Work

A hostile work environment claim may include conduct that occurs in a work related context outside an employee's regular workplace.[219] For instance, harassment directed at an employee during the course of offsite employer-required training occurs within the "work environment," even if the training is not conducted at the employer's facility.[220]

**Example 53: Harassment During Off-Site Employer-Hosted Party Was Within Work Environment.**
Fatima's employer hosts its annual holiday party in a private restaurant. One of her coworkers, Tony, drinks to excess, and at the end of the evening attempts to grope and kiss Fatima. Although Tony's behavior occurred outside Fatima's regular workplace and at a private restaurant unaffiliated with her employer, it occurred in a work related context, the company sponsored holiday party. Therefore, based on these facts, the harassment occurred in Fatima's work environment for purposes of a Title VII sexual harassment claim.

**Example 54: Harassment During Non-Work Hours at Employer-Provided Housing Was Within Work Environment.** Rosa is a seasonal farmworker who resides in employer provided housing a few miles away from the farm where she works. Rosa's employer

**App. 071**

requires all seasonal farmworkers to live in employer-provided housing, which is a converted former motel, and deducts "rent" from their paychecks. Another seasonal worker, Lucas, follows Rosa around the housing complex, waiting for her outside of her room and in the parking lot. Rosa reports Lucas's behavior to management and complains that she feels unsafe, but no action is taken. Lucas's behavior escalates, and he sexually assaults Rosa during non working hours at the housing complex. Although Lucas's conduct occurred outside of the workplace, it occurred in a work-related context. Therefore, based on these facts, the harassment occurred in Rosa's work environment.

Conduct also occurs within the work environment if it is conveyed using work related communications systems, accounts, devices, or platforms, such as an employer's email system, electronic bulletin board, instant message system, videoconferencing technology, intranet, public website, official social media accounts, or other equivalent services or technologies.[221] As with a physical work environment, conduct within a virtual work environment can contribute to a hostile work environment. This can include, for instance, sexist comments made during a video meeting, ageist or ableist comments typed in a group chat, racist imagery that is visible in an employee's workspace while the employee participates in a video meeting, or sexual comments made during a video meeting about a bed being near an employee in the video image.

**Example 55: Conduct on Employer's Email System Was Within the Work Environment.** Ted and Perry are coworkers in an architectural firm. Ted is White, and Perry is Black. Every Monday morning, Ted sends jokes from his work computer and work email account to colleagues, including Perry. Many of the jokes involve racial stereotypes, including stereotypes about Black individuals. Perry complains to Ted and their mutual supervisor after several weeks of Ted's emails, but Ted is not instructed to stop and continues to send such emails. Based on these facts, the racial jokes sent by Ted occurred within Perry's work environment

**App. 072**

because, among other reasons, they were sent using Ted's work computer and work email account and were sent to Perry and other colleagues in the workplace.

### c. Conduct That Occurs in a Non-Work-Related Context, But with Impact on the Workplace

Although employers generally are not responsible for conduct that occurs in a non work-related context, they may be liable when the conduct has consequences in the workplace and therefore contributes to a hostile work environment.[222] For instance, if a Black employee is subjected to racist slurs and physically assaulted by White coworkers who encounter him on a city street, the presence of those same coworkers in the Black employee's workplace can result in a hostile work environment.[223]

Conduct that can affect the terms and conditions of employment, even if it does not occur in a work related context, includes electronic communications using private phones, computers, or social media accounts, if it impacts the workplace.[224] For example, if an Arab American employee is the subject of ethnic epithets that a coworker posts on a personal social media page, and either the employee learns about the post directly or other coworkers see the comment and discuss it at work, then the social media posting can contribute to a hostile work environment based on national origin. However, postings on a social media account generally will not, standing alone, contribute to a hostile work environment if they do not target the employer or its employees.

> **Example 56: Conduct on Social Media Platform Outside Workplace Contributes to Hostile Work Environment.** Rochelle, a Black woman born in the United States, works at a tax firm. She alleges that two Black coworkers of Caribbean descent, Martina and Terri, subjected her to a hostile work environment based on national origin. The investigation reveals that Martina's and Terri's harassing conduct included mocking Rochelle, blocking doorways, and interfering with her work, and that it culminated in an offensive post on a popular social media service that they all

**App. 073**

use. In the post, Martina and Terri included two images of Rochelle juxtaposed with an image of the fictional ape Cornelius from the movie *The Planet of the Apes*, along with text explicitly comparing Rochelle to Cornelius. Rochelle learned about the post from another coworker, Jenna. Based on these facts, the combined conduct, including the social media post, was sufficient to create a hostile work environment.[225]

**Example 57: Conduct on Social Media Platform Outside Workplace Does Not Contribute to Hostile Work Environment.** Michael, a courier for a management consulting firm, believes that women should dress conservatively on romantic dates and limit their food intake to appear lady like. Michael shares these beliefs in posts on his private social media accounts. He also shares posts criticizing women's sexual behavior, such as stating, "Why would a man buy a cow when you can get the milk for free?" Michael's coworker Donna finds some of Michael's posts online and is deeply offended even though there is no connection between the posts and the firm or any of its employees, and Michael has never spoken to Donna about these views. These posts, on their own, do not contribute to a hostile work environment based on sex because they do not have an impact on Donna's work environment.

Given the proliferation of technology, it is increasingly likely that the non consensual distribution of real or computer-generated intimate images, such as through social media, messaging applications, or other electronic means, can contribute to a hostile work environment, if it impacts the workplace.

**Example 58: Conduct on Social Media Platform Outside Workplace Contributes to Hostile Work Environment.** Max, a line cook at a restaurant, begins dating Anne, a server who works at the same restaurant. During their relationship, Max obtains

**App. 074**

sexually explicit images of Anne. After Anne breaks up with Max, he threatens to share the images on social media unless she gives him a second chance. When she refuses, he posts the images on a picture-sharing social media application and tags some of their coworkers. Anne overhears her coworkers making fun of the images and talking about how Anne must have poor judgment. Anne is humiliated and finds it difficult to continue to return to work. Based on these facts, the combined conduct, including the social media post, was sufficient to create a hostile work environment.[226]

Finally, harassment by a supervisor that occurs outside the workplace is more likely to contribute to a hostile work environment than similar conduct by coworkers, given a supervisor's ability to affect a subordinate's employment status.[227]

# IV. Liability

## A. Overview of Liability Standards in Harassment Cases

When a complainant establishes that the employer made an explicit change to a term, condition, or privilege of employment linked to harassment based on a protected characteristic (sometimes described as "quid pro quo," as explained in section III.A), the employer is liable and there is no defense.[228]

In cases alleging a hostile work environment, one or more standards of liability will apply. Which standards apply to any given situation depends on the relationship of the harasser to the employer and the nature of the hostile work environment. Each standard is discussed in detail in sections IV.B and IV.C, below. To summarize:

- If the harasser is a proxy or alter ego of the employer, the employer is automatically liable for the hostile work environment created by the harasser's conduct. The actions of the harasser are considered the actions of the employer, and there is no defense to liability.

- If the harasser is a supervisor and the hostile work environment includes a tangible employment action against the victim, the employer is vicariously liable for the harasser's conduct and there is no defense to liability. This is true even if the supervisor is not a proxy or alter ego.

**App. 075**

- If the harasser is a supervisor (but not a proxy or alter ego) and the hostile work environment does *not* include a tangible employment action, the employer is vicariously liable for the actions of the harasser, but the employer may limit its liability or damages if it can prove the *Faragher-Ellerth* affirmative defense, which is explained below at section IV.C.2.b.

- If the harasser is any person other than a proxy, alter ego, or supervisor, the employer is only liable for the hostile work environment created by the harasser's conduct if the employer was negligent in that it failed to act reasonably to prevent the harassment or to take reasonable corrective action in response to the harassment when the employer was aware, or should have been aware, of it.

Negligence provides a minimum standard for employer liability,[229] regardless of the status of the harasser.[230] Other theories of employer liability   automatic liability (for proxies and alter egos) and vicarious liability (for supervisors)—are additional bases for employer liability that supplement[231] and do not replace the negligence standard.[232]

If the complainant challenges harassment by one or more supervisors and one or more coworkers or non employees and the harassment is part of the same hostile work environment claim,[233] separate analyses of employer liability should be conducted in accordance with each harasser's classification.[234]

## B. Liability Standard for a Hostile Work Environment Depends on the Role of the Harasser

The liability standard for a hostile work environment depends on whether the harasser is a:

- Proxy or alter ego of the employer;

- Supervisor; or

- Non-supervisory employee, coworker, or non-employee.

**App. 076**

The applicable standards of liability depend on the level and kind of authority that the employer afforded the harasser to act on its behalf.

### 1. Proxy or Alter Ego of the Employer

An individual is considered an alter ego or proxy of the employer if the individual possesses such high rank or authority that his or her actions can be said to speak for the employer.[235] Individuals who might be considered proxies include sole proprietors and other owners; partners; corporate officers; and high-level managers whose authority or influence within the organization is such that their actions could be said to "speak for" the employer.[236] By contrast, a supervisor does not qualify as the employer's alter ego merely because the supervisor exercises significant control over the complaining employee.[237]

### 2. Supervisor

In the context of employer liability for a hostile work environment, an employee is considered a "supervisor" if the individual is "empowered by the employer to take tangible employment actions against the victim."[238] An employee may, of course, have more than one supervisor.

A "tangible employment action" means a "significant change in employment status" that requires an "official act" of the employer.[239] Examples of tangible employment actions include hiring and firing, failure to promote, demotion, reassignment with significantly different responsibilities, a compensation decision, and a decision causing a significant change in benefits.[240] In some cases, a decision may constitute a tangible employment action even though it does not have immediate direct or economic consequences, such as a demotion with a substantial reduction in job responsibilities but without a loss in pay.[241]

Even if an individual is not the final decision maker as to tangible employment actions affecting the complainant, the individual would still be considered a supervisor if the individual has the "power to *recommend* or otherwise substantially influence tangible employment actions."[242]

Finally, an employee who does not have actual authority to take a tangible employment action with respect to the complainant can still be considered a supervisor if, based on the employer's actions, the harassed employee reasonably believes that the harasser has such power.[243] The complainant might have such a

reasonable belief where, for example, the chain of command is unclear or the harasser has broad delegated powers.[244] In these circumstances, the harasser is said to have "apparent authority."[245]

### 3. Non-Supervisory Employees, Coworkers, and Non-Employees

Federal EEO laws protect employees against unlawful harassment by other employees who do not qualify as proxies/alter egos or "supervisors," i.e., other employees without actual or apparent authority to take tangible employment actions against the employee(s) subjected to the harassment. These other employees may include coworkers with no authority over the complainant as well as shift leads or other workers with limited authority over the complainant. Employees are further protected against unlawful harassment by non employees, such as independent contractors;[246] customers,[247] including hotel guests, airline passengers, and shoppers; students;[248] hospital patients and nursing home residents;[249] and clients of the employer.[250]

> **Example 59: Harassment by a Non-Employee.**
> Howard works as a stocker for a company that sells snacks and beverages in vending machines on customers' premises. At a hospital where Howard is assigned to stock the vending machines, he is harassed daily by a hospital employee who knows Howard's schedule and waits at the vending machines for him to arrive. The hospital employee calls him "H*mo Howard," propositions him, and makes lewd and vulgar sexual comments to him every time the hospital employee sees him. Howard reports this harassment to his employer. Although the harasser is not employed by Howard's employer, because Howard's employer is aware of the sex-based harassment, it has a legal obligation to correct the harassment.[251]

> **Example 60: Harassment by a Non-Employee.** While cleaning a guest room, Paloma, a housekeeper at a hotel, is cornered by a naked guest who propositions her for sex. Paloma immediately reports this conduct to her supervisor. Although the guest is not an

**App. 078**

employee of the hotel, because Paloma's employer is aware of the sex based harassment, it has a legal obligation to correct the harassment.

## C. Applying the Appropriate Standard of Liability in a Hostile Work Environment Case

Once the status of the harasser is determined, the appropriate standard can be applied to assess employer liability for a hostile work environment.

### 1. Alter Ego or Proxy - Automatic Liability

If the harasser is an alter ego or proxy of the employer, the employer is automatically liable for unlawful harassment and has no defense.[252] Thus, a finding that the harasser is an alter ego or proxy is the end of the liability analysis. This is true whether or not the harassment includes a tangible employment action.

> **Example 61: Harasser Was Employer's Alter Ego.**
> Gina, who is Peruvian American, alleges that she was subjected to unlawful harassment because of her national origin by the company Vice President, Walter. Walter is the only corporate Vice President in the organization, answers only to the company's President, and exercises managerial responsibility over the company's operations. Based on these facts, given Walter's high rank within the company and his significant control over the company's operations, Walter is an alter ego of the company, subjecting it to automatic liability for a hostile work environment resulting from his harassment.

### 2. Supervisor - Vicarious Liability

An employer is vicariously liable for a hostile work environment created by a supervisor.[253] Under this standard, liability for the supervisor's harassment is attributed to the employer. As discussed below, unlike situations where the harasser is an alter ego or proxy of the employer, an employer may have an affirmative defense, known as the *Faragher-Ellerth* defense, when the harasser is a supervisor.

The availability of the *Faragher-Ellerth* defense is dependent on whether the supervisor took a tangible employment action against the complainant as part of the hostile work environment. If the *Faragher Ellerth* defense is available, the employer bears the burden of proof with respect to the elements of that defense.

> **If the supervisor took a *tangible employment action* as part of the hostile work environment, then the employer is automatically liable for the hostile work environment and does not have a defense.**
>
> **If the supervisor *did not take a tangible employment action*, then the employer can raise the *Faragher-Ellerth* affirmative defense to vicarious liability by proving both of the following:**
>
> - **The employer acted reasonably to prevent and promptly correct harassment; and**
> - **The complaining employee unreasonably failed to use the employer's complaint procedure or to take other steps to avoid or minimize harm from the harassment.**

### a. Hostile Work Environment Includes a Tangible Employment Action: No Employer Defense

An employer is always liable if a supervisor's harassment creates a hostile work environment that includes a tangible employment action.[254] As previously noted, agency principles generally govern employer liability for a hostile work environment. The Supreme Court stated in *Ellerth* that "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation."[255] Therefore, when a hostile work environment includes a tangible employment action, the "action taken by the supervisor becomes for Title VII purposes the act of the employer,"[256] and the employer is liable.[257]

The tangible employment action may occur at any time during the course of the hostile work environment, and need not occur at the end of employment or serve as the culmination of the harassing conduct.[258] For example, if a supervisor subjects

**App. 080**

an employee to a hostile work environment by making frequent sexual comments and denying pay increases because the employee rejects the sexual advances,[259] then the employer is liable for the hostile work environment created by the supervisor and there is no defense.[260] This is true even though the supervisor's tangible employment action, here denial of pay increases, did not occur at the end of the employee's employment.

An unfulfilled threat to take a tangible employment action does not itself constitute a tangible employment action, but it may contribute to a hostile work environment.[261] By contrast, fulfilling a threat of a tangible employment action because a complainant rejects sexual demands (e.g., denying a promotion) constitutes a tangible employment action. Finally, fulfilling a promise to provide a benefit because the complainant submits to sexual demands (e.g., granting a promotion or not terminating the complainant after the complainant submits to sexual demands) constitutes a tangible employment action.[262]

### b. Hostile Work Environment Without a Tangible Employment Action: Establishing the *Faragher-Ellerth* Affirmative Defense

If harassment by a supervisor creates a hostile work environment that did not include a tangible employment action, the employer can raise an affirmative defense to liability or damages. In *Faragher* and *Ellerth*, the Supreme Court explained that the defense requires the employer to prove that:

- the employer exercised reasonable care to prevent and correct promptly any harassment; and

- the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to take other steps to avoid harm from the harassment.[263]

In establishing this affirmative defense, the Supreme Court sought "to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees."[264] The Court held that this carefully balanced defense contains "two *necessary* elements:"[265] (1) the employer's exercise of reasonable care to prevent and correct promptly any harassing behavior, and (2) the employee's unreasonable failure to take advantage of any preventive or corrective opportunities provided by the employer or to avoid

**App. 081**

harm otherwise.[266] Thus, in circumstances in which an employer fails to establish one or both prongs of the affirmative defense, the employer will be liable for the unlawful harassment. For example, if the employer is able to show that it exercised reasonable care but cannot show that the employee unreasonably failed to take advantage of preventive or corrective opportunities, the employer will not be able to establish the defense.

> **Example 62: Employer Fails to Establish Affirmative Defense.** Chidi, who is of Nigerian heritage, was subjected to national origin and racial harassment by his supervisor, Ang. The employer does not have a written anti harassment policy and does not offer comprehensive anti harassment training. Instead, employees are told to "follow the chain of command" if they have any complaints, which would require Chidi to report to Ang. During meetings with Chidi and his coworkers, Ang repeatedly directed egregious racial and national origin-based epithets at Chidi, and Ang's conduct was sufficient to create a hostile work environment. Chidi reported Ang's harassment to his manager (who was also Ang's supervisor) on at least two separate occasions. Each time, the manager simply responded, "That's just Ang   don't take it seriously." Based on these facts, the employer cannot establish either prong of the affirmative defense. The employer did not exercise reasonable care to prevent or to promptly correct the harassment. Further, the employer cannot establish that Chidi unreasonably failed to take advantage of the employer's complaint process. Based on these facts, the employer is liable for Ang's harassment of Chidi.

> **Example 63: Employer Avoids Liability by Establishing Affirmative Defense.** Kit was subjected to a hostile work environment by their supervisor because of race. The supervisor's harassment was not severe at first but grew progressively worse over a period of months. The employer had an effective anti-

harassment policy and procedure, which it prominently displayed on its employee website and provided to all employees through a variety of other means. In addition, the employer was not aware of any harassment by this supervisor in the past.[267] Kit never complained to the employer about the harassment or took steps to avoid harm from the harassment. The employer learned of the supervisor's conduct from Kit's coworker, who observed the harassment. After learning about it, the employer took immediate corrective action that stopped the harassment. Based on these facts, the employer is not liable for the supervisor's harassment of Kit, because the employer had an effective policy and procedure and took prompt corrective action upon receiving notice of the harassment *and* Kit could have used the effective procedure offered by the employer or taken other appropriate steps to avoid further harm from the harassment but did not do so.

### i. First Prong of the Affirmative Defense: Employer's Duty of Reasonable Care

The first prong of the affirmative defense requires an employer to show that it exercised reasonable care *both* to prevent harassment *and* to correct harassment. To do so, an employer must show both that it took reasonable steps to prevent harassment *in general*, as discussed immediately below, and that it took reasonable steps to prevent and to correct the *specific* harassment raised by a particular complainant. Because the questions of whether the employer acted reasonably to prevent and to correct the specific harassment alleged by the complainant also arise when analyzing employer liability for non supervisor harassment, those issues are discussed in detail at section IV.C.3.a (addressing unreasonable failure to prevent harassment) and section IV.C.3.b (addressing unreasonable failure to correct harassment). The principles discussed in those sections also apply when determining whether the employer has shown under the first prong of the affirmative defense that it acted reasonably to prevent and correct the harassment alleged by the complainant.

**App. 083**

Federal EEO law does not specify particular steps an employer must take to establish that it exercised reasonable care to prevent and correct harassment; instead, as discussed below, the employer will satisfy its obligations if, as a whole, its efforts are reasonable.[268] In assessing whether the employer has taken adequate steps, the inquiry typically begins by identifying the policies and practices an employer has instituted to prevent harassment and to respond to complaints of harassment. These steps usually consist of promulgating a policy against harassment, establishing a process for addressing harassment complaints, providing training to ensure employees understand their rights and responsibilities, and monitoring the workplace to ensure adherence to the employer's policy.[269]

For an anti harassment *policy* to be effective, it should generally have the following features:

- the policy defines what conduct is prohibited;

- the policy is widely disseminated;[270]

- the policy is comprehensible to workers,[271] including those who the employer has reason to believe might have barriers to comprehension, such as employees with limited literacy skills or limited proficiency in English;[272]

- the policy requires that supervisors report harassment when they are aware of it;[273]

- the policy offers multiple avenues for reporting harassment, thereby allowing employees to contact someone other than their harassers;[274]

- the policy clearly identifies accessible[275] points of contact to whom reports of harassment should be made and includes contact information;[276] and

- the policy explains the employer's complaint process, including the process's anti-retaliation and confidentiality protections.

For a complaint *process* to be effective, it should generally have the following features:

- the process provides for prompt and effective investigations and corrective action;[277]

- the process provides adequate confidentiality protections;[278] and

- the process provides adequate anti-retaliation protections.[279]

**App. 084**

For *training* to be effective, it should generally have the following features:[280]

- it explains the employer's anti-harassment policy and complaint process, including any alternative dispute resolution process, and confidentiality and anti retaliation protections;

- it describes and provides examples of prohibited conduct under the policy;

- it provides information about employees' rights if they experience, observe, become aware of, or report conduct that they believe may be prohibited;

- it provides supervisors and managers with information about how to prevent, identify, stop, report, and correct harassment, such as actions that can be taken to minimize the risk of harassment, and with clear instructions for addressing and reporting harassment that they observe, that is reported to them, or that they otherwise become aware of;

- it is tailored to the workplace and workforce;

- it is provided on a regular basis to all employees; and

- it is provided in a clear, easy to understand style and format.[281]

However, even the best anti-harassment policy, complaint procedure, and training will not necessarily establish that the employer has exercised reasonable care to prevent harassment—the employer must also implement these elements effectively.[282] Thus, evidence that an employer has a comprehensive anti-harassment policy and complaint procedure will be insufficient standing alone to establish the first prong of the defense if the employer fails to implement these policies and procedures or to appropriately train employees.[283] Similarly, the first prong of the defense would not be established if evidence shows that the employer adopted or administered the policy in bad faith or that the policy was otherwise defective or dysfunctional.[284] Considerations that may be relevant to determining whether an employer unreasonably failed to prevent harassment are discussed in detail at section IV.C.3.a, below.

Likewise, the existence of an adequate anti-harassment policy, complaint procedure, and training is not dispositive of the issue of whether an employer exercised reasonable care to correct harassing behavior of which it knew or should have known.[285] For example, if a supervisor witnesses harassment by a subordinate, the supervisor's knowledge of the harassment is imputed to the

**App. 085**

employer, and the duty to take corrective action will be triggered.[286] If the employer fails to exercise reasonable care to correct the harassing behavior, it will be unable to satisfy prong one of the *Faragher Ellerth* defense, regardless of any policy, complaint procedure, or training. The duty to exercise reasonable care to correct harassment for which an employer had notice is discussed in detail at section IV.C.3.b, below.

> **Example 64: Employer Liable Because It Failed to Exercise Reasonable Care in Responding to Harassment—Employee Reported to a Supervisor.**
>
> Aisha, who works as a cashier in a fast-food restaurant, was sexually harassed by one of her supervisors, Pax, an assistant manager. Aisha initially responded to Pax's sexual advances and other sexual conduct by telling him that she was not interested and that his conduct made her uncomfortable. Pax's conduct persisted, however, so Aisha spoke to the restaurant's other assistant manager, Mallory. Like Pax, Mallory was designated as Aisha's direct supervisor. The employer has an anti harassment policy, which it distributes to all employees. The policy states that all supervisors are required to report and address potentially harassing conduct when they become aware of such conduct. Mallory, however, did not report Pax's conduct or take any action because she felt Aisha was being overly sensitive. Pax continued to sexually harass Aisha, and a few weeks after speaking with Mallory, Aisha contacted the Human Resources Director. The following day, the employer placed Pax on paid administrative leave, and a week later, after concluding its investigation of Aisha's allegations, the employer terminated Pax. The employer contends that it took reasonable corrective action by promptly responding to Aisha's complaint to Human Resources. However, because Mallory was one of Aisha's supervisors, and was therefore responsible for reporting and addressing potential harassment, the employer cannot establish the affirmative defense,

**App. 086**

having failed to act reasonably to address the harassment after Aisha spoke with Mallory.

**Example 65: Employer Liable Because It Failed to Exercise Reasonable Care in Responding to Harassment—Supervisor Witnessed Harassment.**
Claudia works as an overnight stocker in the housewares department of a big box store. Her employer has an anti harassment policy. The policy is, on its face, effective: for example, it describes harassment; provides multiple avenues for reporting harassment, including a 1 800 number operated by a third party vendor; and contains an anti retaliation provision. The policy is distributed to all employees at the time of their hire and can be accessed any time via computer terminals that all employees can use. Further, the employer ensures that all employees receive annual anti-harassment training that reminds them of the policy, including their rights and obligations under it.

Claudia is directly supervised by Dustin, the housewares department manager. On an almost nightly basis, Dustin likes to "play a game" in which he hides between store aisles and jumps out with his penis exposed to Claudia. Ravi, who manages the employer's produce section, has witnessed Dustin expose his penis to Claudia on a few occasions. Ravi once admonished Dustin for being a "child" and told him "acting like that will lead to you getting fired," but took no further action to address the harassment. Claudia was embarrassed by the harassment and was afraid that complaining would jeopardize her job, so she never reported the harassment, either to the employer or the 1 800 number.

Under these facts, the employer cannot establish the affirmative defense. While the employer appears to

**App. 087**

have acted reasonably in its efforts to prevent harassment by adopting a comprehensive and effective anti harassment policy and providing training, it did not act reasonably to correct harassment that it knew about through Ravi's direct observation.

### ii. Second Prong of the Affirmative Defense: Employee's Failure to Take Advantage of Preventive or Corrective Opportunities

The second prong of the *Faragher-Ellerth* affirmative defense requires the employer to show that the complainant "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[287] If an employer has exercised reasonable care, it will not be liable if the complainant could have avoided all harm from unlawful harassment but unreasonably failed to do so.[288] In addition, if the employee unreasonably delayed complaining and an earlier complaint could have avoided some but not all of the harm from the harassment, then the employer might be able to use the affirmative defense to reduce damages, even if it could not eliminate liability altogether.[289]

> **Example 66: Employer Limits Damages by Establishing Affirmative Defense.** Nina was subjected to a hostile work environment based on national origin harassment by her supervisor, Samantha. The evidence shows that the harassment began when Samantha used egregious epithets to refer to Nina's national origin during an informal meeting Samantha held only with Nina and her coworkers, conduct that was sufficient standing alone to create a hostile work environment. The employer has an accessible anti-harassment policy, distributes the policy broadly, and holds anti harassment training periodically. Although Samantha's harassment of Nina continues, Nina does not complain until four months later, when she accepts a position with another employer. Then, Nina states she did not complain during her employment because she did not want to "rock the boat" or cause Samantha to be fired. The employer has established both

elements of the affirmative defense with respect to the continuing harassment after the meeting because the employer acted reasonably to prevent and correct harassment and Nina could have avoided this harm by complaining promptly. However, the employer is liable for the hostile work environment created by Samantha's initial use of the egregious epithets because Nina could not have avoided this harm by complaining earlier. As a result, Nina is entitled to damages for the hostile work environment arising from the informal meeting but not for any subsequent harassment.

Proof that the employee failed to use the employer's complaint procedure will normally establish the second prong of the affirmative defense if following the procedure could have avoided the harm.[290] In some circumstances, however, there will be evidence of a reasonable explanation for an employee's delay in complaining or failure to utilize the employer's complaint process.[291] In addition, there will be instances when an employee's use of mechanisms other than the employer's official complaint process will be sufficient to demonstrate that the employee took reasonable steps to avoid harm from the harassment.

The reasonableness of an employee's decision not to use the employer's complaint procedure, or timing in doing so, depends on the particular circumstances and information available to the employee *at that time*.[292] An employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. An employee might reasonably ignore a small number of minor incidents, hoping that the harassment will stop without resorting to the complaint process.[293] The employee also may choose to tell the harasser directly to stop the harassment and then wait to see if the harasser stops before complaining to management. If the harassment persists or worsens, however, then further delay in complaining might be unreasonable.

Even if the employee uses the employer's official complaint process, the employer may still be able to establish the second prong of the *Faragher Ellerth* affirmative defense where the employee failed to act reasonably in using the process. If, for example, the complainant unreasonably failed to cooperate in the investigation, the complaint by itself would not constitute a reasonable effort to avoid harm.[294]

a) Reasonable Delay in Complaining or in Failing to Use the Employer's Complaint Procedure

There may be reasonable explanations for an employee's delay in complaining or failure to utilize the employer's complaint process.[295] For example:

- Employer created obstacles to filing complaints: An employee's failure to use the employer's complaint procedure could be reasonable if that failure was based on employer-created obstacles to filing complaints. For example, if the process entailed undue expense by the employee,[296] inaccessible points of contact for making complaints,[297] or intimidating or burdensome requirements, failure to use the process could be reasonable.

- Ineffective complaint mechanism: As a general matter, an employee's subjective belief that reporting harassment will be futile, without more, will not constitute a reasonable basis for failing to take advantage of preventive or corrective opportunities provided by an employer.[298] However, an employee's failure to use the employer's complaint procedure would be reasonable if that failure was based on a *reasonable* belief that the complaint process was ineffective. For example, an employee might have a reasonable belief that the complaint process would be ineffective if the persons designated to receive complaints were all close friends of the harasser.[299] A failure to complain also might be reasonable if the complainant was aware of instances in which the employer had failed to take appropriate corrective action in response to prior complaints filed by the complainant or by coworkers.[300]

- Risk of retaliation: A generalized fear of retaliation, standing alone, generally will not constitute a reasonable basis for failing to take advantage of preventive or corrective opportunities provided by an employer.[301] However, an employee's failure to use the employer's complaint procedure would be reasonable if the employee *reasonably* feared retaliation as a result of complaining about harassment.[302] An employer's complaint procedure should provide assurances that complainants will not be subjected to retaliation. Even in the face of such assurances, however, an employee might reasonably fear retaliation in some instances. For example, if the harasser threatened the employee with reprisal for complaining, then the employee's decision not to report or to delay reporting the harasser would likely be reasonable.[303] Similarly, an employee's failure to complain could be reasonable if the employee or another employee had previously been subjected to retaliation for complaining about harassment.[304] By contrast,

**App. 090**

because it may not be possible for an employer to completely eliminate all unpleasantness that an employee may experience in reporting harassment, a failure to report or delay in reporting will not be considered reasonable if based merely on concerns about ordinary discomfort or embarrassment.[305]

These examples are not exclusive, and there may be other reasonable explanations for why an employee fails to report, or delays in reporting, harassment. For instance, an employee's delay in reporting might be reasonable if linked to psychological trauma resulting from the underlying harassment.[306]

**b) Reasonable Efforts to Avoid Harm Other than by Using the Employer's Complaint Process**

Even if an employee failed to use the employer's complaint process, the employer will not be able to establish the *Faragher-Ellerth* affirmative defense if the employee took other reasonable steps to avoid harm from the harassment. A promptly filed union grievance while the harassment is ongoing, for example, could qualify as a reasonable effort to avoid harm.[307] Similarly, a temporary employee who is harassed at the client's workplace generally would be free to report the harassment to either the employment agency or the client, reasonably expecting that the entity she notified would act to correct the problem.[308]

### 3. Non-Supervisory Employees (E.g., Coworkers) and Non-Employees —Negligence[309]

> **An employer is liable for a hostile work environment created by non-supervisory employees or by non-employees if it was negligent because:**
>
> - **it unreasonably failed to prevent the harassment;**
>   **OR**
>
> - **it failed to take reasonable corrective action in response to harassment about which it knew or should have known.**

Although the negligence standard is principally applied in cases involving harassment by a non-supervisory employee or non-employee, it also can be applied in cases of harassment by a supervisor or an alter ego/proxy.[310]

**App. 091**

**a. Unreasonable Failure to Prevent Unlawful Harassment**

An employer is liable for a hostile work environment created by non supervisory employees or non-employees where the employer was negligent by failing to act reasonably to prevent the unlawful harassment from occurring.[311] Although the relevant considerations will vary from case to case, some of the considerations may include:

1) **Adequacy of the employer's anti-harassment policy, complaint procedures, and training:** As with the first prong of the *Faragher-Ellerth* affirmative defense (which only applies to unlawful harassment by a supervisor), assessing negligence on the part of an employer starts with whether the employer had an adequate anti-harassment policy, complaint procedure, and training program to ensure employees understand their rights and responsibilities pursuant to the policy.[312] The elements described in section IV.C.2.b.i, above, with regard to an effective policy and complaint procedure, apply here as well.

2) **Nature and degree of authority, if any, that the alleged harasser exercised over the complainant:**[313] Employers have a heightened responsibility to protect employees against harassment by other employees whom they have "armed with authority"[314] even if the other employees are not "supervisors."[315]

3) **Adequacy of the employer's efforts to monitor the workplace,**[316] such as by training supervisors and other appropriate officials on how to recognize potential harassment and by requiring them to report or address harassment that they either are aware of or reasonably should have known about.

