**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

STATE OF TEXAS, *et al.*,

                    *Plaintiffs*,

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, *et al.*,

                    *Defendants*.

Case No. 2:24-cv-173-Z

**BRIEF OF SMALL BUSINESS MAJORITY, MAIN STREET ALLIANCE,**
**AND AMERICAN SUSTAINABLE BUSINESS COUNCIL AS *AMICI CURIAE***
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY**
**JUDGMENT AND EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S**
**ANTI-HARASSMENT GUIDANCE**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................iii

INTEREST OF *AMICI CURIAE* .................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT ...................................................................................................... 5

I.   The Anti-Harassment Guidance helps small businesses ensure that they are complying with their obligations under federal workplace civil-rights laws. ............................................................................... 5

II.   The Anti-Harassment Guidance is good for businesses' bottom lines and overall success and is supportive of a healthy economy. ............. 9

III.   Plaintiffs' arguments regarding the burdens imposed by the Anti-Harassment Guidance are unfounded. ............................................... 13

IV.   Enjoining the Anti-Harassment Guidance would sow confusion among employers. ............................................................................................. 15

CONCLUSION................................................................................................ 17

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Baker v. Aetna Life Ins.*,
   228 F. Supp. 3d 764 (N.D. Tex. 2017) ................................................................. 7

*Baldwin v. Dep't of Transp.*,
   EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015) ....................... 7

*Barnes v. City of Cincinnati*,
   401 F.3d 729 (6th Cir. 2005) ................................................................................ 7

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ............................................................................................. 6

*EEOC v. Deluxe Fin. Servs. Corp.*,
   No. 15-cv-02646 (D. Minn. Jan. 20, 2016) ........................................................... 7

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ............................................................................ 7

*Lusardi v. Dep't of the Army*,
   EEOC Appeal No. 0120133385, 2015 WL 1607756 (Apr. 1, 2015) ........................ 7

*Macy v. Dep't of Justice*,
   EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012) ...................... 7

*Mickens v. Gen. Elec. Co.*,
   No. 3:16-cv-00603, 2016 WL 7015665 (W.D. Ky. Nov. 29, 2016) .......................... 7

*Rosa v. Parks W. Bank & Trust Co.*,
   214 F.3d 213 (1st Cir. 2000) ................................................................................ 7

*Schwenck v. Hartford*,
   204 F.3d 1187 (9th Cir. 2000) .............................................................................. 7

**Statutes and Regulations**

3 Colo. Code Regs. § 708-1-81.9(B) ........................................................................... 14

**Other Authorities**

Am. Med. Ass'n & GLMA, *Transgender Individuals' Access to Public Facilities*
   (2018), https://tinyurl.com/yhu4p96x ..................................................................... 14

M.V. Lee Badgett et al., The Relationship Between LGBT Inclusion
   and Economic Development: An Analysis of Emerging Economies
   (2014), https://tinyurl.com/24ryk4jz ....................................................................... 13

**TABLE OF AUTHORITIES—continued**

**Page(s)**

Benevity Impact Labs, The State of Workplace DEI:
How DEI Commitments Impact the Employee Experience (2023),
https://tinyurl.com/rpywhdrh ................................................................. 10

Katie Bevilacqua, *How Small Businesses Can Better Leverage HR*,
SHRM (Jan. 18, 2024), https://tinyurl.com/4u2tk6kt ............................ 9

Taylor N.T. Brown & Jody L. Herman, Williams Inst.,
The Cost of Employment Discrimination Against Transgender
Residents of Florida (2015), https://tinyurl.com/55yu769h ................... 13

Crosby Burns, Ctr. for Am. Progress, The Costly Business of
Discrimination (2012), https://tinyurl.com/mrxye2a7 ......................... 13

Giulia Carbonaro, *America's Labor Shortage is Most Severe
in These 13 States*, Newsweek (Aug. 10, 2023),
https://tinyurl.com/4fz773je .................................................................. 11

Lacey Conner, *The High Cost of Sexual Harassment in the Workplace*,
Axcet HR Sols. (Sept. 25, 2019), https://tinyurl.com/hnpsdaxn ............ 12

