**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS and<br>THE HERITAGE FOUNDATION,<br>    *Plaintiffs*,<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION; CHARLOTTE A.<br>BURROWS, in her official capacity as Chair of<br>the Equal Employment Opportunity<br>Commission; and MERRICK B. GARLAND,<br>in his official capacity as Attorney General of<br>the United States,<br><br>    *Defendants*. | Case No. 2:24-cv-173-Z |

**FILED**

**November 26, 2024**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

**[PROPOSED] BRIEF OF AMICI CURIAE THE NATIONAL WOMEN'S LAW CENTER
AND FIFTEEN NONPROFIT ORGANIZATIONS ADVOCATING FOR GENDER
JUSTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO SUMMARY
JUDGMENT**

_____

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Interest of Amici Curiae ...................................................................................................... 1

Introduction ......................................................................................................................... 1

Argument ............................................................................................................................. 3

   I.   The Harassment Guidance Reflects Title VII's Guarantee of Protection Against Gender-Identity-Based Workplace Harassment ............................................................... 3

   II.  The Plaintiffs' Requested Relief Would Harm the Public Interest by Creating Confusion About the Application of Title VII and Leaving Workers More Vulnerable to Harassment .................................................................................................................. 5

     A.  The Harassment Guidance provides practical advice about the application of Title VII and *Bostock*. ............................................................................................... 5

     B.  The Harassment Guidance is critically needed because discrimination, including harassment, against transgender and nonbinary workers is widespread. ......................... 7

        1. Workplace harassment remains widespread even after *Bostock*. ............................... 7

        2. Workplace harassment on the basis of gender identity takes a variety of forms. ........ 8

        3. Growing animus and rising violence against transgender and nonbinary people underscore the importance of the Harassment Guidance. ........................................... 16

     C.  Gender-identity-based harassment harms transgender and nonbinary workers' mental and physical well-being and can force them out of the workplace. ............................... 17

   III.  The Balance of Equities Weighs Against the Requested Relief. ..................................... 20

Conclusion ......................................................................................................................... 22

Certificate of Compliance .................................................................................................. 23

Certificate of Service ......................................................................................................... 24

Appendix A: List of Amici ............................................................................................... A-1

## TABLE OF AUTHORITIES

**Cases**

*E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444 (5th Cir. 2013)...................................... 15
*Bostock v. Clayton County*, 590 U.S. 644 (2020) ............................................... 2, 3, 15
*Clark v. United Parcel Serv., Inc.*, 400 F.3d 341 (6th Cir. 2005)................................ 6
*Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766 (11th Cir. 2024) ........................... 9, 10, 13
*Corbitt v. Sec'y of the Ala. L. Enf't Agency*, 115 F.4th 1335 (11th Cir. 2024)............... 13
*Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981 (8th Cir. 2002)............................. 21
*Doe v. Arizona*, No. CV-15-02399-PHX-DGC, 2016 WL 1089743 (D. Ariz. Mar. 21, 2016).... 11
*Doe v. Arizona*, No. CV-18-00384-PHX-GMS, 2019 WL 2929953 (D. Ariz. July 8, 2019)  11, 13
*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3rd Cir. 2018) ............................. 14
*Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154 (D. Md. 2022).................. passim
*Garrett v. Kohls Distrib. eFulfillment Ctr.*, No. 3:23-cv-2525, 2024 WL 3237184 (N.D. Tex. June 7, 2024), *report and recommendation adopted*, 2024 WL 3240656 (N.D. Tex. June 28, 2024)........................................................................ 11
*Henderson v. Simmons Foods, Inc.*, 217 F.3d 612 (8th Cir. 2000)............................... 6
*Lammers v. Pathways To a Better Life, LLC*, No. 18-C-1579, 2021 WL 3033370 (E.D. Wisc. 2021)................................................................................ 12
*Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (EEOC Apr. 1, 2015)................................................................................ 10
*Membreno v. Atlanta Rest. Partners*, 517 F. Supp. 3d 425 (D. Md. 2021) ..................... 14
*Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57 (1986)........................................... 2
*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................ 5
*Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864 (9th Cir. 2001) .......................... 10
*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)................................. 2
*Parker v. Strawser Constr.*, 307 F. Supp. 3d 744 (S.D. Ohio 2022) ........................... 15
*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)........................................... 15, 16
*Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001 (D. Nev. 2016)...................... 9
*Shiyan Jiang v. Tex. Comm'n on Env't Quality*, 321 F. Supp. 3d 738 (W.D. Tex. 2018) ................................................................................ 7
*Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 910 (D. Md. 2017), *aff'd in relevant part*, 716 F. App'x 164 (4th Cir. 2017)........................................................... 6


**Statutes**

42 U.S.C. § 2000e-2(a)(1)........................................................................ 1


**Other Authorities**

*Anti-Transgender Legislation*, EQUALITY FEDERATION (last accessed Nov. 15, 2024), https://www.equalityfederation.org/tracker/cumulative-anti-transgender.................... 17
Am. Med. Ass'n & GLMA, *Transgender individuals' access to public facilities* (2018), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf ................................................................................................ 21
Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and*

*Changing Rooms*, 16 Sexuality Rsch. and Soc. Pol'y 70 (July 23, 2018),
https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4b
d4d27fbbcb.pdf; ......................................................................................................................... 21

Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization*: *National Crime
Victimization Survey, 2017-2018*, AM. J. PUB. HEALTH (2021),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7958056/pdf/AJPH.2020.306099.pdf ........ 13

Ann Hergatt Huffman et al., *Workplace support and affirming behaviors: Moving toward a
transgender, gender diverse, and non-binary friendly workplace*, 22 INT'L J. TRANSGENDER
HEALTH 225 (2021),
https://pmc.ncbi.nlm.nih.gov/articles/PMC8118231/pdf/WIJT_22_1861575.pdf ................. 19

Beatriz P. Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its
Violence*, 6 FRONTIERS IN SOCIOLOGY 1 (Mar. 31, 2021),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8022685/pdf/fsoc-06-652777.pdf ............. 17

Brad Sears et al., *LGBT People's Experiences of Workplace Discrimination and Harassment*,
THE WILLIAMS INST., 12 (Sept. 2021), https://williamsinstitute.law.ucla.edu/wp-
content/uploads/Workplace-Discrimination-Sep-2021.pdf...................................... 8, 11, 12, 19

Caroline Medina & Lindsay Mahowald, *Discrimination and Barriers to Well-Being: The State of
the LGBTQI+ Community in 2022*, CTR. FOR AM. PROGRESS (Jan. 12, 2023),
https://www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-
of-the-lgbtqi community-in-2022/....................................................................... 2, 7, 8, 18

Chan Tov McNamarah, *Cis-Woman-Protective Arguments*, 123 COLUM. L. REV. 845 (2023) ... 17

Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. REV. DISCOURSE 40 (2020)11

Chase Strangio, *Deadly Violence Against Transgender People Is on the Rise. The Government
Isn't Helping,* AM. CIVIL LIBERTIES UNION (Aug. 21, 2018), https://www.aclu.org/news/lgbtq-
rights/deadly-violence-against-transgender-people-rise. ........................................................ 20

Cullen Peele, *Roundup of Anti-LGBTQ+ Legislation Advancing In States Across the Country*,
HUMAN RIGHTS CAMPAIGN (May 23, 2023), https://www.hrc.org/press-releases/roundup-of-
anti-lgbtq-legislation-advancing-in-states-across-the-country ............................................... 16

*Deadname*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/deadname (last accessed Nov. 15, 2024).......................................... 10

E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People,
Version 8, INT'L J. OF TRANSGENDER HEALTH (2022),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9553112/pdf/WIJT_23_2100644.pdf... 10, 18

Elizabeth Keohan, *Misgendering: Exploring the Harmful Impact of It*, TALKSPACE (Sept. 8,
2023), https://www.talkspace.com/blog/misgendering-impact/............................................... 10

