IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

STATE OF TEXAS and THE HERITAGE
FOUNDATION,

     Plaintiffs,

v.                                                                  2:24-CV-173-Z

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, *et al.*,

     Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs' and Defendants' Cross-Motions for Summary Judgment. ECF Nos. 29, 34. Having considered the Parties' briefing and the relevant law, the Court **GRANTS** Plaintiffs' Motion and **DENIES** Defendants' Motion. Specifically, the Court **HOLDS** that Defendant EEOC exceeded its statutory authority by issuing Enforcement Guidance requiring bathroom, dress, and pronoun accommodations inconsistent with the text, history, and tradition of Title VII and recent Supreme Court precedent. The Court **VACATES** the relevant portions of the Enforcement Guidance.

### BACKGROUND

#### I. Statutory Background

Congress enacted Title VII in 1964 to prohibit employment discrimination. 42 U.S.C. § 2000e-2(a). Among other characteristics, Title VII specifically forbids employers to "discriminate against" an employee "because of such individual's . . . sex." *Id.* Title VII defines "sex" to include "pregnancy, childbirth, or related medical conditions." *Id.* § 2000e(k). Title VII applies to all state and federal employers and private employers with fifteen or more employees. *Id.* § 2000e(b).

1

To establish a Title VII violation, a plaintiff must prove that "discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). And although Title VII specifically prohibits workplace discrimination, harassment alone can constitute discrimination "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 78 (1998) (internal citation omitted). To constitute a Title VII violation, the harassment must expose "members of one sex . . . to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (citation omitted).

The Equal Employment Opportunity Commission ("EEOC" or "Agency") implements Title VII and investigates violations. § 2000e-4. An investigation is initiated in two ways: (1) an employee files a charge with EEOC; or (2) an EEOC commissioner initiates a charge. § 2000e-5(b). Once a charge is filed, EEOC notifies the employer and investigates the allegations to determine whether "reasonable cause" exists "to believe that the charge is true." *Id.*

If EEOC determines that reasonable cause exists, it first "endeavor[s] to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Id.* But if conciliation is unsuccessful, EEOC may bring a civil action against the employer. *Id.* § 2000e-5(f)(1). In the case of failed conciliation with a state employer, however, EEOC must refer the charges to the Attorney General and Department of Justice ("DOJ") to determine whether DOJ will initiate a civil suit against the state employer. *Id.*

2

Alternatively, if EEOC investigates a discrimination charge and determines that reasonable cause does not exist, it dismisses the charge and issues the employee a notice of right to sue. *Id.* § 2000e(b), (f)(1). The employee may then bring a civil suit. *Id.* § 2000e(f)(1).

## II. 2021 Guidance

In 2021, then-EEOC Chairwoman Charlotte Burrows issued a "technical assistance" document ("2021 Guidance") outlining the EEOC's stance on Title VII discrimination. *Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (Jun. 15, 2021), https://perma.cc/9VUB-ZK2P.[1] Of note, the 2021 Guidance categorically stated that "employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity." *Id.* And further, it announced that "[p]rohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination." *Id.* Finally—although not couched in categorical terms—it provided that "intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment." *Id.*

Texas challenged the 2021 Guidance. This Court held that the 2021 Guidance was final agency action and vacated the 2021 Guidance as unlawful in October 2022. *See Texas v. EEOC*, 633 F. Supp. 3d 824, 847 (N.D. Tex. 2022). EEOC did not appeal.

## III. 2024 Enforcement Guidance

Less than two years later, EEOC issued its new Enforcement Guidance on Harassment in the Workplace ("Enforcement Guidance" or "Guidance") following a thirty-day period for public comment. *Enforcement Guidance on Harassment in the Workplace*, U.S.

---

[1] After Plaintiffs filed their brief, this Guidance was removed from the EEOC website. Thus, the Court cites to a permalink archive.

EQUAL EMP. OPPORTUNITY COMM'N (Apr. 29, 2024), https://www.eeoc.gov/laws/guidance/
enforcement-guidance-harassment-workplace [https://perma.cc/23Z6-XCWX]. This Guidance
sprawls 189 pages, covering the spectrum of discrimination prohibited by Title VII—
including a separate section on "sex" discrimination. *Id.* Purporting to "communicate[] the
Commission's position on important legal issues," the Guidance "serves as a resource for
employers, employees, and practitioners" and "for EEOC staff and the staff of other agencies."
*Id.* § I(A). But the Guidance disclaimed its authority, stating that its contents "do not have
the force and effect of law" and "are not meant to bind the public in any way." *Id.* § I(A).

Relevant here, the Enforcement Guidance defines "sex" as "'pregnancy, childbirth, and
related medical conditions' and sexual orientation and gender identity." *Id.* at § II(A)(5). And
it concludes that "sex-based harassment includes harassment based on sexual orientation or
gender identity, including how that identity is expressed." *Id.* § I(A)(5)(c). Specifically, sexual
harassment includes "repeated and intentional use of a name or pronoun inconsistent with
the individual's known gender identity (misgendering)" and "denial of access to a bathroom
or other sex-segregated facility consistent with the individual's gender identity." *Id.*

Additionally, the Enforcement Guidance lists myriad hypotheticals constituting
harassment in violation of Title VII. *Id.* In Example 15, the Guidance explains that
instructing a biological male employee who identifies as female that he cannot wear a dress
to work and using male pronouns to address this employee is "harassing conduct . . . based
on . . . gender identity." *Id.* Example 46 hypothesizes a case where the employer, coworkers,
and customers continue to use male pronouns for a post-transition biological male employee
who identifies as female—despite a stated preference for female pronouns. *Id.* § III(B)(3)(d).
The Enforcement Guidance concludes that under these facts, "which must be viewed in the
context of [the employee's] perspective as a transgender individual," the employee "has been

4

subjected to an objectively hostile work environment based on her gender identity that includes repeated and intentional misgendering" in violation of Title VII. *Id.* § I(A)(5)(c).