4) **Adequacy of the employer's steps to minimize known or obvious risks of harassment**, such as harassment by inmates incarcerated in a maximum-security prison;[317] in workspaces that are isolated, decentralized, lack a diverse workforce, or rely on customer service or client satisfaction; and against employees who are vulnerable, young, do not conform to workplace norms based on societal stereotypes, or who are assigned to complete monotonous or low intensity tasks.[318]

> **Example 67: Employer Unreasonably Failed to Prevent Unlawful Harassment.** Willie, a man with intellectual and developmental disabilities, works for a

**App. 092**

janitorial company. The other members of Willie's cleaning crew also are individuals with intellectual and/or developmental disabilities, except for the team lead, Bobby. (As a team lead, Bobby is responsible for ensuring all crew members have access to cleaning supplies and the spaces that the crew will be cleaning; Bobby does not have the ability to hire, fire, demote, promote, transfer, or discipline Willie or any other crew member.) At the time of hire, each new employee is required to watch a one hour anti harassment training video focusing on legal standards and is required to sign a training acknowledgment form without the opportunity to ask questions. Although Willie watched the module, he did not understand it because of his disabilities. No one from the company discussed the training with Willie. While at worksites, Bobby frequently berates Willie and other team members by calling them "dummy" or "ret*rd," and asks demeaning questions, such as "did your mom drop you on your head when you were a baby?" Bobby also mimics the crew members' disabilities. No one else from the janitorial company ever comes to Willie's worksites to check in with him or the other crew members, and because Willie and the other crew members, other than Bobby, do not understand how the anti-harassment policy works, they do not complain and are subjected to continued disability based harassment. Based on these facts, the employer has not acted reasonably to prevent Willie and the other crew members from being subjected to unlawful harassment.

**Example 68: Employer Acted Reasonably to Prevent Unlawful Harassment.** Danielle, a pulmonary and respiratory care nurse at a large hospital system, is responsible for caring for patients recovering from respiratory conditions at the hospital, such as Lewis, a patient recovering from pneumonia. At the time Lewis

**App. 093**

was admitted, his son stated, "I hope your staff is prepared because dad has some 'old timey' attitudes toward women and wandering hands." The hospital is understaffed, which often requires Danielle and other nurses to work in isolated conditions, such as by entering patients' rooms alone. Given Lewis's son's statement and knowing that employees who work in isolated conditions are at a higher risk of harassment, when Danielle is assigned to care for Lewis, her supervisor warns her about Lewis's potential conduct; offers to reassign Lewis to another nurse, if one is available; and, if another nurse is not available or if Danielle wants to keep the assignment, offers to assign another staff member to accompany Danielle into Lewis's room. Based on these facts, the employer has acted reasonably to prevent Danielle from being subjected to unlawful harassment.

### b. Unreasonable Failure to Correct Harassment of Which the Employer Had Notice

Even if an employer acted reasonably to prevent unlawful harassment by coworkers or non-employees, it is still liable for a hostile work environment if it was negligent because it did not act reasonably to correct harassment about which it knew or should have known.[319]

---

**Notice**

- **An employer has notice of harassment if an individual responsible for reporting or taking corrective action with respect to the harassment is aware of it or if such an individual reasonably should have known about the harassment.**

**Corrective Action**

---

**App. 094**

- **Once an employer has actual or constructive notice of potential harassment, it is required to take reasonable corrective action to prevent the conduct from continuing.**

### i. Notice

The first element that triggers an employer's duty to take reasonable corrective action in response to harassment is having notice of the harassment.[320]

An employer has actual notice of harassment if an individual responsible for reporting or taking corrective action with respect to the harassment is aware of it.[321] Thus, if harassment is observed by or reported to any individual responsible for reporting harassment to management or taking corrective action, then the employer has actual notice of the harassment. For example, an employer has actual notice of harassment if an employee with a general duty to respond to harassment under the employer's anti harassment policy, such as the EEO Director, a manager, or a supervisor who does not directly supervise either the harasser or the target of the harassment but who does have a duty to report harassment, is aware of the harassment.[322] In addition, an employer has notice if someone qualifying as the employer's proxy or alter ego, such as an owner or high-ranking officer, has knowledge of the harassment.[323]

> **Example 69: Employer Had Notice of Harassment.**
> Lawrence, a Black man in his sixties, was employed as a laborer in a distribution yard where he was subjected to race- and age-based harassment by coworkers. Although Lawrence's employer contends that it was never notified of the harassment until Lawrence made a complaint after being fired for misconduct, a "yard lead," who was responsible for instructing and organizing teams of yard workers, acknowledges that Lawrence complained to him about the harassment before Lawrence was fired. According to the employer's policy, the yard lead was expected to report problems to the yard manager, who had authority to take disciplinary action against employees. Because the yard lead was responsible for referring Lawrence's

**App. 095**

complaint to an appropriate official authorized to take corrective action, the employer had actual notice of the alleged harassment.[324]

A complaint can be made by a third party, such as a friend, relative, or coworker, and need not be made by the target of the harassment. For example, if an employee witnesses a coworker being subjected to racial epithets by a person at work, and that employee reports it to the appropriate personnel in Human Resources, the employer is on notice of potentially harassing behavior. Similarly, even if no one complains, the employer still has notice if someone responsible for correcting or reporting harassment becomes aware of the harassment, such as by personally witnessing it.[325]

The employer's duty to take corrective action is triggered if the notice it has received is sufficient to make a reasonable employer aware of the possibility that an individual is being subjected to harassment on a protected basis. While no "magic words" are required to initiate a harassment complaint, the complaint (or other vehicle for notice) must identify potentially harassing conduct in some way.[326] Therefore, a complaint simply that a coworker's conduct was "rude" and "aggravating" might not provide sufficient notice depending on the circumstances. Conversely, evidence that an employee had engaged in "unwanted touching" of another employee likely would be sufficient to alert the employer of a reasonable probability that the second employee was being sexually harassed and that it should investigate the conduct and take corrective action.[327]

> **Example 70: Employer Had Notice of Harassment.**
> Susan was subjected to sex-based harassment by her coworker, Jim. Although Susan's employer contends that it did not have notice of the conduct, evidence shows that Susan requested a schedule change when she was scheduled to work alone with Jim, and that Susan's coworkers told her supervisor, Barb, that Susan wanted to avoid working with Jim. Also, Jim told Barb that he may have "done something or said something that [he] should not have to Susan." When Barb asked Susan about working with Jim, Susan became teary and red and said, "I can't talk about it." Barb responded by saying, "That's good because I

**App. 096**

don't want to know what happened." Under the circumstances, Barb had enough information to suspect that Jim was harassing Susan. As Susan's supervisor, Barb had the responsibility to take corrective action, if she had the authority, or to notify another official who did have the authority to take corrective action.[328]

Although an employer cannot be found liable for conduct that does not violate federal EEO law, the duty to take corrective action may be triggered by notice of harassing conduct that has not yet risen to the level of a hostile work environment, but may reasonably be expected to lead to a hostile work environment if appropriate corrective action is not taken.[329]

Notice of harassing conduct directed at one employee might serve as notice not only of the harasser's potential for further harassment of the same employee but also of the harasser's potential to harass others. Factors in assessing the relevance of the employer's knowledge of prior harassment can include the "extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment."[330]

An employer has constructive notice of harassing conduct if, under the circumstances presented, a reasonable employer should know about the conduct. [331] Most commonly, an employer is deemed to have constructive notice if harassing conduct is severe, widespread, or pervasive so that individuals responsible for taking action with respect to the harassment reasonably should know about it.[332] An employer also may be deemed to have constructive notice of harassment if it did not have reasonable procedures for reporting harassment.[333]

> **Example 71: Employer Had Constructive Notice of Harassment.** Joe, who is Mexican American, works as an automotive parts salesman for a car dealership. Joe's job requires him to frequently enter the dealership's service department. The service department is managed by Aseel, who is onsite in the service department all day when he supervises a team of five mechanics. At least once per day while Joe is in the service department, a mechanic, Tanner, yells at Joe across the room, calling him "wetback" and "sp*c,"

**App. 097**

among other epithets. The other mechanics sometimes talk amongst themselves about how Tanner's conduct toward Joe never stops in the service department, that Tanner seems to enjoy having an audience, and how they are surprised that Tanner's conduct continues even after their employer provided anti harassment training to all of the employees working at the dealership. Based on this evidence, the employer had constructive notice of the hostile work environment because Service Manager Aseel knew or should have known about Tanner's conduct.[334]

### ii. Reasonable Corrective Action

Once an employer has notice of potentially harassing conduct, it is responsible for taking reasonable corrective action to prevent the conduct from continuing. This includes conducting a prompt and adequate investigation and taking appropriate action based on the findings of that investigation.

#### a) Prompt and Adequate Investigation

An investigation is prompt[335] if it is conducted reasonably soon after the employee complains or the employer otherwise has notice of possible harassment. Clearly, an employer that opens an investigation into a complaint one day after it is made has acted promptly.[336] By contrast, an employer that waits two months to open an investigation, absent any mitigating facts, very likely has not acted promptly.[337] In many instances, what is "reasonably soon" is fact-sensitive and depends on such considerations as the nature and severity of the alleged harassment and the reasons for delay.[338] For example, when faced with allegations of physical touching, an employer that, without explanation, does nothing for two weeks likely has not acted promptly.[339]

An investigation is adequate if it is sufficiently thorough to "arrive at a reasonably fair estimate of truth."[340] The investigation need not entail a trial-type investigation, but it should be conducted by an impartial party and seek information about the conduct from all parties involved. The alleged harasser therefore should not have supervisory authority over the individual who conducts the investigation and should not have any direct or indirect control over the

investigation. If there are conflicting versions of relevant events, it may be necessary for the investigator to make credibility assessments to determine whether the alleged harassment in fact occurred.[341] Accordingly, whoever conducts the investigation should be well-trained in the skills required for interviewing witnesses and evaluating credibility.

> **Example 72: Employer Failed to Conduct Adequate Investigation.** George, a construction worker, repeatedly complains to the superintendent that he is being harassed because of his disability by Phil, a coworker. After about two weeks, the superintendent asks a friend of his to conduct an investigation, even though this individual is not familiar with EEO law and has no experience conducting harassment investigations. The investigator meets with George and Phil individually for about ten minutes, and asks only a few perfunctory questions. From these interviews, the investigator issues a single-page memorandum concluding, without further explanation, that there is no basis for finding that George was harassed. Based on these facts, the employer has not conducted an adequate investigation.[342]

Upon completing its investigation, the employer should inform the complainant and alleged harasser of its determination and any corrective action that it will be taking, subject to applicable privacy laws.[343]

Employers should retain records of all harassment complaints and investigations.[344] These records can help employers identify patterns of harassment, which can be useful for improving preventive measures, including training. These records also can be relevant to credibility assessments and disciplinary measures.

In some cases, it may be necessary, given the seriousness of the alleged harassment, for the employer to take intermediate steps to address the situation while it investigates the complaint.[345] Examples of such measures include making scheduling changes to avoid contact between the parties; temporarily transferring the alleged harasser; or placing the alleged harasser on non disciplinary leave with pay pending the conclusion of the investigation. As a rule, an employer should make every reasonable effort to minimize the burden or negative consequences to an

employee who complains of harassment, both during and after the employer's investigation.[346]

Corrective action that leaves the complainant worse off could constitute unlawful retaliation.[347] The employer should take measures to ensure that retaliation does not occur. For example, when management investigates a complaint of harassment, the official who interviews the parties and witnesses should remind these individuals about the prohibition against retaliation. Management also should scrutinize employment decisions affecting the complainant and witnesses during and after the investigation to ensure that such decisions are not based on retaliation.

### b) Appropriate Corrective Action

To avoid liability, an employer must take corrective action that is "reasonably calculated to prevent further harassment" under the particular circumstances at that time.[348] Corrective action should be designed to stop the harassment and prevent it from continuing.[349] The reasonableness of the employer's corrective action depends on the particular facts and circumstances at the time the action is taken.[350]

Considerations that will be relevant in evaluating the reasonableness of an employer's corrective action include the following:

> 1) **Proportionality of the corrective action**: Corrective action should be proportionate to the seriousness of the offense.[351] If the harassment was comparatively minor and involved an individual with no prior history of similar misconduct, then counseling and an oral warning might be all that is necessary. In other circumstances, separating the harasser and the complainant may be adequate. On the other hand, if the harassment was severe or persistent despite prior corrective action, then suspension or discharge of the harasser may be necessary.[352]
>
> 2) **Authority granted harasser**: Employers have a heightened responsibility to protect employees against abuse of official power. To that end, employers must take steps to prevent employees who have been granted authority over others from using it to further harassment, even if that authority is insufficient to establish vicarious liability.[353] Thus, the nature and degree of the

**App. 100**

harasser's authority should be considered in evaluating the adequacy of corrective action.[354]

3) **Whether harassment stops**: After taking corrective action, an employer should monitor the situation to ensure that the harassment has stopped. Whether the harassment stopped is a key factor indicating whether the corrective action was appropriate. However, the continuation of harassment despite an employer's corrective action does not necessarily mean that the corrective action was inadequate.[355] For example, if an employer takes appropriate proportionate corrective action against a first-time harasser who engaged in a mildly offensive series of jokes and innuendos, yet the same employee subsequently engages in further harassment, then the employer may not be liable if it also responded appropriately to the subsequent misconduct by taking further corrective action appropriate to the pattern of harassment. On the other hand, an employer who takes no action in response to a complaint of harassment may not be shielded from liability by the fact that the harassment "fortuitously stops."[356]

4) **Effect on complainant**: An employee who in good faith complains of harassment should ideally face no burden because of the corrective action the employer takes to stop harassment or prevent it from occurring; for example, corrective action generally should not involve involuntarily transferring the complaining employee while leaving the alleged harasser in place.[357] However, the employer may place some burdens on the complaining employee as part of the corrective action it imposes on the harasser if it makes every reasonable effort to minimize those burdens or adverse consequences. [358]

5) **Options available to the employer**:[359] Employers have an "arsenal of incentives and sanctions" available to them to address harassment.[360] However, an employer's options for corrective actions may vary depending on who engages in the conduct and where it occurs, among other considerations.

6) **The extent to which the harassment was substantiated**: Where an employer conducts a thorough investigation but is unable to determine with sufficient confidence that the alleged harassment occurred, its response may be more limited. An employer is not required to impose discipline if, after a thorough investigation, it concludes that the alleged harassment did not occur, or if it has inconclusive findings.[361] Nonetheless, if the employer is

**App. 101**

unable to determine whether the alleged harassment occurred, the employer may wish to consider preventive measures, such as counseling, training, monitoring, or issuing general workforce reminders about the employer's anti harassment policy.[362]

**Example 73: Employer failed to take reasonable corrective action.** Malak, a server at a sports bar, is visibly pregnant. Every Sunday, Kevin and Troy spend the afternoon at the bar cheering on their favorite teams, and they usually sit in Malak's section. They repeatedly ask if they can rub her belly "for luck" before games, and berate her when she refuses, calling her a "mean mama." They also frequently make beeping sounds and yell, "Careful! Wide load!" when Malak serves other tables. In addition, they ask if she plans to breastfeed and offer to "help out with practice sessions." Sven, a manager, overhears Kevin and Troy, laughs, and says halfheartedly, "C'mon guys, give her a break." They ignore him and continue to comment about Malak's pregnancy. Malak complains to Sven, who throws up his hands and says, "Hey, I did what I could. What else do you want me to do? If I barred everyone who made a few dumb comments when they were drunk, we'd have no customers at all." Based on these facts, the employer has failed to take reasonable corrective action to address Kevin and Troy's pregnancy based harassment of Malak.

**Example 74: Employer took reasonable corrective action.** Same facts as above, but instead of laughing and making a halfhearted request that Kevin and Troy stop harassing Malak, Sven tells Kevin and Troy that they must stop making comments about Malak's pregnancy and warns them that they will be barred from the

**App. 102**

establishment if they persist. Sven tells Malak to notify him or another manager immediately if the comments continue. Sven also asks Malak if she would like Kevin and Troy reseated in another section, but she declines, and he asks other managers to keep an eye on Kevin and Troy to make sure the two men do not continue to harass Malak. Three weeks later, Kevin and Troy resume making offensive pregnancy related comments to Malak. Before Malak can notify Sven, another manager does so, and Sven promptly gives Kevin and Troy their checks, directs them to pay their bills, and notifies them they are no longer welcome at the bar. Based on these facts, the employer has taken adequate corrective action to address Kevin and Troy's pregnancy based harassment of Malak.

7) Special considerations when balancing anti harassment and accommodation obligations with respect to religious expression:[363] Title VII requires that employers accommodate employees' sincerely held religious beliefs, practices, and observances unless doing so would impose an undue hardship.[364] Employers also are responsible for protecting workers against unlawful harassment, including harassment motivated by religion or created by religious expression. To address these dual obligations, an employer should accommodate an employee's sincerely held religious practice of engaging in religious expression in the workplace, unless doing so would create, or reasonably threatens to create, a hostile work environment. Thus, while an employer may need to provide a religious accommodation that disrupts "[c]omplete harmony in the workplace,"[365] the employer should take corrective action to address religious expression that creates, or threatens to create, a hostile work environment, or otherwise would result in undue hardship.[366] As with other forms of harassment, an employer should take corrective action before the conduct becomes sufficiently severe or pervasive to create a hostile work environment.

Corrective action in response to a harassment complaint must be taken without regard to the complainant's protected characteristics. Thus, employers should

follow consistent processes to investigate harassment claims, and to determine what corrective action, if any, is appropriate. For example, it would violate Title VII if an employer assumed that a male employee accused of sexual harassment by a female coworker had engaged in the alleged conduct based on stereotypes about the "propensity of men to harass sexually their female colleagues"[367] and therefore fired him.

In some circumstances, an employee may report harassment but ask that the employer keep the matter confidential and take no action. Although it may be reasonable in some circumstances to honor the employee's request when the conduct is relatively mild, it may not be reasonable to do so in all circumstances,[368] including, for instance, if it appears likely that the harassment was severe[369] or if employees other than the complainant are vulnerable.[370] One mechanism to help minimize such conflicts could be for the employer to set up an informational phone line or website that allows employees to ask questions or share concerns about harassment anonymously.[371] In such circumstances, the employer also may be required to take general corrective action to reduce the likelihood of harassment in the future, such as recirculating its anti-harassment policy.

### c) Assessing the Liability of Joint Employers

If an individual has been assigned by an employment agency to work for a client, then both the agency and the client may jointly employ the individual during the period when the individual works for the client.[372] If a worker is jointly employed by two or more employers, then each of the worker's employers is responsible for taking corrective action to address any alleged harassment about which it has notice.[373] An employer has the same responsibility to prevent and correct harassment of non-direct hire employees as harassment of permanent employees.[374] Therefore, under such circumstances, if the worker complains about harassment to both the client and the employment agency, then both entities would be responsible for taking corrective action.[375] Joint employers are not required to take duplicative corrective action, but each has an obligation to respond to potential harassment, either independently or in cooperation. Once the employee complains to either entity, that entity is responsible to take reasonable steps within its control to address the harassment and to work with the other entity, if necessary, to resolve the situation.[376]

**App. 104**

As with an employer, an employment agency is responsible for taking reasonable corrective action within its own control. This is true regardless of whether the employment agency's client is also a joint employer. Corrective action may include, but is not limited to: ensuring that the client is aware of the alleged harassment; insisting that the client conduct an investigation and take appropriate corrective measures on its own; working with the client to jointly conduct an investigation and/or identify appropriate corrective measures; following up and monitoring to ensure that corrective measures have been taken; and providing the worker with the opportunity to take another job assignment at the same pay rate, if such an assignment is available and the worker chooses to do so.

> **Example 75: Temporary Agency Takes Adequate Corrective Action, But Client Does Not.** Yousef is a Muslim software engineer of Arab American heritage. He is assigned by an employment agency to work for a technology company on a software development project. The evidence establishes that the agency and technology company are joint employers of Yousef. Soon after Yousef starts working, Eddie, one of his coworkers, begins making frequent comments about his religion and ethnicity. For example, Eddie says that Middle Easterners and Muslims "prefer to solve problems with their guns and bombs, rather than their brains." He also says that "the Middle East's number one export is terrorism," and recommends that Yousef's work be reviewed carefully "to make sure he's not embedding bugs on behalf of terrorists." Yousef tells Eddie to stop, but he refuses. Yousef complains to the employment agency, which promptly notifies the technology company and requests that it take corrective action. The technology company refuses to take any action, explaining that Eddie is one of its most experienced programmers, that his assistance is crucial to the project's satisfactory completion, and that his reputation in the tech industry has attracted numerous prestigious clients to the company. The employment agency promptly reassigns Yousef to a different client at the same pay rate.[377] The employment agency also

**App. 105**

declines to assign other workers to the technology company until the company takes appropriate corrective action to address Eddie's conduct. Based on these facts, the agency took appropriate corrective action as to Yousef, while the technology company did not.

# V. **Systemic Harassment**

## A. **Harassment Affecting Multiple Complainants**

Like other forms of discrimination, harassment can be systemic, subjecting multiple individuals to a similar form of discrimination. If harassment is systemic, then the harassing conduct could subject many, or possibly all, of the employees of a protected group to the same circumstances. For example, evidence might show that the Black employees working on a particular shift were subjected to, or otherwise knew about, the same racial epithets, racial imagery, and other offensive race-based conduct.[378] In such a situation, evidence of widespread race based harassment could be used to establish that Black employees working on that shift were individually subjected to an objectively hostile work environment. Similarly, evidence that a group of individuals with intellectual disabilities had been physically abused, financially exploited, and subjected to verbal abuse including frequently being called "ret*rded," "dumb ass," and "stupid"[379] could establish a disability-based hostile work environment for all of the impacted individuals.

> **Example 76: Same Evidence of Racial Harassment Establishes Objectively Hostile Work Environment for Multiple Employees.** A group of five Black correctional officers, who are the only Black officers on their shift, experienced racial mistreatment and jokes, including aggressive treatment by dog handlers stationed at the entrance and racial references and epithets, such as the n-word, "back of the bus," and "the hood." Much of the conduct occurred in a communal setting, such as the cafeteria, in which supervisors participated or laughed at the conduct without objecting. This conduct occurred regularly,

**App. 106**

despite the Black officers' repeated objections. Although none of the Black officers were personally subjected to every harassing incident, they each were subjected to some of the similar conduct because the harassers treated them as a cohesive group. Further, each became aware of harassment experienced by the others, even if they were not present when every discriminatory comment was made. Based on these facts, given the totality of circumstances, each of the Black officers was subjected to an objectively hostile work environment based on race.[380]

## B. Pattern or Practice of Harassment

In some situations involving systemic harassment, the evidence may establish that the employer engaged in a "pattern or practice" of discrimination, meaning that the employer's "standard operating procedure" was to engage in or tolerate harassment creating a hostile work environment.[381] An allegation of a pattern or practice of harassment focuses on the "landscape of the total work environment, rather than the subjective experiences of each individual claimant"[382]—in other words, whether the work environment, as a whole, was hostile.[383] For instance, in one case, the court concluded that evidence of widespread abuse, including physical assault, threats of deportation, denial of medical care, and limiting contact with the "outside world," was sufficient to establish that it was the employer's standard operating procedure to subject Thai nationals employed on the defendant's farms to a hostile work environment.[384]

An employer's efforts to prevent or correct systemic harassment must be adequate to fully address the nature and scope of the harassment the employer knows (or reasonably should know) was or is occurring. For example, an employer cannot simply correct the harassment as to a particular subset of individuals known to be affected. Moreover, if there have been frequent individual incidents of harassment, then the employer must take steps to determine whether that conduct reflects the existence of a wider problem requiring a systemic response, such as developing comprehensive company-wide procedures.[385]

**Example 77: Evidence Establishes Pattern or Practice of Sex Harassment.** Zoe alleges that she has

**App. 107**

been subjected to ongoing sex-based harassment at the soap manufacturing plant where she works. An investigation reveals that female employees throughout the same plant have been frequently subjected to physically invasive conduct by male coworkers, including the touching of women's breasts and buttocks; that women have been targeted by repeated sexual comments and conduct; and that there are open displays of sexually offensive materials throughout the plant, including pornographic magazines and calendars. The investigation further reveals that the employer either knew or should have known about the widespread sexual harassment. In particular, much of the harassment occurred openly in public places, such as the display of pornography, and many incidents, such as sexual comments, occurred in the presence of supervisors who were required by the employer's anti-harassment policy to report sexual harassment to the Human Resources Department. Finally, although management has taken some corrective action in isolated cases, there is no evidence that management has taken steps to determine whether the harassment is part of a systemic problem requiring appropriate plant wide corrective action. Based on these facts, the employer has subjected female employees at the plant to a pattern or practice of sexual harassment.[386]

# VI. **Selected EEOC Harassment Resources**

A. EEOC Harassment Home Page: **https://www.eeoc.gov/harassment (https://www.eeoc.gov/harassment)**

B. EEOC Sexual Harassment Home Page: **https://www.eeoc.gov/sexual-harassment (https://www.eeoc.gov/sexual-harassment)**

C. EEOC Select Task Force on the Study of Harassment in the Workplace: **https://www.eeoc.gov/eeoc-select-task-force-study-harassment-workplace**

**App. 108**

Case 2:24-cv-00173-Z     Document 31     Filed 10/23/24     Page 111 of 220     PageID 457

**(https://www.eeoc.gov/eeoc-select-task-force-study-harassment-workplace)**

D. Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic* (2016), **https://www.eeoc.gov/june-2016-report-co-chairs-select-task-force-study-harassment-workplace (https://www.eeoc.gov/june-2016-report-co-chairs-select-task-force-study-harassment-workplace)**

E. Promising Practices for Preventing Harassment: **https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment (https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment)**

F. Promising Practices for Preventing Harassment in the Federal Sector: **https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector (https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector)**

G. EEOC Retaliation Home Page: **https://www.eeoc.gov/retaliation (https://www.eeoc.gov/retaliation)**

H. Enforcement Guidance on Retaliation and Related Issues: **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)**

# Addendum Pursuant to 29 C.F.R. § 1695.6(c) on EEOC Responses to Major Comments Received on the Proposed Enforcement Guidance on Harassment in the Workplace

The Equal Employment Opportunity Commission (Commission or EEOC) published a Notice in the *Federal Register* on October 2, 2023, inviting the public to submit comments on its proposed Enforcement Guidance on Harassment in the Workplace and including a hyperlink to the federal website with the proposed guidance.**[387]** The comment period ended on November 2, 2023.  During this period, the EEOC received over 37,000 comments from private individuals, organizations, and

**App. 109**

legislators.  The majority of comments from private individuals were identical form (standardized) comments or slightly altered form comments.  The comments from organizations addressed a range of issues and some requested that the Commission add additional hypothetical examples.

The Commission carefully considered all the comments it received in the process of revising the draft and preparing the final guidance.  The major issues raised in the comments and the Commission's responses are listed, summarized, and addressed below.

## EEOC Authority

### EEOC Authority to Address Harassment Based on Gender Identity Related to Sex-Segregated Facilities and Pronouns

Comment: Some commenters contended that the Commission exceeded its statutory authority under Title VII of the Civil Rights Act of 1964 (Title VII) because, they asserted, the proposed guidance exceeded the scope of Title VII as interpreted by the Supreme Court in *Bostock v. Clayton County*, 590 U.S. 644 (2020).  These commenters stated that the decision in *Bostock* was limited in scope and did not address, among other things, sex segregated bathrooms.

Response:

The proposed guidance did not attempt to—nor does the final guidance attempt to   impose new legal obligations on employers with respect to any aspect of workplace harassment law, including gender identity discrimination. Nor does the guidance exceed the scope of the Supreme Court's decision in *Bostock*.

Section 703(a)(1) of Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  At least since 1986, the Supreme Court has been unequivocal that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," including discriminatory harassment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).

**App. 110**

The Court in *Bostock* explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," and therefore held that discharging an employee because of sexual orientation or gender identity is unlawful sex discrimination that violates section 703(a)(1).  *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660, 683 (2020).  As a form of sex discrimination, discrimination on the basis of sexual orientation or gender identity therefore violates section 703(a)(1) on the same terms as any other form of sex discrimination, including failing or refusing to hire, or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment.  Any other interpretation would be inconsistent with the statutory text and with *Bostock*, and would introduce an inconsistent and textually unsupported asymmetry under which an employee could not be terminated because of their sexual orientation or gender identity but could be harassed or otherwise discriminated against in the terms and conditions of employment based on those same characteristics.

For these reasons, as stated in the final guidance, federal courts interpreting *Bostock* have readily found that unlawful workplace harassment based on sexual orientation or gender identity that constructively changes the terms and conditions of employment under section 703(a)(1) constitutes sex discrimination.  *See* the cases cited in footnote 37 of the final Enforcement Guidance on Harassment in the Workplace.

*Bostock* stated that it did not address "bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681.  Nothing in the guidance suggests that *Bostock* addressed those issues.  Because the EEOC is statutorily required to investigate all private sector Title VII charges of discrimination presented to it in the administrative process, and also to decide administrative appeals by federal employees raising Title VII claims, the EEOC must sometimes take a position on whether an alleged type of conduct violates Title VII even in the absence of binding Supreme Court precedent. In fulfilling its statutory duties, the EEOC considers applicable legal authority and arguments advanced by affected parties when determining whether a violation has occurred in the context of a particular charge or federal sector EEO appeal.  As noted in the final guidance, by the time *Bostock* was decided the Commission had been presented with the federal sector administrative appeal in *Lusardi v. Department of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015), involving a

transgender employee.  On the facts presented in that administrative appeal, the Commission decided that Title VII's prohibition on sex discrimination requires employers to provide transgender employees access to sex segregated facilities consistent with their gender identity.  *See also Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 135 (E.D. Pa. 2020) (listing allegations that plaintiff was prevented from using a bathroom that was consistent with her gender identity as among the allegations that supported her Title VII and ADA hostile work environment claims).  The Commission also decided in *Lusardi* that the repeated and intentional use of pronouns inconsistent with an employee's gender identity could contribute to a hostile work environment.  As described in footnote 42 of the guidance, even before *Bostock*, courts have considered evidence of intentional and repeated misgendering, viewed in light of the totality of circumstances, as potentially supportive of a hostile work environment claim.

## Substance of the Guidance

### Adding More Hypothetical Examples to the Final Guidance that Address Harassment in More Contexts

Comment: Numerous commenters urged the Commission to add additional examples illustrating how the EEO laws apply to potential harassment in a variety of contexts.

Response: The final guidance has many examples involving a broad range of circumstances.  The new examples provide more comprehensive guidance on the EEOC's views as to the application of federal EEO laws to potential harassment scenarios.  They also highlight how harassment can affect various vulnerable populations and underserved communities, including teen workers and survivors of gender-based violence.  Discrimination against vulnerable populations and underserved communities is among the Commission's subject matter priorities for fiscal years 2024 2028.  *See* EEOC, Strategic Enforcement Plan Fiscal Years 2024-2028, **https://www.eeoc.gov/strategic-enforcement-plan-fiscal-years-2024-2028 (https://www.eeoc.gov/strategic-enforcement-plan-fiscal-years-2024-2028)** (last visited Apr. 12, 2024).

Ultimately, however, because of the fact specific nature of these cases, the guidance necessarily cannot be exhaustive, and the guidance is not intended to

**App. 112**

illustrate every possible factual situation that might involve unlawful harassment.  Rather, the guidance presents the overarching legal standards that are applied to particular circumstances in evaluating whether the EEO laws have been violated and the employer is liable.  The examples are intended to be merely a small representative sample to illustrate how the legal principles apply in certain circumstances.

### Totality-of-Circumstances Test

Comment: Multiple commenters requested that the Commission clarify its discussion of how to determine whether harassment is actionable based on the totality of circumstances. Some contended that the proposed guidance places too much emphasis on severity and pervasiveness and fails to properly incorporate those considerations into the broader examination of the totality of circumstances.

Response: The final guidance has been restructured, and the discussion of objective hostility in section III.B has been revised to more clearly illustrate how to evaluate whether harassment creates a hostile work environment based on the totality of circumstances.  As the Supreme Court has explained, harassment based on a protected trait violates EEO law when it is sufficiently severe or pervasive to alter the conditions of employment by creating a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The Court has further explained that whether the work environment is hostile "can be determined only by looking at all the circumstances." *Id.* at 23.  Consistent with this Supreme Court precedent, the Commission has retained separate discussions of severity and pervasiveness in the final guidance but further illustrated how they are evaluated, along with other considerations, in the context of the totality of the circumstances.

## Interplay Between Statutory Harassment Prohibitions and Other Rights

### Free Speech and Religion-Based Rights

Many of the individual comments addressed free speech and religion based rights issues.  Some addressed only free speech, and many addressed both free speech and religion-based rights.  However, because the constitutional analysis of free

speech and religion-based rights is different, the Commission addresses them separately.

### Free Speech

Comment: Numerous commenters, including the majority of private individuals who submitted form comments, contended that the draft guidance unconstitutionally infringes on the free-speech rights of employees or employers either by restricting their speech on certain issues, including abortion, or by requiring that they engage in certain speech, such as requiring the use of pronouns based on another individual's gender identity.  Some commenters further requested clarification on the application of federal EEO laws to speech and expressive conduct that occurs outside the workplace, such as on personal social media accounts.

Response: The Commission fully recognizes the importance of protecting free speech and has added to the guidance specific language about the potential interaction between statutory harassment prohibitions and other legal doctrines, including the U.S. Constitution, at section I.A and footnote 363. The interplay between free speech protections and statutory harassment prohibitions in particular matters can be highly fact-specific, and the Commission will carefully consider these issues as presented on a case by case basis.  A detailed discussion of free speech principles, however, is beyond the scope of this final guidance.

Some commenters also expressed concern that, as they understood the guidance, *any* workplace discussion of religious perspectives on certain issues, such as abortion or gender identity, would be unlawful harassment.  That interpretation is not correct and is not the Commission's intent.  As discussed in the final guidance, whether conduct constitutes unlawful harassment depends on all the circumstances and is only unlawful under federal EEO law if it creates a hostile work environment.  To help clarify that potentially offensive conduct based on a protected characteristic does not necessarily constitute unlawful harassment, the final guidance includes language in section I.B and at the beginning of section II to emphasize that conduct is not necessarily unlawful merely because it is based on a protected characteristic and that conduct also must alter a term, condition, or privilege of employment, typically by creating a hostile work environment.