EEOC, Enforcement Guidance on Harassment in the Workplace
(2024), https://tinyurl.com/3x8efapr ......................................... 3, 5, 6, 8

EEOC, *Examples of Court Decisions Supporting Coverage of
LGBT-Related Discrimination Under Title VII*,
https://tinyurl.com/ycdhnyth .................................................................. 7

EEOC, *Federal-Sector EEO Cases Involving Sexual Orientation
or Gender Identity (SOGI) Discrimination*,
https://tinyurl.com/476w7ah7 ................................................................ 7

EEOC, *What Laws Does EEOC Enforce?*,
https://tinyurl.com/3jtmvpp7 .............................................................. 2, 3

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in
Public Accommodations: A Review of Evidence Regarding Safety and
Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*,
16 Sexuality Rsch. & Soc. Pol'y 70 (2018),
https://tinyurl.com/2nphs6su ................................................................ 14

Vivian Hunt et al., McKinsey & Co., Diversity Wins:
How Inclusion Matters (2020), https://tinyurl.com/mscj3dx6 .............. 12

Iowa Civ. Rts. Comm'n, Sexual Orientation & Gender Identity: An
Employer's Guide to Iowa Law (2018),
https://tinyurl.com/yb4mhn58 ............................................................... 14

## TABLE OF AUTHORITIES—continued

Page(s)

Matt Krentz et al., Boston Consulting Grp.,
  *Inclusive Cultures Have Healthier and Happier Workers*
  (Sept. 14, 2021), https://tinyurl.com/a465naaf ...................................................... 11

Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S.
  Businesses $1 Trillion*, Gallup.com (Mar. 13, 2019),
  https://tinyurl.com/4tr8zva2 .................................................................................. 11

N.Y. Div. of Hum. Rts., Guidance on Protections from Gender Identity
  Discrimination Under the New York State Human Rights Law
  (2020), https://tinyurl.com/2rrspmv6 ...................................................................... 14

OSHA, Best Practices: A Guide to Restroom Access for Transgender
  Workers (2015), https://tinyurl.com/3eyzcv43 ........................................................ 14

Ramsey Sols., The Small-Business Labor Crisis: 2023 Report (2023),
  https://tinyurl.com/5z2pau62 .................................................................................. 11

Theodore A. Rizzo et al., Int'l Ctr. for Rsch. on Women,
  The Costs of Sex-Based Harassment to Businesses:
  An In-Depth Look at the Workplace (2018) ............................................................ 12

Ahva Sadeghi, *Building a Diverse, Equitable and Inclusive Culture
  for Gen-Z*, Forbes (Sept. 5, 2023), https://tinyurl.com/2deb69rh .......................... 11

Brad Sears et al., Williams Inst.,
  LGBT People's Experiences of Workplace Discrimination and
  Harassment (2021), https://tinyurl.com/34rzrya5 ......................................... 9, 10, 11

Small Bus. Majority, *Scientific Opinion Poll: Small Business Say
  Commonsense Regulations Needed to Ensure a Competitive
  Economy* (May 22, 2018), https://tinyurl.com/2s47w9bf .................................. 9, 15

U.S. GAO, GAO-20-564,
  Workplace Sexual Harassment: Experts Suggest Expanding
  Data Collection to Improve Understanding of Prevalence and
  Costs (2020), https://tinyurl.com/36aztju8 ............................................................ 12

Sarah Warbelow et al., Hum. Rts. Campaign, 2023 State Equality
  Index (2024), https://tinyurl.com/4n4j5jh3 ............................................................ 14

# INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* Small Business Majority, Main Street Alliance, and American Sustainable Business Council represent tens of thousands of businesses across the United States that are relying on the expertise of the U.S. Equal Employment Opportunity Commission and its guidance documents, including the Enforcement Guidance on Harassment in the Workplace ("Anti-Harassment Guidance" or "Guidance"). *Amici* submit this brief to highlight the importance to employers of having greater clarity regarding their obligations under Title VII and analogous federal workplace-anti-discrimination laws, something that is particularly helpful to small businesses like *Amici*'s members. *Amici* provide the following statements of interest:

Small Business Majority is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. Small Business Majority engages a network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth. Small Business Majority's work is bolstered by extensive research and deep connections with the small business community.