Enforcement and Litigation Statistics, U.S. EQUAL EMP. OPPORTUNITY COMM'N,
https://www.eeoc.gov/data/enforcement-and-litigation-statistics-0.......................................... 5

*FBI Releases 2022 Hate Crime Statistics*, U.S. DEP'T OF JUSTICE (last updated Sept. 23, 2024),
https://www.justice.gov/hatecrimes/hate-crime-statistics-2022............................................... 16

Joanne Stephane et al., *Uncovering culture: A call to action for leaders*, DELOITTE DEV. LLC
(2023), https://www2.deloitte.com/content/dam/Deloitte/us/Documents/about-deloitte/dei/us-
uncovering-culture-a-call-to-action-for-leaders.pdf?dl=1.................................................. 19, 20

Julie Moreau, "*Laughed out of interviews": Trans Workers Discuss Job Discrimination*, NBC
NEWS (Oct. 6, 2019, 2:22 PM), https://www.nbcnews.com/feature/nbc-out/laughed-out-
interviews-trans-workers-discuss-job-discrimination-n1063041............................................. 14

Julie Moreau, *No link between trans-inclusive policies and bathroom safety, study finds,* NBC News (Sept. 19, 2018), ................................................................................................................ 21

Kelly Hayes, *"'Gay is not a permanent thing': Legislature passes bill to restrict LGBTQ topics in elementary schools,"* FLORIDA POLITICS (Mar. 9, 2022), https://floridapolitics.com/archives/505744-gay-is-not-apermanent-thing-legislature-sends-controversial-parental-rights-bill-to-governor/ ........................................................................ 17

Kevin A. McLemore, *Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, SELF AND IDENTITY (2014). ................................................................. 11

Lily Zheng, *Transgender, Gender-Fluid, Nonbinary, and Gender-Nonconforming Employees Deserve Better Policies*, HARVARD BUS. REV. (Nov. 20, 2020), https://hbr.org/2020/11/transgender-gender-fluid-nonbinary-and-gender-nonconforming-employees-deserve-better-policies. ...................................................................... 16

M. Killian Kinney et al., *Improving "Life Chances": Surveying the Anti-Transgender Backlash, and Offering a Transgender Equity Impact Assessment Tool for Policy Analysis*, THE JOURNAL OF LAW, MEDICINE & ETHICS, 50(3): 489-508 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9679585/pdf/S1073110522000894a.pdf.... 15

M.V. Lee Badgett et al., *The Business of LGBT-Supportive Workplace Policies*, THE WILLIAMS INSTITUTE (May 2013), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Support-Workplace-May-2013.pdf ................................................................... 19

*Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2024*, AM. CIVIL LIBERTIES UNION (last accessed Nov. 15, 2024), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2024 ................................................................................................................................. 17

Meredith Russo, *What It Feels Like to Use the Wrong Bathroom*, N.Y. TIMES (May 24, 2016), https://www.nytimes.com/2016/05/24/opinion/what-it-feels-like-to-use-the-wrong-bathroom.html. ................................................................................................................... 14

Rachel Dowd, *Transgender people over four times more likely than cisgender people to be victims of violent crime*, THE WILLIAMS INST., (Mar. 23, 2021), https://williamsinstitute.law.ucla.edu/press/ncvs-trans-press-release/. .................................. 13

Sandy E. James et al., *Early Insights: A Report of the 2022 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUALITY, 21 (Feb. 2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf.... 20

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUALITY (2016, updated Dec. 2017), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf....... 8, 9, 20

Steve Crabtree, *Global Study: 23% of Workers Experience Violence, Harassment*, GALLUP (Dec. 14, 2022), https://news.gallup.com/opinion/gallup/406793/global-study-workers-experience-violence-harassment.aspx................................................................................................................ 9

*The Epidemic of Violence Against the Transgender and Gender Non-Conforming Community in the United States: The 2023 Report*, HUMAN RIGHTS CAMPAIGN FOUNDATION (Nov. 2023), https://reports.hrc.org/an-epidemic-of-violence-2023. .................................................. 16

*What does "cisgender" mean?*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/wordplay/cisgender-meaning (last accessed Nov. 14, 2024).............................. 10

*Why Deadnaming Is Harmful*, CLEVELAND CLINIC (Nov. 17, 2021), https://health.clevelandclinic.org/deadnaming. ...................................................................... 10

## INTEREST OF AMICI CURIAE

Amici The National Women's Law Center ("NWLC") and fifteen nonprofit organizations advocate for workers' rights, gender justice, and robust enforcement of anti-discrimination and labor laws. Amici routinely participate in cases before federal district and appellate courts to advance the rights and protections of women, girls, and LGBTQI+ people. The relief Plaintiffs seek in this case would undermine efforts to combat widespread workplace discrimination against transgender and nonbinary individuals that causes them direct and devastating harm. Amici thus submit this brief in support of Defendants' opposition to Plaintiffs' shortsighted request. A listing of amici curiae and their statements of interest is attached as Appendix A.

## INTRODUCTION

In its April 2024 Enforcement Guidance on Harassment in the Workplace ("Harassment Guidance"), ECF No. 31 (App. 19),[1] the Equal Employment Opportunity Commission ("EEOC") reminds employers across the country to do something both simple and totally free: not disrespect the basic humanity of their employees and not allow coworkers to do so either. This request—well within bounds of the agency's authority and Supreme Court precedent— extends to *all* workers of every color, creed, and sex. In asking this Court to single out transgender and nonbinary workers for lesser treatment, Plaintiffs seek to deny them the same basic respect and humanity afforded their coworkers. This Court should deny that request.

Title VII's broad remedial mandate prohibits sex discrimination against "any individual" in hiring, firing, or the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long recognized that this prohibition includes sex-based

---

[1] Also available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace.

harassment, including same-sex harassment and "harassing conduct [not] motivated by sexual desire." *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 64-66 (1986); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 80 (1998).

In *Bostock v. Clayton County*, the Supreme Court confirmed that Title VII's prohibitions extend to transgender and nonbinary people because an individual's gender identity is "inextricably bound up with sex." 590 U.S. 644, 655, 658, 660-61, 669 (2020). The EEOC's Harassment Guidance operationalizes that mandate, providing that "sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed," and detailing examples to guide Title VII enforcement efforts. Dkt. No. 1-1 at 17.

Despite Title VII's plain language and the Supreme Court's holding in *Bostock*, transgender and nonbinary workers endure widespread and severe workplace harassment because of their gender identity. By one measure, 70% of transgender workers reported experiencing discrimination or harassment in the past year alone.[2] This harassment can take a variety of forms, including but not limited to intentional misgendering, epithets, physical and sexual assault, threats, property damage, stereotyping, and denial of access to bathrooms and other facilities. As numerous recent court decisions illustrate, transgender and nonbinary workers frequently experience gender-identity-based harassment in multiple forms, often at the same time and for an extended period. The widespread and severe harassment these workers suffer harms not only their access to employment opportunities, but also their mental, physical, and financial wellbeing.

---

[2] Caroline Medina & Lindsay Mahowald, *Discrimination and Barriers to Well-Being: The State of the LGBTQI+ Community in 2022*, CTR. FOR AM. PROGRESS (Jan. 12, 2023), https://www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-of-the-lgbtqi community-in-2022/.

Granting Plaintiffs' requested relief by vacating the Harassment Guidance and issuing a permanent injunction would exacerbate these harms by singling out transgender and nonbinary workers for greater risk of continued and increased harassment. Therefore, Plaintiffs' motion for summary judgment (Dkt. No. 29) should be denied.

## ARGUMENT

### I.    The Harassment Guidance Reflects Title VII's Guarantee of Protection Against Gender-Identity-Based Workplace Harassment.