In the wake of this new Enforcement Guidance, EEOC Commissioner Andrea Lucas issued a dissenting statement warning that "[w]omen's sex-based rights in the workplace are [now] under attack." *Commissioner Andrea R. Lucas's Statement on EEOC Enforcement Guidance on Harassment in the Workplace*, U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/commissioner-andrea-r-lucass-statement-eeoc-enforcement-guidance-harassment-workplace [https://perma.cc/6F2Y-M7HH]. In the Enforcement Guidance, "the Commission formally takes the position that . . . harassing conduct under Title VII includes "denial of access to a bathroom or other sex-segregated facility consistent with an individual's gender identity." *Id.* And—in Commissioner Lucas's view—the Enforcement Guidance "effectively eliminates single-sex workplace facilities and impinges on women's . . . rights to freedom of speech and belief." *Id.* Commissioner Lucas also disparaged the Guidance's attempt to disclaim its legal authority, arguing that this "disclaimer is worth little" and that a "rule called by any other name is still a rule." *Id.*

Texas and the Heritage Foundation ("Heritage") (collectively, "Plaintiffs") challenged the new Enforcement Guidance on four counts. ECF No. 1. Specifically, Plaintiffs argue that the Enforcement Guidance is (1) contrary to law; (2) in excess of EEOC's statutory rulemaking authority; (3) arbitrary and capricious; and (4) an invalid substantive rule that EEOC failed to publish in the Federal Register. *Id.* at 27–30.

Plaintiffs filed their Motion for Summary Judgment on all counts on October 23, 2024. ECF No. 29. Defendants, in turn, filed a Cross-Motion for Summary Judgment and Response on November 13, 2024. ECF No. 34. Plaintiffs replied on December 4, 2024. ECF No. 48. And Defendants replied on January 10, 2025. ECF No. 51.

### IV. Executive Order 14168

Ten days after the briefing closed, President Trump took office and immediately issued Executive Order 14168 "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 20, 2025). The Executive Order directed EEOC to immediately rescind the Enforcement Guidance. *Id.* But then-Commissioners Charlotte Burrows, Jocelyn Samuels, and Kalpana Kotagal issued a statement affirming their support for LGBTQI workers and arguing that these individuals "are protected by federal law and entitled to the full measure of America's promise of equal opportunity in the workplace." Jocelyn Samuels (@JSamuelsEEOC), X (Jan. 21, 2025, 3:33 PM), https://x.com/JSamuelsEEOC/status/1881817519188795700 [https://perma.cc/E4AT-H6MK]. In their statement, the Commissioners argued that "Congress authorized the EEOC to hold employers accountable if they discriminate or permit a hostile work environment on protected grounds, and the agency will continue to fulfill this important Congressional mandate. To exclude any group of workers from these protections contravenes both the law and this mandate." *Id.*

A few days later, President Trump removed Commissioners Burrows and Samuels from office. *See* Alexandra Olson & Claire Savage, *Trump Fires Two Democratic Commissioners of Agency That Enforces Civil Rights Laws in the Workplace*, AP (Jan. 29, 2025, 1:22 AM), https://apnews.com/article/trump-eeoc-commissioners-firings-crackdown-civil-rights-c48b973cb32bad97e9da9e354ba627db [https://perma.cc/ZP87-E9RY]. Thus, the EEOC lacked the quorum of Commissioners necessary to formally rescind the Enforcement Guidance in accordance with President Trump's Executive Order. *See The State of the EEOC: Frequently Asked Questions*, U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/wysk/state-eeoc-frequently-asked-questions [https://perma.cc/CFA6-C8JX] (explaining that the EEOC cannot rescind guidance without a quorum).

Given these facts, the Court ordered both Parties to brief the Court on how the Executive Order affected the disposition of this case. ECF No. 52. The Parties submitted a joint brief on February 10, 2025. ECF No. 53.

## LEGAL STANDARD

### I. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The moving party must identify the basis for granting summary judgment and identify the evidence that demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. All evidence must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

### II. Review of Agency Decisions

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (alteration in original) (quoting 5 U.S.C. § 702). As required by the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). By ensuring that an agency has engaged in reasoned decision making—holding unlawful and setting aside agency action that is "in excess of statutory authority" or "arbitrary, capricious, an abuse of discretion, or otherwise not in

7

accordance with law"—the court has fulfilled its role. 5 U.S.C. § 706(2)(A), (C). "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 371. To conduct this interpretation, courts must begin with the statute's text. The plain "ordinary meaning and structure of the law itself" governs. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

ANALYSIS

I. **Plaintiffs' claims are justiciable.**

A. **The Enforcement Guidance is final agency action.**

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. If an agency action is not final, the court lacks subject matter jurisdiction. *See Peoples Nat'l Bank v. Off. of Comptroller of Currency of U.S.*, 362 F.3d 333, 337 (5th Cir. 2004). "Final agency actions are actions which (1) mark the consummation of the agency's decisionmaking process; and (2) by which rights or obligations have been determined, or from which legal consequences will flow." *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)) (internal marks omitted). And the "Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (internal marks omitted).

i. *The Enforcement Guidance is the consummation of EEOC's decisionmaking process.*

EEOC issued the Enforcement Guidance after a thirty-day notice and comment period. *See* 88 Fed. Reg. 67750 (Oct. 2, 2023). No party disputes that the Enforcement Guidance is the "consummation" of EEOC's decisionmaking process—nor could they

8

reasonably do so. Agency action is the consummation of an agency's decisionmaking process when it is not "merely tentative or interlocutory [in] nature." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). And here, the Enforcement Guidance is neither tentative nor interlocutory. It was promulgated by EEOC after notice and comment. As such, the Court finds that the Enforcement Guidance satisfies the first prong of the finality test because it is the "consummation" of EEOC's decisionmaking process. *See Texas v. EEOC*, 933 F.3d at 441 (holding that the second prong of the finality test was dispositive because the defendants did not dispute the first prong).

### ii. *The Enforcement Guidance produces legal consequences and determines rights and obligations of covered employers.*

Courts have consistently held that guidance which "bind[s] [the agency] and its staff to a legal position produce[s] legal consequences or determine[s] rights and obligations, thus meeting the second prong [of the finality test]." *Id.* And if an agency "bases enforcement actions on the policies or interpretations formulated in the [guidance]," that guidance is "for all practical purposes binding." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1021 (D.C. Cir. 2000) (internal marks omitted). Courts also look for "mandatory language to determine whether an agency's action binds it and accordingly gives rise to legal consequences. In some cases, the mandatory language of a [guidance] alone can be sufficient to render it binding." *Texas v. EEOC*, 933 F.3d at 441–42 (internal marks omitted).