**App. 114**

Finally, the Commission revised the draft to respond to requests that it clarify its position with respect to conduct that occurs outside the workplace.  Section III.C.2.c of the final guidance explains that conduct that occurs outside the workplace, including on social media accounts, and that does not target the employer or its employees and is not brought into the workplace generally will not have an impact on the workplace and therefore will not contribute to a hostile work environment.

### Religion-Based Rights

#### Religious Accommodation Under Title VII

Comment: Many commenters urged the EEOC to address the interplay between an employer's Title VII obligation to provide a reasonable accommodation for an employee's sincerely held religious beliefs, practices, and observances and its obligation to prevent and correct unlawful harassment in the workplace.  Most of these comments focused on religious expression with regard to pronouns and cited the decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2020), which held that a public university violated a professor's constitutional right to free speech by refusing to accommodate his request not to refer to a transgender student using pronouns consistent with the student's gender identity, a practice that conflicted with his religious beliefs.

Response: Section IV.C.3.b.ii(b)(7) of the guidance addresses the interaction between statutory harassment prohibitions and Title VII religious accommodation requirements with respect to expression in the workplace. The Commission revised this section of the guidance by providing more detail about the Title VII precedent as well as new examples.  The Commission also added language about the Supreme Court's recent decision in *Groff v. DeJoy*, 600 U.S. 447 (2023), which clarified the undue hardship standard in Title VII religious accommodation cases.

The Commission acknowledges that in some cases, the application of the EEO statutes enforced by the EEOC may implicate other rights or requirements including those under the United States Constitution, other federal laws such as the Religious Freedom Restoration Act (RFRA), or sections 702(a) and 703(e)(2) of Title VII.  When the Commission is presented with individualized facts in an EEOC administrative harassment charge, the agency works with great care

**App. 115**

to analyze the interaction of Title VII harassment law and the rights to free speech and free exercise of religion. For further information, see the relevant sections of EEOC's Compliance Manual Section on Religious Discrimination. EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, at §§ 12-I.C, 12-III.D, and Addendum (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination)** .

Similarly, the Commission fully recognizes the importance of the constitutional right to free speech, which was analyzed by the court in *Meriwether v. Hartop, supra*, a case cited by many commenters. While the plaintiff in that case did not plead a cause of action under Title VII, if a charge is filed with the EEOC raising similar issues, the EEOC will give the decision appropriate consideration. The Commission carefully considers the facts presented in EEOC charges alleging a failure to provide a reasonable accommodation for a religious belief, practice, or observance, and takes into consideration the employer, employment context, and other relevant facts.

Although cited in a few comments, the Commission did not cite or address in the final guidance the decision in *Kluge v. Brownsburg Community School Corp.*, 64 F.4th 861 (7th Cir. 2023). *Kluge* involves a Title VII religious accommodation claim related to pronoun and first-name use, but the Seventh Circuit vacated and remanded the case after the Supreme Court issued *Groff*. 2023 WL 4842324 (7th Cir. July 28, 2023). Once the courts have completed adjudication of *Kluge*, the Commission will give the final decision appropriate consideration when considering charges alleging these issues.

To assist employers with potential defenses, including religious defenses, in the context of individual charge investigations, the Commission is enhancing its administrative procedures and webpages. Specifically, the Commission will revise materials accompanying the Notice of Charge of Discrimination letter and related webpages to identify how employers can raise defenses in response to a charge. This information will be public and viewable by any employer with questions or concerns about how to raise a defense, including a religious defense, in the event that one of its employees files a charge of discrimination. The Commission also will update the Respondent Portal to encourage an employer to raise in its position statement (or as soon as possible after a charge

is filed) any factual or legal defenses it believes apply, including defenses based on religion.

As appropriate, the Commission will resolve a charge based on the information submitted in support of asserted defenses, including religious defenses, in order to minimize the burden on the employer and the charging party. Regardless of whether the Commission agrees with the employer's asserted defenses, those defenses are entitled to de novo review by a court in any subsequent litigation.

### Interplay Between Statutory Harassment Prohibitions and the U.S. Constitution, Sections 702(a) and 703(e)(2) of Title VII, and RFRA

Comment: Numerous commenters expressed concern about the potential interaction of statutory prohibitions against discrimination, including unlawful harassment, with the religion-based rights of employees and employers, and they urged the Commission to clarify the interplay between statutory harassment prohibitions and religion based rights protected under the U.S. Constitution, Title VII (the religious organization exceptions), and the Religious Freedom Restoration Act (RFRA).

Response: The Commission recognizes the importance of protecting religion-based rights. Because the interplay between religion-based rights and statutory harassment prohibitions can be highly fact specific, the Commission will consider these issues as presented on a case by case basis. The Commission added language at section I.A. and footnote 363, which highlight the potential interaction between statutory harassment prohibitions and other legal doctrines, including the U.S. Constitution, RFRA, and sections 702(a) and 703(e)(2) of Title VII. The Commission also added more discussion, legal citations, and examples to section IV.C.3.b.ii(b)(7), which addresses balancing antiharassment and accommodation obligations with respect to religious expression. Readers seeking to learn more about the interplay between statutory harassment prohibitions and religion-based rights should consult relevant portions of the EEOC's Compliance Manual Section on Religious Discrimination. See EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, at §§ 12-I.C, 12-III.D, and Addendum (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination)** .

**App. 117**

Finally, as noted above, to assist employers seeking to assert potential defenses, including religious defenses, in the context of individual charge investigations, the Commission is enhancing its administrative procedures and providing information to employers and respondents to charges.

### National Labor Relations Act

Comment: Multiple commenters requested the Commission clarify the interplay between an employers' obligations to address workplace harassment under federal employment discrimination laws and to comply with the National Labor Relations Act.

Response: A discussion of the interaction of EEO laws with the National Labor Relations Act (NLRA), 29 U.S.C. § 157 et seq., is beyond the scope of this guidance, which is focused only on statutes enforced by the Commission.  The National Labor Relations Board (NLRB) has the sole authority to enforce the NLRA.  The EEOC consults with the NLRB's Office of General Counsel as needed to help ensure workable application of the statutory protections for both workers' civil rights and the NLRA.

---

[1] 477 U.S. 57 (1986).

[2] See EEOC, Enforcement and Litigation Statistics, **https://www.eeoc.gov/data/enforcement-and-litigation-statistics-0 (https://www.eeoc.gov/data/enforcement-and-litigation-statistics-0)** (last visited Apr. 25, 2024).

[3] See, e.g., EEOC v. Sandia Transp., LLC, No. 1:23-cv-00274 (D.N.M. consent decree entered Mar. 14, 2024) (settlement on behalf of four women subjected to sex harassment that included the owner repeatedly using various epithets and stating he hated "f*ckin' dealing with women"); EEOC v. Schuff Steel Co., No. 2:22-cv-01653 (D. Ariz. consent decree entered Dec. 19, 2023) (settlement on behalf of a class of aggrieved Black and Latino employees alleging race  and national  origin  based harassment, including use of the N-word; calling Latino employees "beaners;" and ridiculing Latino employees who did not speak English well); EEOC v. UFP Ranson, LLC, No. 3:21  CV 00149 (N.D.W. Va. consent decree entered Sept. 28, 2023) (settlement of lawsuit alleging harassment based on race and religion on behalf of a Black Muslim worker who was repeatedly called race- and religion-based epithets;

told that members of the Ku Klux Klan worked at the facility; had objects thrown at him while he was praying; was physically intimidated and shoulder checked; and was required to perform tasks by means that were unnecessarily onerous); *EEOC v. Chipotle Servs., LLC*, No. 2:22-cv-00279 (W.D. Wash. consent decree entered Sept. 14, 2023) (settlement on behalf of three female employees, including a teenager, subjected to a sexually hostile work environment that included touching, unwelcome sexual comments, and requests for sex); *EEOC v. T.M.F Mooresville, LLC*, No. 5:21-cv-00128 (W.D.N.C. consent decree entered Aug. 24, 2022) (settlement on behalf of a class of White housekeeping employees allegedly subjected to harassment based on race, which included use of racially derogatory terms such as "white trash"); *EEOC v. CCC Grp.,* 1:20-cv-00610 (N.D.N.Y. consent decree entered Aug. 9, 2021) (settlement on behalf of seven Black employees at an industrial construction site allegedly subjected to repeated racist slurs, displays of nooses, and comments about lynchings by White supervisors and coworkers); *EEOC v. Nabors Corp. Servs., Inc.*, No. 5:16-cv-00758 (W.D. Tex. consent decree entered Nov. 12, 2019) (settlement on behalf of nine Black employees and one White employee based on alleged racial harassment, which included employees being addressed as "n****r" and being referred to as the "colored crew," and retaliation, among other allegations).

**4** 42 U.S.C. § 2000e-5 (Title VII); 29 U.S.C. § 626 (Age Discrimination in Employment Act (ADEA)); 42 U.S.C. § 12117(a) (Americans with Disabilities Act (ADA)); 42 U.S.C. § 2000ff 6(a) (Genetic Information Nondiscrimination Act (GINA)). *This guidance addresses harassment claims under provisions of the federal EEO laws that prohibit discrimination by employers, including section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1) (private sector and state and local government) and section 717 of Title VII, 42 U.S.C. § 2000e 16(a) (federal agencies). It does not address potential claims of unlawful harassment under provisions that prohibit discrimination by other entities covered under Title VII, such as employment agencies and labor organizations, including sections 703(b) and 703(c) of Title VII, 42 U.S.C. §§ 2000e 2(b) and 2000e 2(c). See, e.g.*, *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84-85 (1st Cir. 2007) (upholding a jury verdict finding a union liable for sexual harassment that occurred during a union sponsored bus trip).

The standards discussed here under EEOC enforced laws will not necessarily apply to claims alleging unlawful harassment under other federal laws or under state or local laws.

**App. 119**

**5** We note, for instance, that a discussion of the interaction of EEO laws with the National Labor Relations Act (NLRA), 29 U.S.C. § 157 et seq., is beyond the scope of this guidance, which is focused only on statutes enforced by the Commission. The National Labor Relations Board (NLRB) has the sole authority to enforce the NLRA. The EEOC consults with the NLRB's Office of General Counsel as needed to help ensure workable application of the statutory protections for both workers' civil rights and the NLRA.

**6** See 29 C.F.R. § 1695.2(c)(7)(i).

**7** For further information, see the relevant sections of EEOC's Compliance Manual Section on Religious Discrimination. EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, §§ 12-I.C, 12-III.D, and Addendum (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination)** .

**8** See section VI, *infra* (providing links to EEOC harassment related resources).

**9** See, e.g., *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (holding that the plaintiff established at least a plausible claim of race based harassment where a White coworker's statements that she "could not understand African Americans because they cannot speak properly communicated racial enmity by summoning an odious trope about African American speech patterns"); *Gates v. Bd. of Educ.*, 916 F.3d 631, 633 34, 640 41 (7th Cir. 2019) (concluding that a reasonable jury could find that the plaintiff was subjected to a racially hostile work environment based on three incidents with his supervisor, specifically that his supervisor made a joke in which he referred to the plaintiff as a "sh*t sniffing n****r," threatened to write up the plaintiff's "black ass," and stated he was "tired of you people" and again referred to the plaintiff as "n****r"); *Ellis v. Houston*, 742 F.3d 307, 314, 320 21 (8th Cir. 2014) (reversing a grant of summary judgment for the defendants on the plaintiffs' racial harassment claims under 42 U.S.C. §§ 1981 and 1983 where there was evidence of a widespread pattern of racial harassment that included racial stereotyping, such as referring to the African American plaintiffs as "the gang" or "the back of the bus" and addressing them with comments about the "hood" or fried chicken and watermelon); *Boone v. Old Colony Young Men's Christian Ass'n*, No. 13-13131, 2015 WL 7253676, at *3 (D. Mass. Nov. 17, 2015) (concluding that a reasonable jury could find that a reference to a pornographic movie with a title based on racial stereotypes constituted race based harassment); *Chambers v. Walmart Stores, Inc.*, No. 1:14CV996, 2015 WL 4479100, at *1, *3 (M.D.N.C. July 22,

**App. 120**

2015) (recommending denial of a motion to dismiss a racial harassment claim alleging that a manager used racial slurs and negative racial stereotypes, such as referring to Black people as "Blackie" and using the term "ghetto" to describe the appearance of the store), *report and recommendation adopted*, 2015 WL 5147056 (Sept, 1, 2015).

[10] *See* EEOC, *Compliance Manual Section 15: Race & Color Discrimination* § 15-II (2006), **https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#II (https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#II)** ; *see also, e.g.*, *Ellis*, 742 F.3d at 314 (noting "[o]ffensive comments . . . about the qualities of black hair and black hairstyles" when describing a pattern of race based harassment); *Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 864 (8th Cir. 2010) (concluding that the evidence was sufficient to establish that the plaintiff's work environment was hostile where, among other things, the plaintiff alleged that she was admonished for answering the phones because "customers weren't used to hearing a black voice").

[11] *See, e.g.*, § II.B.3, *infra* (explaining that harassment based on stereotypes about a protected group need not be motivated by animus or hostility toward that group).

[12] *See* EEOC, *Compliance Manual Section 15: Race & Color Discrimination* § 15 III (2006), **https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#III (https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#III)** ; *see also, e.g.*, *EEOC v. Pioneer Hotel, Inc.*, No. 2:11 CV 01588, 2013 WL 3716447, at *3 (D. Nev. July 15, 2013) (denying a motion to dismiss a claim of harassment against a class of Latino and/or dark-skinned employees based on national origin and/or skin color); *Wiltz v. Christus Hosp. St. Mary*, No. 1:09-CV-925, 2011 WL 1576932, at *8 (E.D. Tex. Mar. 10, 2011) (stating harassment is based on color when the complained-of conduct has a color-related character or purpose and collecting cases supporting the same); *Brack v. Shoney's, Inc.*, 249 F. Supp. 2d 938, 953 55 (W.D. Tenn. 2003) (holding there was sufficient evidence of color based harassment to survive the employer's summary judgment motion where the plaintiff's supervisor called him "little black sheep" and expressed a preference for a "fair skinned" manager, among other things); *cf. Etienne v. Spanish Lake Truck & Casino Plaza, LLC*, 778 F.3d 473, 477 (5th Cir. 2015) (vacating summary judgment for the employer regarding its failure to promote the plaintiff to a managerial position where the plaintiff offered evidence that she was qualified for the position and provided direct evidence that she was not considered for the position because of

**App. 121**

her skin color); *Arrocha v. City Univ. of N.Y.,* No. CV-02-1868, 2004 WL 594981, at *6 (E.D.N.Y. Feb. 9, 2004) (concluding that the plaintiff had alleged color, not race, discrimination where the plaintiff claimed light skinned Hispanics were favored over dark-skinned Hispanics); *Walker v. Sec'y of the Treasury*, 713 F. Supp. 403, 405-08 (N.D. Ga. 1989) (concluding that the plaintiff stated a claim for relief under Title VII where she alleged that her supervisor, a Black woman with dark skin, terminated the plaintiff, also a Black woman, because of her light skin color), *aff'd without opinion*, 953 F.2d 650 (11th Cir. 1992).

[13] This example is adapted from the facts in *EEOC v. Rugo Stone, LLC*, No. 1:11-cv-915 (E.D. Va. consent decree entered Mar. 6, 2012).

[14] *See, e.g.*, *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (concluding that the plaintiff could establish that he was harassed based on his national origin, Korean, where his supervisor allegedly subjected Korean workers to abuse based on their failure to "live up" to the stereotype that Korean workers are "better than the rest").

[15] *See* 29 C.F.R. § 1606.1 ("The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity . . . because an individual has the physical, cultural or linguistic characteristics of a national origin group."); EEOC, *Enforcement Guidance on National Origin Discrimination* § II.B (2016)https://www.eeoc.gov/laws/guidance/national origin guidance.cfm# Toc451518801 (stating that national origin discrimination includes discrimination based on physical, linguistic, or cultural traits); *see also, e.g.*, *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 799-801 (8th Cir. 2003) (holding that evidence of frequent harassment, including taunts about a Hispanic employee's accent and statements that "Hispanics should be cleaning" and that "Hispanics are 'stupid,'" was sufficient to show that an employee was subjected to pervasive harassment that created a hostile work environment); *Gonzales v. Eagle Leasing Co.*, No. 3:13 CV 1565, 2015 WL 4886489, at *5 (D. Conn. Aug. 14, 2015) (holding that a reasonable jury could find that the plaintiff was subjected to a hostile work environment based on race, national origin, and ethnicity where the harassment included derogatory comments about traditional Cuban food); *Garcia v. Garland Indep. Sch. Dist.,* No. 3:11-CV-502, 2013 WL 5299264, at *4-6 (N.D. Tex. Sept. 20, 2013) (declining to grant summary judgment where a hostile work environment claim included an allegation that the defendant's employees mocked the plaintiff's mispronunciation of words

and ridiculed her for lack of English fluency); *Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 355 56 (M.D. Pa. 2012) (holding that a fact finder could infer that harassment was based on race or national origin where the plaintiff's supervisor criticized her "awful" Pakistani-styled dress, called her a "brown b\*tch," suggested she did not know how to open a door due to her national origin, and told her she needed to learn to drive because "we don't ride camel[s] here").

**16** Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). This term is broad and is not limited to traditional or organized religions. However, social, political, or economic philosophies, as well as mere personal preferences, are not religious beliefs protected by Title VII. EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, § 12 I.A.1 (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_9593682596821610748647076 (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_9593682596821610748647076)** .

**17** *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 613 17 (9th Cir. 1988) (applying Title VII to religious discrimination claim based on atheism); *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 143-44 (5th Cir. 1975) (same); *Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 329 ("Under Title VII, atheists are entitled to the exact same protection as members of other religions.") (E.D. Pa. 2016); *see also Reed v. Great Lakes Cos.*, 330 F.3d 931, 934 (7th Cir. 2003) (noting that firing someone for being an atheist violates Title VII's prohibition against religious discrimination); *Scott v. Montgomery Cnty. Sch. Bd.*, 963 F. Supp. 2d 544, 559 n.11 (W.D. Va. 2013) ("Title VII's definition of 'religion' includes 'all aspects of religious observance and practice, as well as belief . . . .' and . . . protects persons who are not members of organized religious groups as well as atheists." (internal citation omitted)).

**18** *See, e.g.*, *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 443 44 (5th Cir. 2011) (holding that a fact finder could conclude that the plaintiff was subjected to unlawful religious harassment, which included disparaging comments about his religious beliefs); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (reversing summary judgment for the employer on a religious harassment claim that included evidence that the employee was harassed, in part, because of his religious headwear).

**App. 123**

**19** *See, e.g., Sunbelt Rentals, Inc.*, 521 F.3d at 316-18 (reversing summary judgment for the employer where there was evidence that a Muslim employee was subjected to persistent religious harassment, which included repeatedly referring to the employee as "Taliban" or "towel head," challenging the employee's allegiance to the United States, and stereotyping Muslims as terrorists).

**20** *See, e.g.*, *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 279 (3d Cir. 2001) (holding that a reasonable jury could find that hostility directed toward an Orthodox Jewish college professor regarding her insistence that she not work during the Sabbath constituted harassment based on religion); *Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 203, 214 (E.D.N.Y. 2014) (holding that a reasonable jury could conclude that the plaintiff was subjected to unlawful religious harassment after he received an exception to the employer's no beard policy as a reasonable accommodation when, for example, supervisors asked the plaintiff to see the letter documenting his religion and disciplined him for various infractions shortly thereafter).

For more information on religious discrimination, see **https://www.eeoc.gov/religious-discrimination (https://gcc02.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.eeoc.gov%2Freligious-discrimination&data=05%7C02%7CERNEST.HAFFNER%40EEOC.GOV%7C0397e d2e83794acef8b508dc649c0eaf%7C3ba5b9434e564a2f9b91b1f1c37d645b%7C 0%7C0%7C638495868628661952%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC 4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C0%7C% 7C%7C&sdata=Aph0elAVg7%2Bkn4u4%2BCImcHiV1wCoakEee52omKzX45A%3 D&reserved=0)** (last visited Apr. 24, 2024) (discussing religious discrimination and providing links to other EEOC resources).

**21** For a detailed discussion and additional examples of Title VII's prohibition against harassment because of religion, see section 12 III.B of EEOC's Compliance Manual Section on Religious Discrimination. EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, §12-III.B (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_399804943246016107488776728 (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_399804943246016107488776728)** .

**App. 124**

[22] *See Winspear v. Cmty. Dev., Inc.*, 574 F.3d 604, 608 (8th Cir. 2009) (remanding hostile work environment claim to the district court in order to address summary judgment motion in the first instance where the district court had noted that the plaintiff "'may have raised a genuine issue of material fact as to whether [] repeated comments about [the plaintiff's] brother suffering in Hell and . . . needing to find God constituted a hostile work environment'" but also had erroneously analyzed the hostile work environment claim as a constructive discharge claim).

[23] *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620 21 (9th Cir. 1988) ("Protecting an employee's right to be free from forced observance of the religion of his employer is at the heart of Title VII's prohibition against religious discrimination."); *see also Garcimonde Fisher v. Area203 Mktg., LLC*, 105 F. Supp. 3d 825, 840 (E.D. Tenn. 2015) ("Title VII forbids employers from forcing employees to make [the] choice ["My religion or my job?"] whether overtly or covertly. Hostile work environment claims prevent employers from creating conditions that are inhospitable to any but those who share their beliefs."); *EEOC v. United Health Programs of Am., Inc.*, No. 1:14-cv-3673, 2020 WL 1083771, at *5-11 (E.D.N.Y. Mar. 6, 2020) (affirming jury verdict concerning a hostile work environment based on religion where employees were forced to participate in "new age" religious activities at work against their wishes).

[24] *See Tillery v. ATSI, Inc.*, 242 F. Supp. 2d 1051, 1058 (N.D. Ala. 2003) (summary judgment to employer denied where the owner "repeatedly subjected plaintiff to lectures about her prospects for salvation during working hours, made highly personal inquiries into her private life (e.g., the legitimacy of her children, and whether a prior marriage had been terminated by divorce versus the doctrine of annulment sanctioned by the Catholic Church), and 'strongly suggested [she] talk with God'"); *see also EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 837 (S.D. Ind. 2002) (discussing how employers' "expectations" regarding alleged voluntary participation in religious activities can amount to coercion).

[25] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (stating that sex based harassment includes "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" (alteration in original) (quoting 29 C.F.R. § 1604.11(a))); *see also, e.g.*, *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 475 (5th Cir. 2002) (holding that the district court erred in granting judgment as a matter of law for the employer where sex-based harassment consisted of repeated touching, vulgar comments, propositions, and physical aggression).

**App. 125**

[26] Harassment based on sex is often referred to interchangeably as sex-based harassment or sexual harassment, without regard to whether the harassment at issue involves what this document refers to as "sexual conduct."

[27] *See, e.g.*, *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (explaining that non sexual conduct can be based on sex and therefore contribute to a sex-based hostile work environment); *Rosario v. Dep't of the Army*, 607 F.3d 241, 248 (1st Cir. 2010) (stating that conduct that does not have sexual connotations can contribute to a sex based hostile work environment).

[28] *See infra* Example 35: Comparative Evidence Gives Rise to Inference that Harassment Is Based on a Protected Characteristic (providing an example of facially sex-neutral offensive conduct motivated by sex, such as bullying directed toward employees of one sex).

[29] This document does not analyze application of the Pregnant Workers Fairness Act to harassment based on an employee's request for, or receipt of, an accommodation.

[30] *See Walsh v. Nat'l Comput. Sys., Inc.*, 332 F.3d 1150, 1160 (8th Cir. 2003) (upholding jury verdict finding the plaintiff was subjected to a hostile work environment based on pregnancy where the plaintiff's supervisor made numerous derogatory comments about her pregnancy and required the plaintiff to provide advance notice and documentation of doctor's appointments, even though the plaintiff's coworkers were not required to provide such information for appointments); *Fugarino v. Milling, Benson, Woodward LLP*, No. 21-594, 2022 WL 6743191, at *3 (E.D. La. Oct. 11, 2022) (denying summary judgment to the employer on the plaintiff's claim of pregnancy based harassment alleging, among other things, that she was subjected to comments about the size of her breasts, the "shape and curves of her body" as an Italian pregnant woman, and how her "'milk' would come in" and make her breasts even larger); *Young v. AlaTrade Foods, LLC*, 2:18 CV 00455, 2019 WL 4245688, at *2 (N.D. Ala. Sept. 6, 2019) (denying summary judgment to the employer on the plaintiff's sexual harassment claim alleging that she was subjected to conduct that included comments from the plaintiff's supervisor who, upon learning she was pregnant, told her "he was upset because he did not want anyone else to have her," "made sexual hand gestures with his smock in front of her and told her that she had 'nice breasts' that were 'a nice size for sucking,'" said she had a "fine sexy ass," touched her, whispered in her ear, touched/grazed her buttocks, and showed her pictures of himself partially undressed).

**App. 126**

**31** 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions ....").

**32** *See Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1260 (11th Cir. 2017) (concluding that Title VII prohibits discrimination based on breastfeeding); *EEOC v. Hous. Funding II, Ltd.*, 717 F.3d 425, 430 (5th Cir. 2013) (holding that Title VII prohibits discharging an employee because she is lactating).

**33** *See* EEOC, *Enforcement Guidance on Pregnancy Discrimination and Related Issues* § I.A.3.d (2015), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues#IA3d (https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues#IA3d)** (stating that Title VII prohibits discrimination against a woman because she uses contraceptives and citing cases).

**34** *See id.* § I.A.4.c, **https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues#IA4c (https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues#IA4c)** ; *see also, e.g., Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) (holding that Title VII prohibits discrimination against a female employee because she has had an abortion); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (same). Title VII would similarly prohibit adverse employment actions against an employee based on her decision not to have an abortion. *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 267 (S.D.N.Y. 2007) (concluding that a declaration by a female employee that she was encouraged by a manager to get an abortion was anecdotal evidence supporting a class claim of pregnancy discrimination).

**35** *See Zuckerman v. GW Acquisition LLC*, No. 20 CV 8742, 2021 WL 4267815, at *2 (S.D.N.Y. Sept. 20, 2021) (denying the defendant's motion for summary judgment where two owners made a series of offensive comments about the plaintiff's decision to breastfeed and to pump breastmilk at the office, including one owner asking "'if he could 'have some milk in [his] coffee' and whether [the plaintiff] could 'just squirt it in there,'" and another owner "frequently yell[ing] 'pump station' or 'pumper' when he would pass the designated pumping area in the office").

**36** *See Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); *Copeland v. Ga. Dep't of Corr.*, ___ F.4th ___, No. 22-13073, 2024 WL 1316677, at *5 (11th Cir. Mar. 28, 2024) (citing

**App. 127**

*Bostock* and stating that "discrimination against transgender individuals like [the plaintiff] is discrimination 'because of sex'"); *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 995 (8th Cir. 2022) ("*Bostock* held that the statute's prohibition on employment discrimination 'because of sex' encompasses discrimination on the basis of sexual orientation and gender identity."); *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 598 (5th Cir. 2021) ("Under *Bostock v. Clayton County*, discrimination on the basis of sexual orientation or gender identity is a form of sex discrimination under Title VII.").

In its decisions regarding federal employees' EEO claims, the Commission has concluded that discrimination on the basis of sexual orientation or gender identity violates Title VII. *See, e.g.*, *Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756, at \*10 13 (Apr. 1, 2015) (finding that harassment violated section 717 of Title VII, which prohibits federal agencies from engaging in employment discrimination on the basis of sex, because the harassment was based on the plaintiff's gender identity); *Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at \*5, \*10 (July 15, 2015) (concluding as a matter of law that sexual orientation is inherently "a 'sex-based consideration,'" and that an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under section 717 of Title VII).

[37] *Bostock* itself concerned allegations of discriminatory discharge, but the Supreme Court's reasoning in the decision about the nature of discrimination based on sex logically extends to claims of harassment that change the terms, conditions, or privileges of employment under section 703(a)(1) of Title VII. As a result, courts have readily found post *Bostock* that claims of harassment based on one's sexual orientation or gender identity are cognizable under Title VII. *See, e.g.*, *Copeland*, 2024 WL 1316677, at \*5 (citing *Bostock* and stating that "a transgender man who was harassed about his gender after coming out at work" was subjected to ""discrimination 'because of sex'"); *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 121 (4th Cir. 2021) ("[T]he Supreme Court's holding in *Bostock* makes clear that a plaintiff may prove that same-sex harassment is based on sex where the plaintiff was perceived as not conforming to traditional male stereotypes."); *Doe v. City of Det.*, 3 F.4th 294, 300 n.1 (6th Cir. 2021) (stating that harassment on the basis of transgender identity is sex discrimination under Title VII because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex"); *Simmons v. Starved Rock Casework LLC*, No. 20-CV-1684, 2021 WL 5359017, at \*2 (E.D. Wis. Nov. 17, 2021) (finding that the plaintiff had stated a claim for relief by alleging a hostile work environment based

on his heterosexual status); *Boney v. Tex. A&M Univ.*, No. 4:19-CV-2594, 2021 WL 3640714, at *4 n.5 (S.D. Tex. July 19, 2021) ("The Fifth Circuit has construed the Supreme Court's recent decision in *Bostock* as holding that Title VII prohibits workplace discrimination based on homosexuality[; therefore] a plaintiff may establish a Title VII violation by showing a hostile work environment based on sexual orientation discrimination." (citing *Newbury v. City of Windcrest*, 991 F.3d 672, 676 77 (5th Cir. 2021))); *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) (Title VII covers both failure to conform to sex stereotypes and transgender or transitioning status), *aff'd sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) ("It naturally follows [from *Bostock*] that discrimination based on gender stereotyping falls within Title VII's prohibitions."). In addition, in the context of federal sector cases, the Commission has concluded that sex based harassment includes harassment based on sexual orientation or gender identity. *See, e.g.*, *Lusardi*, 2015 WL 1607756, at *10-13 (finding that harassment based on the plaintiff's transgender status violates section 717); *Baldwin*, 2015 WL 4397641, at *7 8 (stating that discrimination, including harassment, that is based on sexual orientation violates section 717).

[38] *See, e.g.*, *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 173 (D. Md. 2022) (concluding that a reasonable jury could find that the plaintiff was subjected to gender identity based harassment that was objectively severe or pervasive, including derogatory terms referring to her transgender status); *Brooks v. Temple Univ. Health Sys., Inc.*, No. 21-1803, 2022 WL 1062981, at *12 (E.D. Pa. Apr. 8, 2022) (denying summary judgment to the employer on the plaintiff sex-based hostile work environment claim where the plaintiff alleged, among other things, that he was called a "f*ggot").

[39] *See, e.g.*, *Roberts*, 998 F. 3d at 121 (stating that alleged physical assaults may be part of a pattern of objectionable, sex-based discriminatory behavior that supports a hostile environment claim); *Eller*, 580 F. Supp. 3d at 173 (holding that a reasonable jury could find that alleged harassment, which included "multiple physical assaults, including one incident when [a transgender teacher] was shoved out of a door, and two incidents . . . when students who had used slurs about her transgender status stepped and pressed down hard on her foot," was objectively severe or pervasive).

[40] *See, e.g.*, *Doe v. Arizona*, No. CV-18-00348, 2019 WL 2929953, at *3 (D. Ariz. July 8, 2019) (denying summary judgment to the employer on the plaintiff's sex based

harassment claim where the plaintiff, a corrections officer, presented evidence including that "supervisors regularly disregarded his requests to conceal his status for the purpose of protecting his safety, and repeatedly engaged in behavior that may be considered harassment by a jury"); *Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016) (denying summary judgment to the employer on a school police officer's sex based harassment claim where the employee was "blindsided" by emails that the school district sent to every police department employee disclosing sensitive information about the plaintiff's sexual identity and invited coworkers to ask questions about his transition).

[41] *See, e.g.*, *Brooks*, 2022 WL 1062981, at \*12 (stating that comments that included "being picked on for his feminine presentation" may be "severe enough to alter the conditions of one's work environment").

[42] *See Copeland*, 2024 WL 1316677, at \*5 9 (concluding that a reasonable jury could find that a male transgender corrections officer was subjected to a sex-based hostile work environment where, among other things, supervisors, coworkers, and inmates intentionally and repeatedly referred to him using feminine pronouns or called him "ma'am"). Courts   even prior to the Supreme Court's *Bostock* decision   have viewed evidence of intentional misgendering of transgender persons as supportive of a hostile work environment claim under Title VII. *See, e.g.*, *Houlb v. Saber Healthcare Grp.*, No. 1:16CV02130, 2018 WL 1151566, at \*2 (N.D. Ohio Mar. 2, 2018) (holding that the alleged misgendering, together with the other alleged offensive conduct, was sufficiently severe or pervasive to constitute a violation of Title VII for purposes of summary judgment); *Tudor v. Se. Okla. State Univ.*, No. CIV 15 324 C, 2017 WL 4849118, at \*1 (W.D. Okla. Oct. 26, 2017) (same); *Versace v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 6:14-cv-1003-Orl-31KRS, 2015 WL 12820072, at \*7 (M.D. Fla. Dec. 3, 2015) (considering alleged misgendering to support the plaintiff's hostile environment claim, but finding the alleged incidents to be insufficiently frequent or severe to constitute a violation); *see also Triangle Doughnuts, LLC*, 472 F. Supp. 3d at 129-30 (holding that the employee plausibly alleged sex-based harassment based in part on being regularly misgendered); *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 758 (S.D. Ohio 2018) (same).