Main Street Alliance is a national network of small businesses, which represents approximately 30,000 small businesses across the United States. MSA

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person—besides *Amici* and their counsel—contributed money to the preparation or submission of this brief.

helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy on behalf of small businesses. MSA also seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed.

The American Sustainable Business Council is a multi-issue membership organization comprised of the business and investor community, which collectively represents over 200,000 businesses, the majority of which are small and midsized businesses. ASBC advocates for solutions and policies that support a just, sustainable stakeholder economy. Its mission is to educate, connect, and mobilize business leaders and investors to transform the public and private sectors and the overall economy.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The U.S. Equal Employment Opportunity Commission issues guidance to ensure that employers are aware of their obligations, and employees are aware of their rights, under the federal workplace civil-rights laws that the EEOC enforces. These include Title VII of the Civil Rights Act of 1964, Title I of the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, and the Pregnant Workers Fairness Act of 2022, among others.[3] Together, these statutes

---

[2] Thousands of *Amici*'s small-business members are covered by the EEOC's Guidance.
[3] *See* EEOC, *What Laws Does EEOC Enforce?*, https://tinyurl.com/3jtmvpp7.

prohibit workplace discrimination, including harassment, on the basis of race, color, religion, sex (including pregnancy, childbirth and related medical conditions, sexual orientation, and gender identity), national origin, disability, genetic information, and age.[4]

In April 2024, following a notice-and-comment period, the EEOC finalized its Enforcement Guidance on Harassment in the Workplace—an update of earlier enforcement-guidance documents that were more than 25 years old.[5] The Guidance covers a range of helpful topics regarding the parameters of the law. For example, the Guidance explains what conduct amounts to unlawful harassment, including how harassment may be based on the expression of traits related to an employee's race, sex, or other protected characteristic. The Guidance also provides reminders regarding employers' responsibility to address harassment by third parties, like customers and vendors. And it reminds employers that implementing EEO policies and training, including providing multiple avenues for complaints, can help them to avoid liability in the context of harassment claims.

One key update—and the subject of Plaintiffs' challenge in this case—is that the Guidance includes now-longstanding federal legal protections for LGBTQ+ employees, and it provides examples of prohibited harassment based on sexual orientation and gender identity. Plaintiffs reject the Guidance's reminders that, for

---

[4] *Id.*

[5] *See* EEOC, Enforcement Guidance on Harassment in the Workplace (2024), https://tinyurl.com/3x8efapr. As the Anti-Harassment Guidance explains, it consolidates and supersedes several earlier EEOC policy and enforcement documents issued between 1987 and 1999. *Id.*

example, purposefully and repeatedly misgendering an employee with the wrong name or pronouns can be a form of unlawful sex-based harassment, and that denying an employee access to a bathroom or changing room consistent with the employee's gender identity could amount to unlawful sex-based harassment. *See* Pls.' Br. 14-17, 22-25.

Plaintiffs are wrong as a matter of law because, as the EEOC explains, the Guidance imposes no new obligations on regulated entities but merely provides examples of harassment that may create hostile work environments, so that employers can work to prevent and address them consistent with Title VII and analogous statutes and relevant precedents. *See* EEOC Br. 5-7, 22-25.

*Amici* write to provide several additional points from the regulated business community. First, small businesses benefit from the Anti-Harassment Guidance, which helps them understand and comply with their obligations under federal civil-rights laws. Next, the Guidance is good for business. Complying with civil-rights laws, particularly those that guard against sexual-orientation and gender-identity harassment in the face of widespread harassment against LGBTQ+ workers, fosters more inclusive workplaces. Maintaining a workplace that addresses and prevents harassment helps to attract, hire, and retain workers of diverse backgrounds,[6] improve worker performance, and reduce turnover—all of which, in return, improves bottom lines, drives business success, and boosts the economy. Further,

---

[6] *Amici* use the terms "diverse" and "diversity" herein to refer to a range of backgrounds and identities, including racial, gender, disability, age, and LGBTQ+ identities.

contrary to Plaintiffs' arguments, the costs of implementing the Anti-Harassment Guidance are minimal. But the costs of enjoining the Guidance are substantial. Businesses appreciate clear guidance, which the Anti-Harassment Guidance provides, to help them comply with the laws by which they are bound. And Plaintiffs' interpretation would lead to the bizarre conclusion that harassment on the basis of a person's sexual orientation or gender identity would somehow be allowed whereas harassment on the basis of any other legally protected class, like race, disability, or religion, would not. Enjoining the Anti-Harassment Guidance would confuse employers about their obligations under federal civil-rights laws.