In *Bostock v. Clayton County*, the Supreme Court held that Title VII's ban on sex-based discrimination applies to discrimination based on gender identity. 590 U.S. at 683. Writing for the majority, Justice Gorsuch observed, "discrimination based on … transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id.* at 669. The EEOC's Harassment Guidance seeks only to implement *Bostock* by giving employers concrete guidance as to when gender-identity-based harassment is actionable under Title VII. It explains, citing *Bostock*, that "sex-based harassment includes harassment based on sexual orientation or gender identity, including how that identity is expressed." Harassment Guidance at 17. It lists specific forms of "[h]arassing conduct based on sexual orientation or gender identity" and provides two detailed examples, including one illustrating "Harassment Based on Gender Identity." *Id.* at 17-18.

The Plaintiffs' arguments that the Harassment Guidance conflicts with Title VII and *Bostock*, or otherwise exceeds the agency's authority, are meritless. Plaintiffs' efforts to restrict *Bostock*'s holding only to the *firing* of workers, *see* Dkt. No. 30 at 14-15, are irreconcilable with the decision's broad holding, which rested on Title VII's prohibition of discrimination in the "terms, conditions, and privileges of employment" and recognized no such limitation. *See Bostock*, 590 U.S. at 670 ("As enacted, Title VII prohibits all forms of discrimination because of

sex, *however they may manifest themselves* or whatever other labels might attach to them.") (emphasis added).

Nor is it remotely correct that the Harassment Guidance "turned Title VII's prohibition on sex discrimination into an accommodation mandate" and requires employers to treat transgender employees more favorably than other employees (Dkt. No. 30 at 19-21). Far from requiring Plaintiffs to make exceptions to "longstanding work rules" related to the use of pronouns, dress codes, and access to restrooms (Dkt. No. 30 at 17), the Harassment Guidance explains how the failure to apply these policies consistently to all employees, regardless of their gender identity, could contribute to a hostile work environment. The Harassment Guidance patently does not treat transgender employees more favorably than other workers—it makes clear that Title VII's protection against sex-based discrimination extends equally to all workers, regardless of their gender identity. *See* Harassment Guidance at 93 ("As a form of sex discrimination, discrimination on the basis of sexual orientation or gender identity therefore violates section 703(a)(1) on the same terms as any other form of sex discrimination, including failing or refusing to hire, or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment.").

Simply put, the EEOC's Harassment Guidance creates no new substantive rights for transgender and nonbinary workers; it merely explains the proper application of Title VII, per *Bostock*, to guide enforcement efforts. The Harassment Guidance falls well within the EEOC's statutory authority and represents a crucial effort by the agency to effectuate Title VII's promise of a harassment-free workplace for everyone, including the many transgender and nonbinary workers who continue to endure unlawful harassment based on their gender identity.

II.    **The Plaintiffs' Requested Relief Would Harm the Public Interest by Creating Confusion About the Application of Title VII and Leaving Workers More Vulnerable to Harassment.**

Plaintiffs ask the Court to vacate and enjoin the entire Harassment Guidance. Granting the requested relief would cause serious, long-lasting harm to workers, and therefore to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (factors of hardship and public interest merge when the Government is the non-moving party).

The EEOC issued its Harassment Guidance to help protect *all* employees from unlawful workplace discrimination, including harassment on the basis of gender identity. EEOC data makes clear that workplace harassment remains a pervasive problem. For example, the EEOC received 31,354 charges alleging harassment in Fiscal Year 2023 alone, representing a significant uptick in complaints from previous years.[3]  Within this context, the Harassment Guidance—which had not been updated since 1999—is an important resource for workers and employers seeking to understand Title VII's application to the modern workplace, and for agency staff enforcing Title VII's protections. *See* Harassment Guidance at 8. Granting the relief Plaintiffs seek would deprive workers and employers of this needed resource. And it would leave many workers, especially transgender and nonbinary workers, more vulnerable to discrimination.

A.  **The Harassment Guidance provides practical advice about the application of Title VII and *Bostock*.**

The Harassment Guidance protects workers' rights by helping employers and employees understand how Title VII applies to real-life situations. It provides detailed explanations and examples of the various legally protected characteristics under federal equal employment

---

[3] Enforcement and Litigation Statistics, U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/data/enforcement-and-litigation-statistics-0. EEOC received 31,354 charges alleging harassment in FY2023, as compared with 24,430 in FY2022, 21,720 in FY2021, 24,221 in FY2020, and 26,221 in FY 2019.

opportunity law, which are intended to reflect the diversity of the country's workforce. It illustrates how unlawful harassment may manifest in the workplace, including in cases of intersectional harassment, harassment that occurs online, harassment by third parties, and harassment that occurs outside of the workplace but nonetheless creates a hostile work environment. It also explains the legal standards for assessing when harassment may violate federal law. Employers can use the information in the Harassment Guidance to help prevent, identify, and address unlawful workplace harassment.

In its discussion of sex harassment, the Harassment Guidance addresses *Bostock* and provides examples of prohibited harassment based on sexual orientation and gender identity. Harassment Guidance at 17-18. The Harassment Guidance's explanation of *Bostock*'s practical application plainly benefits both employers and employees, given the widespread and harmful effects of gender-identity-based discrimination on transgender and nonbinary workers. The clarity the Guidance provides is particularly important because many states look to Title VII for guidance in interpreting their state anti-discrimination laws, so its value will extend to clarifying state-law EEO protections for workers in these states. *See, e.g.*, *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n.3 (8th Cir. 2000) ("Claims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims. *See* Ark. Code Ann. § 16-123-103(c)."); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) ("A sexual harassment claim brought under the Kentucky Civil Rights Act ('KRCA') is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart.") (citing *Ammerman v. Bd. of Educ. of Nicholas Cnty.*, 30 S.W.3d 793, 797-98 (Ky. 2000)); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 910 (D. Md. 2017) (observing Maryland's Fair Employment Practices Act "is the 'state law analogue of Title VII and its interpretation is guided by federal

cases interpreting Title VII.'"), *aff'd in relevant part*, 716 F. App'x 164 (4th Cir. 2017) (citation omitted); *Shiyan Jiang v. Tex. Comm'n on Env't Quality*, 321 F. Supp. 3d 738, 745 n.3 (W.D. Tex. 2018) (noting that the Texas Commission on Human Rights Act ('TCHRA') "was modeled after federal civil rights law and has as an express purpose to provide for the execution of the policies of Title VII," and "Texas courts look to analogous federal precedent for guidance when interpreting the TCHRA.") (citations and quotation marks omitted).

### B. The Harassment Guidance is critically needed because discrimination, including harassment, against transgender and nonbinary workers is widespread.

As both data and individuals' experiences reflect, gender-identity-based workplace harassment is widespread, takes many forms, and causes serious, long-lasting harm to transgender and nonbinary workers. Within this context, the Harassment Guidance is critical to ensuring that these workers receive the full measure of Title VII's protection from unlawful discrimination, especially in light of growing animus toward the LGBTQI+ community.

### 1. Workplace harassment remains widespread even after *Bostock*.

Despite *Bostock's* clear rejection of gender-identity-based discrimination, transgender and nonbinary workers continue to be subjected to workplace harassment based on gender identity at staggering rates, demonstrating the critical need for the EEOC's clear explanation of prohibited behavior in its Harassment Guidance.