Though Defendants aver that it is a mere "survey" of Title VII jurisprudence, the Enforcement Guidance repeatedly uses *mandatory* phrasing to describe employers' Title VII responsibilities, effectively binding the Agency to particular legal positions from which legal consequences flow. At the outset, the Guidance asserts that it "communicates the *Commission's position* on important legal issues." *Enforcement Guidance*, at Purpose. (emphasis added). And the Commission's "position" is that "sex-based harassment includes

9

harassment based on sexual orientation or gender identity, including how that identity is expressed." *Id.* § I(A)(5)(c). Furthermore, the Guidance definitively states that

> [h]arassing conduct based on sexual orientation or gender identity includes . . . outing (disclosure of an individual's sexual orientation or gender identity without permission) . . . repeated and intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering); or the denial of access to a bathroom or other sex segregated facility consistent with the individual's gender identity. *Id.*

These unequivocal statements create mandatory standards. And with these mandatory standards, EEOC establishes rules from which legal consequences will necessarily flow if an employer fails to comply.

Furthermore, the Enforcement Guidance lists myriad hypotheticals outlining what EEOC considers gender-based harassment, and thus harassment qualifying as Title VII discrimination. In these Guidance hypotheticals, an employer may *not* (1) require an employee to wear clothing consistent with his biological sex; or (2) refuse to use pronouns inconsistent with biological sex. *Id.*, at Example 15. And in Example 46, which describes an employer's refusal to use pronouns inconsistent with an employee's biological sex, the Guidance concludes that "[b]ased on these facts, which must be viewed in the context of [the employee's] perspective as a transgender individual, [the employee] has been subjected to an objectively hostile work environment based on her gender identity that includes repeated and intentional misgendering." *Id.* § III(B)(3)(d). Each hypothetical fact pattern constitutes discriminatory harassment in violation of Title VII. Thus, "legal consequences" would result if an employer refused to accommodate a transgender employee's bathroom, dress, and pronoun preferences. While the Enforcement Guidance emphasizes the "case-by-case" nature of Title VII to offset these hypotheticals, the practical effect is clear: the Guidance is EEOC's authoritative statement of what it considers sex-based discrimination in violation of Title

10

VII. It defines employers' legal obligations and thereby establishes standards from which legal consequences will flow. *See Sierra Club*, 228 F.3d at 566.

Additionally, "[a]nother indication that an agency's action binds it and thus has legal consequences or determines rights and obligations is whether the document creates safe harbors protecting private parties from adverse action." *Texas v. EEOC*, 933 F.3d at 442. An agency creates a "safe harbor" when "the language of the [agency] document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions." *Id.* Often, such a safe harbor indicates that the agency action is "binding as a practical matter." *Id.* And by creating safe harbors, an agency's actions may still generate "legal consequences" even when "the agency lacks authority to promulgate substantive regulations implementing the statute it administers." *Id.* In evaluating safe harbor provisions, what matters is whether the document has "practical binding effect" such that "affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (quoting Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like*, 41 DUKE L. J. 1311, 1328–29 (1992)).

In *Texas v. EEOC*, the court concluded that similar EEOC guidance was final agency action in part because it created safe harbors. 933 F.3d at 443. The guidance at issue "tells employers how to avoid Title VII disparate-impact liability." *Id.* And the guidance delineated "circumstances" wherein the agency believed employers qualified for a certain defense. *Id.* There, the court ascertained that the safe harbors worked like "a playbook for employers to use to avoid liability, [as] it describes 'best practices' for employers." *Id.* at 444. Here, the Enforcement Guidance trumpets: employers should preemptively accommodate all transgender employees' bathroom, dress, and pronoun requests to avoid the headache of litigation. If refusing to use pronouns inconsistent with an employee's biological sex

11

constitutes discriminatory harassment in Example 46, why should an employer even *risk* a Title VII violation? The practical effect of the Enforcement Guidance is an unmistakable message to employers: it's better to be safe than sorry. At best, refusing to accommodate transgender employees' requests to dress, use a restroom, or be referred to by pronouns inconsistent with their biological sex is most likely—if not always—a Title VII violation. Like the guidance at issue in *Texas v. EEOC*, the Enforcement Guidance here unquestionably "tells employers how to avoid" Title VII liability for employment discrimination. *Id.* at 443. As such, the Enforcement Guidance creates "safe harbors" for employers processing accommodation requests from transgender employees.

Nor does the Enforcement Guidance's boilerplate disclaimer prevent the Court from holding that the Guidance is final agency action. EEOC points to the Enforcement Guidance's disclaimer that the "contents of this Guidance do not have the force and effect of law, are not meant to bind the public in any way, and do not obviate the need for the EEOC and its staff to consider the facts of each case and applicable legal principles when exercising their enforcement discretion." *Enforcement Guidance*, § I(A); *see also* ECF No. 35 at 14–15. But Courts have repeatedly held such language is mere "boilerplate" and does not automatically remove agency guidance from the realm of final agency action. *See Appalachian Power*, 208 F.3d at 1023 (holding that an agency's inclusion of a disclaimer did not automatically prevent the court from holding that the guidance at issue was final agency action); *see also* Peter L. Strauss, *The Rulemaking Continuum*, 41 DUKE L.J. 1463, 1485 (1992) (explaining that such disclaimers are "a charade, intended to keep the proceduralizing courts at bay").

Finally, the Enforcement Guidance itself *admits* that it creates rights and obligations. In a separate section entitled "EEOC Authority," the Guidance reviews its authority to "address harassment based on gender identity related to sex-segregated facilities and

12

pronouns." *Enforcement Guidance*, at Addendum. The Guidance states that it does not attempt to "impose new legal obligations on employers with respect to any aspect of workplace harassment law, including gender identity discrimination." *Id.* But the Guidance then admits that *Bostock* is its basis for all gender identity-related employment rules. *Id.* And although it admits that *Bostock* addressed only the *termination* of transgender or homosexual persons, it boldly states that "the EEOC must sometimes take a position on whether an alleged type of conduct violates Title VII *even in the absence of binding Supreme Court precedent.*" *Id.* (emphasis added). Thus, it finds that allowing a transgender or homosexual employee to be "harassed or otherwise discriminated against in the terms and conditions of employment based on those same characteristics" would be "inconsistent" with *Bostock*'s holding and would create "textually unsupported asymmetry." *Id.* Accordingly— although the Enforcement Guidance explicitly recognizes that no "binding Supreme Court precedent" underpins its actions—it determines that *Bostock* should be extended to bar "harassment" based on gender identity. *Id.* Thus, the Enforcement Guidance itself acknowledges that it more than "summarizes" Title VII case law. Instead, it fundamentally expands Title VII to include harassment based on gender identity.