In federal sector EEO appeals, the Commission has concluded that misgendering and denial of access to a bathroom consistent with the individual's gender identity may constitute sex discrimination in violation of Title VII. *See, e.g.*, *Jameson v. U.S. Postal Serv.*, EEOC Appeal No. 0120130992, 2013 WL 2368729, at \*2 (May 21, 2013)

(stating that repeated, intentional misuse of the name or pronoun with which a transgender employee identifies may constitute sex based harassment); *Lusardi*, 2015 WL 1607756, at \*10 13 (holding that a supervisor's repeated and intentional use of the incorrect name and pronouns for the complainant, in addition to the agency's refusal to allow the complainant to use the restroom consistent with her gender identity, were actions sufficiently severe or pervasive to subject the complainant to a hostile work environment based on her sex).

[43] *See, e.g.*, *Triangle Doughnuts*, 472 F. Supp. 3d at 129, 135 (listing allegations that plaintiff was prevented from using a bathroom that was consistent with her gender identity as among the allegations that supported her Title VII and ADA hostile work environment claims). In addition to being part of a harassment claim, denial of access to a bathroom consistent with one's gender identity may be a discriminatory action in its own right and should be evaluated accordingly. *See, e.g.*, *Lusardi*, 2015 WL 1607756, at \*6 10 (finding that the agency subjected a transgender employee to disparate treatment when it restricted her access to the women's restroom on account of her gender identity).

[44] *See Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1217 (D. Or. 2002) (denying summary judgment to the employer where the alleged harassment included "questions such as, 'Do you wear the dick in the relationship?' and, 'Are you the man?'").

[45] This example is adapted from the facts in *Cunningham v. Burlington Coat Factory Warehouse Corp.*, No. 1:18 cv 11266, 2024 WL 863236 (D.N.J. Feb. 29, 2024).

Additional cases involving harassment based on gender identity include *Copeland*, 2024 WL 1316677; *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154 (D. Md. 2022); *Grimes v. Cnty. of Cook*, 19-cv-6091, 2022 WL 1641887 (N.D. Ill. May 24, 2022); *Triangle Doughnuts*, 472 F. Supp. 3d 115; *Doe v. Arizona*, 2019 WL 2929953; and *Drew v. U.S. Dep't of Veterans Affs.*, No. CV H 16 3523, 2023 WL 186881 (S.D. Tex. Jan. 12, 2023).

[46] 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer to . . . otherwise discriminate against any individual with respect to . . . [the] terms, conditions, or privileges of employment, because of such individual's age.").

[47] The ADEA does not apply to discrimination or harassment based on workers being younger than others, such as harassment based on the belief that someone is

**App. 131**

too young for a certain position, even if the targeted individual is forty or over. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (holding that the ADEA does not prohibit favoring older workers over younger workers, even if the younger workers are within the protected class of individuals forty or older).

[48] *See, e.g.*, *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 442 43 (5th Cir. 2011) (holding that a fact finder could conclude that the plaintiff, a used car salesperson, was subjected to a hostile work environment based on his age where the plaintiff's supervisor had made profane, age based references to the plaintiff up to half a dozen times a day, the supervisor had engaged in physically threatening behavior toward the plaintiff, and the supervisor had "steered" sales away from the plaintiff and toward younger salespersons).

[49] *See, e.g.*, *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (the plaintiff adduced sufficient evidence of age based hostile work environment where, in addition to age-based remarks, "from the start of her employment . . ., [she was] denied the training given to younger sales associates and relegated to work almost exclusively in the fitting room, and later [] assigned the most unpleasant and arduous duties"); *Guthrie v. J.C. Penney Co.*, 803 F.2d 202, 208 (5th Cir. 1986) (repeated inquiries into the plaintiff's retirement plans constituted evidence of "intentional harassment" sufficient to support claim of age-based constructive discharge); *see also Written Testimony of Patrick Button, Assistant Professor, Department of Economics, Tulane University*, EEOC Meeting of June 14, 2017 - The ADEA @ 50 - More Relevant Than Ever, **https://www.eeoc.gov/meetings/meeting-june-14-2017-adea-50-more-relevant-ever/button (https://www.eeoc.gov/meetings/meeting-june-14-2017-adea-50-more-relevant-ever/button)** (discussing evidence of age discrimination in hiring).

[50] Under Title I of the Americans with Disabilities Act, a disability is "a physical or mental impairment that substantially limits one or more [of an individual's] major life activities"; a "record of such an impairment"; or "being regarded as having such an impairment," if the individual establishes that he or she has been subjected to an adverse employment action, such as harassment, because of an actual or perceived physical or mental impairment and that impairment is not both transitory and minor. *Id.* § 12102(1), (3).

[51] 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."). Section 501 of the Rehabilitation Act of 1973 prohibits

**App. 132**

employment discrimination against applicants or employees of the federal government who are individuals with disabilities. 29 U.S.C. § 791. The Rehabilitation Act Amendments of 1992 made clear that the standards applied under Title I of the ADA also apply to Section 501 employment discrimination claims. 29 U.S.C. § 791(g).

[52] *See, e.g.*, *Quiles Quiles v. Henderson*, 439 F.3d 1, 4, 7 8 (1st Cir. 2006) (affirming a jury verdict finding that a Postal Service employee was subjected to a hostile work environment based on his mental disability (depression) when supervisors mocked him on a daily basis about his mental impairment and commented to other employees that he was a "great risk" because he was receiving psychiatric treatment); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178-79 (4th Cir. 2001) (upholding a jury finding that the plaintiff, who suffered from chronic back issues, was subjected to a hostile work environment based on disability where two supervisors constantly berated him and other workers with disabilities and encouraged other employees to ostracize workers with disabilities and refuse to give them materials they needed to do their jobs).

[53] *See, e.g.*, *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 75 76 (2d Cir. 2019) (concluding that an employee with Tourette's Syndrome and obsessive compulsive disorder had raised a material issue of fact as to whether he was subjected to ongoing and pervasive discriminatory conduct based on disability when coworkers mocked his verbal and physical tics); *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 446 (5th Cir. 2017) (concluding that a reasonable jury could find that the plaintiff was subjected to severe or pervasive disability-based harassment where he had presented evidence that coworkers repeatedly mocked his stutter and his supervisor mocked him in a department wide meeting); *Martsolf v. United Airlines, Inc.*, No. 13-1581, 2015 WL 4255636, at *13 (W.D. Pa. July 14, 2015) (rejecting the employer's motion for summary judgment on the disability based harassment claim of a plaintiff with a hearing and speech disability where there was evidence that employees screamed at the plaintiff when she could not hear them and mocked the way she spoke); *cf. EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 733 (5th Cir. 2007) (affirming jury verdict finding intentional discrimination where, among other things, a supervisor "stated that he no longer wanted to see [the plaintiff's] 'cr*ppled crooked self, going down the hall hugging the walls'").

[54] *See Patton*, 874 F.3d at 446 (concluding that repeated mocking of a stutter "rises above simple teasing and offhand comments" and can support a hostile work environment claim); *see also Salas v. N.Y.C. City Dep't of Investigation*, 298 F. Supp. 3d

Case 2:24-cv-00173-Z      Document 31      Filed 10/23/24      Page 136 of 220      PageID 482

676, 684-85 (S.D.N.Y. 2018) (concluding that daily mimicking of a stutter by a coworker is "a very specific and self explanatory form of bullying" that is sufficient to survive a motion to dismiss).

[55] *See, e.g.*, *Fox v. Gen. Motors Corp.*, 247 F.3d at 174 (upholding a jury verdict on a disability harassment claim based in part on evidence that a supervisor made disparaging comments about employees with disabilities assigned light duty, including calling them "hospital people," supervising their work more closely, and segregating them from other employees); *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 71 (D.D.C. 2005) (holding that a jury could find that unreasonably lengthy delays in responding to the plaintiff's accommodation requests, combined with other harassing acts, were sufficient to establish a hostile work environment).

Harassment based on an individual's request for, or receipt of, a reasonable accommodation also could violate the ADA's interference provision, *see* 42 U.S.C. § 12203(b); 29 C.F.R. § 1630.12(b), and/or the ADA's retaliation provision, *see* 42 U.S.C. § 12203(a); EEOC, *Enforcement Guidance on Retaliation and Related Issues* § II.A.2.e (2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#e._Example (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#e._Example)** s.

[56] 42 U.S.C. § 12102(1)(C), (3) (providing that an individual has a disability if the individual is "regarded as having . . . an impairment"; and that an individual meets this requirement if the individual has been "subjected to an action prohibited [under the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity"); 29 C.F.R. § 1630.2(g)(1)(iii) (noting that the ADA's protections apply where an "individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor'"); *see, e.g.*, *Quiles Quiles*, 439 F.3d at 5 8 (concluding with respect to the plaintiff's disability harassment claim that the evidence supported the jury's finding that the plaintiff was discriminated against because he was either actually disabled or perceived as such by his employer).

[57] 42 U.S.C. § 12102(1)(A)-(B) (including within the definition of disability a record of a physical or mental impairment).

**App. 134**

**58** The ADA expressly prohibits associational discrimination. *See* 42 U.S.C. § 12112(b)(4) (stating that discrimination against a qualified individual with a disability includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association"); 29 C.F.R. § 1630.8 ("It is unlawful for a covered entity to exclude or deny equal jobs or benefits to, or *otherwise discriminate against*, a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a family, business, social or other relationship or association." (emphasis added)); *see, e.g.*, *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467  70 (2d Cir. 2019) (ruling that the plaintiff stated a claim of associational discrimination under the ADA where he alleged that he was qualified to perform his job but was discriminated against based on his employer's perception that he was unavailable or distracted due to his daughter's medical condition).

Harassment based on association under other EEO statutes also is discussed below at notes 67 -71 and accompanying text.

**59** Genetic information is defined to include an "individual's genetic test," "genetic tests of family members," and "the manifestation of a disease or disorder in family members." 42 U.S.C. § 2000ff(4)(A). The definition of genetic information also includes "any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by [an] individual or any family member of such individual." 42 U.S.C. § 2000ff(4)(B). Genetic information is further defined to include, "with respect to [] an individual or family member of an individual who is a pregnant woman, [the] genetic information of any fetus carried by such pregnant woman," and "with respect to an individual or family member utilizing an assisted reproductive technology, [the] genetic information of any embryo legally held by the individual or family member." 42 U.S.C. § 2000ff 8(b).

**60** 42 U.S.C. § 2000ff 1(a)(1) ("It shall be an unlawful employment practice for an employer to . . . discriminate against any employee with respect to the . . . terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee.").

**61** 42 U.S.C. § 2000ff(4)(A).

**62** Cases alleging harassment under GINA based on the manifestation of a disease or disorder in a family member likely will also be covered by the ADA's prohibition

**App. 135**

against associational discrimination. *See supra* note 58 (discussing associational discrimination under the ADA). For example, if an employee is harassed because the employee's mother has cancer, then the employee may raise claims under GINA, as well as under the ADA for associational discrimination.

[63] *E.g.*, 42 U.S.C. § 2000e 3(a); *see also* EEOC, *Enforcement Guidance on Retaliation and Related Issues*, § II.A (2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)** (discussing participation and opposition as protected activity).

[64] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006); *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (applying the *Burlington Northern* standard).

[65] *See, e.g.*, *Carr v. NYC Transit Auth.*, 76 F.4th 172, 181 (2d Cir. 2023) ("[W]hen analyzing a retaliation claim, the sole inquiry regarding the third element of the prima facie case is whether the allegedly retaliatory actions were materially adverse. Even if a plaintiff labels her retaliation claim as a 'retaliatory hostile work environment' claim, courts should not consider whether the allegedly retaliatory actions meet the higher 'severe and [sic] pervasive' standard. All that is relevant is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination."); *Chambers v. Dist. of Columbia*, 35 F.4th 870, 876 (D.C. Cir. 2022) (en banc) ("[T]here are fundamental differences between the antidiscrimination and the antiretaliation provisions. . . . Unlike the antidiscrimination provision, the antiretaliation provision is not expressly limited to actions affecting the terms, conditions, or privileges of employment."); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020) ("[T]he standard applicable to all Title VII retaliation claims is the *Burlington Northern* 'well might have dissuaded' standard."); *Moore v. City of Phila.*, 461 F.3d 331, 341 42 (3d Cir. 2006).

[66] *See, e.g.*, *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012) ("[A] harasser's use of epithets associated with a different ethnic or racial minority than the plaintiff will not necessarily shield an employer from liability for a hostile work environment."); *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401 02 (5th Cir. 2007) (concluding that the EEOC presented sufficient evidence to support its national origin harassment claim where coworkers repeatedly referred to an employee of

**App. 136**

Indian descent as "Taliban" or "Arab" and stated that "[t]his is America . . . not the Islamic country where you came from," even though the harassing comments did not accurately describe the employee's actual country of origin); *Goings v. Lopinto*, No. 22-2549, 2023 WL 2709826, at *5 (E.D. La. Mar. 30, 2023) (stating that "[d]iscrimination on the basis of sexual orientation, including perceived sexual orientation, is prohibited under Title VII" and denying the employer's motion to dismiss where the plaintiff alleged he was called slurs and derogatory terms targeting homosexual individuals by his supervisor, who perceived the plaintiff as gay after seeing a photograph of the plaintiff shirtless and wrestling another male coworker); *Kallabat v. Mich. Bell Tel. Co.*, No. 12 CV 15470, 2015 WL 5358093, at *3 4 (E.D. Mich. June 18, 2015) (denying summary judgment to the employer on the plaintiff's claim that he was harassed based on the mistaken perception that he was Muslim); *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 844, 849 (D. Md. 2015) (holding that an employee of Persian descent stated a valid claim of national origin discrimination and harassment even though her employer mistakenly believed her to be a member of the Parsee ethnic group, which the plaintiff researched and believed originated in India and was a lower caste). *But see, e.g.*, *Yousif v. Landers McClarty Olathe KS, LLC*, No. 12-2788, 2013 WL 5819703, at *3-4 (D. Kan. Oct. 29, 2013) (stating that "perceived" discrimination claims are not cognizable under Title VII); *El v. Max Daetwyler Corp.*, No. 3:09 CV 415, 2011 WL 1769805, at *5-6 (W.D.N.C. May 9, 2011) (rejecting the proposition that Title VII provides a claim for discrimination based on misperception), *aff'd*, 451 F. App'x 257 (4th Cir. 2011).

[67] *See, e.g.*, *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022) (concluding that claims alleging discrimination based on interracial association "are fundamentally consistent with *Bostock v. Clayton County*, 590 U.S. 644 (2020)] and Title VII's plain language prohibiting action 'because of such individual[ ]' plaintiff's race"); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) (observing that "Title VII protects individuals who . . . are 'victims of discriminatory animus toward [protected] third persons with whom the individuals associate'" and that a complainant may be discriminated against based on his own race because the difference between his race and the race of the individual with whom he associated was the cause of the discrimination (quoting *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999))); *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 39 (2d Cir. 2008) (holding that Title VII prohibits discrimination based on interracial association and observing that multiple other circuits agree); *cf. Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175-78 (2011)

(holding that the plaintiff had standing to sue under Title VII where he alleged that his employer terminated him in order to retaliate against his fiancée for a sex discrimination charge she filed against their mutual employer; in authorizing a "person aggrieved" to file a charge or bring a lawsuit, Title VII provides a cause of action to those within the "zone of interests" "arguably [sought] to be protected by the statute"); *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 70 (2d Cir. 2019) (ruling that the plaintiff had stated a claim of associational discrimination under the ADA where he alleged that he was qualified to perform his job but was discriminated against based on his employer's perception that he was unavailable or distracted due to his daughter's medical condition).

[68] *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 128 (2d Cir. 2018) (en banc) ("[W]e hold that sexual orientation discrimination, which is based on an employer's opposition to association between particular sexes and thereby discriminates against an employee based on their own sex, constitutes discrimination 'because of . . . sex.'"), *aff'd on other grounds sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

[69] *Holcomb*, 521 F.3d at 131.

[70] *Tetro*, 173 F.3d at 994 ("A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child.").

[71] *See, e.g.*, *Barrett*, 556 F.3d at 513 (concluding that the district court erred in rejecting two White employees' claim of associational discrimination on the grounds that they failed to show the "requisite degree of association" with Black coworkers and explaining that the degree of association is irrelevant in assessing whether a plaintiff has a valid claim of associational discrimination (citing *Drake v. 3M*, 134 F.3d 878, 884 (7th Cir. 1998)); *cf. Kengerski v. Harper*, 6 F.4th 531, 534 35, 539 (3d Cir. 2021) (noting that associational discrimination is not limited to close or substantial relationships and ruling that the complainant could pursue his retaliation claim for making a complaint regarding harassment based on his association with his biracial grand niece).

[72] *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 79 (1998) (involving male employees sexually harassing a male coworker); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 908 (7th Cir. 2018) (rejecting "entirely" the view that it "strains credulity" that African Americans might be subjected to

unlawful race-based harassment where many managers in the same workplace were also African American and explaining that there are many reasons why women and minorities might tolerate discrimination against members of their own class or might participate in the discrimination themselves).

[73] *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 438 (5th Cir. 2011).

[74] This example is adapted from the facts in *Kang v. U. Lim Am., Inc.*, 296 F.3d 810 (9th Cir. 2002).

[75] *See, e.g.*, *Masud v. Rohr Grove Motors, Inc.*, No. 13 C 6419, 2015 WL 5950712, at *3 5 (N.D. Ill. Oct. 13, 2015) (denying summary judgment for the employer on the plaintiff's harassment claim based on "evidence, viewed in the light most favorable to plaintiff, support[ing] a pervasive pattern of discriminatory harassment based on not one but various protected characteristics all at once"); *see also Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing a claim of intersectional discrimination against an Asian woman, despite favorable consideration of an Asian man and a White woman, noting that "when a plaintiff is claiming race *and* sex bias, it is necessary to determine whether the employer discriminates on the basis of that *combination* of factors, not just whether it discriminates against people of the same race or of the same sex" (emphasis in the original)); *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032-34 (5th Cir. 1980) (recognizing that "discrimination against black females can exist even in the absence of discrimination against black men or white women").

[76] *See, e.g.*, *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1048 (10th Cir. 2020) (recognizing Title VII claim alleging discrimination against older women).

[77] *E.g.*, *Ahmed v. Astoria Bank*, 690 F. App'x 49, 51 (2d Cir. 2017) (holding that a reasonable jury could find that the plaintiff was subjected to unlawful harassment based on race, national origin, and religion, based in part on a senior supervisor's comments that she should remove her hijab, which he called a "rag," and his comment on September 11, 2013, that the plaintiff and two other Muslim employees were "suspicious" and that he was thankful he was "in the other side of the building in case you guys do anything").

[78] *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the

basis of gender."); *Tang v. Citizens Bank*, 821 F.3d 206 (1st Cir. 2016) (reversing summary judgment for the employer where harassment of an Asian woman included a discussion of the purported obedience of Asian women); *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 459 (5th Cir. 2013) (en banc) (upholding a jury verdict on the grounds that a claim that a male employee was harassed because of sex could be established by evidence showing that the male harasser targeted the employee for not conforming to the harasser's "manly man" stereotype); *Waldo v. Consumers Energy Co.*, 726 F.3d 802 (6th Cir. 2013) (harassment of a female employee in a heavily male environment included telling her to "pee like a man" and ridiculing her for carrying a purse); *Rosario v. Dep't of Army*, 607 F.3d 241, 244 (1st Cir. 2010) (harassment included a supervisor constantly complaining about the plaintiff's work attire and bringing coworkers to look at her clothes); *Prowel v. Wise Bus. Forms, Inc*., 579 F.3d 285 (3d Cir. 2009) (denying summary judgment for employer where the plaintiff was harassed based on gender stereotypes of how a man should look, speak, and act because the plaintiff had a high voice; walked in a certain manner; did not curse; was very well groomed; crossed his legs; and discussed topics like art, music, and interior design); *Kang*, 296 F.3d 810 (hostile work environment claim based on supervisor's stereotypical notions that Korean workers were better than others and that the plaintiff failed to live up to his supervisor's expectations); *Nichols v. Azteca Rest. Enters*., 256 F.3d 864 (9th Cir. 2001) (systemic abuse of a male restaurant employee for failing to conform to male stereotypes); *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154 (D. Md. 2022) (employer's response to harassment of transgender teacher included trying to hide plaintiff's gender identity by restricting her clothes, footwear, make up, and nail polish); *Membreno v. Atlanta*, 517 F. Supp. 3d 425 (D. Md. 2021) (harassment of transgender worker included questioning how a man could be attracted to her and ridiculing and demeaning her when she used the ladies' bathroom to the point that she would avoid relieving herself); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (harassment of transgender worker included being subjected to a stricter dress code than other female employees); *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744 (S.D. Ohio 2018) (denying motion to dismiss transgender woman's hostile work environment claim, which included allegations that she was told to "just dress like a man," that she made an "ugly woman," and that after the worker complained of several years of harassment, she was told to "be like a man" and "act like a man"); *Salinas v. Kroger Tex., L.P.*, 163 F. Supp. 3d 419 (S.D. Tex. 2016) (harassment of male coworker was based on the harasser's perception that the plaintiff was effeminate and had "a body like a woman"); *Barrett v. Pa. Steel*

**App. 140**

*Co.*, No. 2:14-CV-01103, 2014 WL 3572888 (E.D. Pa. July 21, 2014) (male plaintiff who worked in "office" portion of facility stated claim of sex harassment where he alleged that he was "made fun of and sexually harassed because he did not participate in cursing or engage in crude banter as did his male co-workers from the 'shop' portion of the facility"); *Zhao v. State Univ. of New York.*, 472 F. Supp. 2d 289, 313 (E.D.N.Y 2007) (denying the employer's motion for summary judgment where evidence included "facially neutral incidents [that] could be consistent with an employer [] punishing an employee for not achieving a standard of performance that has been improperly inflated due to impermissible ethnic stereotyping" where supervisor allegedly made comments suggesting "Chinese employees should work longer and harder than anyone else"); *Rubin v. Kirkland Chrysler-Jeep, Inc.*, 98 Fair Empl. Prac. Cas. (BNA) 159, 2006 WL 1009338 (W.D. Wash. Apr. 13, 2006) (harassment included references to stereotypes of Jews as both cheap and unduly interested in money).

[79] *See Plaetzer v. Borton Auto., Inc.*, No. Civ. 02 3089, 2004 WL 2066770, at *6 (D. Minn. Aug. 13, 2004) (concluding that the plaintiff had presented sufficient evidence to send her harassment claim to a jury where she experienced repeated comments and other conduct implying or stating that she was unqualified and could be fired at any time because she was a woman and because she spent too much time caring for her children); *see also Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 42, 47-48 (1st Cir. 2009) (holding that a reasonable jury could find that the plaintiff, the mother of an eleven year old and six year old triplets, was denied a promotion based on the "common stereotype about the job performance of women with children").

[80] *See Burns v. Johnson*, 829 F.3d 1, 13 14, 17 (1st Cir. 2016) (holding that a reasonable jury could conclude that a male supervisor's harassment of a female subordinate was based, in part, on the gender stereotype that women do not belong in positions of leadership).

[81] *See, e.g.*, *Price Waterhouse*, 490 U.S. at 250.

[82] *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (describing insults directed at Black employees based on negative stereotyping such as "don't touch anything" and "don't steal" as "inherently racist").

[83] The causation principles discussed in this enforcement guidance focus on hostile work environment claims. As discussed below in section III.A, however, unlawful harassment can also involve an explicit change to a term, condition, or privilege of

employment, such as the denial of a promotion for rejecting sexual advances. For more guidance on how to evaluate an allegation involving an explicit change to employment, refer to EEOC guidance that discusses discriminatory employment decisions. *See, e.g.*, EEOC, *Enforcement Guidance on National Origin Discrimination* § III (2016), **https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518806**

**(https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518806)** ; EEOC, *Compliance Manual Section 15: Race & Color Discrimination* § 15 V.A (2006),

**https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#VA (https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination#VA)** .

[84] *See, e.g.*, *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (holding that the employer was entitled to summary judgment where evidence showed that harassment was based on inter departmental politics and personality conflicts).

[85] In this example, there was no evidence that the harassment was based on color, national origin, or any another legally protected characteristic. By contrast, harassment based on a legally protected characteristic is covered under EEO law even if it also is based on non protected reasons.

[86] This example is adapted from the facts in *Webb v. Merck & Co.*, 450 F. Supp. 2d 582 (E.D. Penn. 2006). "A reasonable jury could find that statements such as 'my animals' and 'zookeeper,' when used in referring solely to African-American employees, 'send a clear message and carry the distinct tone of racial motivations and implications. They could be seen as conveying the message that members of a particular race are disfavored and that members of that race are, therefore, not full and equal members of the workplace.'" *Id.* at 597 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996)); *see also Galdamez v. Potter*, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005) ("[T]here are no 'talismanic expressions' of racial animus necessary to sustain a harassment claim, and . . . racially charged 'code words' may provide evidence of discriminatory intent by 'sending a clear message and carrying the distinct tone of racial motivations and implications.'" (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004))).

For a discussion of how the link between harassment and a protected basis can be established by context, see section II.B.4.

**App. 142**

[87] *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) (citing 29 C.F.R. § 1604.11(b) for the proposition that "the trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of the circumstances'").

[88] In this document, use of the term "discriminatory" to describe conduct means only that the conduct was based on a protected characteristic and does not indicate that conduct necessarily satisfies other legal requirements to establish that the conduct violates federal EEO laws, such as creating a hostile work environment.

[89] *See, e.g.*, *Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 63 (1st Cir. 2019) (stating that "the use of sexually degrading, gender specific epithets, such as . . . 'b*tch,' . . . constitute[s] harassment based upon sex" (omissions and second alteration in original) (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229 (1st Cir. 2007))); *Arrieta Colon v. Wal Mart P.R., Inc.*, 434 F.3d 75, 80, 89 (1st Cir. 2006) (agreeing with the lower court that there was sufficient evidence to support the jury verdict on the plaintiff's ADA hostile work environment claim where the plaintiff had a medical condition relating to sexual dysfunction and was subjected to "constant mockery and harassment . . . by fellow coworkers and supervisors alike due to his condition," including comments about impotence, his "pump," and his sexual functioning); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185-86 (4th Cir. 2001) (holding that a workplace where a supervisor constantly referred to African Americans as "monkeys" and "n****rs" was a racially hostile work environment, noting that "the word 'n****r' is pure anathema to African-Americans" and that calling someone a "monkey" "goes far beyond the merely unflattering; it is degrading and humiliating in the extreme").

[90] *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009) (concluding that women were subjected to sex discrimination by conduct that was patently degrading to women, even though members of both sexes were exposed to the conduct, and concluding that such conduct discriminates against women, irrespective of the harasser's motive); *see also Roy*, 914 F.3d at 63 (noting that gender-specific epithets can ground a harassment claim "[r]egardless of [the harasser's] particular and subjective motives"); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996) (concluding that sex based epithets discriminated against the plaintiff based on her sex even if they were motivated by gender-neutral reasons); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (concluding that use of the terms "n****r rigged" and "black ass" supported a race based hostile

**App. 143**

work environment claim even though, the employer asserted, they were not "intended to carry racial overtones"); *cf. Int'l Union, United Auto., Aerospace & Agric. Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1228-31 (10th Cir. 2015) (concluding that the district court erred in discounting the environmental effect of offensive race based conduct when the court focused on the "ostensibly benign motivation or intent" of the alleged harassers).

[91] *Sharp v. S&S Activewear, LLC*, 69 F.4th 974, 981 (9th Cir. 2023) (concluding that "sexually graphic, violently misogynistic" music can give rise to a sex-based hostile work environment claim and that even if the music was not directed toward a particular woman, "female employees allegedly experienced the content in a unique and especially offensive way"); *Gallagher*, 567 F.3d at 271 (concluding that women were subjected to sex discrimination by conduct that was patently degrading to women, even though members of both sexes were exposed to the conduct).

[92] This example is adapted from the facts in *Mangel v. Graham Packaging Co.*, No. 14-CV-0147, 2016 WL 1266257 (W.D. Pa. Apr. 1, 2016).

[93] *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."); *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303 (4th Cir. 2019) (concluding that the plaintiff's allegation that male coworkers started a rumor that she had sex with her boss to obtain a promotion invoked the "deeply rooted perception   one that unfortunately still persists   that generally women, not men, use sex to achieve success"); *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 459 (5th Cir. 2013) (en banc) (upholding a jury verdict on the grounds that a claim that a male employee was harassed because of sex could be established by evidence showing that the male harasser targeted the employee for not conforming to the harasser's "manly-man" stereotype).

[94] *See Plaetzer v. Borton Auto., Inc.*, No. Civ. 02 3089, 2004 WL 2066770, at *6 (D. Minn. Aug. 13, 2004) (concluding that the plaintiff had presented sufficient evidence

**App. 144**

to send her harassment claim to a jury where she experienced repeated comments and other conduct implying or stating that she was unqualified and could be fired at any time because she was a woman and because she spent too much time caring for her children); *see also Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 42, 47-48 (1st Cir. 2009) (holding that a reasonable jury could find that the plaintiff, the mother of an eleven year old and six year old triplets, was denied a promotion based on the "common stereotype about the job performance of women with children").

[95] *See Burns v. Johnson*, 829 F.3d 1, 13 14, 17 (1st Cir. 2016) (holding that a reasonable jury could conclude that a male supervisor's harassment of a female subordinate was based, in part, on the gender stereotype that women do not belong in positions of leadership).

[96] *See, e.g.*, *Price Waterhouse*, 490 U.S. at 250.

[97] *See King v. Aramark Servs., Inc.*, 96 F.4th 546, 564 (2d Cir. 2024) ("[A] reasonable jury could conclude that Thomas's singling out of King for weight related remarks and conduct   remarks and conduct that he did not direct toward her male peers reflected not only a bias against individuals with certain body types, but also a gender-based bias.").

[98] *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (observing that a person is considered transgender "precisely because of the perception that his or her behavior transgresses gender stereotypes" (citing *Price Waterhouse*, 490 U.S. at 251)); *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (stating that "discrimination against a plaintiff who is trans[gender]—and therefore fails to act and/or identify with his or her gender   is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse* who, in sex stereotypical terms, did not act like a woman"); *see also supra* note 78.

[99] *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) (referring to a Black employee as a "drug dealer" "might certainly be deemed to be a [racial] code word or phrase" (citing *Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1273 (7th Cir. 1991))).

[100] *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (describing insults directed at Black employees based on negative stereotyping such as "don't touch anything" and "don't steal" as "inherently racist").

**App. 145**

[101] *See, e.g.*, *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (concluding that the plaintiff could establish that he was harassed based on his national origin, Korean, where his supervisor allegedly subjected Korean workers to abuse based, in part, on their failure to "live up" to the stereotype that Korean workers are "better than the rest").

[102] *See, e.g.*, *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) (holding that "the relevance of discrimination related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision maker was motivated by assumptions or attitudes relating to the protected class," and observing that a supervisor's assertion that an employee, who was in her sixties, was well suited to work with seniors was not offensive but nevertheless had a strong tendency in the circumstances to show that the supervisor believed the employee, because of her age, was not well-suited to deal with younger clientele), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

[103] *See, e.g.*, *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044-45 (7th Cir. 1999) (upholding a jury verdict where a reasonable jury could conclude that "a supervisor's statement to a woman known to be pregnant that she was being fired so that she could 'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake").

[104] This example is adapted from the facts in *EEOC v. Boh Bros. Construction Co.*, 731 F.3d 444, 449 50, 457 60 (5th Cir. 2013) (en banc) (applying *Oncale v. Sundowner Offshore Services,, Inc.*, 523 U.S. 75 (1998), which recognized that same-sex sexual harassment can violate Title VII).

[105] *See, e.g.*, *Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 63 (1st Cir. 2019) (noting that "a reasonable jury could infer that" a comment about the plaintiff's body "was made in part because of her sex, given the context" that included evidence that her coworkers regularly "sexualiz[ed]" her and "emphasiz[ed] aspects of her appearance, such as her blonde hair"); *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 216-17 (1st Cir. 2016) (considering the context, use of the word "ass" was based on sex); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 85 (2d Cir. 2010) (Calabresi, J., concurring) (viewing comment by male coworker about the plaintiff's "big fat ass" to be based on sex).

**App. 146**

[106] *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam); *see also Paasewe v. Action Grp., Inc.*, 530 F. App'x 412, 416 (6th Cir. 2013) (per curiam) (holding that a reasonable jury could find that the plaintiff was subjected to race based harassment where the plaintiff's coworker called him "boy" and threatened his life).

[107] *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 83 (3d Cir. 1996) (stating that racial harassment could be based on "code words," which referred to Black employees as "another one," "one of them," "that one in there," and "all of you"); *cf. Martin v. Brondum*, 535 F. App'x 242, 244 (4th Cir. 2013) (explaining in a case involving an alleged violation of the Fair Housing Act that "[r]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications" (alteration in original) (quoting *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012))); *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 579 (8th Cir. 1999) (characterizing a supervisor's use of the phrase, "your kind" as "offensive and racially tinged").

[108] This example is adapted from the facts in *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012).

[109] *See, e.g.*, *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020) ("Our case law is clear that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim."); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 48 (2d Cir. 2010) (stating that circumstantial evidence that facially sex neutral acts were part of a pattern of sex discrimination may include evidence that the same individual engaged in multiple acts of harassment, some facially sex-based and some not); *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (stating that conduct that appears sex neutral in isolation may appear sex based when viewed in the context of the broader work environment); *Shanoff v. Ill. Dep't of Hum. Servs.*, 258 F.3d 696, 705 (7th Cir. 2001) (stating that a reasonable person could conclude that comments that were not facially discriminatory were "sufficiently intertwined" with facially discriminatory remarks to establish that the former were motivated by hostility to the plaintiff's race and religion); *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) (stating that "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category").