*Amici* urge the Court to deny Plaintiffs' motion for summary judgment, grant the EEOC's cross-motion for summary judgment, and allow small businesses and employers around the nation to benefit from the helpful clarifications and examples contained in the Anti-Harassment Guidance.

## ARGUMENT

### I.    The Anti-Harassment Guidance helps small businesses ensure that they are complying with their obligations under federal workplace civil-rights laws.

EEOC's Anti-Harassment Guidance provides—for the first time in 25 years— updated guidance for employers regarding the current legal standards and scope of liability applicable to workplace-harassment claims.[7] The Guidance reflects several advancements in the law in the intervening decades.

---

[7] *See* Anti-Harassment Guidance, *supra* note 5.

It explains, for example, that race-based harassment may include harassment based not just on the fact of an employee's race, but also "traits or characteristics linked to an individual's race," including an employee's "name, cultural dress, accent or manner of speech, and physical characteristics, including . . . hair textures and hairstyles."[8] It provides updates on pregnancy-related harassment, including harassment based on things like morning sickness and lactation.[9] The Guidance explains that employers face liability for harassing conduct perpetrated by non-employees and third parties, including that carried out by an employer's independent contractors, clients, or customers.[10] And, recognizing the prevalence of remote and hybrid work environments, the Guidance clarifies the contours of harassing conduct that is conveyed via videoconferencing platforms, social media, and other digital-media sources.

The subject of Plaintiffs' challenge in this case is the guidance related to harassment against LGBTQ+ people in the workplace. In *Bostock v. Clayton County*,[11] the Supreme Court held that Title VII's protections against sex discrimination includes protections against discrimination based on sexual orientation and gender identity. Additionally, the EEOC's history of enforcing Title VII to protect LGBTQ+ persons in the workplace goes back to at least 2011 and long predates the Supreme Court's confirmation of these protections in 2020 in

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] 590 U.S. 644 (2020).

*Bostock*.[12] And the EEOC was hardly out on a limb; long before *Bostock*, federal courts—including in this District—held that Title VII prohibits discrimination against LGBTQ+ workers.[13] In so doing, both the EEOC and courts interpreted Title VII to encompass not just discrimination and harassment based on the fact of a person's gender identity or sexual orientation, but also sex harassment stemming from the expression of those characteristics, including the intentional use of names or pronouns inconsistent with the employee's gender; exclusion from bathrooms, changing rooms, or other sex-segregated facilities that align with the employee's gender; and adherence to dress codes.[14] The updated Guidance reflects those important applications of Title VII's prohibition on sex harassment against LGBTQ+ workers in line with federal court precedents around the nation.

---

[12] *See, e.g.*, *Macy v. Dep't of Justice*, EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012) (discrimination based on employee's transgender identity is sex-based discrimination in violation of Title VII); *Baldwin v. Dep't of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015) (discrimination based on sexual orientation is sex-based discrimination in violation of Title VII); *see also* EEOC, *Federal-Sector EEO Cases Involving Sexual Orientation or Gender Identity (SOGI) Discrimination*, https://tinyurl.com/476w7ah7 (cataloging EEOC decisions from 2011 to the present holding that sexual-orientation and gender-identity discrimination violate Title VII).

[13] *See, e.g.*, *Baker v. Aetna Life Ins.*, 228 F. Supp. 3d 764, 770-71 (N.D. Tex. 2017); *see also Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005); *Rosa v. Parks W. Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000); *Schwenck v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000); EEOC, *Examples of Court Decisions Supporting Coverage of LGBT-Related Discrimination Under Title VII*, https://tinyurl.com/ycdhnyth.