In a 2022 survey, 70% of transgender respondents reported experiencing some form of workplace discrimination or harassment in the past year because of their sexual orientation, gender identity, or intersex status.[4] In another survey conducted one year after *Bostock*, 43.8% of transgender respondents reported verbal harassment at work, 26.3% reported sexual harassment

---

[4] Medina & Mahowald, *supra* note 2.

at work, and 28.2% reported physical harassment at work.[5] These survey results mirror a 2015 survey in which 23% of transgender respondents who held a job in the past year reported that their employer, boss, or coworkers had taken specific negative actions against them in the past year because they were transgender. These include (i) their boss or coworker sharing their private, personal information, such as their transgender status (16%), (ii) their boss giving them a negative review (6%), (iii) being told to present as a gender different from their gender identity (4%), (iv) not being allowed to use the bathroom consistent with their gender identity (4%),[6] and (v) being forced to transfer to a different position or department at their job because they were transgender (2%).[7]

Additionally, data suggest transgender and nonbinary workers of color and disabled transgender and nonbinary workers are particularly vulnerable to discrimination. LGBTQI+ workers of color and LGBTQI+ workers with disabilities surveyed in 2022 consistently reported experiencing workplace discrimination at higher rates than LGBTQI+ workers who do not identify as people of color or people with disabilities.[8]

### 2. Workplace harassment on the basis of gender identity takes a variety of forms.

Gender-identity-based workplace harassment can take many forms that may occur separately or, often, in combination. Here, we illustrate just some of the forms harassment can

---

[5] Brad Sears et al., *LGBT People's Experiences of Workplace Discrimination and Harassment*, THE WILLIAMS INST., 12 (Sept. 2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Sep-2021.pdf.

[6] In a more recent survey from 2022, 23% of transgender respondents reported being denied access to restrooms or other facilities. Medina & Mahowald, *supra* note 2, at Figure 11.

[7] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUALITY, 153 (2016, updated Dec. 2017), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[8] Medina & Mahowald, *supra* note 2, at Figure 11.

take, drawing on examples from case law and in the media, with the caveat that the available examples and data reflect only an extremely limited subset of the harassment experienced by transgender and nonbinary individuals in workplaces nationwide. Sadly, much workplace harassment goes unreported or underreported.[9] Transgender and nonbinary workers may be particularly hesitant to report discrimination,[10] including harassment, because they may fear retaliation or other consequences even from raising concerns with their coworkers or supervisors, much less reporting them to the media or in legal proceedings.

Transgender and nonbinary workers are often subjected to intentional misgendering, which is the purposeful and repeated use of a name or pronoun inconsistent with that individual's gender identity. *See, e.g.*, *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 771 (11th Cir. 2024) (plaintiff, a transgender man and sergeant employed by the Georgia Department of Corrections, was misgendered on a daily basis by supervisors and subordinates over the prison-wide radio system so that all employees at the facility could hear it; in addition, he was repeatedly misgendered and subjected to inappropriate comments about his gender in interactions off the radio); *Eller v. Prince George's Cnty. Pub. Sch.*, 580 F. Supp. 3d 154, 162-65 (D. Md. 2022) (plaintiff, a transgender woman and teacher, was repeatedly and intentionally misgendered by staff and students at three separate schools); *Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d

---

[9] One study found that, for all types of workplace harassment, almost half of workplace violence and harassment survivors had never told anyone about their experience. *See* Steve Crabtree, *Global Study: 23% of Workers Experience Violence, Harassment*, GALLUP (Dec. 14, 2022), https://news.gallup.com/opinion/gallup/406793/global-study-workers-experience-violence-harassment.aspx.

[10] In a national survey of transgender workers in the United States, more than two-thirds of respondents who were fired because of their gender identity or expression "did not take any formal action in response." James et al., *supra* note 7, at 152.

1001, 1006-07 (D. Nev. 2016) (plaintiff's employer repeatedly used his deadname[11] and misgendered him on documents); *Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (EEOC Apr. 1, 2015) (complainant, a civilian employee with the U.S. Army Aviation and Missile Research Development and Engineering Center, was repeatedly and intentionally misgendered and referred to by her deadname).

Intentional misgendering, whether of cisgender[12] or transgender individuals, is a tactic of abuse. *See, e.g.*, *Copeland*, 97 F.4th at 771; *Eller*, 580 F. Supp. 3d at 162-65; *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874 (9th Cir. 2001) (coworkers calling male employee "she," "her," and Spanish term for "female whore" was actionable harassment). For transgender and nonbinary individuals, intentional misgendering can have significant psychological impacts, including heightened stress, anxiety, and depression.[13] Transgender and nonbinary individuals who are misgendered have reported feeling humiliated, powerless, devalued, stigmatized, and

---

[11] A deadname is the name a transgender person was given at birth and no longer uses because it does not align with their gender. *See Deadname*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/deadname (last accessed Nov. 15, 2024). Deadnaming, or the act of using a transgender person's deadname, can induce stress and trauma for a transgender person. *Why Deadnaming Is Harmful*, CLEVELAND CLINIC (Nov. 17, 2021), https://health.clevelandclinic.org/deadnaming.

[12] Cisgender "describes someone whose internal sense of gender corresponds with the sex the person was identified as having at birth." *What does "cisgender" mean?*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/wordplay/cisgender-meaning (last accessed Nov. 14, 2024).

[13] *See generally* E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, INT'L J. OF TRANSGENDER HEALTH, S-107 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9553112/pdf/WIJT_23_2100644.pdf (allowing for expressing gender identity, including using correct name and pronouns, "reduce[s] gender dysphoria/incongruence, depression, anxiety, self-harm ideation and behavior, suicidal ideation and attempts"); *see also* Elizabeth Keohan, *Misgendering: Exploring the Harmful Impact of It*, TALKSPACE (Sept. 8, 2023), https://www.talkspace.com/blog/misgendering-impact/ (misgendering can cause "mental health issues and repercussions, like panic attacks, melancholy, self-harm inclinations, or even suicidal thoughts").

disrespected.[14] Further, intentional misgendering can expose transgender and nonbinary individuals to other forms of harassment and violence.[15]

Transgender and nonbinary people are also often the target of demeaning and derogatory language because of their gender identity. Such language may include slurs referencing a person's sexuality or genitalia in a crude or demeaning manner[16] or references to prostitution and pedophilia. *See, e.g.*, *Eller*, 580 F. Supp. 3d at 162 (plaintiff, a transgender teacher, was repeatedly referred to using derogatory slurs and references to pedophilia and child molestation); *Garrett v. Kohls Distrib. eFulfillment Ctr.*, No. 3:23-cv-2525, 2024 WL 3237184, at *4, *6 (N.D. Tex. June 7, 2024) (coworkers frequently mocked the plaintiff, a transgender man, and subjected him to derogatory comments and epithets), *report and recommendation adopted*, 2024 WL 3240656 (N.D. Tex. June 28, 2024).  In one example, coworkers and supervisors repeatedly referred to a transgender corrections officer using demeaning and dehumanizing language and harmful slurs, including referring to him as "he/she," "it," a "d—" and a "b—." Coworkers also made disparaging remarks about his gender and told him that other officers were offended by his gender and would not respond to emergency calls from him, putting his safety at risk. *Doe v. Arizona*, No. CV-18-00384-PHX-GMS, 2019 WL 2929953, at *1 (D. Ariz. July 8, 2019); *Doe v. Arizona*, No. CV-15-02399-PHX-DGC, 2016 WL 1089743, at *1 (D. Ariz. Mar. 21, 2016).

---

[14] Kevin A. McLemore, *Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, SELF AND IDENTITY, 8, 10, 12 (2014).
[15] Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. REV. DISCOURSE 40, 62 n.85 (2020) (collecting sources showing that persons often deliberately misgender transgender persons in an effort to embarrass and harass them).
[16] Sears et al., *supra* note 5, at 3, 5-11 (noting that two-thirds of LGBT employees surveyed reported hearing negative comments, slurs, or jokes about LGBTQ people at work and documenting the range of epithets LGBT workers reported they had been called or had heard at work).