\* \* \*

This Court acknowledges the narrowness of this inquiry. But on balance, the Enforcement Guidance's mandatory language, hypotheticals, and safe harbors support just one conclusion: the Guidance determines the legal obligations of employers in navigating accommodation requests from transgender employees. And legal consequences will result from the Guidance, as it will be used by EEOC staff who "investigate, adjudicate, or litigate harassment claims." *Id.* § I(A). As such, the Enforcement Guidance is final agency action.

13

## B. Plaintiffs have standing.

Plaintiffs bear the burden to establish standing. *NAACP v. Tindell*, 95 F.4th 212, 215 (5th Cir. 2024). And at the summary judgment stage, Plaintiffs must set forth "specific facts" to support standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff "must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (citing *Lujan*, 504 U.S. at 560–61). But when the plaintiff is the object of government action or regulation, "there is ordinarily little question that the action . . . has caused [the plaintiff] injury, and that a judgment preventing . . . the action will redress it." *Lujan*, 504 U.S. at 561–62. And in a pre-enforcement challenge to government actions, such as here, a plaintiff "satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal marks omitted). Finally, "the existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989).

### i. *Texas has standing.*

Texas proved a concrete injury that is sufficiently particularized to establish standing. Title VII directly applies to Texas as an employer because it employs "hundreds of thousands of people." ECF No. 30 at 15. The Texas Department of Agriculture alone employs approximately 650 people. *Id.*; *see also* ECF No. 31 at 212–16 (hereinafter, the "Miller Declaration"). As such, Texas is directly affected by the Enforcement Guidance's requirement that employers accommodate transgender pronoun, bathroom, and dress requests—

14

especially because Texas maintains contrary policies on many of these issues. Thus, as the object of this EEOC regulation, there is no question "that the action . . . has caused [Texas] injury." *Lujan*, 504 U.S. at 561–62.

For example, the Texas Department of Agriculture's current employee dress policy states that "[e]mployees are expected to comply with this dress code in a manner consistent with their biological gender." Miller Declaration, at 4. The dress code further contemplates that men may wear pants, and women may wear skirts, dresses, or pants. *Id.* These provisions directly conflict with the Enforcement Guidance's requirement that employers accommodate a transgender employee's request to dress inconsistently with his biological sex. And Texas Agriculture Commissioner Sid Miller has attested, in his official capacity, that although the Department of Agriculture does not currently have a written pronoun or bathroom policy, he would reject any request from a transgender employee to use bathrooms or pronouns inconsistent with his or her biological sex. Miller Declaration, ¶¶ 8–9.

Furthermore, Texas has demonstrated that compliance with the Enforcement Guidance would generate significant costs. And where a "new Rule requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols," the injury-in-fact requirement is satisfied. *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (internal marks omitted). Indeed, "these are precisely the types of concrete injuries that [courts] ha[ve] consistently deemed adequate to provide standing in regulatory challenges." *Id.*; *see also Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (explaining that "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm"); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (emphasis in original) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))).

Here, Texas established standing based on commissions and omissions. That is, (1) Texas's written policies conflict with the Enforcement Guidance; *and* (2) Texas lacks written policies on bathrooms, pronouns, and other items within its reach. ECF No. 30 at 15–17. Thus, to comply with the Enforcement Guidance, Texas must revise existing policies while drafting additional policies. Furthermore, Texas "must analyze, agency by agency, the risk of EEOC investigations arising from the Guidance's standards." *Id.* The Texas Department of Agriculture alone would "need to update or develop new training programs and materials" to reflect the changes implemented by the Enforcement Guidance. Miller Declaration, ¶ 11. Furthermore, Department of Agriculture employees are required to complete anti-discrimination and harassment training upon hiring and complete additional training on this topic every two years. *Id.* at ¶ 11–12. Under the Enforcement Guidance, the Department would "have to develop a program to track the training of its employees on these new policies." *Id.* at ¶ 11. Accordingly, Texas has established a concrete injury in fact. The compliance costs alone constitute an irreparable injury, *i.e.*, revising, updating, and generating new policies, posters, manuals, and training.

Nor does the recent administration change, the Executive Order, or any subsequent DOJ policy affect the Court's determination that Texas established an injury in fact. As the Court already noted, standing is established at the time the suit is *filed*. *Newman-Green, Inc.*, 490 U.S. at 830. And "subsequent events do not deprive the court of jurisdiction." *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991). Even if this were not the case, an imminent threat of enforcement still exists. The Enforcement Guidance remains EEOC policy while EEOC lacks a quorum. *See The State of the EEOC: Frequently Asked Questions*, U.S. EQUAL EMP. OPPORTUNITY COMM'N, https://www.eeoc.gov/wysk/state-eeoc-frequently-asked-questions [https://perma.cc/38SH-P3NG]. And although President Trump recently

16

nominated a new EEOC commissioner, that nominee is not yet confirmed by the Senate. *See* D'Ontae D. Sylvertooth & Sean J. Oliveira, *President Trump Nominates Assistant U.S. Attorney Panuccio to Serve as EEOC Commissioner*, NATIONAL LAW REVIEW (May 8, 2025), https://natlawreview.com/article/president-trump-nominates-assistant-us-attorney-

panuccio-serve-eeoc-commissioner   [https://perma.cc/YQS2-7S69].   Confirmation   is   not guaranteed. Furthermore, Title VII provides that "a member of the Commission" may initiate a charge against an employer. 42 U.S.C. § 2000e-5(b). And Commissioner Kotagal is still a Commissioner. She joined the majority of then-Commissioners in voting to issue the Enforcement Guidance, and she joined Commissioners Burrows and Samuels in issuing the statement objecting to President Trump's Executive Order. Thus, EEOC could still enforce the Guidance while it remains active EEOC policy.

Consequently, the Enforcement Guidance directly caused Texas's injuries, and these injuries can be directly redressed by Texas's requested remedy of vacatur. If the Court vacates the gender-identity related portions of the Guidance, Texas need not reevaluate and revise its current policies or draft new policies to comply with the Enforcement Guidance's gender-identity provisions. Texas has standing.