**App. 147**

[110] *See, e.g.*, *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010) (concluding that instances of facially neutral harassment were not connected to overtly racial conduct as they "lack[ed] any congruency of person or incident"), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

[111] This example is adapted from the facts in *EEOC v. T-N-T Carports, Inc.*, No. 1:09-CV 27, 2011 WL 1769352 (M.D.N.C. May 9, 2011).

[112] *See, e.g.*, *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 236-37 (5th Cir. 2001) (upholding a jury verdict and concluding that the jury could have found that harassment, which began "almost immediately" after a supervisor learned that the plaintiff was HIV-positive, was based on disability).

[113] *See EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 842 (9th Cir. 2005) (holding that "offensive conduct that is not facially sex-specific nonetheless may violate Title VII if there is sufficient circumstantial evidence of qualitative and quantitative differences in the harassment suffered by female and male employees").

[114] This example is adapted from the facts in *National Education Ass'n, Alaska*, 422 F.3d at 842 44.

[115] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 81 (1998).

[116] *See EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 455 56 (5th Cir. 2013) (en banc) (agreeing with sister circuits that the three evidentiary paths in *Oncale* are not exclusive); *see also, e.g.*, *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) ("These routes, however, are not exhaustive."); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005) (describing *Oncale*'s list as "non exhaustive").

[117] *Boh Bros.*, 731 F.3d at 456.

[118] *See, e.g.*, 42 U.S.C. 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.").

[119] With respect to harassment claims, the Supreme Court has referred to two types of changes to the terms, conditions, or privileges of employment as "explicit" and "constructive" changes. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

**App. 148**

The terms are used in this document to facilitate discussion of the standards attached to each type of change to the terms or conditions of employment.

**120** *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *see also Ellerth*, 524 U.S. at 752 (stating that "Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment").

**121** *Quid pro quo harassment also has arisen in the context of religious harassment where a supervisor denies a job benefit to an employee who refuses to adhere to the supervisor's religious principles. See Venters v. City of Delphi, 123 F.3d 956, 976-77 (7th Cir. 1997) (concluding that a jury could find that a radio dispatcher was subjected to quid pro quo religious harassment when she was discharged by the police chief for not adhering to his religious beliefs).*

**122** *See, e.g.*, *Barnes v. Costle*, 561 F.2d 983, 989 90 (D.C. Cir. 1977) (holding that the plaintiff had alleged discrimination based on her sex when she rejected her supervisor's advances and her position was abolished; the plaintiff alleged that, as a woman, she had been the target of her supervisor's sexual desires and no male had been subjected to similar conduct); *cf. Meritor Sav. Bank, FSB*, 477 U.S. at 65 (distinguishing between a sexual harassment claim linked to the "grant or denial of an economic *quid pro quo*" and a hostile work environment claim).

**123** *Gregory v. Daly*, 243 F.3d 687, 698 (2d Cir. 2001).

**124** Brief for the United States and the Equal Employment Opportunity Commission as Amici Curiae Supporting Respondent at 16, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (No.97 569), 1998 WL 151472, at *16 (alterations in original) (quoting 42U.S.C. §2000e-2(a)(1)); *see also Ellerth*, 524 U.S. at 752 (noting that the terms "quid pro quo" and "hostile work environment" do not appear in the text of Title VII).

**125** *Ellerth*, 524 U.S. at 753-54; *see also Chambers v. District of Columbia*, 35 F.4th 870, 874 75 (D.C. Cir. 2022) (en banc) ("Once it has been established that an employer has discriminated against an employee with respect to that employee's 'terms, conditions, or privileges of employment' because of a protected characteristic, the analysis is complete.").

**126** *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

**127** *Id*.

**128** *Id.* at 21 (quoting *Meritor Sav. Bank, FSB, v. Vinson*, 477 U.S. 57, 64 (1986).

**129** *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (citing, e.g., *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (stating that the requirement of severity or pervasiveness "prevents Title VII from expanding into a general civility code"); *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008) (stating that an employee must "accommodate the normal run of aggravations that are part of holding a job").

**130** *Harris*, 510 U.S. at 21.

**131** Section III.C.1, below, discusses how to determine whether conduct is sufficiently related to be part of the same hostile work environment claim.

**132** *See infra* notes 200-204 and accompanying text.

**133** *Meritor Savings Bank, FSB*, 477 U.S. at 68 (citation omitted).

**134** 29 C.F.R. § 1604.11(a) (defining sexual harassment as including "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature").

**135** *Meritor Sav. Bank, FSB*, 477 U.S. at 68.

**136** *Harris*, 510 U.S. at 21-22.

**137** *See, e.g., Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018) (holding that, because a reasonable jury could find that the conduct was unwelcome, there was an issue of material fact regarding subjective hostility); *Kokinchak v. Postmaster Gen. of the U.S*, 677 F. App'x 764, 767 (3d Cir. 2017) (treating unwelcomeness and subjective hostility as the same issue); *Horney v. Westfield Gage Co., Inc.*, 77 F. App'x 24, 29 (1st Cir. 2003) (treating unwelcomeness and subjective hostility as the same issue); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 873 (9th Cir. 2001) (explaining that the issue of subjective hostility turns on whether conduct was unwelcome to the plaintiff).

**138** *See, e.g., Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (stating that unwelcomeness is one of the requirements in establishing a hostile work environment based on sex); *Smith v. Rock Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016) (same); *Boyer Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (stating that unwelcomeness is one of the requirements in establishing a

**App. 150**

hostile work environment based on race); *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014) (same).

[139] *See, e.g.*, *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (concluding that the plaintiff's testimony about the impact that the alleged racial harassment had on her was sufficient for a jury to find that the plaintiff subjectively perceived the conduct as hostile, notwithstanding her failure to report the conduct to supervisors); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) (concluding that subjective hostility was established through the plaintiff's unrebutted testimony and his complaints to supervisors and the EEOC); *Horney*, 77 F. App'x at 29 (concluding that subjective hostility/unwelcomeness was established by the plaintiff's testimony that the conduct she complained about made her feel offended and humiliated); *Nichols*, 256 F.3d at 873 (concluding that subjective hostility/unwelcomeness was established by the plaintiff's complaints and his unrebutted testimony that conduct was unwelcome); *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 42 (10th Cir. 1998) (concluding that evidence established a jury issue as to subjective hostility where the plaintiff testified that harassment made her "more and more stressed out and pretty cracked," that she "hated" the conduct, that she was "pretty shocked," and that she "just wanted to avoid the whole situation").

[140] *See, e.g.*, *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 223 (5th Cir. 2023) (concluding that the plaintiff presented sufficient evidence that she subjectively viewed the alleged harassment as hostile where she "complained about the harassment, reported it to her supervisors, and suffered psychological harm"); *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 433 (7th Cir. 2012) (concluding that there was sufficient evidence in the record showing that a teenage server at a restaurant found her supervisor's comments and conduct subjectively offensive because she repeatedly informed him that his conduct was unwelcome and complained to two other restaurant managers about the conduct).

[141] *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454 (7th Cir. 1994) (concluding that the plaintiff established harassment was subjectively hostile where, among other things, she told a friend about the conduct and then complained to her supervisor after learning from the friend that she had some legal recourse).

[142] *See EEOC v. Prospect Airport Servs.*, 621 F.3d 991, 997 98 (9th Cir. 2011) (explaining that whether the male complainant welcomed his female coworker's

**App. 151**

sexual propositions depended on his "individual circumstances and feelings" and that it did not matter whether other men would have welcomed the propositions).

[143] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (explaining that the correct inquiry is whether the complainant experienced the conduct as unwelcome, not whether she voluntarily participated in it); *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 754-55 (10th Cir. 2014) (concluding that the issue of whether sexual conduct was unwelcome was a matter for the jury to decide, regardless of whether the plaintiff's participation in it was voluntary).

[144] *See, e.g.*, *Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1047 48 (8th Cir. 2005) (concluding that the complainant failed to establish a prima facie case of sexual harassment where she stated that she did not feel harassed by the conduct); Newman v. Fed. Express Corp.*, 266 F.3d 401, 405-06 (6th Cir. 2001) (concluding that the plaintiff did not subjectively perceive conduct as hostile where he testified during a deposition that he did not consider a racially charged hate letter a "big deal," that he was not surprised, shocked, or disturbed by it, and that he would lose no sleep over it).

[145] *See, e.g.*, *Williams v. Herron*, 687 F.3d 971, 975 (8th Cir. 2012) (concluding that the complainant adequately communicated to the harasser, with whom she had been having a sexual relationship, that his conduct was no longer welcome).

[146] *Cf. Kramer*, 743 F.3d at 749 n.16 (stating that the complainant's private consensual sexual relationship with another county employee was unrelated to her claim of sexual harassment by the sergeant).

[147] *See Gerald v. Univ. of P.R.*, 707 F.3d 7, 17 (1st Cir. 2013) (stating that telling risqué jokes did not signal that the plaintiff was amenable to being groped at work); *Pérez Cordero v. Wal Mart P.R., Inc.*, 656 F.3d 19, 28 (1st Cir. 2011) (stating that acquiescence to a customary greeting among employees—a kiss on the cheek—was not probative of the complainant's receptiveness to his supervisor's sucking on his neck).

[148] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hall v. City of Chi.*, 713 F.3d 325, 330 (7th Cir. 2013) (stating that harassment is actionable if it is severe *or* pervasive and that, thus, "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts" (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001))).

**App. 152**

**149** *See, e.g.*, *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (explaining that in determining whether offensive language created a hostile work environment, the court "look[s] to the 'pervasiveness and severity' of language used, which [the court has] described as being 'inversely related'" (quoting *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005))); *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 11-12 (1st Cir. 2015) (explaining that harassment may be actionable without being both severe and pervasive and that the "severity . . . may vary inversely with its pervasiveness" (quoting *Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976 (Me. 1996))); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 1000 (9th Cir. 2010) (stating that the "required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct" (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001))).

**150** *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) ("Within the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim."); *see also Harris*, 510 U.S. at 22 (explaining that the determination of whether harassment creates a hostile work environment "is not, and by its very nature cannot be, a mathematically precise test").

**151** A hostile work environment may be so intolerable that an employee is compelled to resign employment. Under these circumstances, the employee is said to have been subjected to a constructive discharge. *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). To establish a constructive discharge claim under such circumstances, the employee must both establish a hostile work environment and show that "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Id.* at 141; *see also id.* at 149 ("Creation of a hostile work environment is a necessary predicate to a hostile environment constructive discharge case."); *Green v. Brennan*, 578 U.S. 547, 559 (2016) (observing that *Suders*'s holding that a hostile work environment claim is a "lesser included component" of the "graver claim" of constructive discharge was "no mere dictum" (emphasis omitted)). "[H]arassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts." *Suders*, 542 U.S. at 148.

**152** *See, e.g.*, *Harris*, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

**App. 153**

[153] *Id.*

[154] *See* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic* 28 (2016),
**https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf
(https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf)** .

[155] *Harris*, 510 U.S. at 23.

[156] *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400-01 (5th Cir. 2007) (concluding that the evidence was sufficient to show that harassment based on an employee's Muslim faith and national origin (Indian) resulted in a hostile work environment); *see also Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335-36 (4th Cir. 2010) (concluding that race based conduct could be considered cumulatively with sex based conduct, which would allow a reasonable jury to find that the plaintiff was subjected to a hostile work environment); *Hafford v. Seidner*, 183 F.3d 506, 515-16 (6th Cir. 1999) ("It would not be right to require a judgment against Hafford if the sum of all of the harassment he experienced was abusive, but the incidents could be separated into several categories, with no one category containing enough incidents to amount to 'pervasive' harassment.").

Refer to section III.C.1 for a discussion of how to determine whether conduct is sufficiently related to be considered part of the same hostile work environment claim.

[157] *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 17 (10th Cir. 1987) (determining that although the plaintiff's evidence of a race based hostile work environment was insufficient to establish a hostile work environment, this evidence should be considered with the plaintiff's evidence of sexual harassment "to determine whether there was a pervasive discriminatory atmosphere . . . so that a hostile work environment harassment claim may have been established"); *cf. Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (stating that the "interplay between the two forms of harassment" alleged by the plaintiff could lead a jury to conclude that the "racial harassment exacerbated the effect of [the] sexually threatening behavior and vice versa").

**App. 154**

[158] *See, e.g.*, *Petrosino v. Bell Atl.*, 385 F.3d 210, 215 (2d Cir. 2004) (reversing summary judgment for the employer where the hostile work environment included disparaging remarks about the plaintiff's menstrual cycle, including "dismissing her job concerns as attributable to her menstrual cycle ('He accused me several times of being 'on the rag' . . . whenever I had a dispute with him . . . .") (internal citation omitted)).

[159] This example is adapted from the facts in *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171 (S.D.N.Y. 2013).

[160] *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 752 (1998) (reiterating that that an employer's sexually demeaning behavior alters the terms or conditions of employment in violation of Title VII if it is severe or pervasive); *see also Ford v. Jackson Nat'l Life Ins. Co.,* 45 F.4th 1202, 1231 (10th Cir. 2022) (stating that if "the condition of Ford's employment was altered for the worse" because of the alleged sexual harassment, then the fact that she "continued to proceed through the ranks" provided "no reason" for the court to dismiss her hostile work environment claim); *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 330 (4th Cir. 2010) (stating that the issue is not whether work has been impaired but whether the work environment has been discriminatorily altered and that the "fact that a plaintiff continued to work under difficult conditions is to her credit, not the harasser's"); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009) (concluding that the district court erred in requiring evidence that the complainant's work performance suffered measurably as a result of harassment rather than merely evidence that harassment made it more difficult to do the job); *Dawson v. Cnty. of Westchester, 373 F.3d 265, 274 (2d Cir. 2004) (stating that the crucial question is "whether* the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace").

[161] *Harris,* 510 U.S. at 22-23 (explaining that "Title VII comes into play before the harassing conduct leads to a nervous breakdown" as "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance").

[162] This example is adapted from the facts in *Gallagher*, 567 F.3d at 266-69.

[163] *Ellerth,* 524 U.S. at 763; Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 278 (4th Cir. 2015) (en banc) (quoting Ellerth, 524 U.S. at 763); *see also Copeland v. Ga.*

**App. 155**

*Dep't of Corr.*, ___ F.4th ___, No. 22-13073, 2024 WL 1316677, at *7 (11th Cir. Mar. 28, 2024) *(noting that harassment is "more severe when it involves* participation of supervisors rather than solely peers or subordinates").

[164] *See Gates v. Bd. of Educ.,* 916 F.3d 631, 638 (7th Cir. 2019) (stating that the circuit has "repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a coworker's"); *Zetwick v. Cnty. of Yolo,* 850 F.3d 436, 445 (9th Cir. 2017) (concluding that a reasonable jury could find that the alleged sexual harassment was actionable, in part, because of the harasser's status as a supervisor); *Steck v. Francis,* 365 F. Supp. 2d 951, 971-72 (N.D. Iowa 2005) (stating that a supervisor's agency relation increases the impact of harassment by the supervisor); *see also Fairbrook Med. Clinic, P.A.,* 609 F.3d at 329 (stating that the severity of the harasser's conduct was exacerbated by his significant authority over the complainant); *Rodgers v. W.-S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993) (stating that a supervisor's use of the word "n****r" has a more severe impact on the work environment than its use by coworkers); *cf. Chapman v. Oakland Living Ctr., Inc.,* 48 F.4th 222, 231 (4th Cir. 2022) (stating that although the repeated use of the n-word was by a six-year-old, "the boy who uttered the slurs was not just any 'young child,' but the grandson of OLC's owners and the son of a supervisor being groomed to take over the family business . . . and [t]hus, a reasonable person in Chapman's position could 'fear that the child had his relative's ear and could make life difficult for her'" (citation omitted)).

[165] *See Boyer-Liberto,* 786 F.3d at 279-80 (explaining that, regardless of whether the harasser was the complainant's supervisor for purposes of employer vicarious liability, the determination of objective severity required the court to consider how the harasser portrayed the harasser's authority and what the complainant reasonably believed the harasser's actual power to be).

[166] *See, e.g.*, *Warf v. U.S. Dep't of Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013) ("Evidence of other sexual harassment claims may help support a hostile work environment claim, but evidence of harassment to others does not weigh as heavily as evidence directed against the plaintiff."); *Ziskie v. Mineta*, 547 F.3d 220, 224-25 (4th Cir. 2008) (stating that conduct personally experienced by the plaintiff may be more probative of a hostile work environment than conduct she did not witness, but all the evidence should be considered: "[h]ostile conduct directed toward a plaintiff that might of itself be interpreted as isolated or unrelated to gender might look

**App. 156**

different in light of evidence that a number of women experienced similar treatment"); *see also infra* notes 212 216 and accompanying text.

[167] *See, e.g.*, *Copeland*, 2024 WL 1316677, at *8 (stating that the intentional misgendering and other harassment that a male transgender correctional officer experienced was humiliating where it occurred over the prison radio system, which allowed the whole institution to hear); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (concluding that a fire lieutenant could establish a hostile work environment based on a single incident in which a coworker loudly made obscene and sexist comments at a meeting where the lieutenant was the only woman and many of the men were her subordinates); *Delozier v. Bradley Cnty. Bd. of Educ.*, 44 F. Supp. 3d 748, 759 (E.D. Tenn. 2014) (concluding that a male band leader's sexual comments about a female assistant band leader were sufficient to create a hostile work environment where they were made in front of the assistant band leader's students, thereby undermining her authority and stature in her students' eyes); *Hanna v. Boys & Girls Home & Fam. Servs., Inc.*, 212 F. Supp. 2d 1049, 1061 (N.D. Iowa 2002) (noting the significance of the fact that sexually harassing conduct was directed at the female complainant in the presence of male clients).

[168] *See, e.g.*, *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 945-46 (8th Cir. 2016) ("Actions that might not rise to the level of severe or pervasive in an office setting take on a different character when the two people involved are stuck together for twenty four hours a day with no other people—or means of escape—for miles around.").

[169] *See* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic* 24-25 (2016), **https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/haras sment/report.pdf (https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/hara ssment/report.pdf)** (discussing "superstar" harassers).

[170] *See, e.g.*, *Lapka v. Chertoff*, 517 F.3d 974, 982-84 (7th Cir. 2008) (concluding that, in the case of a complainant who alleged that her coworker raped her, the severity of the sexual assault alleged would be sufficient to establish an objectively hostile work environment).

[171] *See, e.g., Turner v. Saloon, Ltd.,* 595 F.3d 679, 686 (7th Cir. 2010) (concluding that the plaintiff's claim that his female supervisor grabbed his penis through his

**App. 157**

pockets was probably severe enough on its own to create a genuine issue of material fact as to the plaintiff's sexual harassment claim).

[172] *See, e.g.*, *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 263-64 (2d Cir. 2023) (concluding that a reasonable jury could find that the plaintiff was subjected to unlawful harassment based on race and sex when a colleague "shook a rolled up document in her face and started yelling at her in a loud and aggressive manner," alarming other employees, and leading her to take disability leave); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 230 (2d Cir. 2004) (concluding that a hostile work environment based on race could be established by a single incident in which the plaintiff was allegedly punched in the ribs and temporarily blinded by having mace sprayed in his eyes because of his race); *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (concluding that harassing a female employee based on her sex by damaging her wrist to the point that surgery was required "easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment"); *cf. Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496 97 (4th Cir. 2015) (concluding that a reasonable jury could find that two anonymous notes placed in the plaintiff's mailbox, although not pervasive, were sufficiently severe to create hostile work environment where the notes referred to lynching and were in the form of a mock hunting license for African Americans).

[173] *E.g.*, *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1145 (10th Cir. 2008) (concluding that a "jury could easily find that the noose was an egregious act of discrimination calculated to intimidate African-Americans"); *Rosemond v. Stop & Shop Supermarket Co.*, 456 F. Supp. 2d 204, 213 (D. Mass. 2006) (holding that a reasonable jury could conclude that display of a noose in an African American employee's work area was sufficient to create a hostile work environment); *Williams v. N.Y.C. Hous. Auth.*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) (stating that a "noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence" and that the "effect of such violence on the psyche of African-Americans cannot be exaggerated"); *Yudovich v. Stone*, 839 F. Supp. 382, 391 (E.D. Va. 1993) (finding that one of the plaintiffs' supervisors expressed hostility toward the plaintiffs' religion by, among other things, keeping a coffee mug displaying a swastika on his desk).

[174] *See, e.g.*, *Boyer Liberto v. Fountainebleau Corp.,* 786 F.3d 264, 280 (4th Cir. 2015) (en banc) (stating that calling an African American employee "porch monkey" was "about as odious as the use of the word 'n****r'"); *Henry v. CorpCar Servs. Hous., Ltd.*, 625 F. App'x 607, 611, 613 (5th Cir. 2015) (concluding that although the alleged

**App. 158**

harassment was brief as it had occurred over only two days, a jury could find that it was sufficiently severe to create a hostile work environment where, among other things, African American employees were compared to gorillas); *see also Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) (agreeing with the plaintiff that using the term "monkey" to refer to African Americans was "roughly equivalent" to using the term "n\*\*\*\*r"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) (stating that use of "monkey" to describe African Americans was "degrading and humiliating in the extreme").

[175] In *Burlington Industries, Inc. v. Ellerth,* the Court explained that unfulfilled threats are actionable if they create a hostile work environment. *524 U.S. 742, 754 (1998)*. A sufficiently serious threat, even if unfulfilled, could meet the necessary level of severity. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 607 (2d Cir. 2006) ("Threats or insinuations that employment benefits will be denied based on sexual favors are, in most circumstances, quintessential grounds for sexual harassment claims, and their characterization as 'occasional' will not necessarily exempt them from the scope of Title VII."); *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 500 (7th Cir. 1997) (en banc) (Flaum, J., concurring) (stating that a supervisor's unambiguous communication that an adverse job action will follow if sexual favors are denied may cause "real emotional strife," including "anxiety, distress, and loss of productivity regardless of whether the threat is carried out").

[176] *See Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) ("The incident Woods has pleaded—that his supervisor directly called him a 'Lazy Monkey A__ N___' in front of his fellow employees    states an actionable claim of hostile work environment."); *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017); *Rodgers v. W. S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly 'alter the conditions of employment . . .' than the use of an unambiguously racial epithet such as 'n\*\*\*\*r' by a supervisor in the presence of his subordinates." (citation omitted)); *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[I]n my view, being called the n-word by a supervisor . . . suffices by itself to establish a racially hostile work environment. That epithet has been labeled, variously, a term that 'sums up . . . all the bitter years of insult and struggle in America,' 'pure anathema to African-Americans,' and 'probably the most offensive word in English.'" (citations omitted)).

[177] *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 965 (8th Cir. 1993) (quoting *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983)); *see also, e.g.*, *Johnson v. PRIDE Indus.*, 7

**App. 159**

F.4th 392, 403-04 (5th Cir. 2021) (holding that the plaintiff could establish a hostile work environment based on harassment that included the use of "mayate," which the plaintiff knew was Spanish for the n word, by a fellow employee who outranked him); *Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012) ("A raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as 'sl*t,' 'c*nt,' 'wh*re,' and 'b*tch,' . . . has been consistently held to constitute harassment based upon sex." (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229-30 (1st Cir. 2007))); *Hawkins v. City of Phila.*, 571 F. Supp. 3d 455, 464 (E.D. Pa. 2021) ("The term 'f***ot' is so replete with homophobic animus that, if used, instantly separates an individual who identifies as gay from everyone else in the workplace."); *Johnson v. Earth Angels*, 125 F. Supp. 3d 562, 569 (M.D.N.C. 2015) (stating that racial epithets used by supervisors went "far beyond the merely unflattering" and were "degrading and humiliating in the extreme" (quoting *Boyer Liberto*, 786 F.3d at 280)).

[178] *See, e.g.*, *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 439, 442 46 (9th Cir. 2017) (concluding that a reasonable jury could find that the plaintiff was subjected to a hostile work environment where her supervisor greeted her with "at least a hundred" "unwelcome hugs and at least one unwelcome kiss" over a twelve year period); *Hall v. City of Chi.*, 713 F.3d 325, 332 (7th Cir. 2013) ("[I]ncidents, which viewed in isolation seem relatively minor, that consistently or systematically burden women throughout their employment are sufficiently pervasive to make out a [sex based] hostile work environment claim."); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998-1001 (9th Cir. 2010) (determining that a genuine issue of material fact existed as to the abusiveness of the complainant's work environment where, after the complainant twice rejected his coworker's advances, this coworker and other coworkers subjected the complainant to six months of constant sexual pressure and humiliation); *Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 163-64 (5th Cir. 2007) (concluding that a reasonable jury could find that the supervisor engaged in "pervasive harassment" where, among other things, he called the plaintiff "ten to fifteen times a night for almost four months").

[179] *See supra* note 150 and accompanying text.

[180] *See, e.g.*, *Rodgers*, 12 F.3d at 674 (stating that liability is evaluated "on a case by case basis after considering the totality of the circumstances" (quoting *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1380-81 (7th Cir. 1986))); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (stating that "flexibility is useful in a

context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment").

[181] *See, e.g.*, *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1073-74 (9th Cir. 2005) (upholding jury verdict for the plaintiff, noting that the CEO's intentional and repeated use of a "Westernized" version of the plaintiff's name, despite his objections, may not have been severe but was frequent and pervasive).

[182] *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (concluding that, given the short time frame and number of incidents involved, the plaintiff established a genuine issue as to whether she was subjected to a hostile work environment).

[183] This example is adapted from the facts in *EEOC v. Prospect Airport Services, Inc.*, 621 F.3d 991 (9th Cir. 2010).

[184] This example is adapted from the facts in *Broderick v. Ruder*, 685 F. Supp. 1269, 1278 (D.D.C. 1988) (holding that the plaintiff stated a prima facie case of sexual harassment based on evidence that managers harassed female employees by bestowing preferential treatment on those who submitted to sexual advances).

[185] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

[186] *Id.* at 81-82; *see also Reeves v. C.H. Robinson Worldwide*, *Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (en banc) (stating that the analysis requires proceeding with "'[c]ommon sense, and an appropriate sensitivity to social context,' to distinguish between general office vulgarity and the 'conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive'" (quoting *Oncale*, 523 U.S. at 82)); *Hood v. Nat'l R.R. Passenger Corp.*, 72 F. Supp. 3d 888, 893 (N.D. Ill. 2014) (stating that the joking manner in which the challenged comments were made was a relevant consideration in evaluating the severity of Hispanic employees' use of "gringo" to refer to the White complainant).

[187] *Oncale,* 523 U.S. at 82.

[188] *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("Racially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group, but in reality be intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group. . . . By considering both the existence and the severity of

**App. 161**

discrimination from the perspective of a reasonable person of the plaintiff's race, we recognize forms of discrimination that are real and hurtful, and yet may be overlooked if considered solely from the perspective of an adjudicator belonging to a different group than the plaintiff."); *see also Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (stating that a hostile work environment requires evidence establishing that the harassment would have adversely affected a reasonable person of the same protected class in the plaintiff's position), *abrogated on other grounds by Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 321 (2d Cir. 1999) (Newman, J., concurring in part and dissenting in part) (noting that the failure to adopt the perspective of the complainant's protected class might result in applying the stereotypical views that Title VII was designed to outlaw); *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997) (evaluating the sexual harassment claim of a female plaintiff from the viewpoint of a "reasonable woman"); *cf. Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 438 (6th Cir. 2006) (stating that the severity of harassment is evaluated from the "perspective of a reasonable person in the employee's shoes, considering the totality of the circumstances" (citing *Oncale*, 523 U.S. at 81)).

[189] *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 85 (2d Cir. 2010) (Calabresi, J., concurring) (stating that the female complainant could base her hostile work environment claim on sexually derogatory conduct that was the product of locker room culture that some other women participated in); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 272 n.2 (6th Cir. 2009) (concluding that the plaintiff established that she experienced sex-based harassment, even though some women participated in the conduct); *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 886 (D. Minn. 1993) (concluding that expert testimony and testimony of female mine workers established that the work environment affected the psychological well being of a reasonable woman working there, and this conclusion was not affected by the fact that some women did not find the work environment objectionable); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1525 (M.D. Fla. 1991) (stating that the fact that some women did not find the conduct offensive did not mean that the conduct was not objectively hostile).

[190] *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 946 (8th Cir. 2016) (doctoral candidate's physical well being in a remote location and academic future was dependent on a leading expert in the candidate's field of study who harassed her on a research trip).

[191] *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 429, 433 (7th Cir. 2012) (stating that the ten-year age disparity between the teenage complainant and the older harasser, coupled with his authority over her, could have led a rational jury to conclude that the harassment resulted in a hostile work environment).

[192] *Cf. Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1064-65 (9th Cir. 2004) ("While documented workers face the possibility of retaliatory discharge for an assertion of their labor and civil rights, undocumented workers confront the harsher reality that, in addition to possible discharge, their employer will likely report them to [immigration authorities] and they will be subjected to deportation proceedings or criminal prosecution. . . . As a result, most undocumented workers are reluctant to report abusive or discriminatory employment practices.").

[193] *Prettyman v. LTF Club Opers. Co.*, No. 1:18-cv-122, 2018 WL 5980512, at *6 (E.D. Va. Nov. 13, 2018) ("Much of this historical antipathy toward Jews was grounded in economic antisemitism, which makes comments about 'Jewish money' all the more objectionable and offensive. These words and phrases about Jews, like the n-word, are so serious and severe that they instantly signal to an employee that he or she is unwelcome in the work place because of his or her religion.").

[194] *See EEOC v. Glob. Horizons, Inc.*, 7 F. Supp. 3d 1053, 1061 (D. Haw. 2014) (threats of deportation contributed to a hostile work environment); *Chellen v. John Pickle Co., Inc.*, 446 F. Supp. 2d 1247, 1265 (N.D. Okla. 2006) ("The threat of deportation was especially significant in defendants' creation of a hostile working environment. The Chellen plaintiffs feared . . . the harm he could inflict on [them] or their families if they were made to return to India.").

[195] This example is adapted from the facts in *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115 (E.D. Pa. 2020).

[196] *See, e.g., Copeland v. Ga. Dep't of Corr.*, ___ F.4th ___, No. 22-13073, 2024 WL 1316677, at *8 (11th Cir. Mar. 28, 2024) (concluding that working as a corrections officer, which is a "dangerous and sometimes" "violent context," made the intentional misgendering and other harassment that a transgender male correctional officer experienced more severe than it would have been in other contexts); *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 946 (8th Cir. 2016) (concluding that the alleged harassment was sufficient to establish a hostile work environment where, among other things, the plaintiff and the alleged harasser worked in a remote region where they had been dropped by plane).

[197] *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008) (rejecting the district court's suggestion that harassment might be discounted in an environment that was "inherently coarse"; "Title VII contains no such 'crude environment' exception, and to read one into it might vitiate statutory safeguards for those who need them most"); *see also Reeves v. C.H. Robinson Worldwide*, 594 F.3d 798, 810 (11th Cir. 2010) (en banc) (stating that a "member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender specific in the workplace, just because the workplace may be otherwise rife with generally indiscriminate vulgar conduct"); *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) ("[W]e squarely denounce the notion that the increasing regularity of racial slurs and graffiti renders such conduct acceptable, normal, or part of 'conventional conditions on the factory floor.'"); *Vollmar v. SPS Techs., LLC*, No. 15 2087, 2016 WL 7034696, at \*6 (E.D. Pa. Dec. 2, 2016) (concluding that even in a work environment in which foul language and joking are commonplace, the employer can be liable for fostering a hostile work environment for female employees).

[198] *Smith v. Sheahan,* 189 F.3d 529, 535 (7th Cir. 1999); *see also Reeves*, 594 F.3d at 803, 812 13 (holding that the plaintiff, the only woman working on the sales floor, could establish a sexually hostile work environment based on vulgar, sex based conduct, even though the conduct had begun before she entered the workplace); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) ("We do not believe that a woman who chooses to work in the male dominated trades relinquishes her right to be free from sexual harassment . . . ."); *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 626 (6th Cir. 1986) (Keith, J., concurring in part, dissenting in part) (stating that a female employee should not have to assume the risk of a hostile work environment by voluntarily entering a workplace in which sexual conduct abounds); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (rejecting the contention that racial epithets that were common in the defendant's industry could not establish a hostile work environment based on race).

[199] *See, e.g.*, *Reeves*, 594 F.3d at 811 12 (concluding that a reasonable jury could find that the conduct in the plaintiff's office, including use of the terms "wh\*re," "b\*tch," and "c\*nt,; vulgar discussions of women's body parts; and the pornographic image of a woman in the office, contributed to conditions that were humiliating and degrading to women on account of their sex and thus could have created an abusive working environment).

**App. 164**

**200** Although evidence of unwelcomeness may be relevant, the Commission does not believe that a plaintiff needs to prove "unwelcomeness" as a separate element of the prima facie case. *See supra* section III.B.1.

**201** *Compare Souther v. Posen Constr., Inc.*, 523 F. App'x 352, 355 (6th Cir. 2013) (concluding that a jury could not find that the alleged harasser's sexual advances were unwelcome where, among other things, the plaintiff and alleged harasser were engaged in an on and off sexual relationship for five years, she never complained to the alleged harasser or anyone else that his conduct was unwelcome, and the plaintiff and alleged harasser remained friends during the period when the affair was dormant), *with Williams v. Herron*, 687 F.3d 971, 975 (8th Cir. 2012) (concluding that a correctional officer presented sufficient evidence to show that she adequately communicated to the chief deputy that his conduct was unwelcome where she told him that she was uncomfortable continuing their relationship and that she was concerned that she would lose her job if she ended their relationship, given that she knew that other female employees were fired after ending their relationships with him), *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 28 (1st Cir. 2011) (concluding that the plaintiff established that his supervisor's conduct was unwelcome where, among other things, the plaintiff twice unequivocally rejected his supervisor's sexual propositions), *and EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010) (concluding that the plaintiff established a fact issue regarding whether conduct was unwelcome where he repeatedly told his coworker, "I'm not interested," yet she continued to make sexual overtures).