[14] *See, e.g.*, *Mickens v. Gen. Elec. Co.*, No. 3:16-cv-00603-JHM, 2016 WL 7015665 (W.D. Ky. Nov. 29, 2016) (single-sex bathroom use); *EEOC v. Deluxe Fin. Servs. Corp.*, No. 15-cv-02646 (D. Minn. Jan. 20, 2016) (pronoun use); *Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133385, 2015 WL 1607756 (Apr. 1, 2015) (pronoun use).

The Guidance addresses each element of a workplace-harassment claim, including whether and when conduct qualifies as harassing conduct based on an employee's legally protected characteristic; whether it resulted in a change in the terms, conditions, or privileges of employment or created a hostile work environment; and whether the employer is liable for the conduct. And, crucially, throughout the Guidance, the EEOC has provided 77 examples of hypothetical scenarios (including some pertaining to LGBTQ+ workers specifically) to demonstrate the contours of the protections, the type of conduct that rises to the level of actionable harassment, or not, and remedial or corrective actions that an employer should take in response to a given situation.[15]

Contrary to Plaintiffs' insistence, the Guidance breaks no new legal ground. The Guidance is just that—explanatory guidance to help employers ensure that they are complying with existing federal workplace civil-rights laws and to help employees understand their rights and protections under these laws. Employers, including many of *Amici*'s members, use this information to inform their workplace anti-harassment policies and to understand how the EEOC makes enforcement determinations under Title VII and other analogous civil-rights laws by which they are bound.

---

[15] *See* Anti-Harassment Guidance, *supra* note 5.

8

Small businesses, like many of *Amici*'s members, value the Anti-Harassment Guidance.[16] Our members often lack the resources to retain counsel for compliance assistance, sometimes lacking even Human Resources personnel to track and shift practices based on evolving employment law and related litigation risks given the overall landscape.[17] Easy-to-understand guidance that recounts the rules of the road and provides explanatory examples reduces the costs and burden on small businesses and helps employers comply with legal requirements. And, for a small business, anything that reduces risk and increases stability and predictability makes opening, survival, and growth more possible. Any decrease in costs can be beneficial to a small business, where margins can be slim and incomes modest.

## II. The Anti-Harassment Guidance is good for businesses' bottom lines and overall success and is supportive of a healthy economy.

Alongside the harms to workers themselves,[18] harassment in the workplace—specifically harassment against LGBTQ+ workers—has enormous ramifications for

---

[16] Indeed, research by *Amicus* Small Business Majority shows that "an overwhelming majority of small employers" value regulation as a means to even the playing field, and do not view it as a hindrance to business success. Small Bus. Majority, *Scientific Opinion Poll: Small Business Say Commonsense Regulations Needed to Ensure a Competitive Economy* (May 22, 2018), https://tinyurl.com/2s47w9bf.

[17] *See* Katie Bevilacqua, *How Small Businesses Can Better Leverage HR*, SHRM (Jan. 18, 2024), https://tinyurl.com/4u2tk6kt.

[18] Despite legal protections for LGBTQ+ workers, workplace harassment based on sexual orientation and gender identity persists. Nearly half of LGBTQ+ workers report that they have experienced mistreatment in the workplace based on their sexual orientation or gender identity. *See, e.g.*, Brad Sears et al., Williams Inst., LGBT People's Experiences of Workplace Discrimination and Harassment 5 (2021), https://tinyurl.com/34rzrya5. These experiences affect the nature and trajectory of LGBTQ+ workers' participation in the workforce: LGBTQ+ employees have reported staying in jobs for which they are overqualified, declining to seek promotions, quitting

employers, resulting in higher rates of turnover, people leaving the workforce, and, ultimately, less diverse workplaces. Mitigating workplace harassment, including through reliance on guidance from the EEOC, attracts people from a range of backgrounds into the workforce, improves employee performance, reduces turnover, and reduces the monetary and reputational costs of charges of discrimination and related litigation. Workforces that draw employees from a range of racial, gender, LGTBQ+, disability, and other backgrounds drive business success and bolster economic growth. *Amici* and their members understand that the Anti-Harassment Guidance is not just a helpful tool to ensure their compliance with federal law; it's good for business.