Harassment of this nature can also include invasive and inappropriate questions about one's sexuality, genitalia, and private life. In a recent case, James Lammers, a nonbinary individual working as a mental health counselor, experienced invasive questioning and harassment at the residential treatment facility where they worked. *Lammers v. Pathways To a Better Life, LLC*, No. 18-C-1579, 2021 WL 3033370, at *1 (E.D. Wisc. 2021). Lammers's officemate "frequently asked [] questions about various aspects of [Lammers's] gender nonconformity, including [their] physiology, [their] clothing, [their] relationship with [their] wife, and [their] family life in general." *Id.* at *2. Staff "regularly gossiped and frequently made jokes about how Lammers was weird and … would regularly treat Lammers differently than other staff." *Id.* Residents frequently made crude and offensive jokes about Lammers' gender identity. *Id.* Lammers made complaints about their officemate and the comments from residents, but their employer never did anything to address the gender-identity-based harassment Lammers suffered—and instead fired Lammers. *Id.*

Gender-identity-based harassment can also take the form of physical assault, including shoving, grabbing, unwanted touching, hitting, and sexual assault. For example, in one survey, a nonbinary individual reported that their former boss and co-workers sexually abused them to "prove [they're] not into guys."[17] In another instance, a transgender woman was beaten and had her head hit against a trash can when she was taking out the trash at work.[18] In another, a transgender firefighter's coworkers barricaded her in a burning room so hot it melted her protective gear and gave her second- and third-degree burns, and as she burned, her coworkers called her a "freak" and said her she was not welcome in the fire department. *Corbitt v. Sec'y of*

---

[17] *Id.* at 9.
[18] *Id.* at 8.

*the Ala. L. Enf't Agency*, 115 F.4th 1335, 1356 (11th Cir. 2024) (Pryor, J., concurring). The physical harassment that transgender and nonbinary workers suffer in the workplace reflects the heightened rates of physical and sexual violence against such individuals in general. One study found that transgender individuals are over four times more likely than cisgender people to experience violent victimization, including rape, sexual assault, and aggravated or simple assaults.[19]

Transgender and nonbinary workers additionally face express threats of physical and sexual violence. In one recent case, students physically assaulted a transgender teacher on multiple occasions and threatened her with sexual assault. A student also threatened to burn her house down "because she was 'not really a person.'" *See Eller*, 580 F. Supp. 3d at 163-65, 173. In another case, a coworker confronted a transgender correctional officer, blocked the prison's entrance, and threatened to fight him because he had corrected colleagues who misgendered him. *Copeland*, 97 F.4th at 772.  A few days later, the same coworker pushed him and circled him in an armed vehicle as he walked to his car, making him afraid for his life. *Id.*  Instances of physical violence or threats may also involve property damage or other attempts to intimidate or menace the targeted worker. *See, e.g.*, *Doe*, 2019 WL 2929953, at *1 (transgender worker's car tires slashed in an employee parking lot).

---

[19] "Transgender people experienced 86.2 victimizations per 1000 persons compared with cisgender people's 21.7 per 1000 persons." Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization*: *National Crime Victimization Survey, 2017-2018*, AM. J. PUB. HEALTH 726, 727 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7958056/pdf/AJPH.2020.306099.pdf; Rachel Dowd, *Transgender people over four times more likely than cisgender people to be victims of violent crime*, THE WILLIAMS INST., (Mar. 23, 2021), https://williamsinstitute.law.ucla.edu/press/ncvs-trans-press-release/.

Denial of access to bathrooms or other sex-segregated facilities is another harmful form of gender-identity-based harassment that creates a hostile work environment for transgender and nonbinary workers. Some workers are forced to use a bathroom that is inconsistent with their affirmed gender—a situation so uncomfortable it can cause transgender people to avoid using the bathroom at all.[20] This can lead to immediate physical consequences. For example, as the Third Circuit has explained, workers may "avoid going to the bathroom by fasting, dehydrating, or otherwise forcing themselves not to use the restroom throughout the day," which can then cause urinary tract infections and other health problems. *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 523 (3rd Cir. 2018); *see also Membreno v. Atlanta Rest. Partners*, 517 F. Supp. 3d 425, 431 (D. Md. 2021) (plaintiff, a transgender woman working at a restaurant, was prohibited from using the women's restroom and "berated" when she did use it, leading her to avoid using the restroom and "limit the amount of water she drank while working"). Others are refused access to *any* bathroom or are restricted to using only single-stall or gender-neutral bathrooms. For example, a human resources manager required "Jane," a transgender woman from Missouri, to use the single-stall restroom rather than the women's restroom at her workplace. Because there was only one single-stall restroom in her workplace, Jane was forced to wait when the restroom was occupied, being cleaned, or under maintenance, while other women at the company were able to use any of the *twenty-eight* women's restrooms without waiting.[21] This is a pernicious form of discrimination because beyond the physical consequences of having to wait a long time

---

[20] Meredith Russo, *What It Feels Like to Use the Wrong Bathroom*, N.Y. TIMES (May 24, 2016), https://www.nytimes.com/2016/05/24/opinion/what-it-feels-like-to-use-the-wrong-bathroom.html.
[21] Julie Moreau, "*Laughed out of interviews": Trans Workers Discuss Job Discrimination*, NBC NEWS (Oct. 6, 2019, 2:22 PM), https://www.nbcnews.com/feature/nbc-out/laughed-out-interviews-trans-workers-discuss-job-discrimination-n1063041.

to use the bathroom, denying employees access to bathrooms or other sex-segregated facilities can cause psychological harm, including anxiety, depression, and low self-esteem.[22]

Finally, transgender and nonbinary workers are harassed and threatened for being too masculine or feminine, or not masculine or feminine enough—exactly the sort of sex stereotyping the Supreme Court has recognized as unlawful. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."); *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 457 (5th Cir. 2013) (employee stated harassment claim where coworkers "taunted him tirelessly" including with "sex-based epithets like 'fa—ot,' 'pu—y,' and 'princess'" because they saw him as "not a manly-enough man"); *see also Bostock*, 590 U.S. at 662 (observing that an employer who fires both male and female employees for "failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability"). For example, in one case, a transgender woman working as a truck driver was harassed by a co-worker on multiple occasions because she wore clothing considered to be traditionally feminine. The co-worker told her "I wish you wouldn't do that because you are making us look bad," asked, "Can't you just dress like a man?", and told her, "You make for an ugly woman." *Parker v. Strawser Constr.*, 307 F. Supp. 3d 744, 748 (S.D. Ohio 2022). In another instance, after a nonbinary worker began to change their gender expression at work, the human resources department warned them that the way they dressed could damage the company's reputation and threatened consequences for wearing

---

[22] M. Killian Kinney et al., *Improving "Life Chances": Surveying the Anti-Transgender Backlash, and Offering a Transgender Equity Impact Assessment Tool for Policy Analysis*, THE JOURNAL OF LAW, MEDICINE & ETHICS, 50(3): 489-508 at 494 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9679585/pdf/S1073110522000894a.pdf.

makeup or dresses to recruiting events.[23] This is the same type of discrimination that the

Supreme Court held gave rise to a Title VII claim in *Price Waterhouse*—instructing the plaintiff

to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her

hair styled, and wear jewelry." 490 U.S. at 235 (internal quotation omitted).

### 3. Growing animus and rising violence against transgender and nonbinary people underscore the importance of the Harassment Guidance.

The EEOC's Harassment Guidance is particularly important in light of the overall climate

of hostility and violence that transgender and nonbinary people now face in their daily lives.

Blocking the Harassment Guidance could further fuel this animus and undermine efforts to

enforce Title VII's prohibition against workplace harassment.

Hate crimes based on gender identity have risen dramatically in recent years. The FBI

recorded 469 hate crimes motivated by gender identity in 2022 alone, a nearly 32% increase

from the previous year.[24] Growing animus is also reflected in the increase in anti-LGBTQI+ bills

introduced in state legislatures around the country.[25] More than 550 anti-LGBTQ bills were

---

[23] Lily Zheng, *Transgender, Gender-Fluid, Nonbinary, and Gender-Nonconforming Employees Deserve Better Policies*, HARVARD BUS. REV. (Nov. 20, 2020), https://hbr.org/2020/11/transgender-gender-fluid-nonbinary-and-gender-nonconforming-employees-deserve-better-policies.