### ii. *The Heritage Foundation has standing.*

Heritage similarly demonstrated a concrete injury in fact necessary to establish standing. Title VII directly applies to Heritage because it employs approximately 300 people. Korsvall Declaration, ECF No. 31 at 217–20 (hereinafter "Korsvall Declaration"). Like Texas, Heritage must "devote significant time and resources to creating or updating policies, customs, and training programs" to comply with the Enforcement Guidance. Korsvall Declaration, ¶ 6. For example, Heritage's employee policies currently require employes to "come to work in professional dress, consistent with the mission . . . and purpose of Heritage" which has always meant that "employees have dressed in a manner traditionally befitting

their biological sex." *Id.* at ¶ 9; *see, e.g., Policy Priorities: Put Family First*, HERITAGE, https://
www.heritage.org/priorities/family [https://perma.cc/6H3N-DZB4] (outlining Heritage's
policy condemning "[r]adical ideologies that deny social and biological truths about sexual
embodiment, marriage, and unborn life"). Thus, complying with the Enforcement Guidance
would "require Heritage to revise its existing policies regarding workplace discrimination
and harassment to account for the myriad examples" listed in the Guidance. Korsvall
Declaration, ¶ 7. As such, Heritage has established compliance costs sufficient to support
standing. *Rest. L. Ctr.*, 66 F.4th at 597 (explaining that "the nonrecoverable costs of
complying with a putatively invalid regulation typically constitute irreparable harm").

Like Texas, Heritage established injuries stemming directly from the Enforcement
Guidance that would be remedied by Plaintiffs' requested relief. And like Texas, Heritage
need not reevaluate and revise its current policies or draft new policies to comply with the
Enforcement Guidance's gender-identity provisions if the Court vacates these Guidance
provisions.

Defendants argue that the District of Columbia ("D.C.") regulates transgender dress,
pronoun, and bathroom accommodations, thus Heritage's injuries stem directly from D.C.
policies—not the Enforcement Guidance. But the Enforcement Guidance established a new,
national sex discrimination policy separate and distinct from any existing D.C. policy. And
causation requires only that the injury "resulted," in some "concretely demonstrable way"
from the challenged practice—*i.e.*, that the injury is "the consequence of the defendants'
actions, or that prospective relief will remove the harm." *Warth v. Seldin*, 422 U.S. 490, 504–
05 (1975). Heritage plausibly argues that a total overhaul of internal employment policies is
required to comply with the Enforcement Guidance. And such re-evaluation would not be
necessary if the Court vacates the gender-identity related portions of the Enforcement

Guidance. Accordingly, Heritage established an injury in fact, causation, and redressability. Heritage has standing.

### C. Plaintiffs' claims are ripe.

A case is ripe for adjudication if all remaining questions are legal and "further factual development" is unnecessary. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). But a claim is not ripe if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal marks omitted).

Here, Defendants argue that Plaintiffs' claims are not ripe because the Enforcement Guidance is not final agency action but is instead mere guidance enforced only on a case-by-case basis. ECF No. 35 at 22. Thus, Defendants argue that because "further factual development" is necessary in both Plaintiffs' claims, the Court should dismiss the case for lack of ripeness. *Id.* at 22–23.

Defendants are incorrect. As the Court previously explained, the Enforcement Guidance is final agency action—boilerplate and "case-by-case" language notwithstanding. *See supra* Section I(A)(ii). The Enforcement Guidance affirmatively states that failure to accommodate a transgender employee's dress, pronoun, and bathroom requests constitutes discriminatory harassment under Title VII. As such—regardless of the specific facts of each case—the Enforcement Guidance proscribes Plaintiffs' current employee policies. Thus, no further factual development is required. Plaintiffs' claims are ripe.

### D. Plaintiffs' claims are not moot.

A case is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). Here, as the Court has

explained, Plaintiffs' injuries can be remedied by Court-ordered vacatur under the APA. Therefore, Plaintiffs' claims are not moot.

## II. The Enforcement Guidance is contrary to law.

Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2), (2)(A), (2)(C). Here, Defendants argue that the Enforcement Guidance is not contrary to law because it proscribes no conduct—it merely summarizes Title VII case law. ECF No. 35 at 33. Defendants aver that the Enforcement Guidance provides insight and clarity for employers about what conduct *might* constitute discriminatory harassment based on gender identity in violation of Title VII. *Id.* According to Defendants, the Guidance's emphasis on the case-by-case nature of Title VII enforcement prevents the Guidance from being contrary to law. *Id.*

Conversely, Plaintiffs contend that the plain text of Title VII prohibits only discrimination "because of . . . [an] individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); ECF No. 30 at 21–23. And Title VII defines "sex" to include "pregnancy, childbirth, or related medical conditions"—not gender identity or sexual orientation. *Id.* § 2000e(k). Accordingly, Plaintiffs argue the Enforcement Guidance contravenes Title VII's plain text by proscribing conduct not addressed in Title VII nor governed by binding Supreme Court precedent. ECF No. 30 at 21–23.

The Court agrees with Plaintiffs for two reasons. First, the Enforcement Guidance contravenes Title VII's plain text by expanding the scope of "sex" beyond the biological binary. Second, the Enforcement Guidance contravenes Title VII by defining discriminatory harassment to include failure to accommodate a transgender employee's bathroom, pronoun, and dress preferences.

20

### ANALYSIS

First, the Enforcement Guidance contravenes Title VII's plain text by expanding the scope of "sex" beyond the biological binary: male and female. Although Title VII defines "sex" to also include "pregnancy, childbirth, or related medical conditions," § 2000e(k), the Enforcement Guidance concludes that "sex" under Title VII "includes 'pregnancy, childbirth, and related medical conditions' *and sexual orientation and gender identity*." *Enforcement Guidance*, § I(A)(5) (emphasis added). Notably, the Guidance uses quotation marks around "pregnancy, childbirth, and related medical conditions"—but not "sexual orientation" or "gender identity." Nor is there citation to Supreme Court precedent expanding Title VII's definition of "sex" to categorically include "sexual orientation" and "gender identity." Because neither the plain text of Title VII nor Supreme Court precedent defines Title VII "sex" this broadly. Thus, the Enforcement Guidance lacks statutory or jurisprudential authority to expand Title VII's definition of "sex" to include these new categories.

The Guidance obliquely references *Bostock* in various footnotes and citations to bolster the Enforcement Guidance's transgender dress, pronoun, and bathroom rules. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 650 (2020). And presumably, the Guidance also relies on *Bostock* to aver that Title VII "sex" now includes both gender identity and sexual orientation. But *Bostock* expressly refused to redefine "sex" under Title VII.