**202** *See Webb Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1027 28 (11th Cir. 2008) (concluding that the plaintiff failed to demonstrate that the harasser's conduct was severe or pervasive, in part because the conduct ended after the plaintiff told the harasser that it made her uncomfortable); *Shanoff v. Ill. Dep't of Hum. Servs.*, 258 F.3d 696, 704 (7th Cir. 2001) (stating that repeated harassment that continues despite an employee's objections is indicative of a hostile work environment); *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1160 (N.D. Ala. 2018) (concluding that a jury could conclude that alleged racial harassment by a customer was objectively hostile, where the customer not only called the plaintiff a "n****r" five to seven times a year over several years, but the customer continued the harassment even after the plaintiff objected and asked the customer to stop using the racial epithet).

**203** *See, e.g.*, *Christian v. Umpqua Bank*, 984 F.3d 801, 806-07, 811 (9th Cir. 2020) (concluding that the evidence created a triable issue as to whether a customer's harassment of the complainant was sufficiently severe or pervasive where the customer persisted in asking the complainant on dates, sending her notes and letters, and repeatedly "pester[ing] her" for months after the complainant asked him to stop).

**204** *See* EEOC, *Compliance Manual Section 12: Religious Discrimination* § 12-III.B.2.b (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_Toc203359509 (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_Toc203359509)** ; *Venters v. City of Delphi*, 123 F.3d 956, 976 (7th Cir. 1997) (concluding that a reasonable person in the plaintiff's position could have found the work environment hostile where the supervisor's remarks were uninvited, intrusive, and continued even after the employee informed her supervisor that his comments were inappropriate).

**205** *See Garcimonde-Fisher v. Area203 Mktg., LLC*, 105 F. Supp. 3d 825, 840 (E.D. Tenn. 2015) ("The references to the King James Bible as the proper Bible and to Catholicism as not the 'right kind' of Christianity could fairly be described as derogatory. While these comments may not be as overtly hostile as depicting a coworker as a satanic figure, they do serve to reinforce the omnipresent message of the workplace that [one] religion is the only religion that will be tolerated.").

**206** *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 18 (2002) (explaining that because a hostile work environment is a single unlawful employment action, a court should not separate individual acts that are part of the broader claim when analyzing timeliness or liability).

**207** *Morgan*, 536 U.S. at 120. *Compare Ford v. Jackson Nat'l Life Ins. Co.,* 45 F.4th 1202, 1228 29 (10th Cir. 2022) (holding that a pre filing period incident in which a manager had engaged in sexually suggestive conduct with a vodka bottle was part of the same hostile work environment as subsequent conduct by other workers that demonstrated "the same type of sex-based hostility that [the plaintiff] ha[d] repeatedly complained of"), *Maliniak v. City of Tucson*, 607 F. App'x 626, 628 (9th Cir. 2015) (concluding that an offensive sign posted within the 300-day charge-filing time period was sufficiently related to the offensive signs that pre-dated the charge-filing period to be considered part of the same actionable hostile work environment claim, where both sets of signs denigrated women), *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165-67 (3d Cir. 2013) (concluding that the plaintiff could proceed

with her hostile work environment claim under *Morgan*'s single unlawful employment practice theory where at least one incident   being called a "b\*tch" during a meeting   occurred within the charge filing period and many of the acts that fell outside the filing period involved similar conduct by the same individuals), *and EEOC v. Fred Meyer Stores, Inc.*, 954 F. Supp. 2d 1104, 1121-23 (D. Or. 2013) (concluding that sexual harassment of a retail store employee by a customer that occurred before the employee's six month absence could be considered along with harassment that occurred after she returned in determining whether she was subjected to a hostile work environment, where the conduct involved the same customer engaging in similar physical harassment before and after the employee's absence from the workplace, and despite the employee's complaint, the harasser was allowed to continue frequenting the store before he sexually harassed her again), *with Martinez v. Sw. Cheese Co., LLC*, 618 F. App'x 349, 354 (10th Cir. 2015) (holding that pre-filing period conduct was not sufficiently related to filing period conduct so as to be part of the same hostile work environment where it did not involve the same type of conduct, it occurred infrequently, and it involved different harassers), *and Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (holding that an incident that occurred within the charge-filing time period was not part of the same hostile work environment as the earlier incidents where there was a three-year gap and the last incident involved a chance encounter on a commuter train).

[208] *See Morgan*, 536 U.S. at 120 21 (affirming lower court's ruling that acts were part of the same actionable hostile environment claim where they involved "the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers"); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (stating that "*Morgan* requires courts to make an individualized assessment of whether incidents and episodes are related" without limiting the relevant criteria or imposing particular factors, and stating that "[t]his flexibility is useful in a context as fact specific and sensitive as employment discrimination and as amorphous as hostile work environment").

[209] *See King v. Aramark Servs., Inc.*, 96 F.4th 546, 561 (2d Cir. 2024) ("A discrete discriminatory act, such as termination, within the limitations period may not only support a claim for damages, it may also render a hostile work environment claim timely *if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment claim*." (emphasis in original)); *Baird v. Gotbaum*, 662 F.3d 1246, 1251-52 (D.C. Cir. 2011) (holding that the district court erred in concluding that the plaintiff's hostile work environment claim could not include discrete acts

5/20/24, 1 28 PM
Enforcement Guidance on Harassment in the Workplace | U S Equal Employment Opportunity Commission
Case 2:24-cv-00173-Z Document 31 Filed 10/23/24 Page 170 of 220 PageID 516

that also were actionable on their own); *Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) (concluding that, although a timely discrete act can provide a basis for considering untimely, non discrete acts as part of the same hostile work environment claim, the timely failure to promote and retaliation were not sufficiently similar to untimely allegations so as to be part of the same hostile work environment claim); *Royal v. Potter*, 416 F. Supp. 2d 442, 453 54 (S.D. W. Va. 2006) (concluding that the plaintiff's actionable hostile work environment claim included termination of a temporary position and failure to promote). *But see Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 892 93 (9th Cir. 2005) (stating that timely acts offered in support of a hostile work environment claim must be non discrete acts because basing a hostile work environment claim on timely discrete and untimely non-discrete acts would "blur to the point of oblivion the dichotomy between discrete acts and a hostile environment").

As discussed in the EEOC's *Compliance Manual* section on threshold issues: "[A] discrete act of discrimination [an official act that is independently actionable] may be part of a hostile work environment only if it is related to abusive conduct or language, i.e., a pattern of discriminatory intimidation, ridicule, and insult. A discrete act that is unrelated to abusive conduct or language ordinarily would not support a hostile work environment claim." EEOC, *Compliance Manual Section 2: Threshold Issues* § 2-IV.C.1.b (2009), **https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-IV-C-1-b (https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-IV-C-1-b)** https://www.eeoc.gov/policy/docs/threshold.html#2-IV-C-1-b; *see also Bearer v. Teva Pharms. USA, Inc.*, No. 19-5415, 2021 WL 4145053, at *24 (E.D. Pa. Sept. 8, 2021) (stating that "failure to be promoted, without any indication that it is connected to hostile or abusive behavior, is simply not a form of harassment that can contribute to a hostile work environment").

[210] This example is adapted from the facts in *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385-87 (7th Cir. 2007).

[211] This example is adapted from the facts in *McGullam*, 609 F.3d at 72-74.

[212] *See* note 166 and accompanying text.

[213] *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803, 811 12 (11th Cir. 2010) (en banc) (concluding that a jury could find that the conduct of male sales floor employee that was sex-specific, derogatory, and humiliating—including vulgar

sexual comments, pornographic images of women, and sex-based epithets—created a hostile work environment for the complainant, who was the only woman on the sales floor, even though the conduct was not specifically directed at her); *cf. Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1523 (M.D. Fla. 1991) (stating that pornography "sexualizes the work environment to the detriment of all female employees").

[214] *See, e.g.*, *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 46 (10th Cir. 2008) (holding that a reasonable jury could conclude that the plaintiff was subjected to a racially hostile work environment, which included anonymous bathroom graffiti and the display of a noose); *see also Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388-89 (2d Cir. 2020) (concluding that the complainant raised disputed issues of material fact as to whether a coworker's comments about religion and the complainant's national origin, which were not directed at the complainant but made to others in his presence, contributed to a hostile work environment).

[215] *See, e.g.*, *Ellis v. Houston*, 742 F.3d 307, 320-21 (8th Cir. 2014) (concluding that the district court erred in evaluating the plaintiffs' § 1981 and § 1983 racial harassment claims by examining in isolation harassment personally experienced by each plaintiff, rather than also considering conduct directed at others, where every plaintiff did not hear every remark but each plaintiff became aware of all of the conduct); *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1257 58 (11th Cir. 2014) (stating that employees could base their racial harassment claims on conduct that they were aware of); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335-36 (6th Cir. 2008) (concluding that evidence of a hostile work environment may include acts of harassment that the plaintiff becomes aware of during her employment that were directed at others and occurred outside her presence).

[216] This example is adapted from the facts in *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 670-72 (7th Cir. 1993).

[217] *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177-78 (2011) (holding that Title VII does not merely authorize suit by someone who was allegedly discriminated against but instead more broadly authorizes suit by anyone who falls within the zone of interests protected by Title VII, meaning "any plaintiff with an interest 'arguably [sought] to be protected by the statute'" (quoting *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 495 (1998)); and further holding that, pursuant to that test, Thompson could bring a lawsuit alleging North American Stainless (NAS) fired him to retaliate against his fiancée, who had filed a

**App. 169**

sex discrimination charge against NAS, because "the purpose of Title VII is to protect employees from their employers' unlawful actions[, and] injuring him was the employer's intended means of harming [his fiancée]"); *cf. Finn v. Kent Sec. Servs., Inc.*, 981 F. Supp. 2d 1293, 1300 (S.D. Fla. 2013) (concluding that a plaintiff might have standing to pursue a claim if the Defendant "required her, as part of her duties, to serve as the delivery vehicle of Defendant's discrimination against other employees based on their race, sex, or color").

[218] Sophie also could file an EEOC charge alleging that she was subjected to unlawful retaliation based on Jordan's threats in response to her objection to the harassment. For more information on what constitutes unlawful retaliation, see EEOC, *Enforcement Guidance on Retaliation and Related Issues* § II.A.2 (2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#2.  Opposition (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#2.  Opposition)** .

[219] *See, e.g.*, *Nichols v. Tri Nat'l Logistics, Inc.*, 809 F.3d 981, 985 86 (8th Cir. 2016) (holding that the district court erred in analyzing a hostile work environment claim by the plaintiff, a truck driver, by excluding alleged sexual harassment of the plaintiff by her driving partner during a mandatory rest period); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) (concluding that a potential client's rape of a female manager at a business meeting outside her workplace was sufficient to establish a hostile work environment since having out-of-office meetings with potential clients was a job requirement); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 (2d Cir. 2001) (concluding that the "work environment" included a short layover for flight attendants in a foreign country where the employer provided a block of hotel rooms and ground transportation).

[220] *See Lapka v. Chertoff*, 517 F.3d 974, 979, 983 (7th Cir. 2008) (concluding that Title VII covered sexual harassment that occurred while attending employer mandated training at an out of state training center).

[221] *See Blakey v. Cont'l Airlines, Inc.*, 751 A.2d 538, 543 (N.J. 2000) (concluding that, although the electronic bulletin board did not have a physical location at the employee's worksite, evidence might show it was so closely related to the workplace environment and beneficial to the employer that continuation of harassment on it should be regarded as occurring in the workplace).

**App. 170**

**222** *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 60 (1986) (noting that an employee had alleged harassment by her supervisor, which included conduct both inside and outside the workplace and conduct both during and after business hours).

**223** *See, e.g.*, *Lapka*, 517 F.3d at 983 (explaining that, to be actionable, harassment need only have consequences in the workplace); *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409 10 (1st Cir. 2002) (stating that the harasser's intimidating conduct outside the workplace helped show why the complainant feared him and why his presence around her at work created a hostile work environment); *Duggins v. Steak 'n Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001) (stating that an employee may reasonably perceive her work environment as hostile if forced to work for, or in close proximity to, someone who harassed her outside the workplace); *cf. Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 630 (2d Cir. 2012) (concluding that alleged harassment of a teacher by a student outside of school did not create a hostile work environment where the student was not in the teacher's class and they did not interact at school).

**224** *See, e.g., Strickland v. City of Detroit,* 995 F.3d 495, 506 07 (6th Cir. 2021) (considering social media posts by police department personnel referring to Detroit residents as "garbage" and characterizing Black Lives Matter supporters as "racist terrorists" in assessing whether the plaintiff's work environment was sufficiently racially hostile to be actionable); *Fisher v. Mermaid Manor Home for Adults, LLC*, 192 F. Supp. 3d 323, 326, 329 (E.D.N.Y. 2016) (determining that a reasonable jury could find that a coworker's Instagram post, brought to the plaintiff's attention by two other coworkers, which compared the plaintiff to a chimpanzee character in the Planet of the Apes movie, created a hostile work environment); *Tammy S. v. Dep't of Def.,* EEOC Appeal No. 0120084008, 2014 WL 2647178, at *12 (June 6, 2014) (concluding that the complainant was subjected to sex based harassment creating a hostile work environment, including by way of postings on the harasser's personal website, which were announced during a training class at work and were viewed and discussed by many employees in the workplace); *Knowlton v. Dep't of Transp.,* EEOC Appeal No. 0120121642, 2012 WL 2356829, at *1 3 (June 15, 2012) (reversing dismissal of a harassment claim that included a race related comment posted by a coworker on Facebook).

**225** This example is adapted from the facts in *Fisher*, 192 F. Supp. 3d at 326-27.

**226** *See Abbt v. City of Hous.*, 28 F.4th 601, 609 (5th Cir. 2022) (concluding that a reasonable jury could find that the plaintiff, a firefighter, was subjected to a sex-

based hostile work environment arising from her colleagues' repeated viewing of a private, nude, intimate video that she had made for her husband).

[227] *See, e.g.*, *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (stating that the severity of the harasser's conduct was exacerbated by his significant authority over the complainant).

[228] *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760 62 (1998) (noting "[a]s a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury").

[229] *Id.* at 759 ("Negligence sets a minimum standard for employer liability under Title VII.").

[230] *Id.* at 758 (stating that negligence and vicarious liability, as set forth in provisions of the Restatement (Second) of Agency, "are possible grounds for imposing employer liability on account of a supervisor's acts and must be considered"); *see also id.* at 759 ("Thus, although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment."); *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 650 55 (10th Cir. 2013) (analyzing harassment by a supervisor under both negligence and vicarious liability standards); *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 421 22 (11th Cir. 1999) (same).

[231] *Sharp v. City of Hous.*, 164 F.3d 923, 929 (5th Cir. 1999) ("The concept of negligence thus imposes a minimum standard for employer liability   direct liability —under title VII, a standard that is supplemented by the agency-based standards for vicarious liability as articulated in *Faragher* and [*Ellerth*]." (internal quotation marks and citation omitted)); *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 540 n.4 (10th Cir. 1998) ("The Supreme Court recognized in [*Ellerth*] and *Faragher* the continuing validity of negligence as a separate basis for employer liability.").

[232] Although negligence and vicarious liability are distinct grounds for employer liability for unlawful harassment by a supervisor, both standards look at the reasonableness of the employer's actions. The D.C. Circuit has explained: "While the reasonableness of an employer's response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the negligence standard, where she bears the burden of establishing her employer's negligence,

**App. 172**

than under the vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence." *Curry v. D.C.*, 195 F.3d 654, 660 (D.C. Cir. 1999) (citing *Shaw v. AutoZone, Inc.*,180 F.3d 806, 812 n.2 (7th Cir. 1999)).

[233] For a discussion of how to determine whether conduct is part of the same hostile work environment claim, refer to section III.C.1, *supra*.

[234] See *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562-63 (6th Cir. 1999); *O'Rourke v. City of Providence*, 235 F.3d 713, 736 (1st Cir. 2001).

[235] See, e.g., *O'Brien v. Middle E. Forum*, 57 F.4th 110, 120 (3d Cir. 2023); *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 54 (2d Cir. 2012); *Helm v. Kansas*, 656 F.3d 1277, 1286 (10th Cir. 2011); *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 383 (5th Cir. 2003); *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000).

[236] See, e.g., *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 90 (1998) (citing circuit court decisions recognizing appropriateness of proxy liability for harassment by individuals occupying such positions); *Townsend*, 679 F.3d at 54 (recognizing that employer liability is appropriate for harassment by individuals occupying these positions); *Johnson*, 218 F.3d at 730 (same); *see also O'Brien*, 54 F.4th at 121 ("We recognize, of course, that 'only individuals with exceptional authority and control within an organization can meet' this standard." (quoting *Helm*, 656 F.3d at 1286)).

[237] See *Harrison v. Eddy Potash, Inc.*, 158 F.3d 1371, 1376 (10th Cir. 1998) (stating that *Faragher* and *Ellerth* do not suggest that a supervisor can be considered the employer's alter ego merely because he possesses a high degree of control over a subordinate); *see also O'Brien*, 57 F.4th at 121 (stating that "merely serving as a supervisor with some amount of control over a subordinate does not establish proxy status"); *Townsend*, 679 F.3d at 55 56 (concluding that a jury instruction was erroneous because it gave the misleading impression that mere status as a supervisor with power to hire and fire is sufficient to render the harasser the employer's alter ego); *Johnson*, 218 F.3d at 730 (concluding that alter ego liability did not apply where the supervisor was not a high level manager whose actions spoke for the defendant).

[238] *Vance v. Ball State Univ., 570 U.S. 421, 424 (2013).*

An employer cannot shield itself from liability by "concentrat[ing] all decisionmaking authority in a few individuals." *Id. at 446-47*. As the Supreme Court

has explained, when an employer attempts to "confine decisionmaking power to a small number of individuals," those decisionmakers will likely still need to rely on input from "other workers who actually interact with the affected employee" and will have "a limited ability to exercise independent discretion when making decisions." *Id. at 447.* Under those conditions, the employer has effectively delegated the authority to take tangible employment actions to the lower level employees on whose input the formal decisionmakers must rely. *Id.* As a result, those lower-level employees will qualify as "supervisors." *See Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 272 (1st Cir. 2014) ("As *Vance* recognizes, at some point the ability to provide advice and feedback may rise to the level of delegated authority sufficient to make someone a supervisor. . ."); *see also Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 416 (6th Cir. 2021) (concluding that a reasonable jury could find that the harasser was the plaintiff's supervisor where there were genuine issues about whether the plaintiff's formal supervisor effectively delegated supervisory power to and relied on recommendations from the harasser); *Boyer Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc) (concluding that an individual whose recommendations "would be rubber stamped" was the plaintiff's supervisor).

[239] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 62 (1998).

As the Supreme Court has explained, *Ellerth* invoked the "tangible employment action" concept "only to 'identify a class of [hostile work environment] cases' in which an employer should be held vicariously liable (without an affirmative defense) for the acts of supervisors." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (alteration in original) (quoting *Ellerth*, 524 U.S. at 760); *see also Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004) (describing *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), as delineating two categories of hostile work environment claims distinguished by the presence or absence of a tangible employment action). *Ellerth* does not address the scope of either Title VII's general antidiscrimination provision or Title VII's anti-retaliation provision. *Burlington N.*, 548 U.S. at 65; *see also Chambers v. District of Columbia*, 35 F.4th 870, 875 76 (D.C. Cir. 2022) (en banc) (concluding that *Ellerth* did not provide grounds for an "objectively tangible harm" requirement under the general antidiscrimination provision).

[240] *E.g.*, *Ellerth*, 524 U.S. at 761; *Faragher*, 524 U.S. at 790.

[241] *See Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 654-55 (5th Cir. 2002).

**242** *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 738 (10th Cir. 2014) (emphasis in original); *id.* at 741 ("Even if the [formal decision maker] undertook *some* independent analysis when considering employment decisions recommended by [the alleged harasser], [the alleged harasser] would qualify as a supervisor so long as his recommendations were among the proximate causes of the [formal decision maker's] decision making." (emphasis in original)).

**243** *See Ellerth*, 524 U.S. at 759 ("If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one."); *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1247 n.20 (11th Cir. 1998) ("Although the employer may argue that the employee had no actual authority to take the employment action against the plaintiff, apparent authority serves just as well to impute liability to the employer for the employee's action."). *But see EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 685 (8th Cir. 2012) (stating that apparent authority is insufficient to establish supervisor status and the imposition of vicarious liability).

**244** In *Kramer v. Wasatch County Sheriff's Off.*, the Tenth Circuit concluded that apparent authority principles also might apply where an employer has vested an employee with some limited authority over the complainant and the complainant reasonably but mistakenly believes that the employee also has related powers, which, in some circumstances, might include the power to undertake or substantially influence tangible employment actions. 743 F.3d at 742-43.

**245** *See generally Kramer*, 743 F.3d at 742 ("Apparent authority exists where an entity 'has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second party has the power to act on behalf of the first [party].'" (quoting *Bridgeport Firemen's Sick & Death Benefits Ass'n v. Deseret Fed. Sav. & Loan Ass'n*, 735 F.2d 383, 388 (10th Cir. 1984))); *see also* Restatement (Third) of Agency § 2.03 (2006) (defining "apparent authority" as the "power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations"); *id.* § 3.03 ("Apparent authority, as defined in § 2.03, is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation.").

**246** *See, e.g.*, *Dunn v. Wash. Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

**App. 175**

[247] *See, e.g.*, *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 n.2 (11th Cir. 2003).

[248] *See, e.g.*, *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1017 (9th Cir. 2018).

[249] *See, e.g.*, *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 914 15 (7th Cir. 2010).

[250] *See, e.g.*, *EEOC v. Cromer Food Servs., Inc.*, 414 F. App'x 602, 606 07 (4th Cir. 2011) (collecting cases in which circuit courts have held employers may be liable for acts of harassment committed against employees by non-employees).

[251] An employer's duty to take reasonable corrective action to prevent harassment from continuing is discussed *supra* at section IV.C.3.b.

[252] *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998) (noting that employer liability for a hostile work environment has not been disputed when the harasser was "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy"); *O'Brien v. Middle E. Forum*, 57 F.4th 110, 117 (3d Cir. 2023) (concluding that, pursuant to *Faragher* and *Ellerth*, the affirmative defense is unavailable when the individual who engaged in the alleged harassment was the employer's proxy or alter ego); *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 52-53 (2d Cir. 2012) (same); *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 383-84 (5th Cir. 2003) (same); *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000) (same).

[253] As discussed in section IV.A, *supra*, an employer also may be liable for harassment by a supervisor pursuant to negligence principles.

[254] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998). A "tangible employment action" means a "significant change in employment status" that requires an "official act" of the employer. *Id*.; *see also supra* section IV.B.2 (discussing the definition of "tangible employment action").

[255] *Ellerth*, 524 U.S. at 761-62.

[256] *Id.* at 762; *see also id.* at 762 63 (explaining that requirements of the "aided in the agency" relation standard "will always be met when a supervisor takes a tangible employment action against a subordinate").

[257] As discussed in section III.C.1, *supra*, a discriminatory employment practice that occurred within the charge filing period may be independently actionable regardless of whether it is also part of a hostile work environment claim.

**App. 176**

**258** *See Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998) (holding no affirmative defense is available where a supervisor's harassment culminates in a tangible employment action and providing examples of non career ending tangible employment actions to include demotion and undesirable reassignment); *Ellerth*, 524 U.S. at 761-63 (holding that vicarious liability will always be imputed to an employer when a supervisor takes a tangible employment action, which could include non career ending actions such as denial of raise or promotion); *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1247 (11th Cir. 1998) (stating an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision "*any time* the harasser makes a tangible employment decision that adversely affects the plaintiff," such as a demotion (emphasis added)); *see also Ferraro v. Kellwood Co.*, 440 F.3d 96, 101-02 (2d Cir. 2006) (stating that the affirmative defense is not available if a tangible employment action was taken against an employee as part of a supervisor's discriminatory harassment and that harassment culminates in a tangible employment action if the action is "linked" to the harassment); *cf. Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (stating that there must be a causal link between the tangible employment action, in this case an alleged reduction in hours, and the sexual harassment, which can be shown by temporal proximity).

**259** Under such circumstances, the employee also would have a claim that the denial of a raise was because of sex. *See supra* section III.C.1 (noting that conduct that is separately actionable also may be part of a hostile work environment claim).

**260** *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007) (stating that the affirmative defense is not available where "the discrimination the employee has suffered included a tangible employment action").

**261** *See Ellerth*, 524 U.S. at 754 (analyzing harassment claim as a hostile work environment claim because it involved only unfulfilled threats); *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004) (analyzing an unfulfilled implied threat as a factor in determining whether the plaintiff was subjected to a hostile work environment).

**262** *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1169 (9th Cir. 2003) (concluding that "determining not to fire an employee who has been threatened with discharge constitutes a 'tangible employment action,' at least where the reason for the change in the employment decision is that the employee has submitted to coercive sexual demands"); *Jin v. Metro. Life Ins. Co., 310 F.3d 84, 98 (2d Cir. 2002) (finding prejudicial*

**App. 177**

*error where the lower court failed to instruct the jury to consider the supervisor's conditioning of the plaintiff's continued employment on her submission to his sexual demands as a possible tangible employment action). But see Santiero v. Denny's Rest. Store*, 786 F. Supp. 2d 1228, 1235 (S.D. Tex. 2011) (concluding that the employee was not subjected to a tangible employment action where she acceded to sexual demands and thereby *avoided* a tangible employment action); *Speaks v. City of Lakeland*, 315 F. Supp. 2d 1217, 1224 26 (M.D. Fla. 2004) (rejecting the *Jin* analysis as inconsistent with Supreme Court and Eleventh Circuit precedent).

[263] *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

[264] *Ellerth*, 524 U.S. at 764.

[265] *Id*. at 765 (emphasis added); *Faragher*, 524 U.S. at 807 (emphasis added); *see also, e.g.*, *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) ("Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements.").

[266] *Ellerth*, 524 U.S. at 765.

[267] If the employer had been aware of previous harassment by the same supervisor, then the employer would not be able to establish the affirmative defense if it had failed to take appropriate corrective action in the past to address harassment by that supervisor. *See Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 312-13 (3d Cir. 2018) (holding that a jury could find that the employer did not act reasonably to prevent harassment by the plaintiff's supervisor where county officials were aware that the supervisor's conduct "formed a pattern of conduct, as opposed to mere stray incidents, yet they seemingly turned a blind eye toward [the supervisor's] harassment").

[268] *See Faragher*, 524 U.S. at 809 ("While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."); *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003) ("The legal standard for evaluating an employer's efforts to prevent and correct harassment, however, is not whether any additional steps or measures would have been reasonable if employed, but whether the employer's actions as a whole established a reasonable mechanism for prevention and correction."); *see*

*also* EEOC, *Promising Practices for Preventing Harassment* (2017), **https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment (https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment)** ; EEOC, *Promising Practices for Preventing Harassment in the Federal Sector,* **https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector (https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector)** (last visited Apr. 12, 2024).

[269] For further guidance on what constitutes reasonable care to prevent harassment, refer to sectionIV.C.3.a, *infra*. An employer also may reduce the likelihood of unlawful harassment by conducting climate surveys of employees to determine whether employees believe that harassment exists in the workplace and is tolerated, and by repeating the surveys to ensure that changes to address potential harassment have been implemented. Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co Chairs Chai R. Feldblum & Victoria A. Lipnic* (2016), **https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf (https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf)** (discussing steps an organization may take to convey a sense of urgency about preventing harassment).

[270] *See, e.g.*, *Agusty-Reyes v. Dep't of Educ.*, 601 F.3d 45, 55 (1st Cir. 2010) (holding that a reasonable jury could conclude that the failure to disseminate the harassment policy and complaint procedure precluded the employer from establishing the first prong of the defense); *Ortiz v. Sch. Bd.*, 780 F. App'x 780, 786 (11th Cir. 2019) (per curiam) (denying summary judgment to the employer on the *Faragher Ellerth* affirmative defense where there was evidence that the employer had failed to take reasonable steps to disseminate its anti-harassment policy).

[271] *See EEOC v. V & J Foods, Inc.*, 507 F.3d 575, 578 (7th Cir. 2007) (explaining that, although an employer need not tailor its complaint procedure to the competence of each employee, "the known vulnerability of a protected class has legal significance"). In *V & J Foods*, the victims of harassment were teenage girls working part-time, and often as their first job, in a small retail outlet. *Id.* The court criticized the defendant's complaint procedures as "likely to confuse even adult employees,"

and stated, "[k]nowing that it has many teenage employees, the company was obligated to suit its procedures to the understanding of the average teenager." *Id.*

[272] *EEOC v. Spud Seller, Inc.*, 899 F. Supp. 2d 1081, 1095 (D. Colo. 2012) (determining a trial was required on the issue of whether the employer, which employed some individuals who spoke only Spanish, could satisfy the *Faragher Ellerth* affirmative defense where the employer's handbook contained an anti-harassment policy in English, but there was no evidence that its provisions were translated into Spanish or that written translations were supplied to Spanish speaking employees).

[273] *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005) ("While there is no exact formula for what constitutes a 'reasonable' sexual harassment policy, an effective policy should at least . . . require supervisors to report incidents of sexual harassment."); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (criticizing employer's putative sexual harassment policy where the policy, *inter alia*, failed to place any duty on supervisors to report incidents of sexual harassment to their superiors); *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 541 (10th Cir. 1998) (criticizing employer policy for failing to "provide instruction on the responsibilities, if any, of a supervisor who learns of an incident of harassment through informal means"); *Varner v. Nat'l Super Mkts.*, 94 F.3d 1209, 1214 (8th Cir. 1996) (holding employer liable where the company's policy "in effect required [the plaintiff's] supervisor to remain silent notwithstanding his knowledge of the incidents"); *cf. Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 138 (3d Cir. 2007) (declining to impose punitive damages where defendant provided new supervisors with detailed materials regarding supervisors' obligation to address discrimination issues).

[274] *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998) (holding as a matter of law that the city did not exercise reasonable care to prevent the supervisors' harassment where, among other defects, the city's policy "did not include any assurance that the harassing supervisors could be bypassed in registering complaints"); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986) (stating that it was "not altogether surprising" that the complainant did not follow a grievance procedure that apparently required her to complain first to her supervisor, who was the alleged harasser); *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 596 (6th Cir. 2009) (reversing grant of summary judgment on a hostile work environment claim where the employer's policy failed to provide a mechanism for bypassing a harassing supervisor when making a complaint, *inter alia*); *Clark*, 400 F.3d at 349 50 (stating that a reasonable sexual harassment

**App. 180**

procedure should provide a mechanism for bypassing a harassing supervisor when making a complaint); *Stewart v. Trans Acc, Inc.*, No. 1:09 cv 607, 2011 WL 1560623, at *11 (S.D. Ohio Apr. 25, 2011) (noting the employer's policy "[c]rucially . . . does not contain a reporting procedure, much less a mechanism for bypassing a harassing supervisor"); *see also* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co Chairs Chai R. Feldblum & Victoria A. Lipnic* (2016),

**https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf**

**(https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf)** ("Employers should offer reporting procedures that are multi-faceted, offering a range of methods, multiple points-of-contact, and geographic and organizational diversity where possible, for an employee to report harassment.").

[275] *See Wilson*, 164 F.3d at 541 (noting deficiencies with the employer's policy, including a supervisor-bypass option that "is located in a separate facility and is not accessible during the evening or weekend hours when many employees and students are on the various campuses"); *Lamarr Arruz v. CVS Pharm., Inc.*, 271 F. Supp. 3d 646, 661 (S.D.N.Y. 2017) (the employee's testimony that complaints to the ethics hotline were ignored raises questions regarding the reasonableness of the employer's purported available corrective measures); *Spud Seller*, 899 F. Supp. 2d at 1095 (questioning whether the employer's anti harassment policy was sufficient where employees who spoke only Spanish could not bring complaints directly to the individuals identified in the policy because the points of contact did not speak Spanish); *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1300 (M.D. Ala. 2010) (criticizing the employer's complaint reporting procedure where employees were directed to file complaints with one person at an address located in a different city, the point of contact never visited the location where the harassed employee worked, and the harassed employee was not provided with any other contact information for the point of contact); *Escalante v. IBP, Inc.*, 199 F. Supp. 2d 1093, 1103 (D. Kan. 2002) (determining the employer failed to show it exercised reasonable care by promulgating and implementing an anti harassment policy where it "has a confusing number of contradicting policies, each stating a different reporting mechanism, the specific policy dealing with discrimination claims only provides the employee one person to report such claims to[, and] [t]his person is located in another state, is only accessible by telephone, and the policy does not state the hours or days in which this person may be reached"); *Dinkins v. Charoen*

*Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1269 n.22 (M.D. Ala. 2001) (noting "mid-level supervisors may have blocked Plaintiffs' attempts to contact higher ranking supervisors" thereby rendering the complaint process inaccessible and deficient); *cf. Ocheltree*, 335 F.3d at 334 (finding the employer's "open door" reporting policy deficient where the two points of contact were either always unavailable or refused to speak with the employee when the employee attempted to complain); *Madray v. Publix Supermarkets, Inc*., 208 F.3d 1290, 1298 (11th Cir. 2000) (noting the employer's policy designated several additional company representatives to whom an employee could complain regarding harassment and that these individuals were accessible to employees). Accessibility of points of contact can also be relevant when addressing the second prong of the *Faragher-Ellerth* affirmative defense, which considers whether the complainant unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *See infra* sectionIV.C.2.b.ii and note 297.