The business advantages of mitigating harassment and fostering diversity are many. Critically, employers' ability to cultivate a workplace free of harassment and other forms of discrimination is crucial to bringing LGBTQ+ people into the workplace and to reducing turnover. Workers are more willing to enter and stay in the workforce when they do not fear discrimination and harassment at every corner. And surveys show that people *want* to work for employers who prioritize diversity and inclusion in the workplace—it is a "business-critical investment" for employers.[19] Moreover, the importance of reducing employee turnover and

---

jobs in response to harassment, and removing themselves from the workforce altogether. *See id.*

[19] Benevity Impact Labs, The State of Workplace DEI: How DEI Commitments Impact the Employee Experience 3 (2023), https://tinyurl.com/rpywhdrh (finding that "95% of employees now weigh a prospective employer's DEI efforts when choosing between job offers with similar salary and benefits" and that "78% . . . would not

promoting employee retention can scarcely be overstated. Businesses today—
particularly small businesses—are grappling with persistent worker shortages.[20]
Incentivizing worker retention is therefore a critical goal for all businesses. And
when employers are able to retain their existing employees, it saves employers
money on recruiting and training new employees.[21] *Amici* believe that the Guidance
will serve that aim, promoting employee retention, reducing absenteeism, and
solidifying strong equity values in jobseekers pursuing healthy workplace
cultures.[22]

Further, as *Amici* know, workplaces free of harassment will not just foster
employee retention, but will lead to healthier, more productive, and better-
performing employees able to participate fully and freely in the workplace.[23]

And finally, having greater clarity around workplace civil-rights protections,
including for LGBTQ+ workers, saves employers costs associated with employee

---

consider working for a company that fails to commit significant resources to
prioritizing DEI initiatives").

[20] *See* Ramsey Sols., The Small-Business Labor Crisis: 2023 Report 3 (2023),
https://tinyurl.com/5z2pau62 (noting that 11.3 million small-business owners report
struggling to find the employees they need); Giulia Carbonaro, *America's Labor
Shortage is Most Severe in These 13 States*, Newsweek (Aug. 10, 2023),
https://tinyurl.com/4fz773je.

[21] Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Businesses $1
Trillion*, Gallup.com (Mar. 13, 2019), https://tinyurl.com/4tr8zva2 (noting that "[t]he
cost of replacing an individual employee can range from one-half to two times the
employee's annual salary").

[22] Ahva Sadeghi, *Building a Diverse, Equitable and Inclusive Culture for Gen-Z*,
Forbes (Sept. 5, 2023), https://tinyurl.com/2deb69rh.

[23] *See, e.g.*, Matt Krentz et al., Boston Consulting Grp., *Inclusive Cultures Have
Healthier and Happier Workers* (Sept. 14, 2021), https://tinyurl.com/a465naaf; Brad
Sears et al., Williams Inst., LGBT People's Experiences of Workplace Discrimination
and Harassment, *supra* note 18, at 23-24.

complaints, enforcement actions, and litigation.[24] Aside from incurring legal fees, employers face reputational and publicity costs stemming allegations of harassment, which in turn may "driv[e] away customers, investors, and potential talent."[25]  As described above, the Anti-Harassment Guidance is a valuable resource to help employers make sense of legal developments over the last several decades and, in turn, fulfill their obligations under Title VII and related civil-rights laws to prevent and address harassment. The reduction of enforcement-related costs is all the more important for many of *Amici*'s members, small businesses without disposable resources to pour into legal and compliance tracking, and margins that can ill-accommodate costly enforcement proceedings.

Ultimately, workplaces composed of employees from across a range of backgrounds—made possible only by, among other things, employers' ability to protect their employees from workplace harassment—benefit from improved collaboration, creativity, and innovation in the workplace and, in turn, promote economic growth.[26] Diversity in the workplace, meaning the inclusion of workers from a range of backgrounds and lived experiences, helps drive business success.