[24] *FBI Releases 2022 Hate Crime Statistics*, U.S. DEP'T OF JUSTICE (last updated Sept. 23, 2024), https://www.justice.gov/hatecrimes/hate-crime-statistics-2022; *The Epidemic of Violence Against the Transgender and Gender Non-Conforming Community in the United States: The 2023 Report*, HUMAN RIGHTS CAMPAIGN FOUNDATION (Nov. 2023), https://reports.hrc.org/an-epidemic-of-violence-2023.

[25] Cullen Peele, *Roundup of Anti-LGBTQ+ Legislation Advancing In States Across the Country*, HUMAN RIGHTS CAMPAIGN (May 23, 2023), https://www.hrc.org/press-releases/roundup-of-anti-lgbtq-legislation-advancing-in-states-across-the-country (noting that there were more state anti-LGBTQI+ bills introduced in 2023 than in the any of the previous five years). Even if these bills fail to pass, or to pass constitutional muster, the damage is done. *See Romer v. Evans*, 517 U.S. 620, 634-35 (1996) ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.") (cleaned up).

introduced in the last legislative session alone, many of which target transgender people specifically.[26] Anti-transgender and -nonbinary laws perpetuate stereotypes regarding gender and encourage the policing and scrutinizing of people's bodies and expression—particularly of those who do not conform to sex stereotypes.

This kind of gender "policing" encourages violent and exclusionary behavior that also impacts cisgender women. Cisgender women have been "questioned, verbally assaulted, followed, and even forcibly removed from facilities" because they were mistaken for transgender women or were perceived as too masculine to use the spaces.[27] In this landscape of heightened violence and backlash, the Harassment Guidance provides essential clarification for businesses and employees alike.

### C. Gender-identity-based harassment harms transgender and nonbinary workers' mental and physical well-being and can force them out of the workplace.

Instances of discrimination and harassment like those described in Section II.B.2—such as misgendering, the use of epithets, physical and sexual assault, and other differential treatment from cisgender employees—have measurably negative effects on transgender workers.[28] In a

---

[26] *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2024*, AM. CIVIL LIBERTIES UNION (last accessed Nov. 15, 2024), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2024; *All Anti-Transgender Legislation*, EQUALITY FEDERATION (last accessed Nov. 15, 2024), https://www.equalityfederation.org/tracker/cumulative-anti-transgender.

[27] Chan Tov McNamarah, *Cis-Woman-Protective Arguments*, 123 COLUM. L. REV. 845, 917-18 (2023) (listing examples of such harassment, including a woman who was verbally harassed because she was perceived to be transgender, a woman who was confronted when she tried to access a women's bathroom "because she 'dress[ed] like a man,'" and a woman who was forcibly removed from a women's bathroom at a restaurant); *see also* Beatriz P. Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 FRONTIERS IN SOCIOLOGY 1, 5 (Mar. 31, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8022685/pdf/fsoc-06-652777.pdf (noting that transgender and cisgender people who "do not fit the norms of gender expression" experience exclusion from bathrooms segregated by gender).

[28] *See* Coleman et al., *supra* note 13, at S126-27, S175; Medina & Mahowald, *supra* note 2.

2022 survey, 78% of transgender individuals reported that in the past year, workplace discrimination affected their mental well-being "moderately" or "to a significant degree," while 62% said the same regarding their spiritual well-being, 51% regarding their physical well-being, and 41% regarding their financial well-being.[29] These harmful consequences are evident in many of the cases discussed in Section II.B.2. For example, Jennifer Eller, a transgender woman and teacher, was diagnosed with PTSD, depression, and anxiety, and she also experienced physical symptoms such as fatigue and nausea as a result of the harassment she experienced at work. She eventually took medical leave to seek treatment for these conditions, and she continued receiving treatment for years, long after she was ultimately compelled to resign due to the harassment. *Eller*, 580 F. Supp. 3d at 165-66, 171.

Conversely, environments that accept and affirm transgender and nonbinary persons' gender expression can help reduce gender dysphoria,[30] which is in turn associated with improved mental health and body-image satisfaction.[31] Research indicates that when LGBT workers, including transgender and nonbinary workers, perceive their workplaces to be supportive, they experience better psychological health and increased job and life satisfaction.[32]

---

[29] Medina & Mahowald, *supra* note 2.
[30] *See* Coleman et al., *supra* note 13, at S107.
[31] *See id.* at S46.
[32] *See, e.g.*, M.V. Lee Badgett et al., *The Business of LGBT-Supportive Workplace Policies*, THE WILLIAMS INSTITUTE, 9 (May 2013), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Support-Workplace-May-2013.pdf; Ann Hergatt Huffman et al., *Workplace support and affirming behaviors: Moving toward a transgender, gender diverse, and non-binary friendly workplace*, 22 INT'L J. TRANSGENDER HEALTH 225, 236-37 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8118231/pdf/WIJT_22_1861575.pdf (finding that perceived supervisor and coworker support are strongly connected to transgender, gender diverse, and non-binary workers' job and life satisfaction).

To avoid discrimination and harassment, many transgender and nonbinary individuals are forced to engage in "covering" behaviors at work. Covering is a form of forced assimilation and "refers to refers to ways in which individuals downplay known disfavored identities to blend into the mainstream."[33] In one study, 68% of transgender and nonbinary workers reported covering in the workplace.[34] For example, transgender and nonbinary workers may cover by "changing their physical appearance; changing when, where, or how frequently they use the bathroom; and avoiding talking about their personal families or social lives while at work."[35] But covering comes at a cost. Seventy-four percent of workers of any identity who engaged in covering behaviors reported that the need to cover at work negatively impacted them, including 60% who reported it negatively impacted their overall well-being and 54% who reported it negatively affected their ability to perform their job to the best of their ability.[36]

Discrimination also forces some transgender and nonbinary workers out of their jobs entirely. One study found that 15% of transgender respondents who held a job in the past year reported that they quit their job to avoid workplace discrimination.[37] Ensuring that transgender and nonbinary workers are safe at work and can maintain their employment without confronting the risk of gender-identity-based harassment is particularly important, given that transgender and

---

[33] Joanne Stephane et al., *Uncovering culture: A call to action for leaders*, DELOITTE DEV. LLC, 1 (2023), https://www2.deloitte.com/content/dam/Deloitte/us/Documents/about-deloitte/dei/us-uncovering-culture-a-call-to-action-for-leaders.pdf?dl=1. Examples include a worker covering their national origin by concealing their accent, or a worker covering their disability by ensuring their hearing aids are not visible. *Id.* at 3, 16.

[34] *Id.* at 5.

[35] Sears et al., *supra* note 5, at 4, 22, Figure 7 (36.4% of transgender employees reported changing their physical appearance at work, 27.5% reported changing their bathroom use at work, and 30% of transgender employees reported changing their voice or mannerisms as a covering behavior).

[36] Stephane et al., *supra* note 33, at 9.

[37] James et al., *supra* note 7, at 154.

nonbinary individuals disproportionately "face housing and food insecurity, homelessness and criminalization."[38] In one recent survey of transgender and nonbinary individuals in the United States, about one-third of respondents were experiencing poverty, and "nearly one-third (30%) of respondents had experienced homelessness in their lifetime."[39]

### III. The Balance of Equities Weighs Against the Requested Relief.

The Plaintiffs will suffer no harm if the Harassment Guidance remains in effect. The document simply provides guidance on the application of Title VII and *Bostock* in the workplace. It does not impose any new obligations or costs on the Plaintiffs. It merely asks them to comply with existing federal law and explains how to do so.

Nor does the Harassment Guidance cause any harm to other workers. Plaintiffs argue that EEOC's failure to consider "the risk to women's safety" posed by allowing transgender workers to access restrooms and other facilities consistent with their affirmed gender is grounds for "setting aside the 2024 Guidance as arbitrary and capricious" (Dkt. 30 at 27). But the Harassment Guidance poses no threat to the safety of women in the workplace. Research has confirmed that "fears of increased safety and privacy violations" because of nondiscrimination laws protecting transgender people's access to restrooms and locker rooms "are not empirically grounded."[40] Results from a 2018 study revealed that "the passage of such nondiscrimination

---

[38] Chase Strangio, *Deadly Violence Against Transgender People Is on the Rise. The Government Isn't Helping,* AM. CIVIL LIBERTIES UNION (Aug. 21, 2018), https://www.aclu.org/news/lgbtq-rights/deadly-violence-against-transgender-people-rise.