In *Bostock*, the parties offered competing definitions of "sex." *Id.* at 655. But the Supreme Court expressly declined all invitations to newly define Title VII "sex." Instead, the majority affirmed a bedrock principle of Title VII: "Sex" refers "only to biological distinctions between male and female." *Id.* And "homosexuality and transgender status are *distinct concepts* from sex." *Id.* at 669 (emphasis added). Thus, the *Bostock* court firmly refused to

expand the definition of "sex" beyond the biological binary. Consequently, *Bostock* does not authorize the Guidance's expansion of Title VII "sex" to include new categories or classes.

Nor can the Enforcement Guidance justify its expansion of "sex" via nonbinding circuit and district court jurisprudence. Although a "federal agency is obligated to follow circuit precedent in cases originating within that circuit," *Arce-Vences v. Mukasey*, 512 F.3d 167, 172 (5th Cir. 2007) (internal citation omitted), an agency such as EEOC—which is only authorized to issue *procedural* rules implementing Title VII—cannot issue new *substantive* rules and definitions derived from non-binding circuit case law. *See* 42 U.S.C. § 2000e-12(a) (authorizing EEOC only to "issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter."). Nor can EEOC then justify a new substantive rule by claiming it is merely the agency's "analysis" of nonbinding case law. A rule is substantive not procedural when it "change[s] the *substantive standards* by which the agency evaluates applications which seek a benefit that the agency has the power to provide." *Texas v. United States*, 809 F.3d 134, 176–77 (5th Cir. 2015) (internal marks omitted) (emphasis in original). And here, the Enforcement Guidance explicitly changed the "substantive standard" by which EEOC discerns and adjudicates Title VII "sex" discrimination.

Beyond its misreading of *Bostock*, the Enforcement Guidance cites no binding authority for its metastasized definition of "sex." Nor does the plain text of Title VII or *Bostock* support the Enforcement Guidance's redefinition. By redefining the core definition of "sex," the Enforcement Guidance fundamentally reshapes the scope of Title VII. And in so reshaping Title VII, the Guidance exceeds its authorization to issue procedural rules governing the implementation of Title VII. Instead, the Guidance enters the forbidden realm of substance, moving beyond the plain text of Title VII or binding Supreme Court precedent to create a new unauthorized definition. Thus, because EEOC is only authorized to issue

procedural rules implementing Title VII as written and interpreted by the Supreme Court, the Enforcement Guidance's expansion of "sex" is contrary to law.

Second, the Enforcement Guidance contravenes Title VII by defining discriminatory "harassment" to include transgender bathroom, pronoun, and dress preferences. As the Court explained, the Enforcement Guidance effectively requires employers to provide accommodations to all transgender employees to avoid the threat of litigation, in direct contravention of Title VII's plain text. Title VII prohibits discrimination "because of . . . [an] individual's . . . sex." 42 U.S.C. § 2000e-2(a). But harassment alone constitutes Title VII discrimination "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale*, 523 U.S. at 78 (internal quotation omitted). To constitute a Title VII violation, the harassment must expose "members of one sex . . . to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (internal quotation omitted). However, courts have long recognized that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same, and the opposite, sex." *Id.* at 81. Nor does Title VII require "asexuality" or "androgyny" in the workplace. *Id.* In sum, Title VII does not bar workplace employment policies that protect the inherent differences between men and women.

Nor does *Bostock*. The only question *Bostock* decided was whether "fir[ing] someone simply for being homosexual or transgender" violated Title VII's prohibition on sex discrimination. *Bostock,* 590 U.S. at 651. Applying a but-for causation standard, the Supreme Court concluded that an employer who fires an employee "for actions or attributes it would tolerate in an individual of another sex[] discriminates against that person in violation of Title VII." *Id.* at 658. That's because—under Title VII's strict but-for causation standard—

23

"discrimination based on homosexuality or transgender status necessarily entails discrimination based on [biological] sex." *Id.* at 669. By the Supreme Court's reasoning, if an employer fires a male employee for being attracted to a man even though it wouldn't fire a female employee for being attracted to a man, that employee's "sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 660.

But the Supreme Court was clear: its holding was narrow and expressly cabined to the question presented in *Bostock. Id.* at 681. The Supreme Court acknowledged the parties' fears that "sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable" after its decision. *Id.* at 681. But it explicitly stated that "[u]nder Title VII . . . we *do not purport to address* bathrooms, locker rooms, or anything else of the kind." *Id.* (emphasis added). And "[w]hether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these." *Id.* Thus, the Supreme Court expressly refused to extend its reasoning in *Bostock* to the scenarios and hypotheticals contemplated in the Enforcement Guidance. And the EEOC cannot "fill in the blanks" for the Supreme Court.

Given the Supreme Court's explicit refusal to extend *Bostock*'s reasoning beyond the question and facts before it, *Bostock* has limited bearing on the Court's analysis here. *Bostock* decided only whether *firing* an employee for being transgender constituted Title VII "sex" discrimination under its but-for causation test. *Bostock* expressly declined to answer the question *sub judice*: does the employer violate Title VII by declining the transgender employee's bathroom, pronoun, and dress preferences via *accommodation*? Distilled to its Title VII essence, the question is even simpler: do sex-specific bathroom, dress-code, and pronoun policies expose members of one sex to "disadvantageous terms" not shared by members of the other sex?

Here, the longstanding implementation of sex-specific bathrooms, locker rooms, and dress codes do not expose members of one sex "to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80–81 (internal marks omitted). Nor does using pronouns consistent with an employee's biological sex. For example: if a male employee who identifies as female is required to use male facilities, he is not exposed to "disadvantageous terms" unlike other males. *Id.* at 80. Instead, he must use male facilities like all other males. Nor is he exposed to "disadvantageous terms" female employees are not also exposed to. All women must use female-specific facilities. This logic also applies to both sex-specific dress codes and pronoun usage. All sexes are "exposed" to the same "terms and conditions": using sex-specific facilities and complying with sex-specific dress codes and pronouns. Although Title VII prohibits discrimination based on biological "sex," it does not reach employment practices which merely recognize and protect the "genuine" differences between men and women. *Id.* The failure to provide a transgender employee an exception to the otherwise sex-neutral rule governing bathroom access, dress, and pronoun usage does not constitute discriminatory "harassment" under Title VII.