[276] *See EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 436 (7th Cir. 2012) (stating "an employer's complaint mechanism must provide a clear path for reporting harassment" and criticizing the defendant for, *inter alia*, failing to provide any point of contact or contact information for employees to make harassment complaints); *cf. Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011) (finding the employer's policy, which included "a complaint procedure and list of personnel to whom harassment may be reported" reasonable).

[277] *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (describing a prompt investigation as a "hallmark of reasonable corrective action").

[278] *See Thomas v. BET Soundstage Rest.*, 104 F. Supp. 2d 558, 565-66 (D. Md. 2000) (stating that the failure to provide confidentiality or protection from retaliation where there is evidence of prevalent hostility can support a finding that the policy was defective and dysfunctional); *cf. AutoZone, Inc. v. EEOC*, 421 F. App'x 740, 741-42 (9th Cir. 2011) ("The EEOC introduced evidence that despite AutoZone policy requiring managers to 'thoroughly investigate each reported allegation as confidentially as possible,' Anderson interviewed Wing about her complaint in a semi-public part of her own store."). An employer should make clear to employees that it will protect the confidentiality of harassment allegations to the extent possible. An employer cannot guarantee complete confidentiality since it cannot conduct an effective investigation without revealing certain information to the alleged harasser and potential witnesses. However, information about the

**App. 182**

allegation of harassment should be shared only with those who need to know about it. *See* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co Chairs Chai R. Feldblum & Victoria A. Lipnic* (2016),

**https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf**

**(https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf)** . Records relating to harassment complaints should be kept confidential on the same basis.

[279] *See Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1145 (8th Cir. 2007) (holding that the employer demonstrated that it exercised reasonable care to prevent sexual harassment where the employer had and effectively deployed a facially valid anti-harassment policy, which included a non-retaliation provision and a flexible reporting procedure that listed four individuals who may be contacted in the case of harassment); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 03 (2d Cir. 2006) (concluding that the employer satisfied the first element of the affirmative defense to disability-based harassment where, among other things, it had an anti-harassment policy that prohibited harassment on account of disability, promised that complaints would be handled promptly and confidentially, and contained an anti-retaliation provision); *Miller v. Woodharbor Molding & Millworks, Inc.*, 80 F. Supp. 2d 1026, 1029 (N.D. Iowa 2000) (stating the gravamen of an effective anti harassment policy includes three provisions: (1) training for supervisors, (2) an express anti-retaliation provision, and (3) multiple complaint channels for reporting the harassing conduct) (collecting cases supporting inclusion of each provision), *aff'd*, 248 F.3d 1165 (8th Cir. 2001); *see also Jaros v. LodgeNet Entm't Corp.*, 294 F.3d 960, 966 (8th Cir. 2002) (upholding a sexual harassment jury verdict for the plaintiff where she resigned instead of cooperating with her employer's investigation because, among other things, the Human Resources Director did nothing to assure her that she would not be subjected to retaliation).

[280] This is a non exhaustive list. *See, e.g.*, Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co Chairs Chai R. Feldblum & Victoria A. Lipnic* 44-60 (2016),

**https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf**

**(https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf)** ; EEOC, *Promising Practices for Preventing Harassment* (2017),

**https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment (https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment)** .

[281] For a detailed discussion of promising practices for anti harassment training, see EEOC, *Promising Practices for Preventing Harassment* (2017), **https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment (https://www.eeoc.gov/laws/guidance/promising-practices-preventing-harassment)** , and EEOC, *Promising Practices for Preventing Harassment in the Federal Sector*, **https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector (https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector)** (last visited Apr. 12, 2024).

[282] *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006) ("An employer may demonstrate the exercise of reasonable care, required by the first element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive.").

[283] *See, e.g.*, *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 223 (5th Cir. 2023) (determining the "evidence indicates that [the defendant] had a policy in theory but not one in practice" where both the plaintiff and her husband tried to contact the human resources office several times to no avail and harassment occurred in front of other employees and was never reported, despite the defendant's policy requiring any person witnessing harassment to report it); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349-50 (6th Cir. 2005) ("While there is no exact formula for what constitutes a 'reasonable' sexual harassment policy, an effective policy should at least . . . provide for training regarding the policy.").

[284] *See Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999) ("But where, as here, there is no evidence that an employer adopted or administered an anti harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer 'exercised reasonable care to prevent' and promptly correct sexual harassment."); *see also Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1299 (11th Cir. 2000) ("[B]ecause we find no inherent defect in the complaint procedures established by Publix's sexual harassment policy, nor any evidence that the policy was administered in bad faith, we conclude that Publix exercised reasonable care to prevent sexual harassment.").

**App. 184**

**285** *MacCluskey v. Univ. of Conn. Health Ctr.*, 707 F. App'x 44, 47-48 (2d Cir. 2017) ("Even where an employer provides a reasonable avenue for complaint, it may be liable if it knew or should have known about the harassment and failed to take appropriate action." (citing *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009))).

**286** *Duch*, 588 F.3d at 764 66 (imputing the supervisor's actual or constructive knowledge of the harassment to the employer).

**287** *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

**288** *See Faragher*, 524 U.S. at 807 ("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.").

**289** *Cf. Savino v. C.P. Hall Co.*, 199 F.3d 925, 935 (7th Cir. 1999) (stating that the employee's "unreasonable foot-dragging will result in at least a partial reduction of damages, and may completely foreclose liability").

**290** *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765; *see also Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009) (second prong of affirmative defense satisfied where the plaintiff was aware that the anti harassment policy required immediate reporting of sexual harassment, yet she failed to say anything for at least five months); *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009) (second prong of affirmative defense satisfied where a reasonable employee in the plaintiff's position would have used the employer's complaint procedure yet the plaintiff instead posted the sexual harassment policy on her office door and told her friend that she was being harassed).

**291** *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 314-16 (3d Cir. 2018) (concluding that a jury could find that the plaintiff's failure to report harassment by her supervisor was not unreasonable where, among other things, her working conditions worsened after she asserted herself in the past, the supervisor warned her that she could not trust the individuals to whom she was required to report the harassment, and the employer had known of the supervisor's prior misconduct but "merely slapped him on the wrist"); *Johnson v. West*, 218 F.3d 725, 732 (7th Cir. 2000) (holding that whether the plaintiff's failure to complain was unreasonable was a factual issue where evidence showed the harasser threatened the plaintiff, verbally

**App. 185**

abused her, and threw mail in her face); *Meza-Perez v. Sbarro LLC*, No. 2:19-cv-00373, 2020 WL 12752817, at *8 (D. Nev. Dec. 16, 2020) (concluding a reasonable jury could find the plaintiff's delay in reporting was not unreasonable where the harasser repeatedly threatened the plaintiff and her family members with physical harm, termination, and deportation).

**292** The employee is not required to have chosen "the course that events later show to have been the best." Restatement (Second) of Torts § 918, comment c (1979); *see also Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 754 (10th Cir. 2014) (noting that the employee's response to harassment was not necessarily unreasonable even if "20/20 hindsight" suggests that she "could have avoided" some of the harm).

**293** *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009) (stating that an employee should not necessarily be expected to complain after the first or second incident of relatively minor harassment and that an employee is not required to report "individual incidents that are revealed to be harassment only in the context of additional, later incidents, and that only in the aggregate come to constitute a pervasively hostile work environment"); *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 36 37 (1st Cir. 2003) (noting that "sometimes inaction is reasonable" and concluding that the failure to report relatively minor incidents of harassment was not unreasonable).

**294** *See Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 357-58 (4th Cir. 2013) (concluding that the second prong of the defense was established by uncontradicted evidence that the employer counseled the complainant on how to file a formal complaint, provided her with a copy of the sexual harassment policy, and repeatedly met with her in an effort to learn what had happened so it could correct the situation, but the complainant refused, for a month, to provide any details or information about the conduct that had prompted her complaint).

**295** *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 806 07 (1998) (stating that employers can establish a defense only if the plaintiff *unreasonably* failed to make use of "a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense").

**296** *See id.* (referencing a proven, effective complaint process that was available "without undue risk or expense").

[297] *See Derry v. EDM Enters., Inc.*, No. 09-CV-6187, 2010 WL 3586739, at *3 (D. Or. Sept. 13, 2010) (concluding that the employee's failure to take advantage of the employer's corrective opportunities was not unreasonable where the only contact persons for reporting harassment were her supervisor, who was the alleged harasser, and the CEO, whose phone number was not readily available and whom the employee was discouraged from contacting without going through her supervisor); *see also supra* note 275.

[298] *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (holding that the employee's failure to report harassment based on speculation that complaints would be ignored was not reasonable).

[299] *See Monteagudo v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico*, 554 F.3d 164, 171-72 (1st Cir. 2009) (concluding that a jury could have determined that the plaintiff's failure to report sexual harassment by her supervisor was not unreasonable, in part, because of the evidence of a close relationship between the harasser and officials designated to accept complaints); *Shields v. Fed. Express Customer Info. Servs. Inc.*, 499 F. App'x. 473, 482 (6th Cir. 2012) (concluding that a reasonable jury could find that the plaintiffs did not act unreasonably in failing to report the operations manager's sexual harassment to other managers where the harasser repeatedly told them that other managers were his friends and would not believe the plaintiffs if they complained).

[300] *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001) (stating evidence that the employer has ignored or resisted similar complaints could be sufficient to excuse an employee's failure to use the employer's complaint procedure); *Mancuso v. City of Atlantic City*, 193 F. Supp. 2d 789, 806 (D.N.J. 2002) (concluding jury could reasonably find that the plaintiff's failure to complain of harassment was not unreasonable where the plaintiff repeatedly witnessed the employer's failure to respond to coworkers' and her own complaints); *Sullivan v. Hanover Foods Corp.*, No. 18 803 (MN), 2020 WL 211216, at *17 (D. Del. Jan. 14, 2020) (evidence that human resources and management frequently ignored complaints regarding race discrimination raised a genuine issue of material fact as to whether the plaintiff was unreasonable in failing to take advantage of preventive or corrective opportunities provided by the defendant); *Baker v. Int'l Longshoremen's Ass'n, Local 1423*, No. CV205-162, 2009 WL 368650 at *8 (S.D. Ga. Feb. 13, 2009) (holding that the plaintiff could introduce evidence of ignored harassment complaints to show that her failure to use the union grievance process was reasonable); *see also Minarsky v.*

5/20/24, 1 28 PM
Enforcement Guidance on Harassment in the Workplace | U S Equal Employment Opportunity Commission
Case 2:24-cv-00173-Z    Document 31    Filed 10/23/24    Page 190 of 220    PageID 536

*Susquehanna Cnty.,* 895 F.3d 303, 313 n.12 (3d Cir. 2018) ("While the policy underlying *Faragher Ellerth* places the onus on the harassed employee to report her harasser, and would fault her for not calling out this conduct so as to prevent it, a jury could conclude that the employee's non-reporting was understandable, perhaps even reasonable. That is, there may be a certain fallacy that underlies the notion that reporting sexual misconduct will end it. Victims do not always view it this way.").

**301** *Barrett*, 240 F.3d at 267 (holding that employee's failure to report harassment based on a speculative fear of retaliation was not reasonable).

**302** *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 416 (6th Cir. 2021) (denying summary judgment and concluding the plaintiff's proffered evidence demonstrated she "was under a credible threat of retaliation" that alleviated her duty to report the harassment); *Minarsky*, 895 F.3d at 314 ("If a plaintiff's genuinely held, subjective belief of potential retaliation from reporting her harassment appears to be well-founded, and a jury could find that this belief is objectively reasonable, the trial court should not find that the defendant has proven the second *Faragher Ellerth* element as a matter of law."); *EEOC v. U.S. Bell, Link Techs., Corp.*, No. 2:03 CV 237, 2005 WL 1683979, at *19 (N.D. Ind. July 19, 2005) (determining that female employees were not unreasonable when they failed to report harassment as a result of the harasser's threats of retaliation and intimidation).

**303** *See Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 37 (1st Cir. 2003) (concluding that a jury could find that the seventeen year old complainant did not act unreasonably in failing to report a sexual assault where her supervisor threatened to have her fired if she complained and he boasted that his father was "really good friends" with the owner); *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 525 26 (5th Cir. 2001) (concluding that, in light of the supervisor's repeated threats of retaliation, a jury could infer that the employee's nine-month delay in filing a complaint was not unreasonable); *O'Brien v. Middle E. Forum*, No. 2:19 cv 06078, 2021 WL 2186434, at *9 (E.D. Pa. May 28, 2021) (concluding that a reasonable jury could find that the employee's fear of retaliation was objectively reasonable based on evidence that the harasser "frequently threatened female employees by telling them that he could hack their computers, view their communications, and that he had cameras throughout the office"; asked female employees to spy on one another and had his sister eavesdrop on them; and had told other female employees he would have them fired for being a "walking lawsuit"); *Kanish v. Crawford Area Transp. Auth.*, No.

1:19-cv-00338 (Erie), 2021 WL 1520516, at *8 (W.D. Pa. Mar. 26, 2021) (holding that there were material issues of fact regarding whether the plaintiff unreasonably failed to avail herself of preventive or corrective opportunities, where she feared being fired if she complained about her supervisor; the harasser viewed himself as "untouchable" because he was a supervisor and cop; and the human resources manager was already aware of the harassment but did not take any action, leading the plaintiff to believe that a complaint would be futile).

[304] *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 437 (7th Cir. 2012) (stating that the employee may have been justified in not reporting the assistant manager's harassment to the district manager because she had previously been treated harshly by a different harasser after reporting his conduct to the district manager); *Still v. Cummins Power Sys.*, No. 07 5235, 2009 WL 57021, at *13 (E.D. Pa. Jan. 8, 2009) (concluding that a trier of fact could find the plaintiff's failure to report the supervisor's racial harassment reasonable, given the plaintiff's testimony that two other employees suffered retaliation after complaining about harassment by the same supervisor).

[305] *See, e.g.*, *Weger v. City of Ladue*, 500 F.3d 710, 725 (8th Cir. 2007) (explaining that imposing vicarious liability on an employer is a compromise requiring more than "ordinary fear or embarrassment" to justify delay in complaining (quoting *Reed*, 333 F.3d at 35)).

[306] *See Minarsky,* 895 F.3d at 316 (concluding that a reasonable jury could find that an employee's delay in reporting sexual harassment by her supervisor was reasonable, in part, because of the psychological impact the harassment had on her); *see also* Brianna Messina, *Redefining Reasonableness: Supervisory Harassment Claims in the Era of #MeToo*, 168 U. Pa. L. Rev. 1061, 1084 and accompanying notes (2020) (citing studies analyzing psychological effects of sexual harassment).

[307] *See, e.g.*, *Agusty Reyes v. Dep't of Educ.*, 601 F.3d 45, 56 (1st Cir. 2010) (stating that a jury could find that the employee exercised reasonable care to avoid harm by filing union complaints, at least one of which was copied to the employer); *Watts v. Kroger Co.*, 170 F.3d 505, 511 (5th Cir. 1999) (concluding that the employee made an effort "to avoid harm otherwise" where she filed a union grievance and did not utilize the employer's harassment complaint process since both the employer and union procedures were corrective mechanisms designed to avoid harm).

**App. 189**

**308** *Cf. EEOC v. Glob. Horizons, Inc.*, 915 F.3d 631, 641-42 (9th Cir. 2019) (explaining that where a client was aware of discrimination and could have taken corrective action to stop it, the client may be liable); *Mullis v. Mechanics & Farmers Bank*, 994 F. Supp. 680, 686 (M.D.N.C. 1997) (holding that a temporary agency may be liable for harassment at a client's workplace where the employee complained to the temporary agency and the temporary agency made no investigation into or attempt to remedy the situation). Depending upon the facts and specific nature of the employment relationship, the staffing firm, the client, or both may be legally responsible under the federal EEO laws for undertaking corrective action. *See generally* EEOC, Notice No. 515.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment A*gencies *and Other Staffing Firms* (1997), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary (https://www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary)** .

**309** As noted earlier in section IV.C.2.b.i, the principles discussed in this section (section IV.C.3) also apply in determining whether the employer has satisfied the first prong of the *Faragher Ellerth* affirmative defense.

**310** For further discussion of the general application of the negligence standard, see notes 229 to 232 and accompanying text.

**311** *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). The Supreme Court stressed in *Vance* that a complainant could "prevail simply by showing that the employer was negligent in permitting…harassment to occur." *Id.* at 445; *see also id.* at 448-49 (explaining that an employee can establish employer liability for nonsupervisory harassment "by showing that his or her employer was negligent in failing to prevent harassment from taking place").

**312** *See id.* at 449 (stating that evidence relevant in determining whether the employer unreasonably failed to prevent harassment would include evidence that the employer did not monitor the workplace, that it failed to respond to complaints, that it failed to provide a system for registering complaints, or that it effectively discouraged complaints from being filed); *see also Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006) (stating that the employer is liable for coworker harassment if "it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers"); *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 953 (7th Cir. 2005) (stating that

**App. 190**

implementation of a harassment policy training session was relevant to whether the employer exercised reasonable care to prevent harassment, but adding that "[t]he mere existence of such a policy . . . does not necessarily establish that the employer acted reasonably in remedying the harassment after it has occurred or in preventing future misconduct"); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334-35 (4th Cir. 2003) (concluding that a jury could find that the employer had constructive knowledge of harassment where the employer failed to provide adequate avenues to complain about harassment); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1279 80 (11th Cir. 2002) (concluding that an anti harassment policy was not effective where it was not aggressively or thoroughly disseminated, it was not posted in the workplace, managers were not familiar with it, it was not in the complainant's personnel file, and the employer's actual practice indicated a tolerance of harassment or discrimination); *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001) (stating that the employer's adoption of a harassment policy that encouraged employees to report harassment to a supervisor or the EEO Director was relevant in evaluating employer liability for coworker harassment).

[313] *Vance*, 570 U.S. at 445-46 (stating that the "nature and degree of authority wielded by the harasser is an important factor to be considered in determining whether the employer was negligent").

[314] *Oberweis Dairy*, 456 F.3d at 717.

[315] *See supra* section IV.B.2 (addressing the definition of "supervisor").

[316] *Vance*, 570 U.S. at 449.

[317] *See Freitag v. Ayers*, 468 F.3d 528, 539-40 (9th Cir. 2006) (rejecting the defendant's argument that prisons are uniquely exempt from liability for sexual harassment under Title VII and affirming that prisons must implement and enforce policies reasonably calculated to minimize the risk of inmates harassing staff).

[318] Risk factors for harassment are identified and discussed in an EEOC report published by the Select Task Force on the Study of Harassment in the Workplace. *See* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace, Report of Co Chairs Chai R. Feldblum & Victoria A. Lipnic*, § E (2016), **https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/harassment/report.pdf**

**App. 191**

**(https://www.eeoc.gov/sites/default/files/migrated_files/eeoc/task_force/hara**
**ssment/report.pdf)** .

[319] *See* 29 C.F.R. §§ 1604.11(d), (e); *see also, e.g.*, *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010); *Beckford v. Dep't of Corr.*, 605 F.3d 951, 957  58 (11th Cir. 2010); *Hawkins v. Anheuser Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003).

[320] *See, e.g.*, *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (holding that the employer could be liable if it knew or should have known of the non  supervisor's harassing conduct yet failed to act).

[321] *See, e.g.*, *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009) (stating that an employer has "actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it"); *see also West v. Tyson Foods, Inc.*, 374 F. App'x 624, 634 (6th Cir. 2010) (determining it was reasonable for the jury to conclude that the employer had actual knowledge of harassment where the aggrieved employee reported harassment to her supervisor in compliance with the employer's anti  harassment policy); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1363-64 (11th Cir. 1999) (per curiam) (addressing the question of whether the employer had adequate notice of the harassment, the court stated, "[t]his inquiry is made easy by the fact that Sundor's own promulgated sexual harassment policy" directs employees to report harassment to their line manager, personnel, or any other manager with whom the employee is comfortable and that "[w]ith this policy, Sundor itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures"); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) ("Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management level employees.").

[322] *See Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 107-08 (3d Cir. 2009) (stating that an employee's knowledge of harassment is imputed to the employer if the employee is specifically charged with addressing harassment, such as a human resources manager designated to receive complaints); *Nischan*, 865 F.3d at 932 (7th Cir. 2017) (concluding that because the employee handbook required any employee with supervisory or managerial responsibility to report any possible harassment he or she is aware of, the employer had notice if a low-level supervisor

**App. 192**

was aware of harassment directed at a coworker with the same low-level supervisor title); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 350 51 (6th Cir. 2005) (applying Title VII standards to hold that the employer could be liable for the failure to prevent and correct harassment where the company's policy imposed the duty on all supervisors to report harassment, and multiple supervisors allegedly witnessed harassment but failed to report it to management); *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 403 (1st Cir. 2002) (concluding that a team leader's knowledge was imputed to the employer where it had a policy allowing employees to report sexual harassment to team leaders).

[323] *See Torres v. Pisano*, 116 F.3d 625, 636-47 (2d Cir. 1997).

[324] This example is adapted from the facts in *Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863 (7th Cir. 2013).

[325] *See Clark*, 400 F.3d at 350 (concluding that the employer had notice of harassment that was witnessed by supervisors with a duty to report it to management, where the employer's anti harassment policy required "*all* supervisors and managers" to report such harassment to the appropriate management personnel) (emphasis in original).

[326] *See, e.g.*, *Okoli v. City of Balt.*, 648 F.3d 216, 224 n.8 (4th Cir. 2011) (determining that, although the employee's complaint did not explicitly mention sexual harassment, the employer "surely should have known" that the plaintiff's complaints, which contained the word harassment and addressed "unethical" and "degrading and dehumanizing" conduct, likely encompassed sexual harassment).

[327] *See Valentine v. City of Chi.*, 452 F.3d 670, 680-81 (7th Cir. 2006) (determining that a question of material fact existed as to whether the plaintiff's complaints about unwanted touching provided the employer with sufficient notice of harassment); *Burke v. Villa*, No. 19-CV-2957, 2021 WL 5591711, at *9 (E.D.N.Y. Nov. 30, 2021) (concluding a rational juror could find the plaintiff's complaint of continuous touching by an assistant manager to the point of aggravation was sufficiently clear to place the employer on notice of potential harassment).

[328] This example is adapted from the facts in *Duch v. Jakubek*, 588 F.3d 757 (2d Cir. 2009).

[329] *See Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 605 06 (7th Cir. 2006) (stating that Title VII's "'primary objective' . . . is 'not to provide redress but to avoid harm'" and

**App. 193**

that the duty to prevent unlawful harassment may require an employer to take reasonable steps to prevent harassment once informed of a reasonable probability that it will occur (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 06 (1998))); *id.* at 606 ("[A]n employer who receives notice that some probability of sexual harassment exists must adequately respond to that information within a reasonable amount of time."); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 448 49 (2013) (stating that the employer is liable for harassment if it failed to act reasonably to prevent the harassment); *cf. Burlington Indus. v. Ellerth*, 524 U.S. 742, 764 (1998) (explaining that Title VII's deterrent purpose would be served by encouraging employees to report harassment at an early stage *before* it is severe or pervasive). *But see Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010) (subdividing the course of harassment into separate periods: one during which it was neither severe nor pervasive and a second during which it was severe or pervasive, but at which point the court determined the employer took reasonable corrective measures).

[330] *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 756 (10th Cir. 2014) (quoting *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 783-84 (10th Cir. 1995)).

[331] *See e.g.*, *Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008) (quoting *Weger v. City of Ladue*, 500 F.3d 710, 721 (8th Cir. 2007)).

[332] *See, e.g., id.*; *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009) (quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003)); *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 105 n.4 (3d Cir. 2009) (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999)); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (stating that the employer cannot adopt a "see no evil, hear no evil" strategy and that notice of harassment is imputed to the employer if a "'reasonable [person], intent on complying with Title VII,' would have known about the harassment" (quoting *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995))).

[333] *Chapman v. Oakland Living Ctr.*, 48 F.4th 222, 232 (4th Cir. 2022) (concluding that a reasonable jury could find that the employer had constructive notice of harassment where the employer failed to produce evidence that it had a harassment reporting policy when the harassment occurred and, although the employer had an employee handbook, the only copy was kept in a desk where the plaintiff may never have seen it).

**App. 194**

**334** This example is adapted from the facts in *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir. 2002).

**335** *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (stating that a base level of reasonable corrective action may include, among other things, prompt initiation of an investigation); *Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011) (stating that an adequate remedy requires the employer to intervene promptly).

**336** *See Crawford v. BNSF Ry. Co.*, 665 F.3d 978, 985 (8th Cir. 2012) (concluding that the defendant exercised reasonable care to prevent and correct harassment when it initiated an investigation upon receiving a harassment complaint, placed the alleged perpetrator on administrative leave within two days, and terminated him within two weeks); *Pantoja v. Dep't of Air Force*, EEOC Appeal No. 01995176, 2001 WL 1526459, at *1 (Nov. 21, 2001) (affirming administrative judge's decision that the agency was not liable for alleged sexual harassment where the agency immediately investigated the allegations and within one day moved the alleged harasser to another building).

**337** *See EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 436 (7th Cir. 2012) (stating that a two-month delay in initiating an investigation was not the type of response "reasonably likely to prevent the harassment from recurring" (quoting *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005))).

**338** *See Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1999) (denying the employer's motion for summary judgment where the employer failed to investigate racially abusive phone calls that were known to the employer, noting that "[e]arlier action may have discouraged the later calls and other conduct toward [the employee]"). For federal employers, EEOC Management Directive 715 (MD 715), which is the policy guidance the EEOC provides to federal agencies for their use in establishing and maintaining effective EEO programs, at Part G (Agency Self Assessment Checklist) asks, in the context of receiving a harassment allegation, whether the agency conducted a prompt inquiry "beginning within 10 days of notification" of alleged harassment. *See* EEOC, MD-715 - PART G Agency Self-Assessment Checklist, at C.2.a.5, **https://www.eeoc.gov/federal-sector/management-directive/md-715-part-g-agency-self-assessment-checklist (https://www.eeoc.gov/federal-sector/management-directive/md-715-part-g-agency-self-assessment-checklist)** (last visited Apr. 12, 2024).

**App. 195**

**339** *See Rockymore v. U.S. Postal Serv.*, EEOC Appeal No. 0120110311, 2012 WL 424237, at *5 (Jan. 31, 2012) (finding that the agency failed to take prompt corrective action where it did not provide any justification for its two week delay in responding to the complainant's sexual harassment complaint, particularly considering the complainant's indication that the alleged harasser had touched her).

**340** *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1304 (11th Cir. 2007); *see also EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 465 66 (5th Cir. 2013) (en banc) (holding that a reasonable jury could conclude that the employer failed to take reasonable measures to prevent and correct harassment where, among other things, the harassment complaint resulted in a belated and cursory 20 minute investigation in which the investigator did not take any notes or ask any questions during his meeting with the complainant, and he never contacted the employer's EEO Officer or sought advice about how to handle the matter); *Shields v. Fed. Express Customer Info. Servs. Inc.*, 499 F. App'x 473, 480 (6th Cir. 2012) (concluding that a jury could find that the employer might have uncovered evidence of harassment if it had conducted a thorough investigation); *Ross v. City of Dublin,* No. 2:14 CV 02724, 2016 WL 7117389, at *18 (S.D. Ohio Dec. 7, 2016) ("A reasonable jury could find that [the employer's] failure to interview [the complainant] . . . manifests indifference or unreasonableness."); *Lightbody v. Wal-Mart Stores E., L.P.*, No. 13-cv-10984, 2014 WL 5313873, at *5 (D. Mass. Oct. 17, 2014) (concluding that a reasonable jury could find that the employer was liable for sexual harassment of the plaintiff because, in investigating the plaintiff's complaint, it failed to follow leads that bore on the alleged harasser's credibility); *Grimmett v. Ala. Dep't of Corr.*, No. CV-11-BE-3594 S, 2013 WL 3242751, at *13 (N.D. Ala. June 25, 2013) (concluding that the employer failed to show that it exercised reasonable care where it presented general evidence that it had initiated an investigation but no specific evidence that would enable the court to evaluate the adequacy of the investigation and the employer's conclusory finding that the harassment complaint was unfounded).

**341** *See Hathaway v. Runyon*, 132 F.3d 1214, 1224 (8th Cir. 1997) ("It is not a remedy for the employer to do nothing simply because the coworker denies that the harassment occurred, and an employer may take remedial action even where a complaint is uncorroborated." (citations omitted)).

**342** This example is adapted from the facts in *EEOC v. Boh Brothers Construction Company, LLC*, 731 F.3d 444 (5th Cir. 2013) (en banc).

**App. 196**

**343** In the context of federal sector employment, federal agencies should consult with legal counsel to address potential Privacy Act concerns.

**344** At a minimum, pursuant to EEOC regulation, employers are required to keep records for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. If an EEOC charge is filed, the employer is required to preserve all records relevant to the charge until its final disposition. The date of final disposition is when the statutory period for filing a lawsuit expires or, where a lawsuit has been filed by an aggrieved person, the EEOC, or the Department of Justice, the date when the litigation is terminated. 29 C.F.R. § 1602.14.

**345** *See Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (stating the obligation to take prompt corrective action is comprised of two parts, of which "[t]he first part consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified").

**346** *See Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990) (agreeing that a "remedial measure that makes the victim of sexual harassment worse off is ineffective per se" and that, thus, a transfer that reduces a complainant's wages or impairs her prospects for promotion is not adequate corrective action); *see also EEOC v. Cromer Food Servs., Inc.*, 414 F. App'x 602, 608 (4th Cir. 2011) (stating that the offer to transfer the complainant to another shift that would have made him worse off was not an acceptable remedial measure); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) (concluding that remedial action was not adequate where the employer twice changed the complainant's schedule to separate her from the harasser, rather than changing the harasser's shift or work area or firing the harasser); *Taylor v. CSX Transp.*, 418 F. Supp. 2d 1284, 1307 08 (M.D. Ala. 2006) (agreeing with the plaintiff that evidence that an employer's remedy placed the plaintiff in a worse position than prior to complaining about harassment is evidence that the employer did not take appropriate corrective action); *cf. Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 812 (7th Cir. 2000) (concluding that, where the employer transferred a harassed employee in response to a harassment complaint to a position that left her materially worse off, the employer could be held liable for the transfer because it "breache[d] the duty of care it owe[d] to the harassed employee").

**347** *Cf.* EEOC, *Enforcement Guidance on Retaliation and Related Issues* § II.C (2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-**

related-issues#C.  Causal (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#C.  Causal) ; *id.* at Example 31 (providing example of preliminary relief granted to prohibit retaliation against alleged harassment victims during pendency of investigation (citing *EEOC v. Evans Fruit Co.*, No. CV-10-3033, 2010 WL 2594960, at *1-2 (E.D. Wash. June 24, 2010))).

[348] *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004) (quoting *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001)).

[349] *See, e.g.*, *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (stating that the employer's response is generally adequate "if it is reasonably calculated to end the harassment" (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999))); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011) (holding that a reasonable jury could find that the employer was liable for harassment where it failed to promptly and effectively enforce its anti harassment policies, which called for a "firm response designed to end the harassment"); *Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011) (explaining that the reasonableness of a remedy depends on its ability to stop the harasser from continuing his conduct and to persuade potential harassers to refrain from engaging in unlawful conduct); *cf. Vance v. Ball State Univ.*, 646 F.3d 461, 473 (7th Cir. 2011) (concluding that the employer was not liable where it took reasonable steps to prevent the harassment from continuing), *aff'd*, 570 U.S. 421 (2013).

[350] *See, e.g.*, *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1018 (9th Cir. 2018) (stating that the reasonableness of corrective action is evaluated from the perspective of what the employer knew or should have known when it took the action); *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) (concluding that the jury was properly instructed to consider the reasonableness of the employer's response to harassment in light of what it knew at the time that the harassment occurred); *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 953 (7th Cir. 2005) (stating that the reasonableness of the employer's response turns on the facts and circumstances when harassment is alleged).

[351] *See, e.g.*, *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) (collecting cases) ("It is only in light of the nature of the harassment that we can see whether a company's response was proportional by examining the promptness of any investigation, the specific remedial measures taken, and the effectiveness of those measures."); *Scarberry v. Exxonmobil Oil Corp., 328 F.3d 1255, 1259 60 (10th Cir. 2003) (stating that the* "test is whether the employer's response to each incident of

harassment is proportional to the incident and reasonably calculated to end the harassment and prevent future harassing behavior"). *But see Tutman v. WBBM  TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000) ("[T]he question is not whether the punishment was proportionate to [the] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring.").

[352] *See Hawkins v. Anheuser Busch, Inc.*, 517 F.3d 321, 342 (6th Cir. 2008) (concluding that, although separating the harasser and complainant may be adequate in some cases, it was not sufficient in this case where the wrongdoer was a serial harasser and management repeatedly transferred the harasser's victims instead of taking other corrective action aimed at stopping the harasser's misconduct, such as training, warning, or monitoring the harasser).

[353] *See Vance*, 570 U.S. at 445  46; *Doe v. Oberweis Dairy*, 456 F.3d 704, 717 (7th Cir. 2006). For a discussion of when vicarious liability applies, refer to section IV.B.2, *supra*.

[354] *See Vance*, 570 U.S. at 445-46.