---

[24] Lacey Conner, *The High Cost of Sexual Harassment in the Workplace*, Axcet HR Sols. (Sept. 25, 2019), https://tinyurl.com/hnpsdaxn (noting that companies regularly expend "upwards of $100,000 to defend against" a harassment claim).
[25] U.S. GAO, GAO-20-564, Workplace Sexual Harassment: Experts Suggest Expanding Data Collection to Improve Understanding of Prevalence and Costs 26 (2020), https://tinyurl.com/36aztju8 (quoting Theodore A. Rizzo et al., Int'l Ctr. for Rsch. on Women, The Costs of Sex-Based Harassment to Businesses: An In-Depth Look at the Workplace 6-7 (2018)).
[26] *See, e.g.*, Vivian Hunt et al., McKinsey & Co., Diversity Wins: How Inclusion Matters (2020), https://tinyurl.com/mscj3dx6 (explaining the economic benefits of diversity in employers' leadership).

Allowing workplace harassment to go unaddressed, by contrast, takes a material and financial toll on businesses and the economy as a whole.[27] As *Amici* and their members well know, tools like the Anti-Harassment Guidance that help businesses prevent and address workplace harassment are good for their bottom lines and overall success.

## III.    Plaintiffs' arguments regarding the burdens imposed by the Anti-Harassment Guidance are unfounded.

Plaintiffs contend that the Anti-Harassment Guidance would burden employers and create irreconcilable tension between federal and state law. They claim that enforcing the mandates of Title VII as explained by the Guidance "makes them responsible for determining and then monitoring the gender identities of their employees." Pls.' Br. 27-28. They argue that the Guidance subjects employers to workplace challenges and saddles them with the task of "review[ing] and revis[ing]" their compliance and training materials and workplace-harassment protocols. *Id.* at 32. They also contend that the Guidance infringes on Texas's state sovereignty by forcing the state "to abandon its laws and policies" governing things like pronoun usage and access to sex-segregated facilities. *Id.* at 32 (internal quotation marks omitted). Their arguments regarding these supposed burdens are unfounded.

---

[27] *See, e.g.,* Crosby Burns, Ctr. for Am. Progress, The Costly Business of Discrimination (2012), https://tinyurl.com/mrxye2a7; Taylor N.T. Brown & Jody L. Herman, Williams Inst., The Cost of Employment Discrimination Against Transgender Residents of Florida (2015), https://tinyurl.com/55yu769h; *cf.* M.V. Lee Badgett et al., The Relationship Between LGBT Inclusion and Economic Development: An Analysis of Emerging Economies (2014), https://tinyurl.com/24ryk4jz.

The rights and obligations that Plaintiffs suggest are so burdensome in fact already exist in approximately half the nation's states and scores of localities—and have for years.[28] By way of example, for more than a decade, Colorado regulations have required employers to "allow individuals the use of gender-segregated facilities that are consistent with their gender identity."[29] Iowa's Civil Rights Commission mandates that employees have access to bathroom facilities consistent with their gender identity.[30] In New York, the intentional misgendering of an employee violates state employment-nondiscrimination protections.[31] Additionally, contrary to Plaintiffs' baseless suggestion, nondiscrimination laws that protect transgender people's access to restrooms that align with their gender identity do not pose a threat to others' privacy or safety.[32]

---

[28] *See* Sarah Warbelow et al., Hum. Rts. Campaign, 2023 State Equality Index (2024), https://tinyurl.com/2p8xaxf3; *see also, e.g.*, OSHA, Best Practices: A Guide to Restroom Access for Transgender Workers (2015), https://tinyurl.com/3eyzcv43.

[29] 3 Colo. Code Regs. § 708-1-81.9.

[30] Iowa Civ. Rts. Comm'n, Sexual Orientation & Gender Identity: An Employer's Guide to Iowa Law (2018), https://tinyurl.com/yb4mhn58.

[31] *See* N.Y. Div. of Hum. Rts., Guidance on Protections from Gender Identity Discrimination Under the New York State Human Rights Law 6-7 (2020), https://tinyurl.com/2rrspmv6.