[39] Sandy E. James et al., *Early Insights: A Report of the 2022 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUALITY, 21 (Feb. 2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf.

[40] Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. and Soc. Pol'y 70, 81 (July 23, 2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e92d7f24b6c89dbd4bd4

laws is not related to the number or frequency of criminal incidents in such public spaces." [41] *See also Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (holding that a school district's policy of allowing a transgender teacher to use the women's faculty restroom did not create a hostile work environment for other teachers). And it certainly poses no risk to the safety of other workers to refer to their coworkers using the correct names and pronouns, or to refrain from harassing their coworkers based on how they dress. To the contrary, the Harassment Guidance helps ensure a safe and productive working environment for all workers.

Notwithstanding all of the foregoing, Plaintiffs maintain that Defendants will suffer no harm if the requested relief is granted. They could not be more wrong. Enjoining the Harassment Guidance would cause tremendous harm—it would create widespread confusion about the scope of employers' obligations and workers' protections under Title VII, undermine the EEOC's efforts to prevent and address workplace harassment, make transgender and nonbinary workers more vulnerable to harassment, and discourage workers from reporting harassing behavior by creating uncertainty about their rights and legal protections. Moreover, insofar as the Plaintiffs ask this Court to enjoin enforcement of Title VII against them with respect to gender-identity-based harassment, such relief would leave Plaintiffs' employees without clear recourse for harassment based on gender identity. Plaintiffs have no legitimate interest in denying any worker, including transgender and nonbinary workers, the protection of an existing federal anti-

---

d27fbbcb.pdf; *see also* Julie Moreau, *No link between trans-inclusive policies and bathroom safety, study finds,* NBC News (Sept. 19, 2018), https://www.nbcnews.com/feature/nbc-out/no-link-between-trans-inclusive-policiesbathroom-safety-study-finds-n911106.

[41] Hasenbush et al., *supra* note 40*; see also* Am. Med. Ass'n & GLMA, *Transgender individuals' access to public facilities* (2018), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf (noting that "no evidence exists" to support claims that those engaging in sexual violence "will take advantage of public accommodation laws" to target women and children.).

discrimination law prohibiting offensive conduct that is so severe or pervasive that it creates a hostile work environment.

## CONCLUSION

The Harassment Guidance is well within the EEOC's authority, works to the public's benefit by ensuring that transgender and nonbinary workers are protected from gender-identity-based harassment, and causes the Plaintiffs no harm beyond the (zero) cost of basic human decency. For the foregoing reasons, *amici* respectfully ask this Court to deny Plaintiffs' Motion for Summary Judgment and refuse to enjoin enforcement of the Harassment Guidance.

Dated: November 20, 2024

Respectfully submitted,

/s/*Elizabeth E. Theran*
Elizabeth E. Theran*†
MA Bar No. 650563
Katherine Sandson*
DC Bar No. 90023114
Rachel Smith*
DC Bar No. 90010647
VT Bar No. 5903
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005
T: (202) 588-5180
F: (202) 588-5185
etheran@nwlc.org

*pro hac vice* pending
† Not admitted in DC; admitted to practice law in New York and Massachusetts, currently working under the supervision of a DC-barred attorney

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.2, I hereby certify that this brief has been prepared in Times

New Roman, 12-point font, and is less than 25 pages long.


/s/*Elizabeth E. Theran*
Elizabeth E. Theran*†
MA Bar No. 650563
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005
(202) 588-5180
etheran@nwlc.org

\* pro hac vice pending
† Not admitted in DC; admitted to practice law in
New York and Massachusetts, currently working
under the supervision of a DC-barred attorney.


Dated: November 20, 2024

**CERTIFICATE OF SERVICE**

I certify that on November 20, 2024, I filed a true and accurate copy of the foregoing brief electronically with the Clerk for the U.S. District Court for the Northern District of Texas via CM/ECF and served it on all counsel of record.

/s/ *Elizabeth E. Theran*
Elizabeth E. Theran*†
MA Bar No. 650563
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005
(202) 588-5180
etheran@nwlc.org

* pro hac vice pending
† Not admitted in DC; admitted to practice law in New York and Massachusetts, currently working under the supervision of a DC-barred attorney.

## APPENDIX A: LIST OF AMICI

**National Women's Law Center:** Amicus curiae The National Women's Law Center ("NWLC") is a non-profit legal advocacy organization that fights for gender justice—in the courts, in public policy, and in our society—working across the issues that are central to the lives of women and girls, especially women of color, LGBTQI+ people, and low-income women and families. Since its founding in 1972, NWLC has worked to advance educational opportunities, workplace justice, health and reproductive rights, and income security. This work has included participating in numerous cases before all levels of federal and state courts to ensure that rights and opportunities are not restricted based on sex. Given that discrimination based on transgender status is necessarily linked to harmful sex stereotypes, NWLC has a particular interest in ensuring that discrimination against LGBTQI+ individuals, including against transgender and nonbinary individuals, is not perpetuated in the name of women's rights.

**Actors' Equity Association:** Actors' Equity Association ("Equity"), a labor organization that represents live theatrical actors and stage managers, is devoted to protecting live theatre as an essential component of a thriving civil society and the basis of its members' livelihoods. Since l913, Equity has fought to win its members a dignified workplace at the theatre, from pay guarantees and pension and welfare benefits to the rules governing auditions. With more than 51,000 members across the nation, Equity is among the oldest and largest labor unions in the performing arts in America. Broadway tours of America's favorite musicals come to every major market in the United States. Equity members live and work in every state in the United States and many members travel frequently throughout the country for work. Preserving protections for transgender and non-binary workers is critical to the ability of Equity's diverse membership to work in live theatre throughout the country.

**Advocates for Transgender Equality Education Fund:** Advocates for Transgender Equality Education Fund ("A4TE") is a nonprofit organization dedicated to advocating for the rights of transgender and nonbinary individuals across the United States. A4TE, through its predecessor organizations National Center for Transgender Equality (NCTE) and Transgender Legal Defense and Education Fund (TLDEF), has appeared as amici in cases regarding transgender rights in a wide range of state and federal courts at all levels. A4TE seeks to achieve full lived equality for the transgender and nonbinary community through impact litigation, policy advocacy, and education. A4TE's efforts focus on critical areas such as employment, healthcare, housing, conditions of confinement, education, identity documents, and public accommodations.

**American Civil Liberties Union:** The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with more than three million members dedicated to defending the principles of liberty and equality embodied in the Constitution and the civil rights laws. As an organization that advocates for First Amendment liberties as well as equal rights for LGBTQ+ people, the ACLU has a strong interest in protecting those individuals from on-the-job harassment and abuse, and has appeared as counsel-of-record or amici in many cases involving the application of nondiscrimination protections to transgender and LGBQ people, including as counsel for Aimee Stephens in *Bostock v. Clayton County*, 590 U.S. 644 (2020).

**American Federation of State, County and Municipal Employees, AFL-CIO:** Amicus American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") advocates for fairness in the workplace, excellence in public services and freedom and opportunity for all working families. We are a membership association and labor union of 1.4 million members who serve in hundreds of occupations across the nation—from nurses and

A-2

EMTs, to corrections officers, childcare providers, sanitation workers and more—providing the vital services that make America happen.