Finally, Congress knows how to amend Title VII to include needed accommodations— for example: religion. Title VII prohibits discrimination based on race, color, sex, *religion*, and national origin. 42 U.S.C. § 2000e-2(a) (emphasis added). Under binding Supreme Court precedent, Title VII affirmatively requires employers to accommodate employees' religious beliefs and practices. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) (explaining that Title VII gives religion "favored treatment" and obligates employers to accommodate employees' requests for religious exemptions from otherwise neutral employment policies). But Congress included no accommodation for transgender employees in Title VII. And courts have previously held that Title VII's language should be interpreted narrowly. For example, Title VII's definition of "sex" was not amended to include "pregnancy,

childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), until the Supreme Court held that Title VII "sex" did not include these factors. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136–38 (1976).

In the wake of *Bostock*, Congress could have redefined Title VII "sex" to include "sexual orientation" and "gender identity." It could have added explicit accommodations for "sexual orientation" and "gender identity." But it did not. *See Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 338 (5th Cir. 2019) (Ho, J., concurring) ("If Congress had meant to prohibit sexual orientation or transgender discrimination, surely the most straightforward way to do so would have been to say so—to add 'sexual orientation' or 'transgender status' or 'gender identity' to the list of classifications protected under Title VII."). Though Congress has the power to amend statutes to add accommodations, EEOC does not. Yet that's exactly what the Enforcement Guidance does. Thus, the absence of any reference to "gender identity" or "sexual orientation" in Title VII's definition of "sex" and Congress's failure to include any specific accommodation for "gender identity" and "sexual orientation" further demonstrate that *requiring* such accommodations contravenes Title VII's plain text.

\* \* \*

By its plain text, Title VII prohibits sex discrimination. And it prohibits pervasive sexual harassment constituting sex discrimination. But Title VII remains rooted in a biological understanding of sex. And Title VII does not require employers or courts to blind themselves to the biological differences between men and women. Nor does it mandate that employers obliterate neutral employment policies rooted in this recognition. Thus, the Enforcement Guidance contravenes Title VII by expanding the definition of "sex" beyond the biological binary and requiring employers to accommodate an employee's dress, bathroom, or pronoun requests.

### III. Because the Court holds that the Enforcement Guidance is contrary to law, it need not reach Parties' other claims.

In addition to arguing that the Enforcement Guidance is contrary to law, Plaintiffs bring three additional challenges. Plaintiffs argue that the Enforcement Guidance exceeds EEOC's statutory rulemaking authority, is arbitrary and capricious, and should have been published in the Federal Register. *See* ECF No. 1 at 28–30. However, because the Enforcement Guidance is contrary to law, the Court does not consider the Parties' remaining arguments. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 4:24-CV-250, 2024 WL 4858589, at *8 (N.D. Tex. Nov. 21, 2024) (disregarding plaintiffs' remaining arguments based on a prior determination that statutory authority was exceeded); *see also PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part) (counseling that "if it is not necessary to decide more, it is necessary not to decide more").

### IV. Vacatur is the appropriate remedy.

Plaintiffs request the Court to vacate the entire Enforcement Guidance. ECF No. 30 at 37–38; ECF No. 30-1 at 3. But Defendants argue relief should be limited to the challenged portions of the Guidance and to the Plaintiffs only. ECF No. 35 at 43–46. Where agency action is found to be unlawful, vacatur is the "default remedy." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951–52 (5th Cir. 2024), *cert. granted*, No. 24-316, 2025 WL 65913 (U.S. Jan. 10, 2025), *and cert. denied sub nom. Braidwood MGMT. Inc. v. Becerra*, No. 24-475, 2025 WL 76462 (U.S. Jan. 13, 2025); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). When a court finds that an agency rule violates the APA, "it shall—not may—hold unlawful and set aside [the] agency action." *Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1114 (internal quotation marks and citation omitted). Nor is the vacating court required to consider "the various equities at stake before determining whether a party is

entitled to vacatur" because the APA provides that "a reviewing court *shall* set aside unlawful agency action." *Braidwood*, 104 F.4th at 952 (emphasis in original). Thus, vacatur is the correct remedy.

But in this case, vacatur of only the unlawful portions of the Enforcement Guidance is most appropriate. Limited vacatur—striking down only particular provisions of an agency rule—is justified in certain circumstances. A two-prong test guides the Court's severability analysis: (1) the "intent of the agency" and (2) "whether the remainder of the regulation could function sensibly without the stricken provision[s]." *Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025) (internal citations omitted). The language of a severability clause should control in the absence of extraordinary circumstances. *Id.*

Here, the Enforcement Guidance contains no severability provision demonstrating the agency's intent should any portion of the Guidance be vacated. Regardless, the severability test's second prong is dispositive here. The Enforcement Guidance is an extensive document covering the spectrum of Title VII law. The gender-identity portions form a fraction of the overall Guidance. And the sections are easily identified. Thus, vacating the gender-identity related portions of the Guidance will not interfere with the "sensibl[e]" function of the Enforcement Guidance. *Id.*

But the question remains: should the Court vacate the unlawful provisions as to the Parties only or universally vacate the unlawful provisions? The Court acknowledges that this is a contested question with "[t]houghtful arguments and scholarship" on both sides. *See United States v. Texas*, 599 U.S. 670, 686, 701–02 (2023) (Gorsuch, Thomas & Barrett, JJ., concurring). And the Supreme Court "will have to address" the "serious" questions about vacatur and universal injunctions "sooner or later." *Id.* at 702. Until then, Fifth Circuit precedent governs this Court. The Fifth Circuit has consistently held that "vacatur under [Section] 706(2) [is] a remedy that affects individuals beyond those who are parties to the

immediate dispute." *Braidwood*, 104 F.4th at 951. It "empowers courts to set aside—*i.e.*, formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 950 (2018)). And it operates nationwide because it "operates on the status of agency action in the abstract." *Braidwood*, 104 F.4th at 951. Thus, in light of this Fifth Circuit precedent, universal vacatur of the gender-identity related portions of the Guidance is appropriate.

## V. A preliminary injunction is not warranted in this case.

Plaintiffs ask the Court to permanently enjoin Defendants from ever "interpreting, applying, or enforcing" Title VII to require Texas or Heritage to accommodate transgender employees' requests to use pronouns inconsistent with their biological sex, use bathrooms or locker facilities inconsistent with their biological sex, or dress inconsistently with their biological sex. ECF No. 30 at 41.