[355] *See, e.g.*, *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2012) (stating that the success or failure of corrective action in stopping harassment is not determinative as to employer liability but is nevertheless material in determining whether corrective action was reasonably likely to prevent the harassment from recurring); *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 8 (1st Cir. 2011) (rejecting the argument that corrective action must have been inadequate because it failed to stop the harassment as "nothing more than a post hoc rationalization"); *Adler v. Wal Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998) ("Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist.").

[356] *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999) ("Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care."); *see Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995) (stating that an employer that fails to take any corrective action is liable for ratifying unlawful harassment even if the harasser voluntarily stops); *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1123-24 (8th Cir. 2007) (stating that an employer that fails to take proper remedial action in response to harassment is

**App. 199**

liable because the "combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998))).

[357] *See* discussion of prompt and adequate investigation at section IV.C.3.b.ii(a).

[358] *See* cases cited in note 346.

[359] *See Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (enumerating factors to be assessed in evaluating the reasonableness of remedial measures and listing potential corrective actions).

[360] *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

[361] *See Swenson v. Potter*, 271 F.3d 1184, 1196 (9th Cir. 2001) ("As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment. . . . Employees are no better served by a wrongful determination that harassment occurred than by a wrongful determination that no harassment occurred.").

[362] *Shields v. Fed. Express Customer Info. Servs. Inc.*, 499 F. App'x 473, 479-80 (6th Cir. 2012) (explaining that, even if the employer's investigation did not substantiate sexual harassment claim, the employer still had the responsibility to ensure that the accused harasser did not engage in harassment in the future, such as by monitoring the accused harasser's conduct); *cf. Christian v. AHS Tulsa Reg'l Med. Ctr., LLC*, 430 F. App'x 694, 698-99 (10th Cir. 2011) (affirming lower court conclusion that the employer took reasonable corrective action where, despite a "reasonably thorough investigation," its findings were inconclusive but it nevertheless counseled the alleged harasser as to its antidiscrimination policy, and he remained subject to more serious sanctions if he was again accused of misconduct).

[363] In some cases, the application of the EEO statutes enforced by the EEOC may implicate other rights or requirements including those under the United States Constitution; other federal laws, such as the Religious Freedom Restoration Act (RFRA); or sections 702(a) and 703(e)(2) of Title VII. Whether enforcement of federal workplace anti harassment laws implicates other legal requirements, and if so, the interplay between federal workplace antidiscrimination laws and any such other legal doctrine, is beyond the scope of this document. For further information, see

the relevant sections of EEOC's Compliance Manual Section on Religious Discrimination. EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, §§ 12 I.C, 12 III.D, and Addendum (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination)** and EEOC, *Compliance Manual Section 2: Threshold Issue*s, No. 915.003, § 2 III.B.4.b.I (2000), **https://www.eeoc.gov/laws/guidance/section-2-threshold-issues (https://www.eeoc.gov/laws/guidance/section-2-threshold-issues)** . As with all investigations, charges raising any of these arguments must be considered as presented on a case by case basis.

[364] Under Title VII, "undue hardship is shown when a burden is substantial in the overall context of an employer's business," "tak[ing] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Groff v. DeJoy*, 600 U.S. 447, 468, 470 71 (2023). With respect to relevant EEOC guidance on religious accommodation, the Court noted that "[w]e have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today." *Id.* at 472. EEOC's Compliance Manual Section on Religious Discrimination, a guidance document that was issued prior to the *Groff* opinion, explains that "[c]osts to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business," which in appropriate circumstances can include adverse effects on employee morale and other impacts on coworkers, customers, and workplace productivity. EEOC, *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, §§ 12 III.D, 12 IV.B.2 (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_673998317380416107 49896553 (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_673998317380416107 49896553)** . The guidance also explains: "Religious expression can create undue hardship if it disrupts the work of other employees or constitutes — or threatens to constitute — unlawful harassment. Conduct that is disruptive can still constitute an undue hardship, even if it does not rise to the level of unlawful harassment." *Id.* § 12-IV.C.6.a, **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_481760063453916107 50058898 (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_481760063453916107 50058898)** . For more information on

balancing religious expression with anti-harassment measures, refer to EEOC *Compliance Manual Section 12: Religious Discrimination*, No. 915.063, at sections 12 IV.C.6.a. and 12 IV.D. (2021), **https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_4817600634539161075005889 (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_4817600634539161075005889)** .

[365] *See Peterson v. Hewlett Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004). Accommodating an employee's religious belief will not impose undue hardship "merely because the employee's co-workers find [the] conduct irritating or unwelcome." *Id.*; *see also Groff*, 600 U.S. at 472 ("[A] coworker's dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'") (citing *TWA v. Hardison*, 432 U.S. 63, 89-90 (1977)); *Brown v. Polk Cnty.*, 61 F.3d 650, 656-57 (8th Cir. 1995) (determining that the employer could be liable for failing to accommodate a department director's "spontaneous" and "entirely voluntary" prayers that "did not occur regularly" and "occasional affirmations of Christianity" with subordinates where the employer offered only speculative concerns about "eventual polarization between born again Christian employees and other employees" and perceptions of favoritism). While an employer must accept some degree of coworker discomfort when providing an accommodation for religious expression under Title VII, "it need not accept the burdens that would result from allowing actions that demean or degrade, or are designed to demean or degrade, members of its workforce." *Peterson*, 358 F.3d at 607-08.

[366] *See, e.g.*, *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1078 (8th Cir. 2006) (concluding that the employer was not liable for religious harassment of the plaintiff because it took prompt and appropriate remedial action after learning of the plaintiff's objections to her coworker's proselytizing); *see also Ervington v. LTD Commodities, LLC*, 555 F. App'x 615, 617-18 (7th Cir. 2014) (concluding that the employer was not required to accommodate an employee by allowing her to distribute pamphlets that were offensive to coworkers, including material that negatively depicted Muslims and Catholics and stated that they would go to hell); *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1021 (4th Cir. 1996) (holding that the employer did not have to accommodate an employee who sent proselytizing letters to coworkers invading their privacy and criticizing their personal lives because doing so could subject the employer to possible religious harassment lawsuits).

**App. 202**

**367** *Sassaman v. Gamache*, 566 F.3d 307, 311-12 (2d Cir. 2009) (concluding that a male supervisor established a prima facie case of sex discrimination when he presented evidence showing that he was terminated after being accused of sexual harassment by a female employee and was told by his supervisor that "you probably did what she said you did because you're male and nobody would believe you anyway").

**368** As to federal employers, the EEOC's *Promising Practices for Preventing Harassment in the Federal Sector* recommends that agencies promptly, thoroughly, and impartially investigate alleged harassment and take immediate and appropriate corrective action even if the complainant or alleged victim does not want the agency to investigate or correct the alleged harassment. EEOC, *Promising Practices for Preventing Harassment in the Federal Sector*, at Part B n.28, **https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector#_ftn28 (https://www.eeoc.gov/federal-sector/reports/promising-practices-preventing-harassment-federal-sector#_ftn28)**

**369** Some courts have suggested that it may be lawful to honor such a request in some circumstances, but that it may be necessary to take corrective action, despite a complainant's wishes, if harassment is severe. *See Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1186 (9th Cir. 2005) (concluding that the employer acted reasonably in not investigating a complaint where the complainant said he wanted to handle the situation himself and failed to indicate the severity of the harassment, though the employer might have a duty to take corrective action in other circumstances, despite a complainant's wishes), *amended by* 433 F.3d 672 (9th Cir. 2006), *amended by* 436 F.3d 1050 (9th Cir. 2006); *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997) (concluding that, although there is a point at which "harassment becomes so severe that a reasonable employer simply cannot stand by, even if requested to do so by a terrified employee," the employer acted reasonably here in honoring an employee's request to keep the matter confidential and not take action until a later date, where the employee had recounted only a few relatively minor incidents of harassment).

**370** *See Torres*, 116 F.3d at 639 (stating that the employer most likely could not honor a single employee's request not to take action if other workers were also being harassed).

**371** Employers may hesitate to set up such a mechanism due to concern that it may create a duty to investigate anonymous complaints, even if based on mere rumor.

**App. 203**

To avoid any confusion as to whether a complaint through such a phone line or website triggers an investigation, the employer should make it clear that the person who receives the inquiry is not a management official and can only answer questions and provide information. An investigation will proceed only if a complaint is made through the internal complaint process or if management otherwise learns about potential harassment.

[372] For a discussion of how to determine whether an individual is an employee of the employment agency, the client, or both, refer to EEOC, Notice No. 915.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment A*gencies *and Other Staffing Firms* (1997), 1997 WL 33159161, at \*5 6, **https://www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary (https://www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary)** .

[373] *See, e.g.*, *EEOC v. Glob. Horizons*, *Inc.*, 915 F.3d 631, 642 (9th Cir. 2019) (stating that a defendant employer may be liable for a joint employer's conduct but only if the defendant knew or should have known about the other employer's conduct and "failed to undertake prompt corrective measures within its control" (quoting EEOC, Notice No. 915.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms* (1997), 1997 WL 33159161, at \*11, **https://www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary (https://www.eeoc.gov/laws/guidance/enforcement-guidance-application-eeo-laws-contingent-workers-placed-temporary)** )); *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414-16 (4th Cir. 2015) (holding that the defendant, an auto parts manufacturer, exercised sufficient control over a temporary worker to be considered her joint employer and therefore the defendant could be held liable for sexual harassment and retaliation experienced by the plaintiff while working at the defendant's facility).

[374] *Glob. Horizons*, 915 F.3d at 641-42 (explaining that where a client was aware of discrimination and could have taken corrective action to stop it, the client may be liable).

[375] *See id.* (holding that two joint employers could be held liable for the same hostile environment if both knew or should have known of it and both had the ability to take corrective action); *Magnuson v. Peak Tech. Servs.*, 808 F. Supp. 500,

**App. 204**

511-14 (E.D. Va. 1992) (where the plaintiff was subjected to sexual harassment by her supervisor during a job assignment, three entities could be found liable: the staffing firm that paid her salary and benefits, the automobile company that contracted for her services, and the retail car dealership to which she was assigned; the staffing firm and automobile company were held to the standard for harassment by non employees, under which an entity is liable if it had actual or constructive knowledge of the harassment and failed to take immediate and appropriate corrective action within its control); *cf. Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 229 (5th Cir. 2015) ("A staffing agency is liable for the discriminatory conduct of its joint employer client if it participates in the discrimination, or if it knows or should have known of the client's discrimination but fails to take corrective measures within its control.") (ADA discriminatory termination case); *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 811 12 (7th Cir. 2014) ("The firm also is liable if it *knew or should have known about the client's discrimination and failed to undertake prompt corrective measures within its control*." (quoting EEOC, Notice No. 915.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment A*gencies *and Other Staffing Firms* (1997))) (emphasis in original).

[376] *See Mullis v. Mechs. & Farmers Bank*, 994 F. Supp. 680, 686 (M.D.N.C. 1997) (holding a temporary agency may be liable for harassment at a client's workplace where the employee complained to the temporary agency and the temporary agency made no investigation into or attempt to remedy the situation).

[377] As discussed *supra* at section IV.C.3.b.ii(a) and section IV.C.3.b.ii(b), reassigning an employee who complains about harassment will generally not be an appropriate remedial measure and could possibly constitute retaliation. However, reassignment may be the only feasible option in circumstances where a temporary agency lacks control over the alleged harasser or workplace.

[378] *See, e.g.*, *Ellis v. Houston*, 742 F.3d 307, 318, 320 22 (8th Cir. 2014) (observing that harassment of Black correctional officers working on the same shift was directed at them as a group and that each of the officers became aware of any harassment experienced by the others).

[379] *EEOC v. Hill Country Farms, Inc.*, No. 3:11-cv-00041 (S.D. Iowa May 1, 2013), ECF No. 92; Press Release, EEOC, Jury Awards $240 Million for Long Term Abuse of Workers with Intellectual Disabilities (May 1, 2013), **https://www.eeoc.gov/newsroom/jury-awards-240-million-long-term-abuse-**

**workers-intellectual-disabilities (https://www.eeoc.gov/newsroom/jury-awards-240-million-long-term-abuse-workers-intellectual-disabilities)** ; *see also* Dan Barry, *The 'Boys' in the Bunkhouse*, N.Y. Times, Mar. 9, 2014, **https://www.nytimes.com/interactive/2014/03/09/us/the-boys-in-the-bunkhouse.html (https://www.nytimes.com/interactive/2014/03/09/us/the-boys-in-the-bunkhouse.html)** .

[380] This example is adapted from the facts in *Ellis v. Houston*, 742 F.3d 307 (8th Cir. 2014).

[381] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (stating that a pattern or practice claim required the government to establish that "racial discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice"); *see also EEOC v. Pitre Inc.*, 908 F. Supp. 2d 1165, 1178 79 (D.N.M. 2012) (denying the defendant's motion to dismiss and permitting EEOC to proceed to jury trial under pattern-or-practice method of proof); *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1069-70 (C.D. Ill. 1998) (concluding that a pattern or practice of sexual harassment could be established by evidence that the employer regularly tolerated unlawful sexual harassment at its auto assembly plant); *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 888 (D. Minn. 1993) (concluding that the employer's tolerance of a sexually hostile environment at a mine and processing plant made sexual harassment of women the "standard operating procedure").

[382] *Mitsubishi*, 990 F. Supp. at 1074; *see also EEOC v. Dial Corp.*, 156 F. Supp. 2d 926, 946-47 (N.D. Ill. 2001) (stating that pattern-or-practice liability turns not on the particularized experiences of individual claimants but on the landscape of the total work environment).

[383] *EEOC v. Int'l Profit Assocs., Inc.*, No. 01 C 4427, 2007 WL 3120069, at *17 (N.D. Ill. Oct. 23, 2007) (holding that the EEOC was required to establish that sexual harassment that occurred at the worksite during the relevant time period, taken as a whole, was sufficiently severe or pervasive that a reasonable woman would have found the work environment hostile or abusive).

[384] *EEOC v. Glob. Horizons, Inc.*, 7 F. Supp. 3d 1053, 1058 63 (D. Haw. 2014).

[385] *See generally Mitsubishi*, 990 F. Supp. at 1075.

**App. 206**

After an employer's responsibility to take overarching action has been established, employees' entitlement to individual relief is determined on a case by case basis. *Id.* at 1077.

[386] This example is adapted from the facts in *EEOC v. Dial Corp.*, 156 F. Supp. 2d 926 (N.D. Ill. 2001).

[387] Proposed Enforcement Guidance on Harassment in the Workplace, 88 Fed. Reg. 67,750 (Oct. 2, 2023), **https://www.federalregister.gov/d/2023-21644 (https://www.federalregister.gov/d/2023-21644)** .  The proposed guidance also was posted prominently on the EEOC's website at www.eeoc.gov.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C. 20002**

Commissioner
Andrea R. Lucas

April 29, 2024

## COMMISSIONER ANDREA R. LUCAS'S STATEMENT ON
## EEOC ENFORCEMENT GUIDANCE ON HARASSMENT IN THE WORKPLACE

     Women's sex-based rights in the workplace are under attack—and from the EEOC, the very federal agency charged with ***protecting women*** from sexual harassment and sex-based discrimination at work. In its new harassment guidance, the Commission formally takes the position that for both private companies and federal employers, harassing conduct under Title VII includes "denial of access to a bathroom or other sex-segregated facility consistent with [an] individual's gender identity." Relatedly, the Commission declares that harassing conduct includes "repeated and intentional use of a name or pronoun inconsistent with [an] individual's known gender identity."[1] The Commission's guidance effectively eliminates single-sex workplace facilities and impinges on women's (and indeed, all employees') rights to freedom of speech and belief. In issuing this guidance, the EEOC ignores biological reality; dismisses the sex-based privacy and safety needs of women; disregards decades of safeguarding principles for women and girls; and fundamentally betrays its mission.

     Biological sex is real, and it matters. Sex is binary (male and female) and is immutable. In the words of Justice Ginsburg for the Supreme Court in *United States v. Virginia*, "[p]hysical differences between men and women . . . are enduring: The two sexes are not fungible."[2] It is not harassment to acknowledge these truths—or to use language like pronouns that flow from these realities, even repeatedly. Relatedly, each sex has its own, unique privacy interests, and women have additional safety interests, that warrant certain single-sex facilities at work and other spaces outside the home. It is neither harassment nor discrimination for a business to draw distinctions between the sexes in providing single-sex bathrooms or other similar facilities which implicate these significant privacy and safety interests. And the Supreme Court's decision in *Bostock v. Clayton County* does not demand otherwise: the Court explicitly stated that it did "not purport to address bathrooms, locker rooms, or anything else of the kind."[3]

     The Commission's guidance turns anti-harassment principles completely upside down. Under the Commission's pronouncement, a company denying biological males access to its women's workplace bathroom, shower, locker or dressing room, or sleeping facilities no longer is exercising reasonable care to *prevent* harassment of female workers. To the contrary, taking this reasonable and necessary step to protect women now is deemed evidence of *harassment* against any biological male who self-identifies as having a female "gender identity."

---

[1] The EEOC's Chair previously attempted to unilaterally declare these positions via a "technical assistance" document (a category of sub-regulatory document not voted on by the full Commission panel). This attempt was soundly rejected and vacated in *Texas v. EEOC et al.*, 2:21-CV-194-Z, 633 F.Supp.3d 824 (N.D. Tex. 2022).

[2] 518 U.S. 515, 533 (1996) (cleaned up).

[3] *Bostock v. Clayton County,* 590 U.S. 644, 681 (2020); *see also id.* at 655-56 (assuming that "sex" refers "only to biological distinctions between male and female.").



Commissioner
Andrea R. Lucas

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C. 20002**

April 29, 2024

Women in the workplace will pay the price for the Commission's egregious error. Every female worker has privacy and safety rights that necessitate access to single-sex workplace bathrooms limited to biological women. But it is important not to lose sight of the fact that this is not just about white-collar female workers' daytime access to bathrooms in the large, clean, modern facilities of major corporate employers, companies which can afford to create costly multiple single-stall all-gender bathrooms in an attempt to balance women's safety and privacy interests with the Commission's new edict. Thousands of women across the country work in jobs—often blue-collar, agricultural, or low-wage service positions—that require them to change clothes in locker rooms or shower at work. Some women even must sleep in work-provided lodging, including thousands of female migrant agricultural workers, many of whom are non-English speakers who are especially vulnerable to sexual assault and likely to have little recourse if the worst happens. Numerous women work the night shift at factories and plants, in hospitals, or in janitorial and cleaning roles in businesses across the country. Many young teenage girls work in the evening and at night at fast-food and quick-service restaurants. Moreover, many women and girls who themselves are not employees (but rather are customers, clients, or students) also use single-sex facilities at locations in which employees perform duties, like a store dressing room or a gym, spa, or school locker room or showers. A woman or girl's risk of sexual harassment or assault from a biological male is exponentially higher when undressing, showering, or sleeping, or when working after dark or in isolated or remote locations. Many of these groups of women already are at increased risk of sexual harassment, assault, or rape—indeed, each year, the Commission admirably files many lawsuits on behalf of hundreds of such female workers who have suffered sexual harassment and assault at work. But the Commission's new harassment guidance will elevate "gender identity" over these and other women's interests.

Congress did not grant the Commission authority to issue substantive regulations under Title VII.[4] The Commission states in the harassment guidance that the "contents of this document do not have the force and effect of law, [and] are not meant to bind the public in any way." That disclaimer is worth little. A rule called by any other name is still a rule. The Commission separately describes the guidance as a "resource for employers, employees, and practitioners; for EEOC staff and staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues." As the guidance makes clear at its very start, it "communicates the Commission's position on important legal issues," that is, the agency's enforcement positions. Many employers will conform their workplaces accordingly to avoid investigation and litigation by the EEOC, including by effectively eliminating single-sex facilities in favor of ones separated by "gender identity" and by policing speech and belief expressing biological reality. Women will suffer the consequences.

---

[4] *See* 42 U.S.C. § 2000e-12(a) (granting Commission authority only to issue "suitable procedural regulations" to carry out Title VII); *see, e.g.*, *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976); *Texas*, 633 F. Supp. 3d at 841-42.

**App. 209**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| | § | |
| THE STATE OF TEXAS; and | § | |
| THE HERITAGE FOUNDATION, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Case No. 2:24-cv-00173-Z |
| | § | |
| EQUAL EMPLOYMENT OPPORTUNITY | § | |
| COMMISSION, ET AL., | § | |
| *Defendants.* | § | |

## DECLARATION OF SID MILLER

I, Sid Miller, am over the age of 18 and fully competent in all respects to make this declaration.
Pursuant to 28 U.S.C.§ 1746, I testify that:

1.    I make this declaration on the basis of my own personal and professional knowledge.

2.    The Texas Department of Agriculture (the "Department") is an agency of the State of
Texas responsible for matters relating to agriculture and rural community affairs. It has approximately 649
employees.

3.    Since January 5, 2015, when I took the oath of office, I have served as Commissioner for
Agriculture for the State of Texas. My duties as Commissioner are to oversee the Department and all of
its statutory functions. I have an executive staff of six, two of whom report to me. Through my position
with the Department, I am familiar with its employment policies and practices.

4.    I have reviewed the guidance promulgated by EEOC on April 29, 2024 entitled
Enforcement Guidance on Harassment in the Workplace (the "2024 Guidance"), available at
https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace. Relying on the
Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), the 2024 Guidance states that
"[u]nder Title VII, 'sex' includes … sexual orientation and gender identity." The 2024 Guidance the offers
examples of actionable "sex-based harassment," including "use of name or pronoun inconsistent with [an]

1

individual's gender identity (misgendering)" and "denial of access to a bathroom or other sex-segregated facility consistent with [an] individual's gender identity." It also deems—in its "Example 15"—that it is "harassing conduct ... based on ... gender identity" if a supervisor requires a biological male employee to wear pants rather than a dress.

5.      The 2024 Guidance conflicts with the Department's workplace policies.

6.      The Department's expectation is for employees to dress professionally and be well-groomed. The Department has an agencywide dress code in line with this expectation. Whether an employee's manner of dress is unprofessional or inappropriate would ultimately be evaluated by on a case-by-case basis. If any employee dressed as a member of the opposite sex, I would consider such conduct to be a violation of these standards.

7.      On April 13, 2023, the Department formalized these standards. This Dress Code and Grooming Policy is attached as Exhibit A and sets forth that "[e]mployees are expected to comply with this dress code in a manner consistent with their biological gender"—that is, biological sex rather than any subjective gender identity— and provides, for example, that dresses are acceptable business attire for women but not for men. Exhibit A at 1.

8.      The Department occupies offices across the State at facilities that are Department-owned, state-owned or leased, and privately-owned properties. The Department complies with the Texas Facilities Commission's Tenant Manual and any other applicable lease agreements governing its use of facilities not owned by the Department. The Department has restrooms available for use by its employees at the facilities it occupies that are either unisex single-occupancy or designated by sex. I interpret "sex" as referring to biological sex rather than gender identity. If any employee wanted to use the restrooms designated for the opposite sex, I would reject such a request. Any complaint regarding restroom usage would be evaluated on a case-by-case basis pursuant to Department policies.

9.      The Department does not have a policy of directing its employees to use pronouns based on gender identity to refer to other employees. It also does not discipline employees for use of pronouns based on biological sex rather than the gender identity of other employees. If any employee wanted the Department to require other employees to use pronouns based on gender identity, I would reject such a

2

request. Any workplace conflicts over pronoun usage would be handled on a case-by-case basis to ensure compliance with Department policies.

10.     The Department maintains policies generally prohibiting workplace harassment or discrimination on the basis of sex, but it does not have specific policies related to sexual orientation and gender identity. The Department's policies are part of each of its employees' human resources training, which they must complete within three days of the date of hire and then every two years thereafter.

11.     To avoid the liability threatened by the 2024 Guidance—if it is upheld as lawful—the Department will need to devote significant time and resources to updating its policies and training programs. It will also need to update or develop new training programs and materials to reflect these policy changes. The Department then must train human resources personnel, who will then be responsible for implementing the new policies and training programs. And the Department would then have to develop a program to track the training of its employees on these new policies.

12.     Department employees are required to complete training regarding workplace discrimination and harassment within three days of hiring. All employees must also complete biennial training on workplace discrimination and harassment.

13.     The 2024 Guidance also purports to require employers to police third parties who either engage in so-called "misgendering" or denial of access to a preferred bathroom. The Department would thus need to evaluate its reporting and complaint processes to ensure they are "effective," as required by the 2024 Guidance. Designing effective processes will require consideration of the Department's obligations as interpreted in the 2024 Guidance, and the Department's obligation to ensure the safety and privacy of its employees and third parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of October 2024.

SID MILLER

3



# Texas Department of Agriculture
*Dress Code and Grooming Policy*

COMMISSIONER SID MILLER

| | |
|---|---|
| **Objective** | An employee's appearance should reflect the culture, dignity, and professionalism of the Texas Department of Agriculture. All employees, regardless of assignment, are expected to present themselves in a professional manner that cultivates a favorable impression from coworkers, other government officials, agency customers and the general public. Employees are expected to comply with this dress code in a manner consistent with their biological gender. Basic elements for appropriate attire across the board consist of clothing that is in neat and clean condition. |
| **Applicability** | This dress code and grooming policy applies to all employees of TDA, including interns and contract employees who will be working on TDA premises or interacting with others on behalf of TDA. Divisions may institute dress codes for their respective areas but may not authorize violation of the minimum standards established by this agency policy. An exception would be for appropriate attire related to a specialized service, activity or event being conducted.  Examples of such would be field work in agriculture and consumer protection, export pens, facilities-related labor and other similar types of specialized assignments or special events that, as a practical matter, call for a departure from these standards.  In such circumstances employees shall wear attire appropriate for the mission. See "Specific requirements and departure from standards", below. |
| **Procedures** | TDA supervisors may exercise reasonable discretion in assessing appropriateness in employee attire and appearance. Any staff member who does not meet the attire or grooming standards set by TDA will be subject to corrective action and may be asked to leave the premises to change their clothing. Staff members will not be compensated for any work time missed because of failure to comply with designated workplace attire and grooming standards. |
| **Guidelines** | **Business Attire**<br>Business attire should generally be utilized where employees will be interacting with the public and other government officials or testifying or making presentations on behalf of the agency. This would consist of traditional business wear, including Western business attire.<br><br>The following are some examples of business attire: For men, business attire includes a long-sleeved dress shirt, tie, and sport coat worn with trousers and dress shoes or boots.  For women, business attire includes tailored pantsuits, businesslike dresses, coordinated dressy separates worn with or without a blazer, and conservative, closed-toe shoes or boots.<br><br>**Business Casual**<br>For less formal occasions, business casual attire, which is less formal than traditional business attire, but is still intended to give a professional and businesslike impression, may be appropriate. Business casual is the appropriate minimum attire for day-to-day office assignments where in-person interaction is primarily with fellow coworkers and not with the general public or other government officials.<br><br>Western attire is included in the business casual category and is encouraged. Jeans may not be tattered or torn. Cowboy hats must reflect favorably on the professionalism of the agency and in no circumstance be unclean or tattered.<br><br>The following are some examples of business casual attire:<br>Shirts with collars, business casual crewneck or V-neck shirts, blouses, and golf and polo shirts.<br><br>Examples of inappropriate shirts include T-shirts, shirts with inappropriate slogans, tank tops, muscle shirts, camouflage, and crop tops.<br><br>Pants: Casual slacks and trousers and jeans without holes, frays, etc. Examples of inappropriate pants |

include shorts, camouflage, and baggy or sagging pants or pants worn below the waist or hip line.

Footwear: Casual slip-on or tie shoes, Western boots, and clean athletic shoes. Examples of inappropriate footwear include flip-flops, slippers, slides and crocs.

### TDA-Specific Attire
Agency uniforms and approved agency embroidered attire are allowable and encouraged.  Employees should confirm the appropriate agency-related attire with their supervisor.

### Inappropriate Attire and Grooming Generally
Employees are expected to demonstrate good judgment and professional taste. Courtesy towards coworkers and one's professional image to customers are factors to be used in assessing whether you are dressing in attire that is appropriate. Cleanliness and proper hygiene are indispensable. The following are examples of inappropriate dress:

Clothing that is too tight or revealing; clothing with rips, tears or frays; or any extreme style or fashion; pajamas, workout clothes and sweats; T-shirts, shirts with inappropriate slogans, tank tops, team jerseys, muscle shirts, camouflage and crop tops; shorts, camouflage pants, baggy or sagging pants or pants worn below the waist or hip line; flip-flops, slides, slippers or crocs.

### Examples of Standards for Men and Women
Standards for men's attire:  Shoelaces tied, shirts buttoned appropriately near the collar, button down shirts tucked in; no pants tucked in boots; no sandals, crocs or slides, no shoes without socks. You are a professional, look like one.

Standards for women's attire:  No sweatpants, pajamas, night gowns, miniskirts, no excessive cleavage, skirts should be within four inches of the knees. Pants and Western apparel are allowable. Footwear should reflect a business or business casual professional look; no slippers, crocs, or slides. You are a professional, look like one.

### Grooming Standards
No unnatural neon or fluorescent hair colors, no nose, lip, or other facial piercings.

### Specific requirements and departure from standards
Certain staff members may be required to meet special dress, grooming and hygiene standards, such as wearing uniforms or protective clothing, depending on the nature of their job.  Uniforms and protective clothing may be required for certain positions. Special events may necessitate a departure from the agency dress code. Supervisors should be consulted to confirm the applicability of specific requirements and departure from the normal agency standards.

**Addressing Related Workplace Problems**

Violations of the policy can range from inappropriate clothing items to offensive perfumes/colognes and body odor. If a staff member comes to work inappropriately groomed or attired, he or she will be required to go home, change into conforming attire, or properly groom, and return to work.

If a staff member's inappropriate attire, poor hygiene or use of offensive perfume/cologne is an issue, the supervisor should first discuss the problem with the staff member in private and should point out the specific areas to be corrected.

If problems with an employee persist, supervisors should follow the normal disciplinary process.  Violation of this agency policy includes remedies up to and including termination.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| STATE OF TEXAS AND THE HERITAGE FOUNDATION, | |
| *Plaintiffs*, | |
| v. | No. 2:24-cv-00173-Z |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chairman of the Equal Employment Opportunity Commission; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | |
| *Defendants*. | |

## DECLARATION OF ERIC KORSVALL

Pursuant to 28 U.S.C. § 1746, I, Eric Korsvall, duly affirm under penalty of perjury as follows:

1.      I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this Declaration.

2.      I serve as Chief Operating Officer for The Heritage Foundation ("Heritage"). My responsibilities include overseeing Heritage's legal compliance, finances and accounting, human resources management, and other administrative operations. As part of my oversight functions, I help ensure proper implementation and compliance with state and federal anti-discrimination laws. That includes reviewing and evaluating rules and regulations promulgated by federal agencies, including the Equal Employment Opportunity Commission ("EEOC" or "Commission"), to determine whether they necessitate policy changes for Heritage. And where such changes are

1

necessary—either because Heritage does not have a policy required by the regulation or has a conflicting policy—I help prepare and execute a plan for bringing Heritage policies into compliance.

3.      Heritage is a 100% mission-aligned, donor-supported, educational organization that formulates and promotes conservative public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense.  Heritage is a non-profit, tax-exempt organization recognized by the IRS under Section 501(c)(3) of the Internal Revenue Code since 1973.

4.      Heritage is an employer subject to the requirements of Title VII.  Heritage employs approximately 300 individuals.

5.      I have reviewed the guidance promulgated by the EEOC on April 29, 2024, entitled, Enforcement Guidance on Harassment in the Workplace ("2024 Guidance"), https://perma.cc/F272-6JTL, which states that "[u]nder Title VII, 'sex' includes … sexual orientation and gender identity." The 2024 Guidance then offers examples of actionable "sex-based harassment," including the "use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)" and "the denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." It also states—in "Example 15"—that it is "harassing conduct … based on … gender identity" if a supervisor requires a biological male employee to wear pants rather than a dress.

6.      Applying the full import of the 2024 Guidance would be antithetical to and violate Heritage's mission and values. To avoid the liability imminently threatened by the EEOC's current understanding of what Title VII requires, as reflected in the 2024 Guidance, and without court

protection, Heritage would need to devote significant time and resources to creating or updating policies, customs, and training programs.

7.      Barring court protection, compliance with the guidance would require Heritage to revise its existing policies regarding workplace discrimination and harassment to account for the myriad examples the 2024 Guidance believes amount to discrimination or harassment on the basis of sexual orientation or gender identity. Heritage would have to update or develop new materials and training programs to reflect those policy changes, as well as develop a program to track the training of its employees on these new policies. Heritage would also need to stand up a new reporting and complaint process for alleged incidents of "misgendering" or bathroom-access disputes.

8.      All of this would require time and resources that Heritage would pay but which would never be recoverable.

9.      Further, Heritage has a dress code that requires employees to "come to work in professional dress, consistent with the mission, culture, business functions, and purpose of Heritage," and historically employees have dressed in a manner traditionally befitting their biological sex.

10.     Heritage also would have to spend money investigating whether it should convert all existing sex-specific bathrooms into single-occupancy bathrooms. That appears to be one possible way to comply with the 2024 Guidance. In the event Heritage concludes such a project is needed, Heritage would have to spend significant financial resources on the conversions. Heritage's headquarters is in downtown Washington, D.C., just a few blocks from the U.S. Capitol, and available space is extremely limited, making any such conversions even costlier. Heritage's headquarters is located in renovated historic buildings originally constructed in the 1920s.

3

Significant modifications to the core of the building where the restrooms are located to accommodate the full import of the 2024 Guidance are likely impossible due to the proximity of the elevator, stair, and electrical stacks.


*Eric Korsvall*
Eric Korsvall

Dated: 10/21/2024

4