[32] *See, e.g.*, Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70, 81 (2018), https://tinyurl.com/2nphs6su (such "fears of increased safety and privacy violations . . . are not empirically grounded"); *id.* at 81 (results from 2018 study showing that "the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces"); Am. Med. Ass'n & GLMA, *Transgender Individuals' Access to Public Facilities* (2018), https://tinyurl.com/yhu4p96x (American Medical Association report concluding that "no evidence exists" to support claims that those engaging in sexual violence "will take advantage of public accommodation laws" to target women and children).

14

And regardless, as discussed above, with regard to federal law, the Anti-Harassment Guidance does not create new law or change existing law—it explains existing legal principles regarding protections against harassment in the workplace. While the Guidance may provide clarifying examples of conduct that amounts to harassment on the basis of sex, it does not impose new obligations on Plaintiffs or other businesses for that matter, but only underscores that those obligations already exist, and have since at least 2020 (as confirmed by the Supreme Court in *Bostock*), if not before. Hence, employers around the country are *already* required to comply with them. And insofar as Plaintiffs have state laws, or employment policies or guidance of their own, that are inconsistent with the Guidance's explanation of the contours of Title VII, those inconsistencies would not be remedied by enjoining the Guidance. They will continue to exist because federal law through Title VII and the body of case law pre- and post-dating *Bostock* interpreting Title VII continues to exist and govern the actions of these and other employers.

## IV. Enjoining the Anti-Harassment Guidance would sow confusion among employers.

Allowing the Guidance to remain in effect will not burden employers; enjoining it stands to harm and confuse them, particularly small businesses like *Amici*'s members. As an initial matter, employers *appreciate* guidance that helps them ensure that they are not running afoul of their legal obligations, including their obligations to prevent and address workplace harassment.[33]

---

[33] *See, e.g.*, Small Bus. Majority, *Scientific Opinion Poll*, *supra* note 16.

Moreover, Plaintiffs push a confused, dual-track legal framework for interpreting Title VII and the other relevant civil-rights statutes that treats the harassment of LGBTQ+ workers differently than members of other protected classes. In the ordinary course, if a worker is protected against discrimination based on a protected characteristic—whether race, color, religion, sex, national origin, disability, age, or genetic information—it is also illegal under the civil-rights laws to harass them based on that protected characteristic. But under Plaintiffs' interpretation, the standard for what may constitute cognizable gender-identity or sexual-orientation harassment under Title VII does not mirror what constitutes cognizable discrimination under Title VII more broadly. Under Plaintiffs' theory of Title VII, for example, harassment on the basis of a person's sexual orientation or gender identity, even when severe or pervasive, may be legal, while harassment tied to all of the other protections named in the law is not. That is not how civil-rights laws work.

Such a carve-out is not just legally incorrect but also burdensome on the good-faith efforts of employers, particularly small businesses, to comply with the requirements of the federal employment civil-rights laws. And because, as described above, the Anti-Harassment Guidance does not create new law or change existing law, enjoining the law would only leave employers like *Amici*'s members confused about their legal obligations. Plaintiffs' proffered interpretation of the civil-rights laws only serves to sow confusion and add compliance costs, imposing an

16

unnecessary burden on employers, particularly small businesses that lack a range of employment-law experts at their command.

Employers desire and deserve the helpful information contained in the Anti-Harassment Guidance to help ensure that they are complying with federal civil-rights mandates, and workers likewise deserve the benefits of clearly articulated guidance regarding these protections. Accepting Plaintiffs' arguments and enjoining the Anti-Harassment Guidance would undermine both of these worthy interests.

## CONCLUSION

For the foregoing reasons, *Amici* urge the Court to deny Plaintiffs' motion for summary judgment and grant the Defendants' cross-motion for summary judgment.

Dated: November 20, 2024                 Respectfully submitted,

*s/ Sarah R. Goetz*
_____

Sarah R. Goetz*
Sunu P. Chandy*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 383-0794
sgoetz@democracyforward.org
schandy@democracyforward.org

*Pro hac vice* application forthcoming

*Counsel for* Amici Curiae

**CERTIFICATE OF SERVICE**

I certify that on November 20, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

Dated: November 20, 2024

*s/ Sarah R. Goetz*
_____