**Equal Rights Advocates:** Equal Rights Advocates (ERA) is a national non-profit civil rights advocacy organization dedicated to protecting and expanding economic and educational access and opportunities for women and girls. Since its founding in 1974, ERA has sought to end gender discrimination and advance equal opportunity for all by litigating high-impact and historically significant cases, engaging in policy reform and legislative advocacy campaigns, conducting community education and outreach, and providing free legal assistance to individuals experiencing unfair treatment at work or in school through our national Advice & Counseling program. ERA has filed hundreds of suits and appeared as amicus curiae in numerous cases to defend and enforce civil rights in state and federal courts, including before the United States Supreme Court. ERA views discrimination against transgender people – particularly harassment and exclusionary policies justified by the very sex stereotypes that have held women back in the workplace and elsewhere – as a pernicious and legally impermissible form of sex discrimination that is harmful to the transgender community, to women, and to our society at large.

**Lambda Legal Defense and Education Fund, Inc.:** For 50 years, Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") has striven to ensure that courts recognize and enforce the employment protections LGBTQ workers have under existing federal and state law. Of special relevance here, Lambda Legal was not only an amicus curiae in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), it also successfully represented the plaintiff-appellant in *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339 (7th Cir. 2017) (en banc), and argued as amicus curiae in both *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc), aff'd sub nom. *Bostock*, 590 U.S. 644 (2020), and *Wittmer v. Phillips,* 66 Co.,

915 F.3d 328 (5th Cir. 2019). Most recently, Lambda Legal served as counsel for a transgender

teacher asserting employment sex discrimination claims under Title VII of the Civil Rights Act

of 1964. *See Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154 (D. Md. 2022).

Thus, the issues before the Court are of acute concern to Lambda Legal and the community it

represents, who stand to be directly affected by the Court's ruling.

**LatinoJustice PRLDEF:** For more than fifty years, LatinoJustice PRLDEF

("LatinoJustice"), a national civil rights organization, has championed the civil rights of Latinos

in the workplace, litigating sexual harassment and other employment discrimination cases.

LatinoJustice regularly engages in impact litigation, representing Latinx and other communities

in areas including economic justice, immigrant rights, and voting rights. LatinoJustice has

worked to eliminate barriers that disproportionately burden women and their economic security.

**Legal Momentum, the Women's Legal Defense and Education Fund:** Legal

Momentum, the Women's Legal Defense and Education Fund, is a national non-profit civil

rights organization that for over 50 years has used the power of the law to define and defend the

rights of girls and women. Legal Momentum has worked for decades to ensure that all

employees are treated fairly in the workplace, regardless of their gender, or sexual orientation.

Legal Momentum has litigated cutting-edge gender-based employment discrimination cases,

including *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and has participated as amicus

curiae on leading cases in this area, including *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742

(1998), *Oncale v. Sundowner Offshore Services*, Inc., 523 U.S. 75 (1998), and *Harris v. Forklift

Systems, Inc.*, 510 U.S. 17 (1993).

**National Center for Law and Economic Justice:** The National Center for Law and

Economic Justice (NCLEJ) advances economic justice for low-income families, individuals and

communities across the country through impact litigation, policy advocacy and support of grassroots organizing. NCLEJ works to build systems that provide economic security and full participation in society for all, including the ability of workers to be free from discrimination and retaliation. NCLEJ litigates extensively in state and federal courts to secure the rights of low-wage workers, including under Title VII of the Civil Rights Act, and represents workers in front of city and federal agencies in workplace anti-discrimination complaints.

**National Council of Jewish Women:** National Council of Jewish Women (NCJW) is a grassroots organization of 210,000 advocates who turn progressive ideals into action. Inspired by Jewish values, NCJW strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms. NCJW's Principles state that "Equal rights and equitable opportunities for all people must be guaranteed, and all forms of discrimination must be eliminated" and in our Resolutions, we resolve to work for "The inclusion and acceptance of all individuals no matter their gender self-identification." Consistent with our Principles, Resolutions, and longstanding commitment to ending workplace harassment and affirming equal rights for LGBTQ+ individuals, NCJW joins this brief.

**The National Employment Lawyers Association and the National Institute for Workers' Rights:** The National Employment Lawyers Association ("NELA") is the largest professional membership organization in the country comprising lawyers who represent workers in labor, employment and civil rights disputes. Founded in 1985, NELA advances employee rights and serves lawyers who advocate for equality and justice in the American workplace. NELA and its 69 circuit, state, and local affiliates have a membership of over 4,000 attorneys who are committed to working on behalf of those who have been illegally treated in the workplace. This membership includes residents of Texas who would be adversely impacted by a

ruling against Plaintiffs-Appellants. NELA's members litigate daily in every circuit, affording NELA a unique perspective on how the principles announced by the courts in employment cases actually play out on the ground. NELA strives to protect the rights of its members' clients and regularly supports precedent-setting litigation affecting the rights of individuals in the workplace. The mission of the National Institute for Workers' Rights ("the Institute") is to advance workers' rights through research, thought leadership, and education for policymakers, advocates, and the public. The Institute aspires to a future in which all workers are treated with dignity and respect; workplaces are equitable, diverse, and inclusive; and the wellbeing of workers is a priority in business practices. As the nation's employee rights advocacy think tank, the Institute influences the broad, macro conversations that shape employment law.

**National Employment Law Project**: The National Employment Law Project ("NELP") is a national non-profit with over 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. NELP seeks to ensure that all employees, and especially the most vulnerable ones, receive access to good jobs and the full protection of labor and employment laws. NELP's community-based partners, including worker centers, unions, and other worker-support organizations in communities across the 50 states, have seen the kinds of impacts raised in this case, and would be harmed if the Court rules against the EEOC in this case. NELP has litigated and participated as amicus curiae in countless cases in federal circuit and state courts and the U.S. Supreme Court addressing the importance of compliance with workplace protections.

**National Network to End Domestic Violence**: The National Network to End Domestic Violence (NNEDV) represents the 56 U.S. state and territorial coalitions against domestic violence. NNEDV is dedicated to creating a social, political, and economic environment in

which domestic violence no longer exists. NNEDV works to make domestic violence a national priority, change the way society responds to domestic violence, and strengthen domestic violence advocacy at every level. NNEDV was instrumental in the passage and implementation of the Violence Against Women Act. NNEDV has a strong interest in upholding protections against discrimination based on gender identity and sexual orientation, as these protections can allow people of all genders to earn a living and receive protection and support when dealing with abuse.

**The National Partnership for Women & Families**: The National Partnership for Women & Families is a nonprofit, nonpartisan advocacy group that has over 50 years of experience in combating barriers to equity and opportunity for women. The National Partnership works for a just and equitable society in which all women and families can live with dignity, respect, and security; every person has the opportunity to achieve their potential; and no person is held back by discrimination or bias. Our organization has a long history of combating workplace harassment, including successfully litigating *Barnes v. Costle*, the first sexual harassment case in the country; contributing amicus briefs in *Meritor Savings Bank v. Vinson*, the landmark Supreme Court case recognizing sexual harassment as sex discrimination; and testifying before the Senate on the issue of sexual harassment. As a result of this history, we have a strong understanding of the history, details and legislative intent informing the law and are deeply invested in ensuring that the promise of the law is comprehensively enforced. In line with our mission and expertise, the National Partnership believes that fair labor and employment practices, like the Equal Employment Opportunity Commission's April 2024 Enforcement Guidance on Harassment in the Workplace, are critical to women's ability to succeed and thrive in our economy and to building an economy that benefits workers, businesses and the nation as a

whole. This is particularly true for women of color, disabled women, LGBTQI+ people, and women living at the intersection of multiple identities more broadly.

**Service Employees International Union**: Amicus Curiae Service Employees International Union (SEIU) is a labor organization representing approximately two million working people in the United States, Canada, and Puerto Rico in healthcare, property services, and public services. SEIU is committed to the fair and equal treatment of all workers, including LGBTQI+ individuals. SEIU strives to ensure that all workers are protected from discrimination because of sex, including discrimination based on gender identity. SEIU members rely on Title VII to enforce their rights to a safe workplace free of discrimination, and therefore have a strong interest in ensuring that EEOC guidance protects all workers from workplace harassment.