The decision to issue a permanent injunction rests soundly within the equitable discretion of the district court. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006). "[A]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). To obtain a permanent injunction, a plaintiff must demonstrate four factors: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156–57. These final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, a plaintiff must demonstrate actual success on the merits to obtain

29

a permanent injunction. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004).

### A. Plaintiffs fail to demonstrate irreparable harm.

Here, Plaintiffs argue that irreparable harm exists because they will incur nonrecoverable compliance costs under the 2024 Guidance. ECF No. 30 at 39. Plaintiff Texas also argues that the 2024 Guidance irreparably infringes on Texas's sovereignty by interfering with its ability to enforce its own workplace laws which are contrary to the 2024 Guidance. *Id.* at 39–40.

It is "well-established that an injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (internal marks omitted). For irreparable injury, the mere "possibility" of injury is not enough. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs must instead "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). Furthermore, courts have held that a state suffers irreparable harm when it is unable to "enforce its duly enacted" laws. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

Here, irreparable injury is the dispositive factor. But Plaintiffs allege no irreparable injury sufficient to justify the broad scope of the injunctive relief they request. Plaintiffs Heritage and Texas argue that enforcement of the 2024 Guidance will generate enormous compliance costs. And as the Court previously explained in its standing analysis, such compliance costs do constitute a significant injury that is likely irreparable. *See supra*

Section I(B). Plaintiff Texas further alleges that it is irreparably harmed by the 2024 Guidance because the Guidance infringes on Texas's sovereign right to enforce its duly enacted laws and employment policies to the contrary. But the Court vacated the gender identity provisions of the 2024 Guidance. As such, Plaintiffs will incur neither these compliance costs nor this sovereign injury.

Nor have Plaintiffs alleged that any future irreparable injury is likely to occur now that the Court vacates the 2024 Guidance. Plaintiffs vaguely allege that EEOC could again issue guidance interpreting Title VII to require gender identity accommodations. But Plaintiffs have alleged no facts demonstrating that this is likely to occur in the absence of a permanent injunction. *See Winter*, 555 U.S. at 7 (explaining that a plaintiff must demonstrate more than mere "possibility" that an irreparable injury will occur). In fact, the Trump Administration issued Executive Order 14168 stating that "the Executive Branch will enforce all sex-protective laws to promote th[e] reality" that "women are biologically female, and men are biologically male." 90 Fed. Reg. 8615 (Jan. 20, 2025). And EEOC issued a statement affirming that it will comply with the Executive Order. *See Removing Gender Ideology and Restoring the EEOC's Role of Protecting Women in the Workplace*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (Jan. 28, 2025), https://www.eeoc.gov/newsroom/removing-gender-ideology-and-restoring-eeocs-role-protecting-women-workplace    [https://perma.cc/R38R-2YLF]. EEOC stated that "the agency is returning to its mission of protecting women from sexual harassment and sex-based discrimination in the workplace by rolling back the Biden administration's gender identity agenda." *Id.* And although EEOC acknowledged that it cannot repeal the Enforcement Guidance while it lacks a quorum, Acting Chair Lucas asserted that she remains opposed to the Guidance. *Id.*

Although Plaintiffs alleged irreparable injury from the 2024 Guidance, Plaintiffs allege no future irreparable injury, nor do they allege facts demonstrating that future

irreparable injury is likely. And Plaintiffs' injuries from the 2024 Guidance are adequately redressed by the Court's vacatur of the Guidance's gender-identity related provisions. Accordingly, Plaintiffs fail to allege sufficient irreparable injury to justify a permanent injunction.

Plaintiffs point to two cases from the Northern District of Texas in which the district court issued a permanent injunction to support their claim for permanent injunctive relief. *See Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021); *Texas v. Cardona*, 743 F. Supp. 3d 824, 898 (N.D. Tex. 2024). But in both these cases, the court found that Plaintiffs had sufficiently demonstrated irreparable injury. And as the Court explained, such post-vacatur irreparable injury is absent here.

**B. The remaining factors do not warrant a permanent injunction.**

Here, because Plaintiffs allege no injuries beyond those stemming from the 2024 Guidance, Plaintiffs' injuries are fully remedied by the Court's vacatur of the gender-identity related portions of the 2024 Guidance. And the final factors—balance of the equities and public interest—are at best neutral. The Court must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether the "injunction will [ ] undermine the public interest." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). Here, a permanent injunction serves no significant public interest. The Court vacated the gender-identity related portions of the 2024 Guidance, the Trump Administration issued an Executive Order stating that the Guidance should be rescinded, and EEOC stated its intention to do so when it regains a quorum. *See supra* Section V(A). Generally, the public interest is "in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (internal citation omitted). And here—after the Court's vacatur of the unlawful portions—Plaintiffs have not indicated that any other provisions in the

Enforcement Guidance contravene Title VII. Furthermore, both EEOC and the Trump Administration have indicated they will comply with Title VII's plain text. Accordingly, the remaining factors do not warrant a permanent injunction at this time.

*   *   *

The Court vacated the gender-identity related portions of the Guidance. And Plaintiffs failed to demonstrate irreparable harm beyond harm stemming directly from the challenged portions of the 2024 Guidance. Accordingly, the Court need not—and should not—issue a permanent injunction. *See Monsanto*, 561 U.S. at 165–66 (explaining that a district court's permanent injunction was overbroad because it did "not have any meaningful practical effect independent of its vacatur" and holding that "[i]f a less drastic remedy (such as partial or complete vacatur . . .) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted"). Here, Plaintiffs' injuries are fully redressed by the Court's vacatur of the gender identity provisions of the 2024 Guidance. As such, a permanent injunction in this case is unwarranted.

### CONCLUSION

Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 29) is **GRANTED**. Defendants' Cross-Motion for Summary Judgment (ECF No. 34) is **DENIED**. Pursuant to the Court's instant Order, the following portions of the 2024 Guidance are contrary to law:

- All language defining "sex" in Title VII to include "sexual orientation" and "gender identity" (including but not limited to the definitions found in Section I(A) and Section II(A)(5)(c));
- The entirety of Section II(A)(5)(c) outlining harassment based on sexual orientation and gender identity;
- Example 46 in Section III(B)(3)(d); and
- All language defining "sexual orientation" and "gender identity" as a protected class (including but not limited to language in Section II(B)(3) and Section II(B)(6)).

Therefore, the above provisions of the 2024 Guidance are **VACATED**.

**SO ORDERED**.

May 15, 2025

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE